Exhibit 1

STATE OF NEW YORK
SUPREME COURT                    COUNTY OF ALBANY

13-16086-0

In the Matter of the Application of the TOWN OF VERONA
(Oneida County), the TOWN OF VERNON (Oneida County),
MICHAEL McDONOUGH, DANIEL DEAL, JAMES
ANDERSON and MELVIN PHILLIPS,

Petitioners-Plaintiffs,

-against-

HON. ANDREW CUOMO, as Governor of the State of New          **ORDER TO**
York, MADISON COUNTY, JOHN M. BECKER, as                    **SHOW CAUSE**
Chairman of the Board of Supervisors of Madison County,
ONEIDA COUNTY, ANTHONY J. PICENTE, JR., as Oneida           Index No.
County Executive, the NEW YORK STATE GAMING                 RJI No.
COMMISSION, SHELDON SILVER, as Speaker of the New
York State Assembly, DEAN SKELOS, as Co-Majority Leader
of the New York State Senate, and JEFFREY KLEIN, as Co-
Majority Leader of the New York State Senate,

Respondents-Defendants,

For a Judgment Pursuant to Article 78 of the Civil Practice Law
and Rules and for a Declaratory Judgment.

---

**HON.ROGER D. MCDONOUGH, J.S.C.**
HON. _____, Justice of the Supreme Court

Upon the annexed Petition/Complaint together with the Exhibits annexed thereto

and upon the Affidavits of Owen Waller, Myron Thurston, Daniel Deal, James Anderson,

Melvin Phillips, and Cornelius D. Murray, together with the Exhibits annexed thereto;

and it appearing that the matters therein raise significant issues that pertain to the vote on

a Constitutional Amendment to be made by the People at a forthcoming statewide general

election in November, 2013, it is hereby

**ORDERED** that Respondents-Defendants and/or their counsel appear before this Court at _9:30 a.m.    September 13, 2013_, to show cause why the Petition/Complaint herein should not be granted declaring the Upstate New York Gaming Economic Development Act of 2013, enacted pursuant to Chapters 174 and175 of the Laws of 2013, unconstitutional and why Respondents-Defendants should not be permanently enjoined from implementing the May 16, 2013 Settlement Agreement between the Oneida Indian Nations and the State of New York appended as Exhibit "F" to the Petition/Complaint or spending any funds whatsoever to implement or administer said Agreement and/or the provisions of Chapters 174 and 175 of the Laws of 2013; and it is further

**ORDERED** that a copy of this Order to Show Cause and the Petition/Complaint annexed thereto, and the Affidavits of Owen Waller, Myron Thurston, Daniel Deal, James Anderson, Melvin Phillips and Cornelius D. Murray, and Petitioners-Plaintiffs' Memorandum of Law shall be served upon Respondents-Defendants and/or their counsel on or before _August 26, 2013_, and a copy of same shall be sent, certified mail, return receipt requested to the Oneida Indian Nation and its Legal Department at the addresses specified in Paragraph "46" of the Petition; and it is further

**ORDERED** that papers submitted in response or opposition to Petitioners-Plaintiffs' application shall be personally or electronically served on their counsel by no later than _September 6, 2013_.

_____
Justice of the Supreme Court

Hon. Roger D. McDonough, A.J.S.C.

DATED:    Albany, New York
          _August 13_, 2013

G:\DATA\Health Department\CDM\Vernon-Verona Gambling\OTSC-jss.doc

2

STATE OF NEW YORK
SUPREME COURT                    COUNTY OF ALBANY

---

In the Matter of the Application of the TOWN OF VERONA
(Oneida County), the TOWN OF VERNON (Oneida County),
MICHAEL McDONOUGH, DANIEL DEAL, JAMES
ANDERSON and MELVIN PHILLIPS,

                                    Petitioners-Plaintiffs,

                    -against-

HON. ANDREW CUOMO, as Governor of the State of New
York, MADISON COUNTY, JOHN M. BECKER, as
Chairman of the Board of Supervisors of Madison County,
ONEIDA COUNTY, ANTHONY J. PICENTE, JR., as Oneida
County Executive, the NEW YORK STATE GAMING
COMMISSION, SHELDON SILVER, as Speaker of the New
York State Assembly, DEAN SKELOS, as Co-Majority Leader
of the New York State Senate, and JEFFREY KLEIN, as Co-
Majority Leader of the New York State Senate,

                                    Respondents-Defendants,

For a Judgment Pursuant to Article 78 of the Civil Practice Law
and Rules and for a Declaratory Judgment.

---

Albany County Clerk
Document Number 11458773
Rcvd 08/19/2013 4:15:09 PM

**PETITION /
COMPLAINT**
Index No.
RJI No.

TO:   SUPREME COURT OF THE STATE OF NEW YORK,
      COUNTY OF ALBANY

      Petitioners-Plaintiffs, by their attorneys, O'Connell and Aronowitz, as and for a

Petition-Complaint, respectfully allege as follows:

## NATURE OF THE CASE

1.    This is a hybrid Article 78 proceeding and Declaratory Judgment action,

brought in the form of an Article 78 proceeding. *See* CPLR 103(c). The Petitioners-

Plaintiffs are the Oneida County towns of Vernon and Verona and Michael McDonough,

Daniel Deal, James Anderson and Melvin Phillips, who are residents, citizens, property

owners, and taxpayers of the Town of Vernon, and who are also eligible and registered to

vote in statewide elections.

2.    Petitioners-Plaintiffs are challenging the constitutionality of Chapters 174

and 175 of the Laws of 2013 which, *inter alia*:

- Ratified an agreement that had been previously negotiated by Governor Cuomo with the Oneida Indian Nation requiring the Tribe to support and not fund any opposition to a proposed Constitutional amendment to be voted on by the People at the next statewide election scheduled for November 2013. That proposal would repeal the Constitution's current prohibitions against casino gambling and substitute in its place language authorizing such gambling "as regulated by the State"; and

- Provided that in exchange for the Tribe's support, the Tribe would enjoy a 10-county territorial monopoly in Central New York to conduct casino gambling free and clear of any competition; the State and Madison and Oneida Counties would withdraw their legal opposition to the Tribe's attempt to take 17,000 acres of land in the two Counties into trust thereby surrendering sovereign jurisdiction and regulatory control by state and local governments over such land; and the State and Counties committed not to oppose any future land into trust application by the Tribe for as much as 8,000 additional acres of land within the two Counties; and

- Adopted a comprehensive and detailed plan for allowing and regulating casino gambling to take effect if and when the Constitutional amendment is approved, notwithstanding the fact that the Legislature had no power to authorize or regulate such gambling, was not elected to do so, and could not do so until and unless first authorized by the People pursuant to a Constitutional amendment that has yet to be approved.

3.    In addition, Petitioners-Plaintiffs seek to nullify not only the legislation

that ratified the Agreement between Governor Cuomo and the Oneidas, but also to nullify

the Agreement itself and enjoin any State or Madison or Oneida County officials from

implementing it or expending any state funds to administer or carry out the

aforementioned provisions challenged in this litigation.

4.    This case raises profound issues involving fundamental rights that are the

bedrock of a Constitutional democracy; namely, the right to vote, the integrity of the

2

voting process, the right to freedom of speech and association, the right to equal protection under the Law, and the right of the People to amend or not amend, as they see fit, the Constitution via a free and open process. That process should not be corrupted, or manipulated, or rigged, in advance, by State officials who seek to improperly use the resources and power of the State to *require* certain individuals and/or groups to support – and not fund opposition to – a proposed Constitutional amendment. That is what happened here.

5. It is important to understand how the Governor got into a position to exert leverage and place pressure on the Oneida Indian Nation and to extract from it a promise to support rather than oppose a Constitutional amendment the Governor strongly favored but which, until the agreement, the Oneida Nation had staunchly opposed. The Governor was later joined by the Legislatures of Madison and Oneida County and the New York State Legislature; together they sacrificed the interests of the Towns of Vernon and Verona and individual taxpayers in those Towns for the sake of winning approval of the Constitutional amendment. The way they did so was blatantly illegal and an affront to the integrity and sanctity of the fundamental right of the People of the State to vote and to decide how they should be governed in a democratic society.

6. Article XIX, section 1 of the State Constitution specifies one way to amend the Constitution. The houses of two successively elected legislatures must first approve a "concurrent resolution" containing a proposed Constitutional amendment. If the Legislature so acts, then the People of the State of New York must then also approve it in a statewide election before it can take effect.

7. The current Constitution prohibits commercial gambling and directs the

3

Legislature to pass laws to prevent it. New York State Constitution, Art. I, § 9. In 2012, and at Governor Cuomo's behest, a concurrent resolution was introduced in the New York State Legislature containing a proposed Constitutional amendment that would eliminate the prohibition against casino gambling and permit it "as regulated by the State." That resolution passed both houses in 2012. However, as previously mentioned, before it could be voted upon by the People, a second passage of the resolution was required in 2013 by the new Legislature elected in November 2012.

8.     Following first passage, however, opposition to the proposed Constitutional amendment surfaced from many constituencies, not the least of whom was the Oneida Indian Nation, which operates a major Las Vegas-style gambling casino (the Turning Stone Casino) in the Town of Verona, Oneida County, just off Exit 33 of the Thruway.

9.     The Oneida Indian Nation currently enjoys a geographical monopoly with respect to casino gambling in Central New York and it wants to keep it that way. The Oneidas have been able to operate a casino since 1993, despite the State's Constitutional prohibition against casino gambling, on the theory that such prohibition is preempted by the Federal Indian Gaming Regulatory Act ("IGRA").

10.     IGRA provides that if a State permits, as New York State does, some gambling, if only for charitable purposes, then an Indian tribe may operate a commercial casino free of other state restrictions, provided the operation occurs on "Indian land," as defined by IGRA, and provided further that the tribe has entered into a Tribal-State Compact with the State permitting it to operate such a casino.

11.     In 1993, then-Governor Mario Cuomo entered into a Compact with the

4

Oneidas to authorize such gambling.   However, subsequent litigation successfully challenged the validity of the Compact because the Governor had acted uniliaterally and the Compact had never been ratified by the State Legislature. *Peterman v. Pataki*, 21 A.D.3d 1387 (4th Dep't 2005), *lv den* 24 A.D.3d 1328 (2006); *cert den.*, 541 U.S. 1077 (2006). *See also, Saratoga County Chamber of Commerce v. Pataki*, 100 N.Y.2d 801 (2003).

12.    An additional legal cloud descended over the Turning Stone operation on March 29, 2005 when the U.S. Supreme Court ruled that land, including the Turning Stone land owned by the Oneidas, was not sovereign Indian land and was, therefore, subject to State sovereign jurisdiction. *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005).

13.    The Oneidas were fully aware of the ominous implications of the decision in *City of Sherrill, supra*. If the land on which Turning Stone was located was not Indian land, IGRA did not apply and Turning Stone was clearly an illegal operation under Article I, § 9 of the New York State Constitution, as it is currently worded. Accordingly, less than a week after the decision was handed down, the Oneidas filed an application with the U.S. Secretary of the Interior and the Bureau of Indian Affairs within the Department of the Interior to have such land placed in trust under a Federal law that allows the Secretary of the Interior to hold land in trust for the benefit of an Indian tribe. 25 U.S.C. § 465. Once taken into trust, that land is free from state and local sovereignty and taxes, and may also be gambling-eligible under IGRA.

14.    The Oneidas, however, not only sought to have the Turning Stone land placed into trust, but, in addition, approximately 17,370 acres of land owned by the Tribe

5

throughout Oneida and Madison Counties. Given the profound implications such a massive takeover of land would have with respect to the impact on the tax rolls, the loss of state and local governmental control, and the confusing "checkerboard" pattern of alternating state, federal and Indian sovereignty control over such land, the State, the Counties of Oneida and Madison, and the Towns of Vernon and Verona, among others, strongly protested the application and urged the Secretary of the Interior not to approve it.

15.     In May 2008, however, the Secretary agreed to approve the application to the extent of allowing approximately 13,000 of the 17,370 acres to be taken into trust. This land, located throughout Oneida and Madison Counties, included the property on which Turning Stone was operating.

16.     Thereafter, the State and counties jointly filed litigation in Federal District Court in the Northern District of New York, challenging the approval, as did the Towns of Vernon and Verona in a separate legal action. In September 2012, U.S. District Court Judge Lawrence E. Kahn placed the application "on hold" and remanded the case back to the Department of the Interior to make a determination as to whether the Tribe was even eligible to have its land taken into trust. *New York v. Salazar*, 2012 WL 4364452 (N.D.N.Y. 2012). The Court based its decision on a 2009 U.S. Supreme Court decision holding that Indian tribes were not eligible for trust status unless they had been fully recognized as an Indian tribe in 1934 at the time of the adoption of the legislation authorizing such land into trust transactions. *Carcieri v. Kempthorne*, 555 U.S. 379 (2009). That is where the case currently sits, awaiting further action by the Bureau of Indian Affairs.

17.     It is clear that up until very recently, therefore, the State, and the Counties

6

of Oneida and Madison, were vehemently opposed to the Oneidas' application to have land taken into trust because of the economic and jurisdictional havoc such a takeover would wreak on both those counties and the citizens who reside therein. That was all about to change, however.

18. While the Oneidas' Turning Stone Casino operation and its application to have land taken into trust remain in legal limbo by virtue of the Supreme Court's decision in the *City of Sherrill* and the pending federal court challenges, equally uncertain are the prospects for passage of the Constitutional amendment so strongly advocated by Governor Cuomo. As later detailed in this Petition/Complaint, newspaper pundits have described support for the Constitutional amendment as only "lukewarm," especially given the opposition by such powerful groups as the Oneidas and the Seneca Nation of Indians, another Native American tribe, which operates three casinos in Western New York where the Senecas also enjoy a geographical monopoly thanks to the Indian Gaming Regulatory Act's pre-emption of the State's Constitutional prohibitions against gambling.

19. Against this backdrop, Governor Cuomo sought to neutralize the major opponents to his proposal to amend the Constitution. One of the groups he targeted was the Oneida Indian Nation. To that end, in the spring of 2013 he initiated negotiations in secret with the Oneidas and, in particular, the Oneidas' designated Nation Representative, Ray Halbritter.

20. On May 16, 2013, Mr. Halbritter and Governor Cuomo met in Albany at the State Capitol for a celebratory signing of an agreement they had negotiated. In negotiating that Agreement, the Governor had managed to get the Oneidas to support,

7

rather than oppose, the Constitutional Amendment.

21.     The citizens of Central New York and, in particular, the citizens of the

Towns of Vernon and Verona in Oneida County, however, had to pay a very heavy price

indeed. In exchange for the Oneidas' agreeing to support the Constitutional amendment

and not fund any campaign against it, the Governor agreed, *inter alia,* as follows:

- To guarantee the Oneidas' geographic exclusivity within a 10-county region in Central New York where the Oneidas would be free of any competition in operating a gambling casino, regardless of whether or not the Constitutional Amendment that would allow other casinos to operate was approved;

- Despite the State's and the Counties' prior vehement opposition to the Oneidas' land into trust application, the Governor committed that the State and the Counties of Oneida and Madison would withdraw their Federal court challenge to the decision by the U.S. Secretary of the Interior to take 13,000 acres of land in Madison and Oneida Counties into trust, freeing such land from state and local regulation and taxation;

- The Governor agreed that the State would agree not to challenge the Oneidas if they sought to place as much as an additional 12,000 acres of land into trust, including 8,000 acres which had not yet even been identified;

- The Governor agreed that such land would be exempt from state and local property, sales, use and occupancy taxes and free from state and local zoning authority;

- The Governor agreed that the Counties would withdraw the tax foreclosure proceedings commenced against land owned by the Oneidas and which was in tax-delinquent status;

- The Governor agreed that the Legislature would ratify the Compact signed several years earlier by the Oneidas with Governor Mario Cuomo that permitted the Oneidas to engage in casino gambling, thereby nullifying the prior Court determination invalidating the Compact because of the lack of legislative ratification;

- The Governor agreed that the Legislature would enact legislation incorporating the terms of the Agreement he had just negotiated with the

8

> Oneidas; and said Agreement further provided that land in Oneida and
> Madison Counties that was originally part of the Oneidas' 300,000 acre
> historic reservation, as recognized in the 1794 Treaty of Canandaigua,
> would be considered a "reservation" regardless of who now owned fee
> title to the land. It should be noted that under Federal law, 18 U.S.C.
> 1151(a), any land that is designated as "reservation" land is considered
> "Indian Country" subject to the primary jurisdiction of the federal
> government and the Indian tribe and not the State. *Alaska v. Native
> American Village of Venetie*, 522 U.S. 520, 527 n.l. (1998).

22.     The implications of this "deal" for the Towns of Vernon and Verona were

devastating. They had lost the power to tax and/or regulate the use of land within their

sovereign jurisdiction. But Governor Cuomo got what he wanted. In exchange for what

the Oneidas would be receiving, he extracted from them, in writing, their commitment to

both support the Constitutional amendment he so badly desired and to not fund any

opposition to it. This commitment was reduced to writing in Section VI(C)(7) of the

Agreement (Exhibit "F"), which reads as follows:

> The Nation shall support any referendum authorized
> by the State Legislature following second passage of a
> concurrent resolution to amend the State Constitution to
> permit or authorize casino gaming. Additionally, the Nation
> shall not directly or indirectly fund any public education
> campaign or program opposing any such referendum, or
> fund directly or indirectly any litigation or administrative
> challenge in connection with any such referendum.

23.     Section II(I) of the Agreement further provided that a breach of Section

VI(C)(7), *supra*, would be considered a "material breach" of the Agreement.

24.     The Agreement was thereafter presented to both the Oneida and Madison

County Legislatures for ratification. Although several legislators in both counties raised

objections to the Agreement, officials in both counties had been advised by the Executive

Branch of State Government that if the counties failed to ratify the Agreement, the State

9

would negotiate a separate deal with the Oneidas and the Counties would not share in the revenue from the slot machines under a separate provision in the Agreement that the Governor had negotiated with the Oneidas. Both County legislatures thereafter ratified the Agreements and, on or about June 18, 2013, a bill entitled the "Upstate New York Gaming Economic Development Act of 2013" (A-8101; S-5883) was introduced into both houses of the State Legislature at the request of Governor Cuomo. That bill, *inter alia*, contained the following:

- Ratification of the Agreement the Governor had negotiated with the Oneidas dated May 16, 2013;

- Ratification of the 1993 Tribal State Compact that Governor Mario Cuomo had negotiated with the Oneidas purporting to permit the Tribe to engage in casino gambling;

- A comprehensive scheme to authorize and regulate casino gambling that was contingent on the approval by the voters of the Constitutional amendment at the November 2013 statewide election, and which included a carveout of a 10-county geographical area in Central New York where casino gambling would not be permitted in competition with the Oneidas, thereby confirming a provision of the deal that Governor Cuomo had negotiated with the Oneidas;

- A carveout of other geographic exclusivity zones in western and northern New York to accommodate the wishes of both the Seneca Nation of Indians in Western New York and the St. Regis Mohawks in Northern New York, respectively, where those tribes also operated casinos.

25. In late June, near the close of the regular 2013 legislative session, a majority of both houses of the State Legislature voted to pass A-8105, S-5883, and on July 30, 2013, the Governor signed said bill into law as Chapter 174 of the Laws of 2013.

26. Also at the very end of the 2013 legislative session, a majority of both houses of the Legislature approved the same concurrent resolution that the 2012 Legislature had approved to amend the Constitution to permit casino gambling. This

10

cleared the way for the resolution to be voted upon at the statewide election in November, in accordance with Article XIX of the State Constitution.

27.     In this litigation, Petitioners-Plaintiffs seek first to enjoin any state or county officials from implementing or carrying out any of the terms of the Agreement entered into by the Governor with the Oneidas dated May 16, 2013. They contend that the Governor, the State Legislature, and the Madison and Oneida County Legislatures exceeded their authority in entering into, ratifying and codifying such an agreement that requires the Oneidas both to support and not to fund opposition to the proposed constitutional amendment in exchange for receiving the extremely favorable treatment set forth in the May 16, 2013 Agreement.[1]

28.     While elected state officials surely have the right to personally urge individuals and entities to vote for or against a particular ballot proposition, they cannot use their authority as state officials, nor commit the resources or power of the State, to **require** persons to vote a certain way or not to speak out as a condition of or in exchange for receiving favorable treatment.

29.     This blatant attempt, confirmed in writing, to effectively buy the support of, and stifle any opposition from, the Oneidas in order to ensure passage of a Constitutional amendment strikes at the very foundation of our democracy and subverts the sanctity of the electoral process. It not only infringes upon the First Amendment rights of the Oneidas, who may nevertheless be willing to forgo such rights for the sake of monetary gain and sovereign jurisdiction, it also undermines the rights of the rest of

---

[1] All Native American Indians are citizens of the United States and the state in which they reside and are eligible to vote in all State elections. *See* Indian Citizenship Act of 1924, Public Law 68-175, codified at 8 U.S.C. 1401(b).

11

the voting and taxpaying electorate who are entitled to a free and fair election that is not rigged or bought by public officials who abuse the power and resources of the State to ensure the outcome of a proposition on the ballot.

30. In addition to injunctive relief, Petitioners-Plaintiffs are asking this Court to declare the Upstate New York Gaming Economic Development Act of 2013, enacted pursuant to Chapters 174 and 175 of the Laws of 2013, illegal, null and void to the extent that it ratifies the aforementioned Agreement and carries out its terms by granting geographic exclusivity to the Oneidas to operate a casino free of competition, to the extent it ratifies the Tribal-State Compact executed by former Governor Cuomo with the Tribes, to the extent it recognizes all former land owned by the Oneidas in Madison and Oneida Counties as reservation land, to the extent it removes such land from the governmental control of the Towns, and to the extent it affords such land tax-free status.

31. Finally, Petitioners-Plaintiffs seek to declare those parts of the legislation purporting to authorize and regulate casino gambling unconstitutional because the current Legislature lacked the authority to authorize or regulate such gambling in any way. In enacting this legislation prior to any Constitutional amendment, the Legislature has pre-empted the right of the People by usurping the power to act before it has been given to them. By acting in advance of the approval of the Constitutional Amendment, this Legislature is seeking, in effect, to have the People not only approve a Constitutional amendment authorizing casino gambling, but to dictate, in advance, how that amendment will be implemented. That is not the province or prerogative of this Legislature, but only a Legislature convened after such an approval, assuming that approval is forthcoming. The Legislature has no power to tie the hands of the People in such fashion. Petitioners-

12

Plaintiffs McDonough, Deal, and Anderson are opposed to the proliferation of casino gambling in this State, and their right to equal protection under the law and the right to cast a vote on the amendment in November, on equal footing with every other voter, has been infringed by the actions of Respondents-Defendants to stack the deck and rig the election by buying off other voters through the abuse of their power. The Constitution is not for sale!

## PARTIES

32. Plaintiff, Town of Verona, is a municipal corporation of the State of New York, and is a governmental entity with democratically elected officials occupying an area of approximately 69.7 square miles, located in Oneida County in the State of New York. The Town of Verona has a significant and legally cognizable interest in maintaining governmental authority over property located within its borders and the activities conducted thereon, and has an interest in preserving its ability to levy taxes on said property and regulate, by appropriate zoning laws and other local ordinances, the uses to which said property may be put in order to protect and enhance the health and welfare of its citizenry.

33. Petitioner-Plaintiff, The Town of Vernon, is a municipal corporation of the State of New York and is a governmental entity with democratically elected officials occupying an area of approximately 31.8 square miles, located in Oneida County, State of New York. The Town of Vernon has a significant and legally cognizable interest in maintaining governmental authority over property located within its borders and the activities conducted thereon, and has an interest in preserving its ability to levy taxes on said property and regulate, by appropriate zoning laws and other local ordinances, the

13

uses to which said property may be put by the owners of said land in order to protect and enhance the health and welfare of its citizenry.

34.    Petitioner-Plaintiff, Michael McDonough, is over the age of 21 years, a resident of the State of New York, and the Town of Vernon, and he owns property and resides at 3707 Fancette Road, Vernon, New York, within the Town of Vernon, and is eligible to vote in all Federal, State and local elections. He is opposed to the proliferation of commercial gambling within the State of New York and intends to vote against the proposition scheduled to be on the statewide ballot in the statewide election scheduled to be held in November 2013 that would amend Article I, § 9(1) of the State Constitution so as to allow commercial gambling as regulated by the State. A copy of that proposition is annexed hereto as Exhibit "A".

35.    Petitioner-Plaintiff, Daniel Deal, is over the age of 21 years, a resident of the State of New York, and the Town of Vernon, and he owns property and resides at Skinner Road, Vernon Center, New York, within the Town of Vernon, and is eligible to vote in all Federal, State and local elections. He is opposed to the proliferation of commercial gambling within the State of New York and intends to vote against the proposition scheduled to be on the statewide ballot in the statewide election scheduled to be held in November 2013 that would amend Article I, § 9(1) of the State Constitution so as to allow commercial gambling as regulated by the State. A copy of that proposition is annexed hereto as Exhibit "A".

36.    Petitioner-Plaintiff, James Anderson, is over the age of 21 years, a resident of the State of New York, and the Town of Vernon, and he owns property and resides at Wilson Road, Vernon Center, New York, within the Town of Vernon, and is eligible to

14

vote in all Federal, State and local elections. He is opposed to the proliferation of commercial gambling within the State of New York and intends to vote against the proposition scheduled to be on the statewide ballot in the statewide election scheduled to be held in November 2013 that would amend Article I, § 9(1) of the State Constitution so as to allow commercial gambling as regulated by the State. A copy of that proposition is annexed hereto as Exhibit "A".

37.     Melvin Phillips is a native-born Oneida Indian and an American citizen who resides at 4675 Marble Road in the Town of Vernon, and is eligible to vote in all state and local elections. He is opposed to the Settlement Agreement entered into on May 16, 2013 by Governor Cuomo and Raymond Halbritter which purports to take into trust land he owns.

38.     Respondent-Defendant Cuomo is the duly elected and serving Governor of the State of New York and is responsible for carrying out the laws enacted by the Legislature of the State of New York, and as such he maintains his principal office in the City and County of Albany. Mr. Cuomo is being sued in his official capacity as Governor.

39.     Respondent-Defendant Hon. Sheldon Silver is the duly elected and serving Speaker of the Assembly of the State of New York. Mr. Silver is being sued in his official capacity as Speaker of the Assembly.

40.     Respondents-Defendants Hon. Dean Skelos and Hon. Jeffrey Klein are both duly elected and serving senators in the New York State Senate, and as such, by agreement, they currently share on an alternating basis the position of Majority Leader of

15

the Senate. Messrs. Klein and Skelos are being sued in their official capacities as Co-Majority Leaders of the Senate.

41. Respondent-Defendant New York State Gaming Commission is a body established pursuant to Article I of the Racing Pari-Mutuel Wagering and Breeding Law, as added by § 1 of Part A of Chapter 60 of the Laws of 2012. The New York State Gaming Commission, as so established, is empowered to monitor any corporation, association or person engaged in gambling activity and examine the books, records and accounts of any such corporation, association or person engaged in gambling activity pursuant to a license, registration, franchise, certificate or permit issued by the Commission. The Commission maintains its principal offices in the County of Schenectady.

42. Respondent-Defendant County of Oneida is a municipal corporation, as defined in Section 3 of the County Law, with the powers and duties assigned to it in accordance with the County Law of the State of New York. Both the Towns of Vernon and Verona are situated within said County.

43. Respondent-Defendant County of Madison is a municipal corporation, as defined in Section 3 of the County Law, with the powers and duties assigned to it in accordance with the County Law of the State of New York.

44. Respondent-Defendant Anthony J. Picente, Jr. is the duly appointed and serving County Executive of the County of Oneida with all the powers and duties assigned by law to him. Mr. Picente is being sued in his official capacity.

45. Respondent-Defendant John M. Becker is the Chairman of the Board of Supervisors of Madison County and as such is responsible for carrying out the duties

16

assigned by law to him. Mr. Becker is being sued in his official and representative capacity.

46.     The Oneida Indian Nation of New York (hereinafter "OIN" or "Nation" or "Oneidas") is a Federally recognized Indian tribe that owns fee title to substantial amounts of property in both the Towns of Vernon and Verona and in other parts of both Oneida and Madison County. As a Federally recognized Indian tribe, the OIN enjoys sovereign immunity such that it cannot be sued in State courts; however, a copy of the Order to Show Cause and Petition herein are being delivered by Certified Mail, Return Receipt Requested, to the address of the Nation listed at its website as 2037 Dream Catcher Plaza, Oneida, New York 13421.   A copy of the Order to Show Cause and Petition are also being sent via Certified Mail, Return Receipted Requested, to the Nation's Legal Department whose address, upon information and belief, is 5218 Patrick Road, Verona, New York 13478.  Petitioners-Plaintiffs invite the Nation to intervene in this proceeding.

## BACKGROUND

47.     By Decision dated March 29, 2005, the United States Supreme Court ruled that, with the possible exception of a 32-acre parcel of land remaining from what was once a 300,000 acre reservation in New York State, the Oneida Indian Nation could not assert sovereignty over land even though the Tribe now holds fee title to such land. *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (March 29, 2005).

48.     The Decision in *City of Sherrill*, *supra*, placed in doubt the legality of the operation by the Tribe of a so-called "Class III" Las Vegas-style gambling casino, known as the Turning Stone Casino, that the Oneidas had been operating since 1993 on land to

17

which they held fee title in the Town of Verona, claiming the right to conduct such operation under color of the provisions of the Federal Indian Gaming Act ("IGRA"), Public Law 100-497, codified at 25 U.S.C. 2701 *et seq.*; 18 U.S.C. §§ 1166-1168.

49.     Under Federal court precedents, a tribe may operate a commercial casino pursuant to IGRA on "Indian land" even if such gambling is otherwise prohibited elsewhere within the State so long as the State allows some form of gambling for charitable purposes, as is the current case in New York. New York State Constitution, Art. I, § 9.

50.     IGRA defines "Indian land" as land within the limits of a reservation, or lands held in trust by the United States, or land held in "restricted fee" over which a Tribe exercises governmental power. 25 U.S.C. § 2703(4).

51.     Since, as a result of the decision in *City of Sherrill*, the land on which Turning Stone is located met none of the definitions of "Indian land," the Oneidas, on April 4, 2005, six days after the Supreme Court's Decision in *City of Sherrill*, made an application pursuant to 25 U.S.C. § 465 to place into trust not just the parcel of land on which Turning Stone was located, but approximately 17,370 acres of land described as follows:

> 1. Lands comprising approximately 3,428 acres in Oneida County which included the Turning Stone Casino, gaming-related amenities, five golf courses, and a gas station and convenience store.
>
> 2. Lands comprising approximately 6,475 acres in Madison County and Oneida County, housing the location of the Nation's government, health, education and cultural facilities and activities, member housing, hunting lands, and other non-gaming enterprises including twelve gas stations and convenience stores, a newspaper operation, three marinas, and agricultural operations; and

18

> 3. Lands comprising approximately 7,467 acres in Madison and Oneida County that were generally undeveloped, including active and inactive agricultural lands.

52. Thereafter, the State of New York, the Counties of Oneida and Madison, and the Towns of Vernon and Verona, vigorously opposed the proposed trust application which, if approved, would have removed all lands taken into trust from the sovereign jurisdiction of the State of New York and from the local tax rolls, and in addition, would have exempted transactions conducted thereon by the Oneidas from all applicable sales taxes occurring on such land.

53. In the meantime, the Appellate Division, Fourth Department of State Supreme Court upheld an earlier ruling by the Oneida County State Supreme Court, invalidating the so-called Tribal-State Compact entered into in 1993 by then-Governor Mario Cuomo with the Oneida Indian Nation purporting to allow the Oneidas to operate the Turning Stone casino in accordance with IGRA. The Court held that the Compact was invalid because it had never been ratified by the New York State Legislature. After the Appellate Division ruled, the United States Supreme Court declined to review the matter. *Peterman, et al. v. Pataki*, 21 A.D.3d 1387 (4th Dep't 2005), *lv. denied*, 24 A.D.3d 1328 (2006); *cert. denied*, 549 U.S. 1077 (2006).

54. A valid Tribal-State Compact is also a prerequisite to the legality of an Indian tribe's operating a casino under IGRA. *See* 25 U.S.C. § 2710(d)(1)(C).

55. In May, 2008, the Bureau of Indian Affairs (BIA) within the U.S. Department of the Interior announced its decision to approve most of the Oneidas' land-into-trust application, approving the acquisition of approximately 13,004 acres of the over 17,000 acres the Oneidas had asked to have taken into trust.

19

56.     Thereafter, the State of New York and the Counties of Oneida and Madison jointly filed suit in the U.S. District Court for the Northern District of New York challenging, on a number of grounds, the legality of the action taken by BIA in approving the application. *State of New York, et al. v. Salazar*, N.D.N.Y., Case No. 6:08-CV-00644 [LEK]. They contended, *inter alia*, that:

a)     the Oneida Indian Nation was not a Federally-recognized tribe in 1934 and, therefore, pursuant to the U.S. Supreme Court's decision in *Carcieri v. Salazar*, 555 U.S. 379 (2009), the Oneidas were not eligible to have land taken into trust pursuant to 25 U.S.C. § 465;

b)     the determination was arbitrary and capricious and would remove at least $14.35 million annually from the tax rolls and frustrate the application of New York environmental, health, land use and other regulations, while creating conflicts that would inevitably arise from the "checkerboard" of alternating jurisdictions that would burden the administrations of state and local governments and adversely affect land owners adjacent to the patches of land taken into trust (the very concerns enunciated by the U.S. Supreme Court in *City of Sherrill, supra*, when it ruled that land owned by the Oneidas was not sovereign Indian land).

57.     The Towns of Vernon and Verona also filed a separate lawsuit in the U.S. District Court for the Northern District of New York challenging the decision by the Secretary of the Interior to take land into trust (*Town of Verona, et al. v. Kempthorne*, case no. 6:08-CV-00647 [LEK]), alleging, *inter alia*, that (1) the Federal Government lacked the authority under the U.S. Constitution to take land into trust and thereby to

20

deprive the state of its sovereignty without its consent; (2) that the OIN was ineligible for land into trust treatment; and (3) that the decision was arbitrary and capricious for many of the very same reasons that the State and counties had alleged in their joint lawsuit.

58.     In a decision dated September 24, 2012, U.S. District Court Judge Lawrence E. Kahn ruled that the application by the Oneidas to place the land into trust should be remanded to the Secretary of the Interior and the Bureau of Indian Affairs in order to determine whether, in fact, the Oneidas were a federally-recognized Indian tribe in 1934, as required by the Indian Reorganization Act as so interpreted by the U.S. Supreme Court in *Carcieri*, *supra*. *See New York v. Salazar*, 2012 WL 4364452* 13 (2012).

59.     Thereafter, both the Counties of Oneida and Madison and the State of New York submitted arguments to the Bureau of Indian Affairs (BIA), stating their continued opposition to the proposed land into trust application of the Oneidas, and why the Oneidas were not a Federally-recognized tribe as of 1934 and why, therefore, the Tribe was not eligible for land into trust treatment. The case in federal court is still pending while awaiting a determination by BIA.

60.     Meanwhile, and at the behest of Governor Cuomo, a resolution in the form of a Governor's Program Bill, was submitted to the Legislature in calendar year 2012 proposing to amend Article I, § 9 of the New York State Constitution by deleting the current requirement in Section 9 that prohibits commercial gambling and authorizing, in its place, "casino gambling regulated by the State..." A copy of the resolution and the Memorandum in support thereof are annexed hereto as Exhibit "A". Said resolution was thereafter approved by both houses of the Legislature during its 2012 session.

21

61.     Pursuant to Article XIX, § 1 of the Constitution, if a joint resolution to
amend the Constitution is approved by both houses of the Legislature, that exact same
resolution must be approved by both houses in "... the next regular session convening
after the succeeding general election of members of the State Assembly" (which, in this
context, meant the calendar year 2013), and then, if approved a second time, it must be
submitted to the voters for approval before the Constitution can be amended.

62.     Even before the aforementioned Constitutional amendment was proposed,
Raymond Halbritter, who represents himself to be the Oneida Nation Representative and
the Chief Executive Officer of Nation Enterprises, the business arm of the OIN, was an
outspoken vocal opponent of amending the State Constitution to allow casino gambling
on a statewide basis, which threatened the monopoly OIN enjoyed in operating the
Turning Stone Casino in the Central New York area.  Without such Amendment, similar
gambling operations could not be conducted by non-Indians by virtue of the New York
State Constitution and implementing state law.  *See*, New York State Constitution,
Article I, § 9; General Municipal Law, § 185; Penal Law, Article 225.  The Oneidas,
however, could continue to operate despite the constitutional prohibition under color of
IGRA, which preempted state law.

63.     Attached hereto as Exhibit "B" is a letter from Mr. Halbritter published on
September 14, 2011 on Indianz.com, a major website dealing with issues relating to
Native American Indians.   Said article questioned the wisdom of amending the
Constitution and noted the difference between Native American gambling operations,
which, he alleged, invested in the community where they are located, whereas other
corporate casino operators' loyalties are not to the localities where they operate.

22

64.     Attached as Exhibit "C" is an article written by a well-known reporter for

the Associated Press covering the State Capitol in Albany, Michael Gormley, who quoted

Mr. Halbritter as follows with respect to his opposition to the Constitutional Amendment:

> "Indian nations are fundamentally different from the
> gambling industry," Halbritter said Wednesday. "Unlike
> them, we are governments that are obligated to invest our
> revenues and resources into our ancestral lands and
> surrounding communities right here in New York."
>     "New York is reeling from the legacy of pain left
> behind by companies looking to maximize only their own
> short-term profits," Halbritter said. "Elected officials
> should not continue the same pattern by rewinding the
> clock in support of a scheme to make our region like
> Atlantic City."

65.     In 2013, it was necessary for the Legislature to prove the aforementioned

Constitutional amendment a second time before it could be placed on a statewide ballot.

66.     There was and there still remains considerable doubt as to whether the

amendment will be approved by the voters, especially given the potential opposition from

constituencies like the Oneidas, who, because of the wealth derived from their Turning

Stone Casino operation, were well-positioned to fund an aggressive campaign against the

Constitutional amendment.

67.     The aforementioned opposition was referred to in a "blog" by Karl

Sleight, former Executive Director of the New York State Ethics Commission and now a

member of the well-known law firm of Harris Beach.

68.     Mr. Sleight's blog, dated May 17, 2013, and entitled "Neutralizing the

Opposition," is attached hereto as Exhibit "D". In said article, Sleight indicated that polls

were showing "lukewarm" support for the Constitutional amendment to expand casino

gaming in New York State.

69.     In order to blunt or neutralize the opposition to the proposed Constitutional amendment, and beginning on or about April or May 2013, Governor Cuomo, and/or his representatives, initiated secret negotiations with Mr. Halbritter and/or representatives of the Oneida Indian Nation, culminating in an agreement, signed by the Governor and Mr. Halbritter, on behalf of the Nation, on May 16, 2013.  The signing celebration was held at the State Capitol. A copy of an article appearing in the Syracuse *Post-Standard* is annexed hereto as Exhibit "E" and describes the broad outlines of the Agreement, a copy of which Agreement is annexed hereto as Exhibit "F".

70.     That Agreement, which had to be subsequently ratified by the Oneida County, Madison County and New York State Legislatures, purported to remove the legal obstacles to the Oneidas' continuing to operate Turning Stone while at the same time removing their opposition to the proposed constitutional amendment, and provided, in pertinent part, that:

a)     The State would withdraw its pending challenge in Federal Court to the approval by the U.S. Secretary of the Interior of the Oneidas' Land Into Trust application to the extent of 13,004 acres;

b)     The Counties would withdraw their pending legal actions to foreclose on Oneida-owned land on which the Oneidas had not paid property taxes;

c)     Transactions occurring on Oneida-owned land taken into trust would no longer be subject to state or local excise, fuel, sales use or occupancy taxes;

24

d)      The State and Oneida and Madison Counties would not oppose any future application by the Tribe to place the 4,366 acres into trust that the Secretary of the Interior had refused to approve out of the approximately 17,000 acres that the Oneidas had originally sought to place into trust;

e)      Neither the State nor the Counties would oppose any future application by the Oneidas to place an additional and as yet unidentified 8,000 acres into trust over and above the land originally applied for (7,000 acres of which would be located in Oneida County and 1,000 in Madison County);

f)      The Oneidas would be allowed to continue their Class III gambling operation at the Turning Stone Casino and the State agreed to ratify the compact that had originally been signed with the Oneidas by former Governor Mario Cuomo in 1993 but which had never been ratified by the Legislature;

g)      The Nation's Turning Stone Casino operation would enjoy a ten-county wide geographical exclusivity zone, insulating itself from competition from any other casino operator or video lottery gaming devices operated by the State within that 10 county area; and

h)      The State agreed that all of the land that was once part of the Oneidas' historic reservation (pursuant to the 1794 Treaty of Canandaigua) that was currently located in either Oneida or Madison County would still qualify as a "reservation" for purposes of current State and Federal law. (Note: under federal law, 18 U.S.C. 1151(a), reservation land is part of "Indian Country," and, as such, primary jurisdiction over such land rests with the federal government and Indians

25

rather than the State. *Alaska v. Native Alaskan Village of Venetie*, 522 U.S. 520, 527, n.1 [1998]).

71.     In exchange for the foregoing, the Oneidas agreed to give the State a 25% share of any revenue it collected from the operation of its slot machines at the Turning Stone Casino, and out of which the State would make annual payments of $3.5 million to Madison County, and $2.5 million annually to Oneida County for 19 ¼ years. In addition, the Oneidas agreed to make a one-time payment of $11 million which was to be turned over by the State to Madison County, which payment was not dependent on any revenues from the slot machines. *See* Settlement Agreement, § 3(A), (B), annexed as Exhibit "F".

72.     In exchange for the foregoing consideration, the Nation and its officials, individually and collectively, agreed pursuant to Section VI(C)(7) of the Agreement as follows:

> The Nation shall support any referendum authorized by the State Legislature following second passage of a concurrent resolution to amend the State Constitution to permit or authorize casino gaming. Additionally, the Nation shall not directly or indirectly fund any public education campaign or program opposing any such referendum, or fund directly or indirectly any litigation or administrative challenge in connection with any such referendum.

73.     Under the terms of the Compact, a breach of Section VI(C)(7) is considered a "material breach" of the Agreement. *See* § II(I) at page 2 of Agreement (Exhibit "F").

74.     Section VIII-B of the Agreement provided that: "The State will enact legislation approving this Agreement."

26

75.    Upon information and belief, subsequent to the execution of this Agreement by the Governor, either Governor Cuomo and/or his designated representatives advised elected representatives of both the Oneida and Madison Counties that unless the County legislatures of both counties ratified the foregoing Agreement, the State would proceed without them and enter into its own agreement with the Oneidas, whereby the Counties would receive no share of any money that the State was to receive from the Oneidas' operation of the slot machines pursuant to § 3(A) of the Agreement.

76.    Upon information and belief, the Governor and/or his representatives also advised officials of Madison County that failure to ratify the Agreement would mean that Madison County would not receive any of the $11 million the Oneida Indian Nation agreed to pay the State as a one-time payment pursuant to § 3(A) of the Settlement Agreement.

77.    Thereafter, by majority vote, the Legislatures of both the Oneida and Madison County ratified the aforementioned agreement.

78.    Thereafter, in June 2013, proposed legislation (Assembly Bill No. A-8101; Senate Bill No. S-8553 – a copy of which is annexed hereto as Exhibit "G"), entitled the "Upstate New York Gaming Economic Development Act of 2013" was introduced in both houses of the State Legislature and thereafter was passed by a majority vote in both the Assembly and Senate, and thereafter was signed into law by Governor Cuomo pursuant to Chapter 174 of the Laws of 2013, on July 30, 2013.

79.    That legislation addressed a multitude of issues involving casino gambling, including how casino gambling would be legalized and regulated to be effective in the event that the People of the State approved in a statewide referendum,

27

scheduled to be placed on the ballot at the statewide general election in November 2013, the proposition contained in the concurrent resolution (Exhibit "A") amending the State Constitution to permit commercialized gambling. *See* § 52 of Chapter 174 of the Laws of 2013.

80.     Chapter 174 of the Laws of 2013 also added a new Article 13 entitled "Destination Resort Gaming" to the Racing, Pari-Mutuel Wagering and Breeding Law which, *inter alia*, identified zones and regions within zones where casino gambling could occur and assigned additional responsibilities to the Respondent-Defendant New York State Gaming Commission. Said section defined the process for licensing casino operations, the siting of casino operations by a newly-established New York State Gaming Facility Location Board, the process for licensing employees and vendors, how casino gambling games were to be implemented, and contained restrictions on the sale and consumption of alcoholic beverages. Said legislation further provided for the exclusion of certain persons from gambling establishments, and included provisions with regard to the taxation of gambling revenues, and programs for problem gamblers. Said legislation also provided for the appointment of a Gaming Inspector General to investigate corruption within the gambling industry created pursuant to this statute.

81.     Section 1311(2)(C) of Article 13 of the Racing, Pari-Mutuel Wagering and Breeding Law, as added pursuant to § 2 of Chapter 174 of the Laws of 2013, provided that no gambling otherwise authorized pursuant to said section would be permitted in the counties of Oneida, Madison, Onondaga, Oswego, Cayuga, Cortland, Chenango, Otsego, Herkimer and Lewis which were exactly the same counties specified in the agreement

28

between the State and the Oneidas (Exhibit "F") whereby the State guaranteed the Oneidas that it would not allow a casino to operate in competition against the Oneidas.

82.     Section 11 of Chapter 174 of the Laws of 2013 ratified the settlement agreement entered into on May 16, 2013 between Governor Andrew Cuomo and the Oneidas (Exhibit "F") and § 12 of Chapter 174 of the Laws of 2013 ratified *nunc pro tunc*, the Tribal State Compact that had been entered into back in 1993 by then Governor Mario Cuomo and the Oneidas purporting to authorize the Oneidas to operate a gambling casino pursuant to IGRA.

83.     Section 35 of Chapter 174 of the Laws of 2013 further amended the previously adopted state budget by appropriating additional funding to administer and operate the State Gaming Commission because of the additional responsibilities imparted to it with the approval of casino gambling under said legislation.

84.     In addition, pursuant to separate agreements that the Governor had entered into with both the Seneca Nation of Indians in Western New York and the St. Regis Mohawks in Northern New York, subdivision 2 of Section 1311 of the Racing, Pari-Mutuel Wagering and Gambling Law, as added by Section 2 of Chapter 175 of the Laws of 2013, provided that there would be no casino gambling west of Route 14 in New York State (to protect the territorial gambling exclusivity to the Seneca Nation of Indians) or in the Counties of Clinton, Essex, Franklin, Hamilton, Jefferson, Lewis, St. Lawrence and Warren County (to protect the territorial gambling exclusivity of the St. Regis Mohawks).

85.     Section 2 of the Upstate New York Gaming Economic Development Act of 2013, as originally enacted (Chapter 174 of the Laws of 2013), also contained a provision adding a new § 1300 to the Racing, Pari-Mutuel Wagering and Breeding Law,

subdivision 15 of which stated that: "Political contributions from the casino industry will be minimized to reduce the potential of political corruption from casinos."

86.     However, the very same day that bill passed both houses of the Legislature, June 21, 2013, new legislation (A-8112, S-5904) was passed that repealed the aforementioned provision seeking to minimize political contributions from the casino industry as originally contained in Section 1300, subdivision 15, and that legislation was also signed into law by the Governor, on July 30, 2013 (Section 1 of Chapter 175 of the Laws of 2013). A copy of Chapter 175 is annexed hereto as Exhibit "H".

87.     Chapter 175 of the Laws of 2013 made further so-called technical amendments to Chapter 174, but left intact the main provisions establishing the structure whereby casino gambling would be authorized and regulated if the People were to approve a Constitutional amendment authorizing casino gambling at the November, 2013 statewide general election.

88.     In June, 2013, both houses of the Legislature, again by majority vote, adopted the concurrent resolution (Exhibit "A"), thereby clearing the way for it to be voted on by the people at the statewide elections scheduled for November, 2013.

### AS AND FOR A FIRST SEPARATE AND INDEPENDENT CLAIM FOR RELIEF, PETITIONERS-PLAINTIFFS ALLEGE AS FOLLOWS:

89.     Petitioners-Plaintiffs repeat and reallege each and every preceding paragraph of this Petition/Complaint as if fully set forth herein.

90.     Native American Indians, including members of the Oneida Indian Nation, born in the United States, are citizens of the United States and the states wherein they reside and are eligible to vote in both state and federal elections. 8 U.S.C. 1401(b).

91.     Neither the Governor nor the counties of Oneida and Madison nor the New York State Legislature had or have the authority to enter into an agreement or enact a law that conditions the receipt of certain benefits upon another person or entity provided that said person or entity agrees to support and/or not oppose a particular proposition to be voted on at any election, including a Constitutional amendment.

92.     While elected officials are certainly free to voice their own personal opinions and urge others to vote for or against or otherwise support or oppose a particular proposition on a statewide ballot, they may not use the apparatus of State Government or State power and resources to require, either by contract or law, that others vote for or against or otherwise support or oppose a particular ballot proposition.

93.     By entering into the Agreement (Exhibit "F"), later ratified by the State and County Legislatures, purporting to give the Oneidas

> (a) a ten (10) countywide geographic exclusivity area, where they could operate their casino free from competition;
>
> (b) the right to pick and choose up to 25,000 acres of land, 8,000 of which would yet to be identified, that could be placed into trust without opposition or challenge by the State and/or counties and which would be free from State and/or local regulations; and
>
> (c) exemptions from applicable local State property sales use, fuel and occupancy taxes -- all on condition that the Oneidas and their officers support and not oppose a constitutional amendment to expand constitutional gambling scheduled to be voted on by the People --

31

the Governor and the other State and County Respondents-Defendants unconstitutionally attempted to "rig" an election, contrary to Plaintiffs-Petitioners McDonough's, Deal's, Anderson's and Phillips' rights to freedom of speech, including the right to be informed of the views of the Oneidas with respect to a pending ballot proposition, the right to equal protection under the law, and the right to vote in a fair and honest election in which the Government itself did not abuse its power to favor a certain outcome by, in effect, improperly buying votes.

## AS AND FOR A SEPARATE SECOND AND INDEPENEDENT CAUSE OF ACTION, PETITIONERS-PLAINTIFFS ALLEGE AS FOLLOWS:

94.     Petitioners-Plaintiffs repeat and reallege each and every preceding paragraph of this Complaint as if fully set forth herein.

95.     The illegal actions of Respondents-Defendants resulted in the loss of the sovereign control of the Petitioners-Plaintiffs Towns of Vernon and Verona to govern within their boundaries, including the right to regulate land use, to levy taxes, and to otherwise govern their citizens.

## AS AND FOR A SEPARATE THIRD AND INDEPENDENT CAUSE OF ACTION, PETITIONERS-PLAINTIFFS ALLEGE AS FOLLOWS:

96.     Petitioners-Plaintiffs repeat and reallege each and every preceding paragraph of this Petition/Complaint as if fully set forth herein.

97.     Article I, § 9 of the Constitution of the State of New York is part of the State Constitution's Bill of Rights and currently provides in pertinent part that no

32

commercial gambling "shall hereafter be authorized or allowed within the state, and directs the state legislature to pass laws prohibiting it."

98.    In enacting Chapter 174 of the Laws of 2013, purporting to allow commercial gambling to take effect if and when the People approve the concurrent resolution annexed as Exhibit "A," the Legislature has acted prematurely and without appropriate legislative authorization, and in violation of the Bill of Rights and, in particular, Article I, § 9 of the Constitution. Until and unless the People should decide to allow casino gambling, the Legislature can enact no laws purporting to regulate it notwithstanding the fact that such laws would be scheduled to take effect after such vote. The People did not elect the current Legislature to legislate with respect to casino gambling other than to prevent it. Voters in the towns of Vernon and Verona, and the individually named Plaintiffs herein, would also be placed in the position of having not only to vote on a constitutional amendment that could allow commercialized gambling, but will also, if they vote affirmatively, automatically put into effect a set of laws that regulate gambling in a particular way, notwithstanding the fact that the People had not authorized the current Legislature to vote on any such matter.

99.    Accordingly, all provisions of Chapter 174 of the Laws of 2013 purporting to authorize and regulate casino gambling in the State are unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners-Plaintiffs respectfully request that this Court enter judgment as follows:

- Declaring that the Respondents-Defendants acted in excess of their constitutional authority in entering into and/or ratifying the May 16, 2013 Agreement with the Oneida Indian Nations; and

33

- Declaring the Governor and the Legislature have exceeded their authority in passing and signing into law legislation ratifying such Agreement and in passing and signing into law legislation purporting to authorize and regulate casino gambling before they had the power to do so; and

- Declaring Chapter 174 of the Laws of 2013, as amended by Chapter 175, unconstitutional; and

- Enjoining the Respondents-Defendants and any and all state officials and Oneida and/or Madison County officials from taking any steps or actions to spend any State funds whatsoever to implement in any way the aforementioned provisions of the Settlement Agreement and Chapter 175 of the Laws of 2013; and

- Granting Petitioners-Plaintiffs such other, further and different relief as the Court deems appropriate including, but not limited to, the costs and disbursements of this action and, as appropriate, awarding attorneys' fees.

DATED:     Albany, New York
           August ____ , 2013

                                    O'CONNELL AND ARONOWITZ
                                    By:

                                    Cornelius D. Murray, Esq.
                                    Attorneys for Petitioners-Plaintiffs
                                    Office and P.O. Address
                                    54 State Street
                                    Albany NY  12207-2501
                                    (518) 462-5601

34

## **VERIFICATION**

CORNELIUS D. MURRAY, an attorney duly admitted to practice in the courts of this state, hereby affirms that he has read the foregoing Petition/Complaint and that the matters stated therein are true except to matters therein that are stated upon information and belief and as to those matters he believes them to be true based upon his familiarity with the enactment of the laws and based upon documentation alluded to as exhibits in the Complaint and conversations with his clients.

_____
Cornelius D. Murray

DATED:     August /7, 2013

G:\DATA\Health Department\CDM\Vernon-Verona Gambling\Petition-Complaint.doc

# EXHIBIT
# A

# PROGRAM BILL # 26

## GOVERNOR'S PROGRAM BILL
### 2012

### MEMORANDUM

#### CONCURRENT RESOLUTION OF THE SENATE AND ASSEMBLY

Proposing an amendment to subdivision 1 of section 9 of article 1 of the constitution, in relation to casino gambling in the state

## PURPOSE:

To provide for the authorization of commercial casino gambling in New York State.

## SUMMARY OF PROVISIONS:

· Article 1, Section 9 of the State Constitution would be amended to authorize casino gambling as regulated by the state.

## EXISTING LAW:

Article 1, Section 9 of the State Constitution generally proscribes all gambling except for four exceptions. These four exceptions are: (1) pari-mutuel wagering on horse racing; (2) State lotteries; (3) bingo conducted by certain charitable, non-profit and religious organizations; and (4) games of chance conducted by these same charitable, non-profit, and religious organizations.

## JUSTIFICATION:

Casino gaming has significant potential to be a major economic engine for New York State, and we need to confront the reality of gaming in New York State. That reality is that we already have gaming throughout the State. While we do not fully regulate, realize it, or capitalize on it, we have gaming. Native Americans have five casinos in New York, and we have nine racinos at our racetracks. In fact, New York State now has more than 29,000 electronic gambling machines – more than Atlantic City, and more than any state in the Northeast or Midwest.

New York State is also surrounded by gambling. States and Canadian provinces just across our borders have legalized casino gambling. Our competitor states and provinces get the tourism, revenue, and good jobs that belong here.

It is estimated that over $1 billion of economic activity can be generated from casino gaming. Passing a constitutional amendment would allow New York to do gaming right.

## LEGISLATIVE HISTORY:

Over the past 40 years, numerous resolutions have been introduced to amend the State Constitution to authorize commercial casino gambling. None of these proposals have achieved the required second passage by the legislature and have never been subject to a vote of the electorate. In 2011, Assembly Bill No.3293/Senate Bill No. 3326, Assembly Bill No. 3605/Senate Bill No. 3327, and Assembly Bill No. 6753 were introduced to authorize casino gambling. None of the bills were acted on.

## BUDGET IMPLICATIONS:

There are no immediate budget implications, since the constitutional amendment cannot go into effect until January 1, 2014. Future budget implications would be dependent on the nature of the State's regulation of such gambling.

## EFFECTIVE DATE:

Constitutional amendments require the passage of two separately elected Legislatures and approval by the voters. As a result, the amendment could not take effect until January 1, 2014.

Legislative Bill Drafting Commission
89143-02-2

# PROGRAM BILL # 2 6

S.
- - - - - - - -
Senate
- - - - - - - -

IN SENATE--Introduced by Sen

--read twice and ordered printed,
and when printed to be committed
to the Committee on

- - - - - - - - A.
Assembly
- - - - - - - -

IN ASSEMBLY--Introduced by M. of A.

with M. of A. as co-sponsors

--read once and referred to the
Committee on

*CONSTCOR*
(Authorizes casino gambling within
the state as regulated by the state)

- - - - - - - -

Const. casino gambling

CONCURRENT RESOLUTION
OF THE SENATE AND ASSEMBLY

proposing an amendment to subdivi-
sion 1 of section 9 of article 1 of
the constitution, in relation to
casino gambling in the state

## IN SENATE

**Senate introducer's signature**

The senators whose names are circled below wish to join me in the sponsorship of this proposal:

| | | | | |
|---|---|---|---|---|
| s20 Adams | s44 Farley | s58 Kennedy | s54 Nozzolio | s28 Serrano |
| s15 Addabbo | s02 Flanagan | s34 Klein | s53 O'Mara | s51 Seward |
| s55 Alesi | s08 Fuschillo | s26 Krueger | s37 Oppenheimer | s09 Skelos |
| s11 Avella | s59 Gallivan | s24 Lanza | s21 Parker | s14 Smith |
| s40 Ball | s12 Gianaris | s39 Larkin | s13 Peralta | s25 Squadron |
| s42 Bonacic | s22 Golden | s01 LaValle | s30 Perkins | s16 Stavisky |
| s46 Breslin | s47 Griffo | s52 Libous | s61 Ranzenhofer | s35 Stewart- |
| s38 Carlucci | s60 Grisanti | s45 Little | s48 Ritchie | Cousins |
| s50 DeFrancisco | s06 Hannon | s05 Marcellino | s33 Rivera | s49 Valesky |
| s32 Diaz | s36 Hassell- | s07 Martins | s56 Robach | s57 Young |
| s17 Dilan | Thompson | s62 Maziarz | s41 Saland | s03 Zeldin |
| s29 Duane | s10 Huntley | s43 McDonald | s19 Sampson | s27 |
| s31 Espaillat | s04 Johnson | s18 Montgomery | s23 Savino | |

## IN ASSEMBLY

**Assembly introducer's signature**

The Members of the Assembly whose names are circled below wish to join me in the multi-sponsorship of this proposal:

| | | | | |
|---|---|---|---|---|
| a049 Abbate | a107 Crouch | a095 Jaffee | a052 Millman | a012 Saladino |
| a092 Abinanti | a014 Curran | a057 Jeffries | a015 Montesano | a113 Sayward |
| a105 Amedore | a063 Cusick | a135 Johns | a132 Morelle | a029 Scarborough |
| a084 Arroyo | a045 Cymbrowitz | a112 Jordan | a039 Moya | a016 Schimel |
| a035 Aubry | a034 DenDekker | a099 Katz | a003 Murray | a140 Schimminger |
| a124 Barclay | a081 Dinowitz | a074 Kavanagh | a037 Nolan | a064 Silver |
| a040 Barron | a114 Duprey | a065 Kellner | a128 Oaks | a027 Simanowitz |
| a082 Benedetto | a004 Englebright | a129 Kolb | a069 O'Donnell | a036 Simotas |
| a122 Blankenbush | a054 Espinal | a025 Lancman | a051 Ortiz | a146 Smardz |
| a055 Boyland | a071 Farrell | a091 Latimer | a136 Palmesano | a079 Stevenson |
| a008 Boyle | a123 Finch | a013 Lavine | a088 Paulin | a011 Sweeney |
| a026 Braunstein | a007 Fitzpatrick | a050 Lentol | a141 Peoples- | a110 Tedisco |
| a044 Brennan | a137 Friend | a125 Lifton | Stokes | a115 Tenney |
| a116 Brindisi | a143 Gabryszak | a072 Linares | a058 Perry | a002 Thiele |
| a131 Bronson | a090 Galef | a127 Lopez, P. | a087 Pretlow | a061 Titone |
| a046 Brook-Krasny | a133 Gantt | a053 Lopez, V. | a073 Quart | a031 Titus |
| a147 Burling | a077 Gibson | a001 Losquadro | a021 Ra | a062 Tobacco |
| a117 Butler | a149 Giglio | a126 Lupardo | a097 Rabbitt | a148 Walter |
| a101 Cahill | a066 Glick | a111 Magee | a009 Raia | a041 Weinstein |
| a096 Calhoun | a023 Goldfeder | a120 Magnarelli | a006 Ramos | a020 Weisenberg |
| a043 Camara | a150 Goodell | a059 Maisel | a134 Reilich | a024 Weprin |
| a106 Canestrari | a075 Gottfried | a060 Malliotakis | a109 Reilly | a070 Wright |
| a089 Castelli | a005 Graf | a030 Mackey | a078 Rivera, J. | a094 Zebrowski |
| a086 Castro | a098 Gunther | a019 McDonough | a080 Rivera, N. | a093 |
| a138 Ceretto | a130 Hanna | a104 McEneny | a076 Rivera, P. | a100 |
| a033 Clark | a139 Hawley | a017 McKevitt | a119 Roberts | a103 |
| a047 Colton | a083 Henstie | a108 McLaughlin | a056 Robinson | a145 |
| a010 Conte | a028 Hevesi | a022 Meng | a068 Rodriguez | |
| a032 Cook | a048 Hikind | a121 Miller, D. | a067 Rosenthal | |
| a142 Corwin | a018 Hooper | a102 Miller, J. | a118 Russell | |
| a085 Crespo | a042 Jacobs | a038 Miller, M. | a144 Ryan | |

1) Single House Bill (introduced and printed separately in either or both houses). Uni-Bill (introduced simultaneously in both houses and printed as one bill. Senate and Assembly introducer sign the same copy of the bill).

2) Circle names of co-sponsors and return to introduction clerk with 2 signed copies of bill and 4 copies of memorandum in support (single house); or 4 signed copies of bill and 8 copies of memorandum in support (uni-bill).

LBDC 01/06/12

Section 1. Resolved (if the concur), That subdivision 1 of section 9 of article 1 of the constitution be amended to read as follows:

1. No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, or any department thereof; nor shall any divorce be granted otherwise than by due judicial proceedings; except as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, the net proceeds of which shall be applied exclusively to or in aid or support of education in this state as the legislature may prescribe, [and] except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government, and except casino gambling regulated by the state shall hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section.

§ 2. Resolved (if the concur), That the foregoing amendment be referred to the first regular legislative session convening after the next succeeding general election of members of the assembly, and, in conformity with section 1 of article 19 of the constitution, be published for 3 months previous to the time of such election.

# EXHIBIT B



ph: 202 630 8439   fax: 202 318 2182

**Home > *Indian Gaming***

Print | Subscribe

**Ray Halbritter: The real story about Indian gaming in New York**
WEDNESDAY, SEPTEMBER 14, 2011

Filed Under: New York | Opinion    Like    Tweet    Share

"State legislative field hearings were held last week examining whether or not the State will begin the historic process of seeking to amend the New York State Constitution to allow commercialized gambling throughout the State. Supporters of bringing the gambling industry into the Empire State have already started pushing the message that allowing such a dramatic transformation will be the solution to New York's economic problems. There is a reason, however, why such a bold change cannot happen merely by passing a law. This is one of the extraordinary instances when the Constitution must be amended by two terms of the legislature, followed by a statewide referendum approved by the voters, something which is rarely done.

Undoubtedly, supporters of this effort will point to Indian nations, such as the Oneida Nation, as proof of the positive impact gaming can have on New York's communities. The problem with that argument, however, is that Indian nations are fundamentally different from the gambling industry. Unlike them, we are governments that are obligated to invest our revenues and resources into our ancestral lands and surrounding communities right here in New York. This is the real story of the Oneida Indian Nation and its success.

Take a look at Central New York. The region was once one of the primary manufacturing centers of this country until the shareholders and board members of countless companies closed up and moved to places like Mexico and China in search of higher profits."

Get the Story:
Ray Halbritter: The Real Story About American Indian Gaming in New York State
(Indian Country Today 9/14)

HOT TOPICS
• Carcieri | Patchak
• land-into-trust
• off-reservation gaming

ARCHIVE
2013 | 2012 | 2011 | 2010 |
2009 | 2008 | 2007 | 2006 |
2005 | 2004

NEWS TOPICS
Business Deals
California
Casino Stalker
Compacts
Connecticut
Land Acquisitions
Legislation
Litigation
Meetings
NIGC
New York
Openings and Closings
Opinions / Editorials
Public Relations
Regulation

ADVERTISEMENT

PROVIDING AUDIT, CONSULTING, AND TRAINING SERVICES TO NATIVE AMERICAN TRIBES AND CASINOS NATIONWIDE
EGGHART

**Russell Peters**
ticketmaster.com
Live in Albany on 9/26 One Night Only!


AdChoices ▷

Home | Arts & Entertainment | Business | Canada | Cobell Lawsuit | Education | Environment | Federal Recognition | Forum | Health | Humor | Indian Gaming | Indian Trust | Jack Abramoff Scandal | Jobs & Notices | Law | National | News | Opinion | Politics | Sports | Technology | World

Indianz.Com Terms of Service | Indianz.Com Privacy Policy
About Indianz.Com | Advertise on Indianz.Com

Indianz.Com is a product of Noble Savage Media, LLC and Ho-Chunk, Inc.

# EXHIBIT C



MESOTHELIOMA * LUNG CANCER
HAVE YOU BEEN DIAGNOSED? WERE YOU EXPOSED TO ASBESTOS?
Principal office 809 Third Ave, New York, NY 10022  Attorney Advertising.

CALL LEVY PHILLIPS & KONIGSBERG, LLP
FOR A FREE CONSULTATION
518-871-1627
Prior results do not guarantee a similar outcome.

IN YOUR COMMUNITY: JOBS    AUTOS    REAL ESTATE    RENTALS    CLASSIFIEDS    OBITUARIES    FIND&SAVE    LOCAL BUSINESSES    PLACE AN AD

**syracuse.com**
Powered by: **THE POST-STANDARD**

**Central New York**

Set Weather    Search

Sign in | Join

NEWS    BUSINESS    SPORTS    H.S. SPORTS    ENTERTAINMENT    LIVING    brought to you by: **Shhh...** SALE

Business  Crime  Lottery  Obits  Opinion  Politics  The Post-Standard  Special Reports  State  U.S. & World  More News

UPSTATE UNIVERSITY HOSPITAL COMMUNITY CAMPUS    **family birth center**    > expand <

# Madison County will tackle Oneida nation-New York agreement today



Gov. Andrew Cuomo, left, and Oneida Indian Nation leader Ray Halbritter talk while signing an agreement May 16 on land and casino issues. Standing in back are John Becker, chairman of the Madison County Board of Supervisors, left, and Oneida County Executive Anthony Picente. (Mike Groll | The Associated Press)

Print (http://blog.syracuse.com/news/print.html?entry=/2013/05/madison_county_will_tackle_one.html) (http://connect.syracuse.com/user/gcoin/index.html) By Glenn Coin | gcoin@syracuse.com (http://connect.syracuse.com/user/gcoin/posts.html)
Follow on Twitter (https://twitter.com/glenncoin)
on May 30, 2013 at 5:30 AM, updated May 30, 2013 at 5:31 AM

(http://ads.syracuse.com/RealMedia/a
SYRACUSE, N.Y. -- The Madison County Board of Supervisors will vote today on the casino and land deal between the Oneida Indian Nation and the state of New York.

The meeting begins at 10 a.m. in supervisors chambers in the county office building in Wampsville. A memo from supervisors Chairman John Becker says the board will "receive, review, consider and if appropriate approve " the agreement announced May 16.

Sponsored By:

OCRRA org

(http://ads.syracuse.com/RealMedia/ads/click_lx.ads/www.: 0000_RFTR_Spring_2013_120x60- 0504.html/516d306f5046454770656b4142375444)


Stock Up & Save During Our Ten For $10 Sale!
16 oz. · All Varieties
Wish · Bone Salad Dressing
TEN

Offer valid thru Saturday, June 1, 2013.
(http://ads.syracuse.com/RealMedia/ads/click_lx.ads/www.:

## Photo of the Day



(http://photos.syracuse.com/post-standard/2013/05/central_new_york_weather_-_may_7.html#incart_photo)



has sought additional revenues to pay for restorations and increases in funding for schools, public colleges and health care.

Ray Halbritter, the Oneida Nation Representative and CEO of Nation Enterprises and its Turning Stone Resort Casino, warns the state against allowing non-Indian casino competitors.

"Indian nations are fundamentally different from the gambling industry," Halbritter said Wednesday. "Unlike them, we are governments that are obligated to invest our revenues and resources into our ancestral lands and surrounding communities right here in New York."

"New York is reeling from the legacy of pain left behind by companies looking to maximize only their own short-term profits," Halbritter said. "Elected officials should not continue the same pattern by rewinding the clock in support of a scheme to make our region like Atlantic City."

Senate Majority Leader Dean Skelos, a Long Island Republican, isn't supporting or blocking casinos at this time, but supports a constitutional amendment that would require a public vote.

"He has talked about the potential for economic growth and jobs, but in the end it should be up to the people," said Skelos' spokesman, Scott Reif.

"It is a complex matter," Cuomo said. "It has numerous ramifications on a number of levels ... at this point I'm not encouraging, I'm not dissuading" the Legislature.

"At one time the question was gaming or no gaming," Cuomo said. "That's not the question anymore. There will be gaming ... so the question has shifted."

Cuomo said he hopes to have "a position by January, when the new session starts, as part of a new agenda for the new year."

"We're just beginning the process of letting people know the economic advantages of enhanced gaming," said James Featherstonhaugh, president of the New York Gaming Association pushing for more casinos. "We believe that once New Yorkers know all of the facts, this significant level of support will become an overwhelming level of support."

Quinnipiac questioned 1,016 registered voters Sept. 13-18. The poll has a margin of error of plus or minus 3.1 points.

© 2013 Oneida Tribe of Indians of Wisconsin
PO Box 365
Oneida, Wisconsin 54155

Home | Members | Directory | Contact Us | Sitemap

site created by:
Infinity Technology, Inc.

# EXHIBIT D

New York Racing and Gaming Blog

Insights on Legal, Political and Regulatory Issues

## Neutralizing the Opposition

Posted on May 17, 2013

By Karl J. Sleight

With much fanfare in the State Capitol, the governor and leaders of the Oneida Indian Nation announced the outline of an agreement that on its face resolved virtually all of the long simmering issues between New York state, local governments and the Nation. The agreement still requires several layers of government approvals, and addresses long standing issues including land claims, pricing differentials in cigarettes and gasoline, local government revenue sharing and more. Most importantly, for the immediate future was an understanding that the Oneida's will receive exclusive rights to casino gaming in a 10 county region of Central New York (Cayuga, Chenango, Cortland, Herkimer, Lewis, Madison, Oneida, Onondaga, Oswego and Otsego counties). Although the arrangement is not dependent on the state's push toward development of non-Native American casinos, one expects that the Oneida's will not engage in an effort to stop the state's efforts. Ray Halbritter, President and CEO of the Oneida Nation, is known as a shrewd negotiator and one has to wonder who will be the long term beneficiary of this announcement when the dust settles. Has the changed landscape now shifted the odds of added casinos in New York?

Recent polling shows lukewarm support for the constitutional amendment to expand casino gaming in New York. Without a clear cut majority favoring the amendment, an enterprise like the Oneida Nation weighing into the debate against the amendment could easily have tipped the balance sending the measure down to defeat. Once the dust settles and details begin to emerge, there will likely be questions on multiple fronts. But for now, the governor has seemingly neutralized a logical foe to the major job development initiative left in this legislative session.

A careful examination of the landscape sees this strategy playing out elsewhere. Genting, the operator of the highly successful Resorts World casino at Aqueduct Race Track, appears well-positioned by the governor's plan not to start any casino development in the outer boroughs of New York City or Long Island for five years. This strategy serves to effectively grant Genting its own exclusivity zone for probably close to a decade. With that, expect Genting to also sit on the sidelines as the governor's plan takes shape. Like the Oneida's, Genting has the financial wherewithal to send the constitutional amendment down to defeat.

Since the reorganization of NYRA last summer, the racing and breeding industry has been silent in any public criticism of the casino expansion plans. The current framework has been a boon to the equine industry in New York, particularly with the revenue stream that comes from the tremendous success of Resorts World. It is hard to imagine that risks associated with tinkering with the status quo would be appealing for the horse crowd. Lighting candles and hoping for a repeat of Upset's victory over Man O' War may be a wise strategy.

The negotiations between the governor and the Legislature over locations and zones where casinos will be located on its face swirls around talk of politicizing the selection process. There is a more practical reason for keeping zones undisclosed until after the November vote on the amendment of the state constitution. The eastern corridor from Maryland to Maine is rapidly increasing the number of casinos in the region. High end projects are underway (MGM and Springfield, MA) or are in deep financial distress (The Revel and Atlantic City, NJ). Without a clear understanding of the geographical zones, competitors may have insufficient information to decide whether to spend precious dollars fighting to defeat the constitutional amendment in New York. To that end, so far they have been neutralized.

That leads us back to the beginning. The Seneca and Mohawk Nations have more fluid leadership structures than the Oneida's where Mr. Halbritter is an institution. They also have substantial financial resources to cause great mischief for the constitutional amendment. A protracted mediation between the Senecas and the state has produced nothing, drawing the ire of the governor. Whether this stalemate follows the blueprint of the Oneida's remains to be seen. If not, it would not be a surprise to see some who have been relegated to wallflower status engaging in favor of the amendment, directly or indirectly, if things got tight in late October.

There is still a long way to go before New Yorkers are playing Black Jack or Texas Hold'em at an Empire State casino. The race has started and so far the early hurdles seem to be getting cleared, but there's still a ways to go before the finish line.

Share this:                   | Print | Email | Twitter 1 | LinkedIn | Facebook | Google +1 |

This entry was posted in Miscellaneous and tagged Casino siting in New York state, Genting, Governor Cuomo, NY Constitutional amendment, NYRA, Oneida Nation by New York Racing and Gaming Blog. Bookmark the permalink [http://blog.harrisbeach.com/racingandgaming/?p=1036].

Terms and Conditions    Privacy Policy    Disclaimer    Visit HarrisBeach.com

© 2012-3 Harris Beach PLLC Attorney Advertising. Prior results do not guarantee a similar outcome.

# EXHIBIT E



AdChoices

IN YOUR COMMUNITY: JOBS   AUTOS   REAL ESTATE   RENTALS   CLASSIFIEDS   OBITUARIES   FIND&SAVE   LOCAL BUSINESSES   PLACE AN AD

**syracuse.com**
Powered by: **THE POST-STANDARD**

# Central New York

Set Weather        Search

Sign in | Join

| NEWS | BUSINESS | SPORTS | H.S. SPORTS | ENTERTAINMENT | LIVING |

brought to you by: St JOSEPH'S

Business   Crime   Lottery   Obits   Opinion   Politics   The Post-Standard   Special Reports   State   U.S. & World   More News

ASHLEY Furniture HomeStore   $5000 FREE Furniture Giveaway!

## 34 comments

# Oneida Nation, state agree on wide-ranging deal on gaming, taxing, land



Sponsored By:

DCRRA.org

(http://ads.syracuse.com/RealMedia/ads/click_lx.ads/www.syracuse.cor
0000_RFTR_Spring_2013_120x60-
0504.html/516d306f50464547706556b4142375444)

New York Gov. Andrew Cuomo, left, and Ray Halbritter, federally recognized representative of the Oneida Indian Nation, talk while signing an agreement on the Oneida's Turning Stone Casino in Vernon during a news conference on Thursday, May 16, 2013, in Albany, N.Y. The Oneidas have struck a deal with the Cuomo administration to guarantee exclusive territory for their casino in exchange for an estimated $50 million in annual payments to the state. The proposed deal was reached as Cuomo pushed a proposal to bring three Las Vegas casinos to Upstate New York at yet-to-be-identified locations. Standing in back are John Becker, chairman of the Madison County Board of Supervisors, left, and Oneida County Executive Anthony Picente. ((AP Photo/Mike Groll))

Print (http://blog.syracuse.com/news/print.html?entry=/2013/05/oneida_nation_state_agree_on_h.html)
(http://connect.syracuse.com/user/gcoin/index.html) By Glenn Coin | gcoin@syracuse.com
(http://connect.syracuse.com/user/gcoin/posts.html)
Follow on Twitter (https://twitter.com/glenncoin)
on May 16, 2013 at 2:05 PM, updated May 16, 2013 at 3:41 PM

(http://ads.syracuse.com/RealMedia/ad...                  n/news/20

## Crime in Central NY



(http://www.syracuse.com/crime/police-blotter/)

**Police Blotter
(http://www.syracuse.com/crim
blotter/#incart_special-report)**
Search for arrests by Syracuse and Central New York law enforcement agencies and local New York State Police.

Map Onondaga County reported crimes
(http://www.syracuse.com/crime/police-
reports/#incart_special-report)

Crime database: A look at local stats
(http://topics.syracuse.com/tag/Crime%
20database/index.html#incart_special-
report)

Crime & Safety forum
(http://www.syracuse.com/forums/crime/#ir
report)

18
Tweet

69
Like

0

Share
Email

For the first time, the Oneida Indian Nation has agreed to share its wealth with its longtime adversary, the state of New York.

In a deal announced today, the Oneidas will give 25 percent of their gaming machine revenues to the state in exchange for exclusive rights to run casinos in a 10-county area of Central New York. Gov. Andrew Cuomo said that could mean $50 million a year for the state.

Other details of the agreement just announced in Albany by Cuomo, Oneida nation leader Ray Halbritter, Oneida County Executive Anthony Picente and Madison County Board of Supervisors Chairman John Becker:

-- Oneida and Madison counties agree to drop all legal action against the Oneidas over land and tax issues. The state will drop any support of those actions.

-- No casinos would be built in the 10-county Central New York region, which includes Onondaga County. Vernon Downs, which opened in 2006, could continue to operate.

Case 1:13-cv-01100-LEK-DEP   Document 1-1   Filed 09/06/13   Page 53 of 261

-- The Oneidas, which have been granted 13,000 acres of tax-exempt trust land by the federal government, agree to cap their total trust land to 25,000 acres.

-- Oneida County will get $2.5 million a year and Madison County will get $3.5 million from the state's share of the Oneidas' payments.

-- The Oneidas will charge -- and keep -- the same sales taxes New York state charges. The Oneidas must use that money for the same kinds of services New York does.

-- The nation will waive its sovereign immunity for the agreement, allowing New York to take the tribe to federal court in any disputes.

-- In order to take effect, the agreement would need the approval of the federal Department of Interior, the state Legislature, and the governing boards of Madison and Oneida counties.

-- The agreement does not depend on whether the state Legislature and voters approve an expansion of private casino gambling in New York.

-- If that referendum passes, the remaining eight counties in the region would share 10 percent of the money the state collects from the Oneidas.

Here is the map of the six regions of New York that Cuomo outlined last week. The mustard-colored portion is the 10-county area in which Turning Stone now has exclusive casino rights. The counties are Cayuga, Chenango, Cortland, Herkimer, Lewis, Madison, Oneida, Onondaga, Otsego and Oswego:

Six Upstate Regions for Resort Gaming Destinations (http://www.scribd.com/doc/140444511)



Six Upstate Regions for R

· Share
· Embed

· 1
of1

2013 Best Skin Tighteners
How To Tighten Loose, Sagging Skin Without Surgery, Lasers, or a Dr.
www.SkinCareSearch.com/FaceLifting

President's Refi Program
Refinance rates hit 2.90% APR! Calculate new mortgage payment now.
www.Refinance.LowerMyBills.com

Mortgage Rates Hit 2.50%
If you owe under $729k you may qualify for 2.90% APR Govt Refi Plans.
www.SeeRefinanceRates.com

5 Star Travel, Low Prices
Great Travel Destinations at Wholesale Prices, Make Residual Income!
http://bit.ly/1c8m4qV

Tweet 18                                          Email

More Crime & Safety news
▸ (http://www.syracuse.com/crime)

## Photo of the Day



(http://photos.syracuse.com/post-standard/2013/08/eid_al-fitr_in_central_new_yor_5.html#incart_photo)

**Eid al-Fitr in Central New York (http://photos.syracuse.com/post standard/2013/08/eid_al-fitr_in_central_new_yor_5.html#in**

See All Photo Galleries
(http://photos.syracuse.com/post-standard/index.html)

Syracuse and CNY Photo Essays
(http://photos.syracuse.com/syracusecom_photo

Videos by The Post-Standard
(http://videos.syracuse.com/post-standard/index.html)

## More News Topics



**Sean Kirst: Read his latest columns**

(http://www.syracuse.com/kir:



**Opinion: Editorials, letters & more**

(http://www.syracuse.com/opi:



**CNY Obituaries**

(http://obits.syracuse.com/obit

## Most Comments    Most Read

**289** Confederate flag to fly over Richmond Va, stirring controversy
(http://www.syracuse.com/news/index.ssf/2013/(
comments) (http://www.syracuse.com/news/index.ssf/2013/08/confederate_fla_h comments)

**117** Update: Father of deceased teen calls Salmon River Falls 'unsafe,' says too many
(http://www.syracuse.com/news/index.ssf/2013/(
comments) (http://www.syracuse.com/news/index.ssf/2013/08/oswego_count comments)

**108** English and math test scores for New York:
See how your school or district did and
(http://www.syracuse.com/news/index.ssf/2013/(
comments) (http://www.syracuse.com/news/index.ssf/2013/08/english_and_n comments)

**79** Jon Bon Jovi show at NYS Fair mysteriously scuttled, but Cuomo
(http://www.syracuse.com/news/index.ssf/2013/(
comments)

# EXHIBIT F

# SETTLEMENT AGREEMENT

# BY

# THE ONEIDA NATION

# THE STATE OF NEW YORK

# THE COUNTY OF MADISON

# &

# THE COUNTY OF ONEIDA

## I.    PREAMBLE

WHEREAS the Oneida Nation, the State of New York, Madison County and Oneida County are committed to protecting and promoting the environment, health, safety and welfare of all of their people, to protecting and strengthening the social fabric of Central New York, and to developing the entire regional economy;

WHEREAS long-standing disputes between the Oneida Nation and the State of New York, Madison County and Oneida County, have generated litigation in state and federal courts regarding property and other taxation, the status of Nation lands and transfer of such lands to the United States to be held in trust for the Oneida Nation;

WHEREAS the Oneida Nation, the State of New York, Madison County and Oneida County recognize that existing disputes and litigation are costly and disruptive and desire to foster intergovernmental cooperation and joint effort that will permit them and their peoples to move forward in a way that can improve lives in the whole of Central New York;

NOW, THEREFORE, the Oneida Nation, the State of New York, Madison County and Oneida County for themselves, related parties and agencies, and their successors in interest and assigns, do hereby resolve all outstanding disputes by entering into this Agreement.

## II.    GENERAL DEFINITIONS

The following definitions apply to terms used in this Agreement:

1

A.    "Boylan tract" means the 32 acre (more or less) of state tax-exempt land held to be tribal land retained by the Oneida Nation in *Boylan v. United States*, 256 F.165 (2d Cir. 1920).

B.    "Casino Gaming" means the types of gaming activities referenced in the Indian Gaming Regulatory Act, 25 U.S.C. § 2703(7), as Class III gaming activity, except that Casino Gaming shall not include: (i) charitable gaming conducted pursuant to N.Y. Const. art. I, § 9 , cl. 2; (ii) pari-mutuel wagering on horse racing conducted pursuant to N.Y. Const. art. I, § 9, cl. 1; or (iii) the state lottery conducted pursuant to N.Y. Const. art. 1,§ 9, cl. 1. The foregoing exception for the state lottery shall not include Video Lottery Gaming Devices or Gaming Devices. For the purposes of this Agreement, the use of the term Class III gaming activities refers to types of gaming activities, and it shall not matter whether or not such gaming activities are conducted by an Indian or an Indian tribe, within or outside of Indian country or under IGRA or on some other basis.

C.    "Counties" means Madison County and Oneida County collectively, or Oneida County or Madison County individually, as shall be determined by the usage of such terms in this agreement, and all officers and officials of each County and their respective successors in interest and assigns, both individually and collectively.

D.    "Effective Date" means the date on which the United States District Court for the Northern District of New York enters an order in *State of New York, et al. v. Salazar*, et al., 6:08-cv-644 (LEK), approving this Agreement and dismissing that litigation as provided in Section VI(A)(1)(a) of this Agreement.

E.    "Gaming Device" means Slot Machines, Video Lottery Gaming Devices and Instant Multi-Games.

F.    "Instant Multi-Game" means the game and specifications referred to in the letter and attachment from the N.Y.S. Racing & Wagering Board Chairman to the Oneida Nation Representative dated November 23, 1994.

G.    "Marble Hill tract" means the 104 acres (more or less) of state tax-exempt land retained by the Oneida Nation as Lots 2 and 3 in the June 25, 1842 Orchard Party treaty.

H.    "Master Settlement Agreement" means the settlement agreement (and related documents) entered into November 23, 1998 by the State and leading United States tobacco product manufacturers.

I.    "Material Breach" means a violation by the State, the Counties or the Nation of a provision in Sections III(A), IV, V or VI(A), (B) and (C)(1), (3), and (7), and VII(A).

J.    "Nation" means the Oneida Nation of New York, a federally-recognized, sovereign Indian Nation, 77 Fed. Reg. 47,868, 47,870 (August 10, 2012), all officers of the Nation,

2

all instrumentalities of the Nation, and their respective successors in interest and assigns, both individually and collectively.

K.   "Nation Compact" means the gaming compact (including its appendices) entered into by the State on April 16, 1993 and approved by the United States Department of the Interior on June 4, 1993, which approval was published at 58 Fed. Reg. 33160 (June 15, 1993), as has been or may be amended from time to time ("Oneida compact," "compact" and "gaming compact").

L.   "Nation Land" means land possessed by the Nation within the exterior boundaries of the Reservation and that (i) is the 32-acre (more or less) *Boylan* tract, (ii) is the 104-acre (more or less) Marble Hill tract, (iii) that is held in trust by the United States or any of its agencies for the benefit of the Nation or (iv) Reacquired Land that is within the Cap as defined in Section VI(B)(4) of this Agreement.  Reacquired Land that exceeds the Cap defined in Section VI(B)(4) of this Agreement is not Nation Land as that term is defined herein.

M.   "Nation Payment" means the quarterly amount of money due under Section III(A) of this Agreement.

N.   "Net Win" means the amounts wagered on Gaming Devices less the payout from Gaming Devices, but before expenses, to be calculated on a quarterly basis.  As used in this definition of Net Win, the term "free play" refers to any dollar amounts that may be used by a player to play a Gaming Device without paying any other consideration. Free play used by the Nation in an amount not to exceed ten percent of the total quarterly net win from gaming devices shall be subtracted from the calculation of Net Win. In the event that the free play allowance for video lottery gaming in Section 1617-a of the Tax Law is increased, the free play allowance for the Nation shall be similarly increased.

O.   "Parties" means the State, the Nation, and the Counties, as defined herein; each of them individually is a "Party."

P.   "Reacquired Land" means all land possessed by the Nation, except that Reacquired Land does not include the 32-acre (more or less) *Boylan* tract, the 104-acre (more or less) *Marble Hill* tract, or excess federal land that has been or will be transferred to the Department of the Interior pursuant to 40 U.S.C. § 523 to be held in trust for the Nation.

Q.   "Reservation", as used in this Agreement, means the land within Madison and Oneida County acknowledged as the reservation of the Oneida Nation in Article II of the Treaty of Canandaigua, 7 Stat. 44 (1794), as depicted on the map attached as Exhibit I.

R.   "Slot Machine" shall mean a video facsimile or slot machine which means any mechanical, electrical or other device, contrivance or machine, which upon insertion of a coin, currency, token or similar object therein, or upon payment of any consideration

3

whatsoever, is available to play or operate, the play or operation of which, whether by reason of the skill of the operator or application of the element of chance or both, may deliver or entitle the person playing or operating the machine to receive cash or tokens to be exchanged for cash or to receive any merchandise or thing of value, whether the payoff is made automatically from the machine or in any other manner whatsoever, and where the outcome of each iteration of play or operation of the machine is determined at the time of play or operation, whether through the operation of an on-board random number generator in the machine itself or by a central determinant system which employs a random number generator. A video facsimile or slot machine that meets this definition of Slot Machine shall be considered a Slot Machine for purposes of this Compact, regardless of whether it is connected to an on-line system, which system performs monitoring, accounting or other functions, or determines the outcome of play or operation or transmits the outcome of play or operation to the machine from a central determinant system.

S.    "State" means the State of New York, the Governor of the State, all departments or agencies of the State, all authorities established under the authority of the State, and their respective successors in interest and assigns, both individually and collectively.

T.    "Video Lottery Gaming Devices" shall mean individual player terminals, with touch-screen, button-controlled video screen or other electronic display devices, including but not limited to single or multi-stage displays, secondary electronically-controlled displays such as wheels, dice or other displays, which are connected to a central determinant system that delivers to each individual player terminal an outcome, determined in advance of each iteration of game play, from a finite, randomly created pool of outcomes and thereby allows multiple players to compete for such outcomes. The Video Lottery Gaming Devices shall not eject nor otherwise dispense coins or currency and may perform the following functions related to the game:

a.    Accepts currency, other representative of value or a cashless activation card qualifying the player to participate in one or more games;

b.    Provides players with the ability to choose, or have the video lottery gaming devices automatically choose for them, combinations of numbers, colors and/or symbols;

c.    Electronically displays, if applicable, the game identifier and the player choices;

d.    Prints and dispenses a redemption ticket, or otherwise provides a representation of the value of player winnings in a manner consistent with the technical standards of the Nation Compact, when the player activates the cash-out function;

4

    e.    Displays game information such as credit balance and other information as required or permitted in the technical standards of the Nation Compact;

    f.    Displays, for verification purposes only, the outcome of the game, but does not determine that outcome; and

    g.    Performs security functions necessary to maintain the integrity of the operation of the gaming device, as provided in the technical standards of the Nation Compact.

## III.    NATION PAYMENT

A.    Amount. In consideration of all the undertakings by the State and Counties herein, the Nation agrees to pay to the State: (i) as the Nation Payment, twenty-five percent (25%) of any Net Win (as defined in Section II(N) of this Agreement) with respect to Gaming Devices operated by or on behalf of the Nation, and (ii) a one-time payment in the amount of eleven million dollars ($11,000,000.00).

B.    Distribution of Nation Payment. Annually, the State shall make twenty-five percent (25%) of the Nation Payment available to the County of Oneida. Additionally, from the Nation Payment, during the term of this agreement, the State shall annually allocate (i) a sum of three and one-half million dollars ($3,500,000.00) to the County of Madison and (ii) for a period of nineteen and one-quarter years, a sum of two and one-half million dollars ($2,500,000.00) to the County of Oneida. Additionally, the State shall distribute the one-time eleven million dollar ($11,000,000.00) payment received by the State pursuant to Section III(A) to the County of Madison. The Counties' share of all these payments is in full satisfaction of all existing tax liens that they claim as against the Nation and in full satisfaction of tax revenues of any kind that the Counties will not receive from the Nation in the future under the terms of this Agreement or because of the trust status of Nation Land. The Nation shall have no liability to the Counties with respect to distribution of the Nation Payment to them. All disputes concerning the Nation Payment shall be matters to be resolved solely between the Nation and the State pursuant to the dispute resolution provisions of this Agreement. Notwithstanding any other provision of this Agreement, the State shall have the sole and exclusive right to enforce the Nation's payment obligations under Section III of this Agreement.

C.    Timing. The Nation Payment shall be made quarterly, within thirty (30) days after the close of the quarter.

D.    Commencement of payment. Within seven (7) days after the Effective Date, the Nation shall make the one-time payment of eleven million dollars ($11,000,000.00) that is described in Section III(A) of this Agreement. The Nation shall commence payment of the Nation Payment as to Net Win for the quarter that begins on January 1, 2014, or, if the Effective Date is later than January 1, 2014, then as to so much of the quarter that remains after the Effective Date.

## IV.    GAMING EXCLUSIVITY

5

A.     **Geographic Scope of Exclusivity.** Except as provided in Section IV(B) of this Agreement, the Nation shall have total exclusivity with respect to the installation and operation of Casino Gaming and Gaming Devices, by the State or any State authorized entity or person, within the following geographic area: Oneida County, Madison County, Onondaga County, Oswego County, Cayuga County, Cortland County, Chenango County, Otsego County, Herkimer County and Lewis County.

B.     **Gaming Activities Permitted By Others within Exclusivity Zone.** The State shall not legalize, authorize or consent to or engage in, Casino Gaming or the installation or operation of any Gaming Device within the zone of exclusivity set forth in Section IV(A) of this Agreement, except for the following, which are exceptions to the exclusivity provided the Nation under this agreement: (a) charitable gaming conducted pursuant to N.Y. Const. art. I, § 9, cl. 2; (b) pari-mutuel wagering conducted pursuant to N.Y. Const., art. I, § 9, cl.1; (c) the lottery conducted pursuant to N.Y. Const., art I, § 9, cl. 1 (such lottery not to include Video Lottery Gaming Devices); and (d) at Vernon Downs, the type, nature and character of Video Lottery Gaming Devices, and pari-mutuel wagering on horse racing, both live and simulcasting, that as of May 15, 2013, have been authorized and now exist at Vernon Downs. The Vernon Downs exception shall permit the holder of the of the video lottery gaming license and its harness racetrack license to be sold or transferred to another entity as authorized by the New York State Gaming Commission, but the Vernon Downs exception shall cease to be applicable if a licensee at Vernon Downs ends its corporate existence, relinquishes its video lottery gaming license or its harness racetrack license, has either license revoked, or voluntarily ceases race meetings, pari-mutuel betting or betting on Video Lottery Gaming Devices, other than for unavoidable reasons such as (but not limited to) acts of God and strikes. Other gaming in the exclusivity zone that is not expressly permitted in this paragraph but that that is unlawful and has not been authorized or consented to by the State, although not a permitted gaming activity under the terms of this Agreement, shall not constitute a breach by the State or the Counties of this Agreement or of its exclusivity terms in Section IV of this Agreement.

C.     **Gaming Activities By the Nation.** The Nation shall continue to engage in Class III Gaming pursuant to the terms of the Nation Compact. To remove any uncertainty regarding the Nation compact, the previous amendments (including as to Instant Multi-Game), or the Nation's entitlement under the Nation compact to adopt games and specifications contained and approved in other tribal gaming compacts in New York (including Gaming Devices), all of the foregoing shall be deemed ratified and approved by the Legislature. The gaming procedures and specifications that are contained in Exhibit H to this Agreement are approved. The Nation and the State shall in good faith endeavor to promptly undertake the ministerial changes necessary to conform the language of such most favored nation amendments to the existing gaming specifications, and also to reflect the gaming procedures and specifications referenced in the preceding sentence in this paragraph. The Nation Compact, its amendments and those amendments specified in Exhibit H to this Agreement shall be deemed ratified by the Legislature upon its approval of this Agreement. Notwithstanding any contrary term of this Agreement, this Agreement does not modify or eliminate the rights and duties of the Nation or the State under the Nation Compact, modify or eliminate any substantive term of the compact, or modify or · eliminate the process for dispute resolution as to matters addressed by the Nation Compact.

V.     **RESOLUTION OF TAX DISPUTES**

6

A.       Imposition of Nation Tax on Sales of Goods and Services. As of the Effective Date, the Nation, pursuant to its governmental authority as an Indian nation to impose taxes upon sales of goods and services occurring on Nation Land, shall adopt and implement an ordinance imposing each of the following taxes and pricing standards, and allowing for the following exemptions, with respect to sales of goods and services on Nation Land. Nation Land shall be a "qualified reservation" for purposes of the Tax Law and Section V of this Agreement, which is a "tax agreement" for purposes of Tax Law §§ 284-e(5) and 471-e(5), as amended from time to time.

        1.       Equal Cigarette and Tobacco Products Taxes. To the extent that the State imposes or otherwise charges taxes on cigarettes and tobacco products possessed, transported, sold or conveyed throughout the State, including but not limited to taxes imposed pursuant to Article 20 of the State Tax Law, the Nation shall impose a Nation tax ("Nation Excise Tax") on cigarettes and tobacco products possessed, transported, sold or conveyed by any Seller on Nation Land to non-Indian purchasers that shall be no less than the amount of the State taxes on such cigarettes and tobacco products. The State shall notify the Nation of any change in the amount of State taxes on cigarettes and/or tobacco products. If the change results in an increase in the amount of State taxes on cigarettes and/or tobacco products, the Nation Excise Tax shall increase to an amount no less than the corresponding State tax within seven (7) days of such notice or the effective date of the change, whichever is later. If the change results in a decrease in, or elimination of, the State tax on cigarettes and/or tobacco products, the Nation Excise Tax may, at the Nation's discretion, decrease to an amount no less than the corresponding State tax.

        2.       Equal Fuel Taxes. To the extent that the State imposes or otherwise charges taxes on motor fuel and highway diesel motor fuel imported, possessed, transported, sold or conveyed throughout the State, including but not limited to taxes imposed pursuant to Articles 12-a and 13-a of the State Tax Law, the Nation shall impose a Nation tax ("Nation Fuel Tax") on motor fuel and highway diesel motor fuel imported, possessed, transported, sold or conveyed by any Seller on Nation Land to non-Indian purchasers that shall be no less than the amount of the State taxes on such fuels. The State shall notify the Nation of any change in the amount of State taxes on motor fuel and/or highway diesel motor fuel. If the change results in an increase in the amount of State taxes on motor fuel and/or highway diesel motor fuel, the Nation Fuel Tax shall increase to an amount no less than the corresponding State tax within seven (7) days of such notice or the effective date of the change, whichever is later. If the change results in a decrease in, or elimination of, the State tax on motor fuel and/or highway diesel motor fuel, the Nation Fuel Tax may, at the Nation's discretion, decrease to an amount no less than the corresponding State tax.

        3.       Equal Sales Tax, Use Tax and Occupancy Tax.

                a.       To the extent that the State, the Counties, or the cities or school districts located within the Counties, impose, charge or otherwise require collection and remittance of a sales tax, use tax or occupancy tax, including but not limited to any taxes authorized by Articles 28 and 29 of the State Tax Law and any hotel or bed taxes, the Nation shall impose a corresponding sales tax, use tax or occupancy tax ("Nation Sales Tax," "Nation Use Tax" and "Nation Occupancy Tax"), on the

7

same terms and subject to the same definitions and exemptions as such State and/or local tax, on the sale of goods, services or occupancy by a seller to non-Indians. The Nation Sales Tax rate, the Nation Use Tax rate and the Nation Occupancy Tax rate shall be no less than the combined State and local sales tax rate, combined State and local use tax rate or combined State and local occupancy tax rate in effect for the jurisdiction in which the Nation Lands where the sales or conveyances occur is located.

          b.     Upon any future increase in the rate of State sales tax, use tax or occupancy tax, or an increase in the rate of local sales tax, use tax or occupancy tax imposed by the Counties, or the cities or school districts located within the Counties, the Nation Sales Tax, Nation Use Tax or Nation Occupancy Tax shall increase to an amount no less than the new combined rates of sales tax, use tax or occupancy tax imposed by State, the Counties, or cities or school districts located within the Counties. Upon any future decrease in such rates, or elimination of the State or local sales tax, use tax or occupancy tax, the Nation Sales Tax, Nation Use Tax or Nation Occupancy Tax may, at the Nation's discretion, decrease to an amount no less than the combined rates of sales tax, use tax or occupancy tax imposed by State, the Counties, or the cities or school districts located within the Counties.

          c.     Upon any future change in the base of the sales tax, use tax, or occupancy tax imposed by the State, the Counties, or the cities or school districts located within the Counties that results in additional goods, services or occupancy becoming subject to such taxes, the Nation Sales Tax, Nation Use Tax, or Nation Occupancy Tax, as applicable, shall be amended to conform to the base of the sales tax, use tax, or occupancy tax imposed by the State, the Counties, and the cities or school districts located within the Counties. Upon a future change in the base of the sales tax, use tax, or occupancy tax imposed by the State, the Counties, or the cities or school districts located within the Counties that results in a decrease in such base, whether by creating an exemption or otherwise, the Nation Sales Tax, Nation Use Tax or Nation Occupancy Tax may, at the Nation's discretion, be amended to conform to the base of the sales tax, use tax, or occupancy tax imposed by the State, the Counties, or the cities or school districts located within the Counties.

          d.     The State shall notify the Nation of a change in the rate or base of the sales taxes, use taxes or occupancy taxes imposed by the State, the Counties or the cities or school districts located within the Counties, to the extent such taxes are administered by the State. The Counties, the cities or the school districts located within the counties, respectively, shall notify the Nation of a change in the rate or base of any sales tax, use tax or occupancy tax, to the extent such taxes are administered by the Counties or such cities and school districts, respectively. If the change results in an increase in rate or in additional goods, services or occupancy becoming subject to such taxes, the Nation Sales Tax, Nation Use Tax or Nation Occupancy Tax shall be amended to conform to such change as provided herein within seven (7) days of such notice or the effective date of the change, whichever is later.

          4.     **Equal Minimum Pricing Standards for Cigarettes.** To the extent that the State mandates minimum prices for the possession, transportation, sale or conveyance of cigarettes throughout the State, the Nation shall impose minimum prices ("Nation Minimum Prices") for the possession, transportation, sale or conveyance of those same cigarettes sold by any Seller on Nation

8

Lands to non-Indian purchasers. The Nation Minimum Prices on these products shall be calculated in the same manner as the corresponding State minimum prices are calculated. For the purpose of establishing the basic cost of cigarettes and the applicable minimum prices of Native American manufactured cigarettes, the minimum price of any cigarettes directly manufactured by the Nation or by another Native American manufacturer shall be calculated in the same manner as the corresponding State minimum prices are calculated. The basic cost of cigarettes directly manufactured by the Nation or by another Native American nation, tribe or individual, for the purposes of establishing applicable minimum prices, shall be 60% of the average manufacturers' list price, before trade or rebates, of the top three brands by market share.

5.    **Nation Tax Stamp for Cigarettes.** The Nation shall affix a Nation cigarette tax stamp on all cigarettes, including cigarettes that the Nation may exclude from the Nation Excise Tax, Nation Sales Tax, Nation Use Tax and Nation Minimum Price requirements under Section V(A)(6) of this Agreement, which shall constitute the Nation's certification that the cigarettes comply with the requirements of this Agreement, including but not limited to the requirements governing imposition of Nation taxes and minimum pricing. The Nation may receive unstamped cigarettes directly from federally licensed manufacturers without going through a New York State licensed cigarette stamping agent.

6.    **Exemption for Sales to Native Americans.** Notwithstanding any other provision of this Agreement, the Nation is authorized to exclude from the Nation Excise Tax, Nation Fuel Tax, Nation Sales Tax, Nation Use Tax, Nation Occupancy Tax and Nation Minimum Price requirements any retail sale on Nation lands, other than sales made via the internet, by the Nation, or by any entity owned directly or indirectly by the Nation, to any Native American or the immediate family of any Native American member living in the same household, provided, however, that any sale of cigarettes bearing the Nation Tax Stamp that occurs on other than Nation Lands shall be subject to State excise taxes pursuant to Article 20 of the State Tax Law unless there is proof that Nation Excise Taxes have been paid. This provision does not prevent a member of a New York Indian nation or tribe from presenting his or her membership card to vendors off-reservation for purchase of goods and services, other than cigarettes, tobacco products, motor fuel and highway diesel motor fuel, exempt from New York taxes as long as the goods and services will be delivered to his or her residence on the reservation.

7.    **Exemption for Nation-Manufactured Products.** The Nation may exclude from the Nation Sales Tax and Nation Use Tax any possession, transportation, sale or conveyance of products, other than cigarettes and tobacco products, manufactured on Nation Lands by the Nation or any entity owned, chartered, incorporated or controlled, directly or indirectly, by the Nation, including but not limited to traditional Native American crafts.

8.    **Material Tax Law Changes.** In the event there is a change to the State Tax Law or any article thereof that materially affects the terms or operation of this Agreement, such as the enactment of new, or the amendment of existing, transaction, sales, excise or similar taxes, and other than a modification of the rate or base of any tax as provided in Section V(A)(1)-(3) of this Agreement, the State and the Nation shall modify this Agreement accordingly.

9

9.        Master Settlement Agreement.  The Nation shall report to the State, on forms substantially similar to those contained in Exhibit J, its purchases of all cigarettes for the express and limited purpose of ensuring appropriate third-party compliance with the requirements of the Master Settlement Agreement, as amended and interpreted.

B.        Use of Nation Excise, Sales, Use and Occupancy Tax Revenues. The Nation shall use revenues from the Nation Excise Tax, Nation Fuel Tax, Nation Sales Tax, Nation Use Tax and Nation Occupancy Tax exclusively for the provision of the same types of governmental programs and services, and to the discharge by the Nation of the same types of governmental obligations, for which state or local governments use revenues from their tax collections. The Nation shall retain exclusive discretion in determining the specific types of governmental programs and services for which revenues shall be expended.  Nothing in this Agreement shall affect any obligation of the State or any other government to provide programs and services required under any treaty or law, or to discriminate or to permit any discrimination against the Nation or its members with respect to such obligations.

C.        Assurances.

1.        The State and the Counties shall undertake reasonable efforts to fulfill their obligations and restrictions under this section.

2.        The collection of the Nation Excise Tax, Nation Fuel Tax, Nation Sales Tax or Nation Use Tax pursuant to this Agreement shall be in full satisfaction of any taxes on the sales or provision of goods and services on Nation Land.  The State and the Counties shall not take any action to collect unpaid sales or use taxes on the sale of goods or services, other than motor fuel or highway diesel motor fuel sold to a carrier subject to article 21-a of the State Tax Law, that are subject to Nation Fuel Tax, Nation Sales Tax or Nation Use Tax pursuant to this Agreement. The State and the Counties shall not take any action to collect unpaid state excise taxes on the sale of cigarettes and tobacco products for which Nation Excise Tax has been paid.

3.        The State and the Counties shall not take any action to impose any direct or indirect tax, assessment, charge or fee on any gaming facility or gaming-related activity conducted by the Nation, except as provided in this Agreement and in the Nation Compact.

4.        The Nation shall contract for an independent third party acceptable to the State to assess and report to the State regarding the Nation's compliance with the tax provisions of this Agreement within six months of the effective date of the Agreement and once per year thereafter. If such a report indicates that the Nation, or any entity owned directly or indirectly by the Nation, has substantially failed to comply with the provisions of Sections V(A)(1), V(A)(4), V(A)(5) and/or V(A)(6) of this Agreement, then such provisions shall be void and Articles 20 and 20-A of the State Tax Law shall apply to all sales of cigarettes on Nation lands that occur more than seven (7) days after the State has notified the Nation of such finding of substantial failure to comply, provided, however, that where such report indicates that such substantial failure to comply is solely attributable to the conduct of one or more individuals acting independently on Nation lands, the Nation shall be afforded thirty (30) days to

10

cure such non-compliance after the State has notified the Nation of such finding of substantial failure to comply.

5.     For purposes of the State Alcoholic Beverage Control Law, the State shall deem the Nation to be operating with a certificate of authority, as provided in article 28 of the State Tax Law, when it is collecting Nation Sales Tax and Nation Use Tax as required by this Agreement.

D.     **Most Favored Nation.** In the event the State enters into an agreement with any other Indian nation or tribe relating to any importation, possession, transportation, purchase, sale or conveyance of any cigarettes, tobacco products, motor fuel or highway diesel motor fuel among or between any other Indian nation(s) (Other Relevant Agreement), the following provisions shall apply:

1.     The State shall provide a copy of the Other Relevant Agreement to the Nation within five (5) days after its execution.

2.     The Nation may, at its option and upon notice to the State, adopt the provision of the Other Relevant Agreement relating to any importation, possession, transportation, purchase, sale or conveyance of any cigarettes, tobacco products, motor fuel or highway diesel motor fuel among or between any other Indian nation(s).

3.     As of the date of notice from the Nation to the State, the provision adopted pursuant to this Section shall be incorporated into this Agreement, and shall amend or replace any existing provision of this Agreement relating to any importation, possession, transportation, purchase, sale or conveyance of cigarettes, tobacco products, motor fuel or highway diesel motor fuel among or between any other Indian nation(s).

E.     **Nation Land Not Taxable.**

1.     Without regard to whether land has been (or has not been) and is now (or is not now) exempt from property taxation or otherwise non-taxable, Nation Land shall be non-taxable, and the Nation shall not be liable to the State or any municipal subdivision of the State for any past, present or future property tax payment with regard to Nation Land, and no bill for such tax shall be issued, all of the foregoing subject to the limitation (Cap) in Section VI(B)(4) on the designation of Reacquired Land to 25,370 acres. For the avoidance of any doubt, Reacquired Land that is in excess of the Cap defined in Section VI(B)(4) shall be subject to State and local taxation.

2.     The Nation shall not assert or seek any other state property tax exemption for Reacquired Land exceeding the Cap in Section VI(B)(4) on the designation of Reacquired Land to 25,370 acres, except with respect to Nation Land that is listed on tax assessment rolls as exempt on the Effective Date. The parcels of Nation Land so listed on tax assessment rolls are in Madison County and are identified as follows: tax parcel identification number 75.-1-4.15 (2.80 acres) (695-cemetery), and tax parcel identification number 75.-1.4.16 (5.69 acres) (695-cemetery). The Nation reserves and asserts federal immunity to property taxation and all other rights under federal law with regard to the 32 acre *Boylan* tract, the 104-acre *Marble Hill* tract, and also to lands held in trust by the United States for the

11

Nation's benefit under 40 U.S.C. § 523 or, as to Reacquired Land held in trust, within the Cap provided in Section VI(B)(4) of this Agreement.

      3.     Any tax lien or tax sale based upon any failure of the Nation to pay any property tax, penalty, interest or assessment that has been asserted against the Nation or Nation land shall be withdrawn or terminated, and shall be deemed void *ab initio*. The State and Counties hereby release and waive all claims for payment of any such property tax, penalty, interest or assessment.

      4.     As to any judicial or administrative proceeding, the State and Counties hereby release any claim that the Reservation was disestablished.

      5.     The State hereby stipulates that the Reservation was not disestablished and that the Reservation is reservation land for purposes of state and federal statutes.

      6.     Notwithstanding Sections V(E)(1) and V(E)(4) of this Agreement, the Nation shall make to the Counties a payment in an amount equal to the amount of property tax that would be due from any non-Indian owner with respect to any parcel of Reacquired Land within the Cap provided in Section VI(B)(4) of this Agreement that is acquired by the Nation after the Effective Date of this Agreement and until such time as the particular land is transferred to the United States in trust for the Nation. With respect to Nation Land, the Nation's payment shall be based on the assessed value of the parcel prior to the transaction in which it was acquired by the Nation.

    F.    **Compliance with Agreement Deemed Compliance with Applicable State Law.** The Nation's compliance with the terms of this Agreement shall be deemed in compliance with State law related to the payment and collection of taxes. No state agency or licensing entity, including but not limited to the State Liquor Authority, shall deny a license or fail to give an approval on the ground that gaming on Nation land or under the Oneida Nation gaming compact may be unlawful or on any ground related to the payment or collection of taxes in conformity with this Agreement.

## VI.    RESOLUTION OF LAND DISPUTES

    A.    Settlement of Existing Litigation.

      1.    Trust Litigation.

        a.    The State, the New York Attorney General, the Counties and the Nation, together with all of the federal defendants (including but not limited to the United States of America, the United States Department of the Interior and its Secretary Sally Jewell, the Bureau of Indian Affairs of the Department of the Interior, and the United States General Services Administration and its Acting Administrator Dan Tangherlini) shall enter into a stipulation incorporating the terms of this Agreement and adopting the same in furtherance of the objectives of this Agreement, in substantially the form of Exhibit B, dismissing *State of New York v. Salazar*, No. 08-cv-644-LEK (N.D.N.Y.), with prejudice. This Agreement shall be submitted to the United States District Court for the Northern District of New York for the issuance by that Court of an order incorporating the terms of this Agreement, approving the

12

same and retaining jurisdiction to enforce any violations hereof, or disputes hereunder, that are not subject to arbitration under a provision of this Agreement.

b.        The State and Counties will not directly or indirectly fund any challenge to the Secretary of the Interior's May 20, 2008 decision to accept Nation Land into trust pursuant to 25 U.S.C. § 465, to any supplemental decision on any matter remanded by a court in connection with any challenge to that decision, or to any challenge to a transfer of excess land pursuant to 40 U.S.C. § 523.

2.        Federal Tax Foreclosure Litigation.

a.        By no later than seven (7) days after the Effective Date, the Counties shall withdraw the petition for a writ of certiorari that they filed in the United States Supreme Court in *Madison and Oneida Counties v. Oneida Indian Nation*, No. 12-604. By that same date and in that same case, the State shall withdraw the amicus brief that it filed on behalf of the Counties.

b.        The Counties shall stipulate to the entry of final judgments in *Oneida Indian Nation v. Madison County,* No. 00-cv-506 (N.D.N.Y), and *Oneida Indian Nation v. Oneida County*, No. 05-cv-945 (N.D.N.Y.) in substantially the form of Exhibits C and D.

3.        State Tax Litigation.

a.        Madison County shall file a stipulation of dismissal in the pending in rem action seeking to foreclose on Nation Land, *In the Matter of Foreclosure of Tax Liens by Action In Rem Pursuant to Article 11 of the Real Property Tax Law by Madison County,* Index No. 03-999 (Madison County Supreme Court).

b.        Oneida County and Madison County shall take all steps necessary to undo all acts taken to foreclose on Nation Land or to enforce property taxation with respect to such land.

c.        Madison County and Oneida County shall not file any further action to foreclose on Nation Land or take any administrative or other step or action to enforce property taxation with respect to such land; provided, however, that Madison County and Oneida County shall have the right to file an action to foreclose upon those lands covered in Section V(E)(6) of this Agreement for which the Nation fails to make the payments in the amounts permitted and required by that Section.

d.        The Counties shall stipulate to the dismissal of the hybrid tax grievance/declaratory judgment actions regarding state statutory property tax exemptions and other issues that were filed by the Nation in Madison and Oneida Counties, respectively, in substantially the form of Exhibits E and F. The State and Counties will not assist or fund, directly or indirectly, any further litigation of the hybrid tax grievance/declaratory judgment actions.

4.        Litigation against State Comptroller, Madison County Attorney and Law Firms.

As of the Effective Date of this Agreement, the Nation shall discontinue directly or indirectly funding any aspect of the litigation entitled *Mahler and Garrow v. Campanie, the Kiley Law*

13

Firm PC, Campanie & Wayland Smith, PLLC and Thomas P. DiNapoli, Comptroller of the State of New York (Supreme Court, Albany County, index number 2502-11, on appeal to the Appellate Division, Third Department), and the Nation shall use its best efforts to encourage the plaintiffs to discontinue that action.

B.     Future Trust Applications.

1.     The Nation, at its option, may submit an application to the United States Department of the Interior requesting that the Department accept the transfer into trust status of some or all of the approximately 4,000 acres of existing Nation Land that was not accepted in the May 20, 2008 Record of Decision for a transfer to the United States to be held in trust (see Exhibit A). The State and Counties represent and warrant that they support the Nation's application for transfer of such land to the United States to be held in trust and release and waive any right they may have to administratively or judicially oppose or challenge the transfer into trust of any such land on any grounds.

2.     If the Nation acquires additional Nation Land, subject to the Cap limitation in Section VI(B)(4) of this Agreement, the State and Counties shall not oppose, in any administrative or judicial proceeding or otherwise, the Nation's application to place the land in trust pursuant to 25 U.S.C. § 465, and they release and waive any right they may have to administratively or judicially oppose or challenge the transfer into trust of any such land on any grounds. Further, the State and Counties shall not oppose any transfer of excess federal land within the Reservation to the Department of the Interior to be held in trust for the Nation pursuant to 40 U.S.C. § 523.

3.     The State and Counties shall not assist or fund, directly or indirectly, any administrative or judicial opposition or challenge to the Nation's application to transfer Nation Land, subject to the Cap limitation in Section VI(B)(4) of this Agreement, into trust pursuant to 25 U.S.C. § 465, or to any transfer of excess federal land within the Reservation to the Department of the Interior to be held in trust pursuant to 40 U.S.C. § 523.

4.     The Nation shall not designate more than 25,370 acres of Reacquired Land as Nation Land, of which: (i) 13,004 acres shall be the existing land owned by the Nation that was accepted to be held in trust by the United States under the May 20, 2008 Record of Decision of the U.S. Department of Interior, (ii) 4,366 acres shall be the existing land owned by the Nation and for which the Nation applied for trust status on April 4, 2005, but which was not accepted into trust under the May 20, 2008 Record of Decision (see Exhibit A), and (iii) up to 7,000 additional acres shall be in Oneida County and up to 1,000 additional acres shall be in Madison County.

5.     For the avoidance of any doubt, the Nation shall not submit an application to have Reacquired Lands taken into trust, above the 25,370 acres specified in Section VI(B)(4).

C.     Governmental Coordination.

1.     The Nation shall not assert sovereignty with respect to any land other than Nation Land.

2.        If any federal law provides for consultation with the Nation concerning any federally-assisted project in Madison County or Oneida County, and if the Nation exercises its consultation right, then the Nation shall give notice to the Secretary of State of New York, and the Secretary of State or his or her designee, in such consultation, shall represent the County or Counties involved in the consultation if so requested by the involved County or County. If a County requests such representation in a consultation by the Secretary of State or his or her designee, the Nation hereby consents to that representation.

3.        To enhance public safety and to improve the coordination of police services, Oneida County shall enter into a deputization agreement with the Oneida Nation Police in substantially the form of Exhibit G.

4.        As to all Reacquired Land that is within the Cap defined in Section VI(B)(4) of this Agreement and is not held in trust by the United States for the benefit of the Nation, the Nation shall adopt, in lieu of the laws and regulations generally applicable to non-Nation properties, ordinances that meet or exceed standards that otherwise may govern land use, building codes, zoning, health, safety and environmental matters, and weights and measures. Any land uses and improvements existing on those lands as of the Effective Date may continue and shall be deemed to be conforming uses under any zoning or other land use statutes, regulations, codes or other administrative requirements. On reasonable notice, the Counties may coordinate with the Nation site visits and testing as reasonably needed to assure that the Nation has fulfilled its meet-or-exceed obligation under this paragraph of this Agreement. For the avoidance of any doubt, Reacquired Land that is in excess of the Cap defined in Section VI(B)(4) shall be subject to State and local regulation.

5.        In the event of any dispute over whether the Nation is meeting any relevant standard, the County(s) shall notify the Nation in writing, alleging with specificity the nature of the alleged violation and proposed corrective action or remedy. The Nation and the State or the County in which the property is located will inspect the disputed use or facility and consult, within fourteen (14) days of notice receipt, to attempt to resolve the concern and provide an opportunity to implement any agreed upon corrective action. Notwithstanding any other dispute resolution process specified in this Agreement, but without altering any right, duty or dispute resolution process specified in the Nation Compact with respect to matters addressed by the compact, any and all disputes arising under this section that remain after consultation shall be resolved by binding arbitration as follows. If the Nation and the State are able to select a full panel consisting of three members, then the arbitration shall be by a Standards Review Panel, with the State selecting one member, the Nation selecting another member, and those two members selecting a third member, whose fees and expenses are to be shared equally by the State and the Nation so long as they are reasonable and proportionate to the size and complexity of the dispute presented. The Standards Review Panel will arbitrate the dispute according to a reasonable process and timetable to be established by the panel and shall issue a decision resolving the dispute, with costs and attorneys' fees to the prevailing party. The decision or award of the Standards Review Panel may be enforced by the United States District Court for the Northern District of New York, which retains jurisdiction to enforce such decisions or awards. Notwithstanding the foregoing, if there is an impasse in the selection of third panel member because the two members chosen by the State and the

15

Nation are unable to agree on a third member, then the dispute shall be arbitrated under the Expedited Procedures provision of the AAA Commercial Arbitration Rules. In any AAA arbitration, the Nation shall select one arbitrator, the State shall select another arbitrator, and those two arbitrators shall select the third arbitrator. The prevailing party shall be entitled to an award of attorneys' fees and costs. Arbitration awards under this section shall be enforced in the United States District Court of for the Northern District of New York, which retains jurisdiction over this agreement and over its enforcement.

6.       Except as may be expressly provided in Section IV(C) of this Agreement, nothing in this section or in any other section of this Agreement replaces, modifies or repeals any provision in the Nation Compact or in any other agreement governing the Nation's gaming facilities and related enterprises and the regulations or standards that govern the operation of those facilities or related enterprises. Where there is any conflict or difference between those other agreements and this Agreement, the other agreements control.

7.       The Nation shall support any referendum authorized by the State Legislature following second passage of a concurrent resolution to amend the State Constitution to permit or authorize casino gaming. Additionally, the Nation shall not directly or indirectly fund any public education campaign or program opposing any such referendum, or fund directly or indirectly any litigation or administrative challenge in connection with any such referendum.

## VII.    ENFORCEMENT

A.      **Limited Waivers of Sovereign Immunity.** The Nation and State hereby irrevocably waive all immunity from suit, including tribal sovereignty immunity and eleventh amendment immunity, for the limited purpose of, and consent to, enforcement of the terms of this Agreement according to its terms by arbitration or before the Northern District of New York having jurisdiction to enforce the settlement in *State of New York v. Salazar*, No. 08-cv-644.

B.      **Notification of Disputes.** If the State, one of the Counties or the Nation believes a Party has violated this Agreement by not fulfilling a duty that is owed to it and that it has a right to enforce, then it shall notify that party in writing. The notice shall state the nature of the alleged violation and any proposed corrective action or remedy. The notifying party and the party receiving notice shall meet initially within fourteen (14) calendar days of receipt of the notice, unless a different date is agreed to by both parties, to attempt to resolve between themselves the issues raised by the notice of possible violation and to provide the opportunity to implement any agreed upon corrective action. Thereafter, the parties shall meet at least two further times within the next twenty-one (21) calendar days to continue good faith consultation. If the parties are unable to reach agreement, they shall within the next fourteen (14) calendar days select a mutually agreeable mediator, the cost of the mediator to be shared equally by each interested party, and shall participate in a mediation to be concluded within thirty (30) days of the selection of the mediator. If within the fourteen (14) calendar days provided for selection of a mediator the parties are unable to agree on the selection of a mediator, then any party immediately may pursue the other dispute resolution processes as permitted by this Agreement. If a mediator is chosen but mediation is unsuccessful as of the thirtieth (30th) day, or if at any point the

16

parties agree in writing that mediation will not be successful, then the parties immediately may pursue other dispute resolution processes as may be permitted by this Agreement. The foregoing notwithstanding, a party confronted with irreparable harm may immediately pursue those other dispute resolution processes.

C.   **Arbitration of Disputes.** Subject to the other provisions of this agreement, in particular those providing only for judicial enforcement with respect to a Material Breach, the Parties must arbitrate any disputes concerning an alleged breach of this agreement that, if proved, would not be a Material Breach. Such binding arbitration shall be pursuant to the AAA Commercial Arbitration Rules. A three-person arbitration panel shall be chosen as provided in Section VI(C)(5) of this Agreement. A substantially prevailing party shall be entitled to an award of attorneys' fees and costs. Any award produced by the arbitration may be enforced in the United States District Court for the Northern District of New York, which retains jurisdiction for the purposes of enforcing this Agreement and arbitration awards authorized by it.

D.   **Consequences of Material Breach.** Disputes concerning allegations of a Material Breach shall be resolved exclusively by the United States District Court for the Northern District of New York, which shall retain jurisdiction for such purpose but after a mediation according to the provisions of Section VII(B) of this Agreement . A prevailing party shall be entitled to an award of attorneys' fees and costs. In the event of an allegation of Material Breach, the affected party shall notify the allegedly breaching party in writing of the material breach.

E.   **Judicial Enforcement.** The United States District Court for the Northern District of New York will reserve and retain jurisdiction, exclusive of any other court, to enforce this Agreement according to its terms, to adjudicate any challenges by a party or by third parties to the enforceability of this Agreement, to compel arbitration of disputes according to the terms of this Agreement, or to confirm any arbitral award. The stipulation of dismissal that is Exhibit B to this Agreement will so provide and will provide that this Agreement is to be incorporated into the judgment of dismissal to be entered upon the stipulation. The parties hereby agree and stipulate that a showing of a material breach of this Agreement shall also be a sufficient showing of irreparable harm to justify injunctive or other equitable relief in any action to enforce this Agreement. Each party to this Agreement waives and releases any claim or defense that any term of this Agreement is not enforceable and, by seeking judicial approval of this Agreement, acknowledges that it is estopped to challenge the enforceability of any of its provisions.

## VIII.   IMPLEMENTATION

A.   **Authority.** The officials executing this Agreement on behalf of the State, the Counties and the Nation, respectively, warrant that they have been authorized to so execute and that they have the lawful authority to do so, subject to the approval of the State Legislature, the County Legislatures, the Oneida Nation Council and, where applicable, the New York Attorney General and, if applicable, the U.S. Department of Interior. Each party is relying on said representation in entering into this Agreement.

17

Case 1:13-cv-01100-LEK-DEP   Document 1-1   Filed 09/06/13   Page 72 of 261

B.    **Legislation.** The State will enact legislation approving this Agreement and its exhibits and containing any terms necessary for the State and Counties to carry out their undertakings in this Agreement.

C.    **Sequence of Implementation.** First, the parties' representatives will execute this Agreement. Second, the Agreement shall be submitted to the Counties' Legislatures for approval and the Nation's Council will approve this Agreement. Third, the Agreement shall be submitted to the State Legislature for approval. Fourth, the Parties, and the New York Attorney General and the Federal Defendants in the federal trust litigation, *State v. Salazar*, No. 08-cv-644 (LEK), will submit for approval the stipulation in substantially the form of Exhibit B to this Agreement. As previously provided in this Agreement, the Effective Date of this Agreement is the date of the federal court's entry of an order approving this Agreement. Upon the Effective Date, the parties' obligations to make payments, file other stipulations, and take other actions are triggered as previously provided in this Agreement.

D.    **Cooperation.** The parties shall work together in good faith to fulfill their commitments to each other under this Agreement, including adoption of necessary laws and regulations, seeking any approval of the United States Department of the Interior that may be required, and opposing any efforts to change, undermine, or invalidate any provision of this Agreement, including initiating or intervening in litigation. Nothing in this Agreement limits the State, the Counties or the Nation from engaging in intergovernmental cooperation with respect to financial or other matters not covered in this Agreement. Nothing is intended to limit or preclude further voluntary or mutual agreements regarding funding, grants or any other matter involving money that might benefit and promote the good of both the Nation and the State and Counties. Without limiting the effect of any substantive provision of this Agreement, nothing herein is or shall be construed to be an admission by any party with respect to any fact or legal issue in litigation.

E.    **Notices and Communications.** Notice required by or related to this Agreement will be made in writing and served by overnight courier or certified mail, return receipt requested. If notice is to be given by the Nation to the Counties, it shall be to the County Executive and to the County Attorney of the relevant County or Counties, and if to the State it shall be to the Governor and the Attorney General, both individually at State Capitol, Albany, New York 12224. A copy shall also be filed concurrently with the Counsel to the Governor, State Capitol, Room 210, Albany, New York 12224. If notice is to be given by the State or Counties, it shall be to the Oneida Indian Nation Representative and the Oneida Nation Legal Department, both located at 5218 Patrick Road, Verona, New York 13478, or to such other address as may be designated by the Nation.

F.    **Inadmissibility.** Any statements made during the course of the settlement negotiations in this matter will not be admissible in any action or proceeding and are strictly confidential.

G.    **No Precedent.** The parties agree that no provision of this settlement shall be interpreted to be an acknowledgment of the validity of any of the allegations or claims that have been made in any litigation covered by this agreement. This settlement does not constitute a determination of, or admission by any party to any underlying allegations, facts or merits of their respective positions.

18

The settlement of the litigation covered by this agreement is limited to the circumstances in those actions alone and shall not be given effect beyond the specific provisions stipulated to. This settlement does not form and shall not be claimed as any precedent for, or an agreement by the parties to any generally applicable policy or procedure in the future.

H.    Entire Agreement. This is a fully integrated agreement that supersedes all prior discussions and negotiations concerning it. The parties may modify this Agreement, but only by a written agreement executed by the party to be charged.

I.    Non-Severability. If any material term, provision, representation, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable or is otherwise finally determined to beyond the authority of any signatory hereto, then this Agreement shall be null and void in its entirety, with each party being returned to the position it held before the effective date.

ENTERED INTO THIS _____ DAY OF MAY, 2013.

THE STATE OF NEW YORK

_____

Andrew M. Cuomo
Governor

ONEIDA COUNTY

_____

Anthony J. Picente, Jr.
County Executive

MADISON COUNTY

_____

John M. Becker
Chairman, Board of Supervisors

ONEIDA NATION OF NEW YORK

_____

Ray Halbritter
Nation Representative

20

## EXHIBITS

A. List of Nation Parcels Accepted into Trust, And Rejected, By May 20, 2008 Record of Decision

B. Stipulation of Dismissal, *State of New York v. Salazar*, No. 08-cv-644-LEK (N.D.N.Y.)

C. Final Judgment, *Oneida Indian Nation v. Madison County*, 00-cv-506 (N.D.N.Y)

D. Final Judgment, *Oneida Indian Nation v. Oneida County*, 05-cv-945 (N.D.N.Y.)

E. Stipulation of Discontinuance of Madison County Hybrid Actions

F. Stipulation of Discontinuance of Oneida County Hybrid Actions

G. Oneida County Police Deputization Agreement

H. Games, Procedures & Specifications

I. Map

J. Master Settlement Agreement Forms

21

EXHIBIT A

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| # | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 54.-1-30 | 42.000 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Stockbridge Valley |
| 3 | 55.-1-3 | 8.176 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Stockbridge Valley |
| 4 | 47.-1-60.1 | 44.810 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Oneida City |
| 5 | 47.-1-50 | 143.015 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Oneida City |
| 6 | 47.-1-46 | 0.230 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Oneida City |
| 7 | 54.-1-14.2 | 2.004 | G3/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Oneida City |
| 8 | 298.000-1-30.3 | 24.100 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 9 | 298.000-1-38 | 17.500 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 10 | 298.000-1-39 | 220.096 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 11 | 310.000-1-15.2 | 85.576 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 12 | 310.000-1-27 | 60.575 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 13 | 323.000-1-1.3 | 4.934 | G2/Casino-Resort | x | Oneida | | Town of Vernon | | Vernon-Verona-Sherrill |
| 14 | 47.-1-50.2 | 0.648 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Oneida City |
| 15 | 47.-1-51 | 1.318 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Vernon-Verona-Sherrill |
| 16 | 323.000-1-2 | 3.899 | G2/Casino-Resort | x | Oneida | | Town of Vernon | | Vernon-Verona-Sherrill |
| 17 | 323.000-1-1.1 | 248.863 | G3/Casino-Resort | x | Oneida | | Town of Vernon | | Vernon-Verona-Sherrill |
| 18 | 47.-1-42 | 0.517 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Oneida City |
| 19 | 299.000-1-58.1 | 84.807 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 20 | 322.000-2-19 | 5.210 | G3/Casino-Resort | x | Oneida | | Town of Vernon | | Vernon-Verona-Sherrill |
| 21 | 47.-1-43 | 0.899 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Oneida City |

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 22 | 322.000-2-28 | 80.516 | G3/Casino-Resort | X | Oneida | Town of Vernon | | Vernon-Verona-Sherrill |
| 23 | 284.000-1-30 | 250.159 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 24 | 285.000-1-32 | 187.518 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 25 | 284.000-1-29 | 39.901 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 26 | 285.000-1-2 | 197.434 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 27 | 285.000-1-5 | 68.556 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 28 | 285.000-1-8.1 | 102.703 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 29 | 284.000-1-27 | 106.200 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 30 | 284.000-1-28 | 75.604 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 31 | 284.000-1-37 | 166.377 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 32 | 297.000-1-3.1 | 88.916 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 33 | 36.82-2-21 | 1.888 | G2 | | Madison | Village of Canastota | Canastota | Canastota |
| 34 | 310.000-2-1 | 0.888 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 35 | 285.000-1-6 | 62.403 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 36 | 284.000-1-18 | 98.569 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 37 | 270.000-1-34 | 76.176 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 38 | 289.000-2-47.1 | 75.350 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 39 | 310.000-2-8.2 | 10.158 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 40 | 310.000-2-9 | 1.407 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 41 | 299.000-1-1 | 157.059 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 42 | 286.000-2-63.8 | 40.001 | G3/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 43 | 288.003-3-42 | 0.370 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 44 | 299.000-1-57.2 | 8.723 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 45 | 299.000-1-57.3 | 7.311 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 46 | 299.000-1-58.3 | 1.794 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 47 | 310.000-2-8.1 | 9.885 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 48 | 284.000-1-23 | 30.545 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 49 | 298.000-1-58 | 170.968 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 50 | 284.000-1-25.2 | 38.887 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 51 | 299.000-1-58.2 | 2.842 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 52 | 283.000-1-5 | 204.802 | G3 | | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 53 | 298.000-1-67 | 21.220 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 54 | 284.000-1-22 | 50.995 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 55 | 284.000-1-24 | 11.151 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 56 | 284.000-1-20 | 19.995 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 57 | 75.-1-4.15 | 3.296 | G2 | | Madison | | Town of Cazenovia | Cazenovia |
| 57 | 75.-1-4.16 | 6.013 | G2 | | Madison | | Town of Cazenovia | Cazenovia |
| 58 | 298.000-1-3 | 21.165 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 59 | 297.000-1-5.1 | 107.726 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 59 | 297.000-1-5.2 | 7.239 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

Page 4

| # | Parcel ID | Acres | Classification | | County | Municipality | | School District |
|---|---|---|---|---|---|---|---|---|
| 80 | 298.000-1-50.2 | 28.907 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 81 | 298.000-1-14 | 19.540 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 82 | 298.000-1-50.1 | 10.184 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 83 | 298.000-1-68.2 | 80.319 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 84 | 298.000-1-50.7 | 6.772 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 85 | 298.000-1-89 | 15.318 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 66 | 298.000-1-41.2 | 1.595 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 66 | 298.000-1-41.1 | 41.273 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 67 | 310.000-1-81 | 0.585 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 68 | 298.000-1-43 | 13.680 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 69 | 299.001-1-35.1 | 3.720 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 70 | 299.001-1-35.2 | 2.110 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 71 | 299.001-1-35.3 | 1.481 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 72 | 298.000-1-42.2 | 1.510 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 73 | 298.000-1-42.1 | 1.582 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 74 | 298.000-1-68.2 | 53.740 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 75 | 38.5-1-20 | 0.490 | G2 | | Madison | Village of Canastota | Canastota | Canastota |
| 78 | 38.8-1-1 | 33.599 | G2 | | Madison | Village of Canastota | Canastota | Canastota |
| 77 | 38.6-1-3 | 3.400 | G2 | | Madison | Village of Canastota | Canastota | Canastota |
| 78 | 38.8-1-4 | 25.440 | G2 | | Madison | Village of Canastota | Canastota | Canastota |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

Page 5

| # | Tax Parcel | Acreage | Code | Casino-Resort | County | City/Village | Municipality | School District |
|---|---|---|---|---|---|---|---|---|
| 79 | 36.38-1-32 | 0.500 | G2 | | Madison | Canastota | Village of Canastota | Canastota |
| 80 | 36.38-1-34 | 0.160 | G2 | | Madison | Canastota | Village of Canastota | Canastota |
| 81 | 36.-1-2 | 86.894 | G2 | | Madison | | Town of Lenox | Canastota |
| 82 | 322.014-1-23 | 0.583 | G2 | | Oneida | Sherrill | City of Sherrill | Vernon-Verona-Sherrill |
| 83 | 322.014-1-25 | 0.270 | G2 | | Oneida | Sherrill | City of Sherrill | Vernon-Verona-Sherrill |
| 84 | 322.014-1-26 | 0.366 | G2 | | Oneida | Sherrill | City of Sherrill | Vernon-Verona-Sherrill |
| 85 | 299.000-1-55.2 | 19.202 | G1/Casino-Resort | | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 86 | 36.38-1-33 | 0.504 | G2 | | Madison | Canastota | Village of Canastota | Canastota |
| 87 | 298.001-1-36 | 0.680 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 88 | 298.002-3-15.1 | 8.051 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 89 | 284.000-1-21 | 21.441 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 90 | 284.000-1-19 | 60.338 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 91 | 322.015-2-65 | 0.190 | G2 | | Oneida | Sherrill | City of Sherrill | Vernon-Verona-Sherrill |
| 92 | 322.015-2-64 | 0.316 | G2 | | Oneida | Sherrill | City of Sherrill | Vernon-Verona-Sherrill |
| 93 | 322.014-1-24 | 121.110 | G2 | | Madison | | Town of Stockbridge | Stockbridge Valley |
| 94 | 91.-1-51 | 2.024 | G2 | | Madison | Oneida | City of Oneida | Oneida City |
| 95 | 37.44-1-3 | 0.385 | G2 | | Madison | Oneida | City of Oneida | Oneida City |
| 96 | 322.015-2-1 | 0.385 | G3 | | Oneida | Sherrill | City of Sherrill | Vernon-Verona-Sherrill |
| 97 | 252.015-2-31 | 0.344 | G2 | | Oneida | | Town of Verona | Oneida City |
| 98 | 28.-2-13.12 | 5.001 | G2 | | Madison | | Town of Lenox | Canastota |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

Page 6

| No. | Tax Map ID | Acres | Alt./Casino | X | County | Municipality | District | School District |
|---|---|---|---|---|---|---|---|---|
| 98 | 26.-2-13.2 | 17.153 | G2 | | Madison | Town of Lenox | | Canastota |
| 98 | 28.-2-13.11 | 43.340 | G2 | | Madison | Town of Lenox | | Canastota |
| 99 | 288.000-2-83.1 | 30.080 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 100 | 38.29-1-2 | 0.840 | G2 | | Madison | City of Oneida | | Oneida City |
| 100 | 38.29-1-38 | 0.773 | G2 | | Madison | City of Oneida | | Oneida City |
| 100 | 38.29-1-3 | 0.510 | G2 | | Madison / Oneida | City of Oneida | | Oneida City |
| 101 | 299.000-1-27 | 20.832 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 102 | 312.000-1-52.1 | 93.570 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 103 | 297.001-1-8.2 | 0.500 | G2/Casino-Resort | X | Oneida | Town of Verona | | Oneida City |
| 103 | 297.001-1-8.1 | 23.600 | G2/Casino-Resort | X | Oneida | Town of Verona | | Oneida City |
| 104 | 312.000-1-85 | 159.690 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 105 | 324.013-1-7 | 0.958 | G2/Casino-Resort | X | Oneida | Village of Vernon | Vernon | Vernon-Verona-Sherrill |
| 106 | 298.000-1-19 | 0.435 | G2/Casino-Resort | X | Oneida | Town of Verona | Vernon | Vernon-Verona-Sherrill |
| 107 | 298.000-1-18 | 8.757 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 108 | 299.001-1-37 | 9.355 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 108 | 299.000-1-39 | 4.440 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 110 | 311.000-1-18 | 31.898 | G1/Casino-Resort | X | Oneida | Town of Vernon | | Vernon-Verona-Sherrill |
| 111 | 36.38-1-36 | 3.128 | G2 | | Madison | Village of Canastota | Canastota | Canastota |
| 112 | 323.012-2-9 | 3.861 | G2/Casino-Resort | | Oneida | Village of Vernon | Vernon | Vernon-Verona-Sherrill |
| 113 | 322.000-1-30 | 22.800 | G2/Casino-Resort | | Oneida | Town of Vernon | | Oneida City |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| # | Parcel ID | Acres | Code | Acquire | County | Municipality | School District |
|---|---|---|---|---|---|---|---|
| 114 | 299.000-1-2 | 142.284 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 115 | 299.000-1-23.1 | 42.642 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 116 | 299.000-1-13 | 58.760 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 117 | 311.000-2-6.1 | 126.564 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 118 | 311.000-1-32 | 52.679 | G1/Casino-Resort | X | Oneida | Town of Vernon | Vernon-Verona-Sherrill |
| 118 | 311.000-2-10.1 | 106.506 | G1/Casino-Resort | X | Oneida | Town of Vernon | Vernon-Verona-Sherrill |
| 118 | 311.000-2-11 | 89.990 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 119 | 312.000-1-2 | 63.373 | G1/Casino-Resort | X | Oneida | Town of Vernon | Vernon-Verona-Sherrill |
| 120 | 81.-1-10.2 | 8.073 | G2 |  | Madison | Town of Lincoln | Canastota |
| 121 | 238.000-2-5 | 329.764 | G2 |  | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 122 | 297.000-1-16 | 49.678 | G2/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 123 | 324.000-1-71 | 59.242 | G1/Casino-Resort | X | Oneida | Town of Vernon | Vernon-Verona-Sherrill |
| 124 | 299.000-1-57.1 | 2.501 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 125 | 322.015-2-4.7 | 0.322 | G2 |  | Oneida / Sherrill | City of Sherrill | Vernon-Verona-Sherrill |
| 125 | 322.015-2-45.1 | 0.788 | G2 |  | Oneida / Sherrill | City of Sherrill | Vernon-Verona-Sherrill |
| 125 | 322.015-2-40.3 | 0.428 | G2 |  | Oneida / Sherrill | City of Sherrill | Vernon-Verona-Sherrill |
| 126 | 54.-1-21.11 | 51.645 | G2/Gov't-Cultural | X | Madison / Oneida | City of Oneida | Stockbridge Valley |
| 127 | 54.-1-32.2 | 155.879 | G2/Gov't-Cultural | X | Madison / Oneida | City of Oneida | Stockbridge Valley |
| 128 | 55.-1-4.2 | 70.118 | G2/Gov't-Cultural | X | Madison / Oneida | City of Oneida | Stockbridge Valley |
| 128 | 55.-1-7 | 51.180 | G2/Gov't-Cultural | X | Madison / Oneida | City of Oneida | Stockbridge Valley |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 128 | 55.-1-38 | 19.060 | G2/Gov't-Cultural | X | Madison | Oneida | City of Oneida | | Stockbridge Valley |
| 128 | 54.-1-33 | 4.300 | G2/Gov't-Cultural | X | Madison | Oneida | City of Oneida | | Stockbridge Valley |
| 129 | 54.-3-4 | 12.520 | G2/Gov't-Cultural | X | Madison | | Town of Lincoln | | Stockbridge Valley |
| 129 | 54.-3-11 | 1.830 | G2/Gov't-Cultural | X | Madison | | Town of Lincoln | | Stockbridge Valley |
| 130 | 54.-3-8 | 129.910 | G3/Gov't-Cultural | X | Madison | | Town of Lincoln | | Stockbridge Valley |
| 131 | 63.-1-2.1 | 220.761 | G3/Gov't-Cultural | X | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 131 | 54.-2-2 | 103.890 | G3/Gov't-Cultural | X | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 132 | 54.-2-5 | 88.507 | G3/Gov't-Cultural | X | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 133 | 55.-2-5.12 | 11.469 | G3/Gov't-Cultural | X | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 134 | 55.-2-9 | 17.580 | G3/Gov't-Cultural | X | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 135 | 55.-2-21.12 | 92.683 | G3/Gov't-Cultural | X | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 136 | 65.-1-6 | 81.761 | G3/Gov't-Cultural | | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 137 | 332.000-1-20.1 | 173.224 | G2/Gov't-Cultural | X | Oneida | | Town of Vernon | | Vernon-Verona-Sherrill |
| 137 | 332.000-1-19.2 | 9.800 | G2/Gov't-Cultural | X | Oneida | | Town of Vernon | | Stockbridge Valley |
| 137 | 332.000-1-27 | 1.490 | G2/Gov't-Cultural | X | Oneida | | Town of Vernon | | Stockbridge Valley |
| 138 | 283.000-1-1.3 | 3.200 | G2 | | Oneida | | Town of Verona | | Oneida City |
| 139 | 282.000-1-3 | 1.203 | G2 | | Oneida | | Town of Verona | | Oneida City |
| 140 | 282.000-1-2.2 | 25.530 | G2 | | Oneida | | Town of Verona | | Oneida City |
| 140 | 283.000-1-77 | 30.270 | G2 | | Oneida | | Town of Verona | | Oneida City |
| 140 | 283.000-1-1.2 | 175.400 | G2 | | Oneida | | Town of Verona | | Oneida City |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 140 | 267.000-1-8 | 116.300 | G2 | | Oneida | Town of Verona | | Oneida City |
| 140 | 282.000-1-1 | 32.200 | G2 | | Oneida | Town of Verona | | Oneida City |
| 140 | 267.000-1-5 | 7.240 | G2 | | Oneida | Town of Verona | | Oneida City |
| 140 | 267.000-1-6 | 72.265 | G2 | | Oneida | Town of Verona | | Oneida City |
| 140 | 267.000-1-7 | 2.540 | G2 | | Oneida | Town of Verona | | Oneida City |
| 141 | 7.79-1-81.1 | 0.250 | G2 | | Madison | Town of Lenox | | Canastota |
| 142 | 282.000-1-2.1 | 1.840 | G2 | | Oneida | Town of Verona | | Oneida City |
| 143 | 310.000-1-16 | 2.495 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 144 | 298.002-3-17 | 6.572 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 144 | 298.002-3-16.3 | 1.700 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 144 | 298.002-3-16 | 0.390 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 145 | 13.23-1-5 | 4.955 | G2 | | Madison | Town of Lenox | | Canastota |
| 145 | 13.23-1-6 | 13.020 | G2 | | Madison | Town of Lenox | | Canastota |
| 145 | 13.23-1-7 | 0.784 | G2 | | Madison | Town of Lenox | | Canastota |
| 146 | 37.44-1-1 | 3.300 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 146 | 37.44-1-1.1 | 1.940 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 146 | 37.44-2-2 | 3.276 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 148 | 37.44-2-1 | 2.200 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 147 | 267.000-1-37.1 | 131.760 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 148 | 311.000-2-24.1 | 73.135 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 148 | 311.000-2-24.6 | 1.100 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 148 | 311.000-2-24.7 | 1.100 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 148 | 311.000-2-24.12 | 1.378 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 149 | 310.000-1-7 | 3.196 | G2/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 150 | 13.-1-37 | 52.200 | G2 | | Madison | Town of Lenox | Oneida City |
| 151 | 54.-2-6.1 | 62.386 | G3/Gov't-Cultural | X | Madison | Town of Stockbridge | Stockbridge Valley |
| 152 | 54.-2-3.13 | 2.237 | G3/Gov't-Cultural | X | Madison | Town of Stockbridge | Stockbridge Valley |
| 152 | 54.-2-3.62 | 0.500 | G3/Gov't-Cultural | X | Madison | Town of Stockbridge | Stockbridge Valley |
| 152 | 54.-2-3.12 | 80.177 | G3/Gov't-Cultural | X | Madison | Town of Stockbridge | Stockbridge Valley |
| 152 | 54.-2-8.22 | 40.290 | G3/Gov't-Cultural | X | Madison | Town of Stockbridge | Stockbridge Valley |
| 153 | 54.-2-8.12 | 59.869 | G3/Gov't-Cultural | X | Madison | Town of Stockbridge | Stockbridge Valley |
| 154 | 311.000-2-26 | 116.111 | G1/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 155 | 83.-1-2.2 | 1.140 | G3/Gov't-Cultural | X | Madison | Town of Stockbridge | Stockbridge Valley |
| 156 | 298.000-1-56.1 | 5.058 | G2/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 157 | 298.000-1-60.3 | 4.745 | G2/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 158 | 312.000-1-62.2 | 162.209 | G1/Casino-Resort | X | Oneida | Town of Vernon | Vernon-Verona-Sherrill |
| 159 | 19.-1-25 | 105.571 | G2 | | Madison | Town of Lenox | Canastota |
| 159 | 19.-1-27 | 105.114 | G2 | | Madison | Town of Lenox | Canastota |
| 160 | 18.-2-4 | 106.690 | G2 | | Madison | Town of Sullivan | Canastota |
| 161 | 18.-2-1 | 4.400 | G2 | | Madison | Town of Sullivan | Canastota |

# EXHIBIT E

STATE OF NEW YORK
SUPREME COURT         COUNTY OF MADISON

---

In the Matter of Foreclosure of Tax Liens by Action
In Rem Pursuant to Article Eleven of the Real Property
Tax Law                                              **STIPULATION**

               by                                   Index No. 03-999

THE COUNTY OF MADISON

---

The Oneida Nation of New York, and the County of Madison, by their respective counsel and pursuant to CPLR § 3217, hereby stipulate and agree to the dismissal of this action with regard to the ninety-eight (98) Nation-owned tax parcels listed in paragraph 1 of the Nation's Verified Answer filed in this action.

1. The Nation and Madison County have entered into an agreement resolving certain disputes between them, including disputes concerning real property taxation of Oneida Indian Nation-owned real property within the County.

2. As a result of the Agreement between the Oneida Indian Nation and Madison County, this action is moot.

3. The complaint, therefore, must be dismissed.

4. Each party shall bear its own costs.

Dated: _____, 2013

Respectfully submitted,

Signature Blocks for the Parties' Counsel

2

**EXHIBIT F**

> At a Motion Term of the Supreme Court
> of the State of New York, held in and for
> the County of Madison, at the Madison
> County Courthouse, Wampsville, New York
> on the _____ day of _____ _____, 2013

STATE OF NEW YORK
SUPREME COURT        COUNTY OF MADISON

In the Matters of the

ONEIDA INDIAN NATION OF NEW YORK,                    **STIPULATION AND ORDER**

Petitioner/Plaintiff,

-vs-

TANYA M. PIFER, as Assessor of the TOWN OF          Index No. 05-1532
LENOX, et al.,                                      RJI No. 05-0297-M

TANYA M. PIFER, as Assessor of the TOWN OF          Index No. 05-1534
STOCKBRIDGE, et al.                                 RLI No. 05-0295-M

TANYA M. PIFER, as Assessor of the TOWN OF          Index No. 05-1535
LINCOLN, et al.,                                    RLI No. 05-0294-M

RAYMOND A. MANN, as Assessor of the TOWN            Index No. 05-1536
OF SULLIVAN, et al.,                                RLI No. 05-0293-M.

PRISCILLA J. SUITS, as Assessor of the TOWN OF      Index No. 05-1537
FENNER, et al.,                                     RLI No. 05-0292-M

RHONDA M. WEIGAND, as Assessor of the TOWN          Index No. 05-1538
OF SMITHFIELD, et al., and                          RLI No. 05-0291-M

TANYA M. PIFER, as Assessor of the TOWN ON          Index No. 05-1606
LINCOLN, et al.                                     RLI No. 05-0323-M

Respondents/Defendants

## STIPULATION

Petitioner Oneida Indian Nation of New York (the "Nation") by its undersigned

counsel, and the County of Madison (the "County") by its undersigned counsel, hereby

stipulate and agree as follows:

1. As a result of an agreement entered into by the State of New York and the
   County of Madison on the ___ day of ___, 2013, the Oneida Nation is not
   liable for any past, present or future property tax with regard to any of the
   properties involved in these actions;

2. All of the claims for relief in this action are, therefore, moot;

3. The actions must be dismissed;

4. Each party shall bear its own costs and expenses.

Dated: June ___, 2013                     Respectfully submitted,

_____
Peter D. Carmen, Esq.
Meghan Murphy Beakman, Esq.
Oneida Nation Legal Department
Oneida Nation of New York
5218 Patrick Road
Verona, NY 13478
(315) 361-8687

Attorneys for Oneida Indian Nation of New
York

and

_____
David M. Schraver, Esq.
Nixon Peabody, LLP
Clinton Square
P.O. Box 31050
Rochester, NY 14603
(585) 263-1000

Attorneys for Madison County

SO ORDERED:

_____
Hon.
Justice of the Supreme Court

Dated: June _____, 2013
       Rome, New York

At a Motion Term of the Supreme Court
Of the State of New York, held in and for
the County of Oneida, at the Oneida
County Courthouse, Rome, New York on
the _____ day of _____, 2013

PRESENT:   HON.
           Supreme Court Justice, Presiding

STATE OF NEW YORK
SUPREME COURT    COUNTY OF ONEIDA

In the Matters of the

ONEIDA INDIAN NATION OF NEW YORK,                    STIPULATION
                                                     & ORDER
              Petitioner/Plaintiff,

        -vs-

FRANK LAGUZZA, CARL PERKINS and KEITH PITMAN,        Index No.
as Assessors of the TOWN OF VERNON, ET AL.,          CA2005-1543

                                                     RJI No.
                                                     32-05-0740

FRANK LAGUZZA, CARL PERKINS and KEITH PITMAN,        Index No.
as Assessors of the TOWN OF VERNON, ET AL.,          CA2005-1544

                                                     RJI No.
                                                     32-05-0741

DEAN F. BURTH, as Assessor of the TOWN OF VIENNA,    Index No.
ET AL.,                                              CA2005-1545

                                                     RJI No.
                                                     32-05-0754

MAURICE WARNER, as Assessor of the TOWN OF           Index No.
VERONA, ET AL.,                                      CA2005-1546

                                                     RJI No.
                                                     32-05-0759

| | |
|---|---|
| KEITH PITMAN, as Assessor of the CITY OF SHERRILL, ET AL., | Index No. CA2005-1547 |
| | RJI No. 32-05-0761 |
| AGNES M. WINN, as Assessor of the TOWN OF AUGUSTA, ET AL., | Index No. CA2005-1548 |
| | RJI No. 32-0509760 |
| MAURICE WARNER, as Assessor of the TOWN OF VERONA, ET AL., | Index No. CA2005-1549 |
| Respondents/Defendants. | |
| For a Judgment pursuant to Article 7 of the Real Property Tax Law and Article 78 and Section 2001 of the Civil Practice Law and Rules. | RJI No. 32-05-0738 |

## STIPULATION

Petitioner Oneida Indian Nation of New York (the "Nation") by its undersigned counsel, and the County of Oneida (the "County") by its undersigned counsel, hereby stipulate and agree as follows:

1. As a result of an agreement entered into by the State of New York and the County of Oneida on the ___ day of ____, 2013, the Oneida Nation is not liable for any past, present or future property tax with regard to any of the properties involved in these actions;

2. All of the claims for relief in this action are therefore moot;

3. These actions must, therefore, be dismissed;

4. Each party shall bear its own costs and expenses.

Dated: May _____, 2013                    Respectfully submitted,


                                           _____
                                           Peter D. Carmen, Esq.
                                           Meghan Murphy Beakman, Esq.
                                           Oneida Nation Legal Department
                                           Oneida Nation of New York
                                           5218 Patrick Road
                                           Verona, NY 13478
                                           (315) 361-8687

                                           Attorneys for Oneida Indian Nation of New
                                           York

                                                         and


                                           _____
                                           David M. Schraver, Esq.
                                           Nixon Peabody, LLP
                                           Clinton Square
                                           P.O. Box 31050
                                           Rochester, NY 14603
                                           (585) 263-1000

                                           Attorneys for Oneida County


SO ORDERED:


_____
Hon.
Justice of the Supreme Court

Dated: May _____, 2013
       Rome, New York

# EXHIBIT G

(under review)

(State issues)

**EXHIBIT H**

# ONEIDA COUNTY-ONEIDA NATION
## SPECIAL DEPUTIZATION AGREEMENT

WHEREAS the County of Oneida, New York ("the County") and the Oneida Nation of New York ("the Nation") are interested in assuring public safety through law enforcement that serves the needs of their respective County residents and Nation members;

WHEREAS the Nation has or may come into possession of land that is held by the Nation through fee ownership, some of which the Secretary of the Interior has agreed or may in the future agree to hold in trust in the name of the United States for the benefit of the Nation pursuant to federal law;

WHEREAS the Nation's land includes the land upon which the Turning Stone Resort & Casino is built, a facility used by tens of thousands of County residents and visitors to the County and at which thousands of Central New York residents are employed;

WHEREAS the Nation by Ordinance has established a Police force comprised of well-trained, highly-qualified personnel;

WHEREAS the Nation Police Department for years has had a productive history of cooperative law enforcement with the Oneida County Sheriff's Office; and

WHEREAS it is in the public interest for the Nation Police to enforce the laws of New York in appropriate circumstances, and thereby to protect and assure public safety;

NOW, THEREFORE, Oneida County, through the Oneida County Sherriff's Office and the Oneida Nation Police Department agree as follows in order to bolster public safety, eliminate any uncertainty about the authority of the Nation Police Department and increase the availability of trained police officers at no expense to the taxpayers:

1.      For the purpose of special deputization under this agreement, the "geographic area of employment," as that term is used in the New York Criminal Procedure Law (hereinafter "CPL"), of the Nation Police shall be land that is possessed by the Nation as a result of fee ownership and land held in trust for the Nation by the United States. This area includes but is not limited to Turning Stone Resort & Casino.

2.      The Oneida County Sheriff will provide a letter specially deputizing qualified officers of the Nation Police upon a request in writing from the Nation's Chief of Police. Said special deputization shall be limited to the "geographic area of employment" of the Nation Police, as defined hereinabove. A qualified officer is an officer currently certified by the New York State Division of Criminal Justice Services ("DCJS") as a police officer. For the purposes of this Agreement, a specially deputized officer shall be a police officer as that term is defined in CPL § 1.20(34)(b).

3.      Nation Police officers acting pursuant to their deputization under this agreement shall act within the requirements of CPL § 140.10 when making arrests for violations of the laws of the State of New York.

4.      Upon making an arrest, a specially deputized Nation Police Officer shall follow the procedures specified in CPL §§ 120.90 and 140.20 or shall deliver the arrested person promptly to an appropriate County law enforcement officer. Nation

2

Police involved in any arrest shall promptly provide all relevant information required for booking, charging, or trial and shall appear as witnesses at trial if called.

5.      Nation Policed officers acting pursuant to their deputization under this agreement shall act within the requirements of Article 35 of the New York Penal Law when using physical force.

6.      Any deputization made pursuant to this agreement shall expire upon the termination of any officer's employment by the Nation Police. The Nation shall inform the Oneida County Sheriff in writing of the termination of an officer's employment by the Nation Police as soon as reasonably possible.

7.      The Oneida County Sheriff may terminate the deputization of one or more officer of the Nation Police for good cause, including failure to maintain their certification by DCJS as a police officer, incompetence or misconduct of the officer. The Oneida County Sheriff shall inform the Nation in writing of the termination of the deputization of an officer as soon as reasonably possible.

8.      The Sheriff shall designate a liaison from the Sheriff's Office to coordinate with the chief law enforcement officer of the Nation Police, to ensure appropriate procedural protocols are implemented within the Nation Police Department's operations that are conducive to the Sheriff supporting and preserving deputization of the Nation Police.

9.      Specially deputized Nation Police Officers shall not hold themselves out as, or claim to be employees of the County of Oneida or the Oneida County Sheriff. Nothing in this agreement shall operate or be construed to make either the County of Oneida or the Oneida County Sheriff responsible for providing or bearing

3

the expense of providing any employment benefit, right, privilege or entitlement to specially deputized Nation Police Officers, including but not limited to worker's compensation, line of duty injury benefits and personal liability protection, unemployment insurance benefits, Social Security coverage or retirement membership credit.

10. Nothing contained in this agreement shall operate to exclude any federal, state, local or Nation law enforcement agency from exercising its lawful and proper jurisdiction at any place or time. Both the Oneida County Sheriff and the Oneida Nation Police shall be free to request assistance from or provide assistance to any other federal, state or local law enforcement agency at any place or time.

11. The Nation agrees to defend, indemnify and hold harmless Oneida County and the Oneida County Sheriff in the event and to the extent that any claim, action or lawsuit is brought against either of them, or any of their officers, deputies, agents, servants or employees, if such claim, action or lawsuit arises out of the act or omission of any member of the Nation Police specially deputized hereunder, but there shall be no such defense or indemnity to the extent that any such claim, action or lawsuit arises out of the negligent, intentional or otherwise wrongful or actionable act or omission of the County of Oneida, the Oneida County Sheriff, or any of their officers, deputies, agents, servants or employees.

12. The Nation agrees to waive its sovereign immunity, but only as explicitly described and limited herein, as to any arbitration by the County or the Oneida County Sheriff in his official capacity to specifically enforce this agreement or their rights to defense or indemnity under this agreement, and as to any monetary claim but

4

only to the extent of the insurance coverage required under this agreement, beyond which there is no waiver of sovereign immunity. The Nation further waives its immunity to an action in the United States District Court for the Northern District of New York to enforce any arbitration award made under the arbitration provisions in this agreement. The Nation expressly does not waive sovereign immunity as against any dispute other than a dispute arising under this agreement or as against any other persons or entities other than the County of Oneida and the Oneida County Sheriff. As to all other persons or entities and all other claims, the Nation expressly reserves its sovereign immunity.

13. The Nation agrees to provide the Oneida County Attorney with proof of liability insurance coverage, satisfactory to the Oneida County Attorney, wherein Oneida County and the Oneida County Sheriff are named as additional insureds for the purpose of protecting the insureds against liability on claims, actions and lawsuits for personal injuries or death, property damage and civil rights deprivations arising out of the acts or omissions of Nation Police Officer, and to provide that such coverage shall not be terminated without prior written notice to the County of Oneida and the Oneida County Sheriff of at least fifteen (15) days prior to said termination.

Specific Insurance minimum requirements shall consist of the following:

| | |
|---|---|
| Commercial General Liability: | $1,000,000.00 |
| Commercial Automobile Liability: | $1,000,000.00 |
| Law Enforcement Liability: | $1,000,000.00 |
| Excess/Umbrella Liability: | $10,000,000.00 |

All policies shall be written on an occurrence basis, shall include a waiver of subrogation and shall be subject to no deductible, self-insured retention or other form of

5

risk retention. If any policy is subject to a deductible or self-insured retention, the Nation shall be responsible for payment of any self-insured retention or deductible on any claim made with respect to those policies.

14.     With the exception stated in the last sentence of this paragraph, all disputes related to the subject matter of this Agreement shall be subject to mandatory arbitration by a panel of three arbitrators who shall follow the Commercial Arbitration Rules of the American Arbitration Association. The Nation shall select one arbitrator; Oneida County/the Oneida County Sherriff shall select another arbitrator; and the two arbitrators shall select the third arbitrator by agreement. Pursuant to the settlement agreement and stipulation and order of dismissal in *State of New York v. Salazar*, No. 6:08-cv-644 (LEK), the United States District Court of the Northern District of New York ("the District Court") shall have sole jurisdiction to compel arbitration and to enforce arbitration awards relating to this agreement or to its subject matter. Prior to commencing an arbitration proceeding, the parties agree to attempt to resolve the dispute through mediation, pursuant to the mediation procedure and timelines set forth in the above-referenced settlement agreement. This Agreement may be terminated only by the mutual agreement of the parties, expressed in a writing signed by the parties. However, the defense and indemnification obligations relating to acts or omissions prior to termination of the agreement shall survive such termination.

15.     Nothing in this agreement creates any third-party beneficiaries or third-party rights.

16.     This agreement may be executed in counterparts.

6

17.     This is a fully integrated agreement containing all the parties'

agreements. It may not be modified except in a writing signed by the party to be charged.

ENTERED INTO:   May___, 2013.

Oneida Nation Police Department                    Oneida County Sheriff's Office

_____                    _____
Joseph Smith                                       Robert M. Maciol
Chief of Police                                    Sheriff

Approved:     May____, 2013

Oneida Nation of New York                          Oneida County, New York

_____                    _____
Ray Halbritter                                     Antony J. Picente, Jr.
Nation Representative                              County Executive

7

# EXHIBIT I

ONEIDA RESERVATION

FIGURE
1.1-3

**EXHIBIT J**

(under review)

(State issues)

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 162 | 18.-1-14 | 23.559 | G3 | | Madison | | Town of Sullivan | Canastota |
| 183 | 18.-1-9.1 | 45.919 | G3 | | Madison | | Town of Sullivan | Canastota |
| 184 | 289.000-1-26 | 0.305 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 185 | 310.000-2-13 | 1.871 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 186 | 46.-1-5.11 | 117.140 | G3/Gov't-Cultural | x | Madison | Oneida | City of Oneida | Oneida City |
| 186 | 46.-1-4.1 | 31.270 | G3/Gov't-Cultural | x | Madison | Oneida | City of Oneida | Oneida City |
| 187 | 55.-2-21.11 | 66.176 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 187 | 55.-2-22 | 3.930 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 168 | 84.-1-2 | 125.140 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 186 | 84.-1-3.1 | 29.870 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 186 | 84.-1-8 | 73.727 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 188 | 84.-1-17 | 38.600 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 168 | 84.-1-3.2 | 27.670 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 188 | 84.-1-18 | 84.136 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 186 | 84.-1-24.1 | 40.543 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 168 | 84.-1-24.31 | 9.879 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 168 | 84.-1-35 | 5.310 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |
| 169 | 73.-1-4 | 105.838 | G3 | | Madison | | Town of Stockbridge | Stockbridge Valley |
| 170 | 324.000-1-70 | 0.874 | G1/Casino-Resort | x | Oneida | | Town of Vernon | Vernon-Verona-Sherrill |
| 171 | 74.-1-18.1 | 279.847 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | Stockbridge Valley |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 171 | 74.-1-9 | 88.890 | G3/Gov't-Cultural | x | Madison | Town of Stockbridge | | Stockbridge Valley |
| 171 | 74.1-1-17 | 87.460 | G3/Gov't-Cultural | x | Madison | Town of Stockbridge | | Madison |
| 171 | 74.-1-19 | 87.930 | G3/Gov't-Cultural | x | Madison | Town of Stockbridge | | Madison |
| 171 | 74.-1-18 | 42.470 | G3/Gov't-Cultural | x | Madison | Town of Stockbridge | | Madison |
| 172 | 361.000-1-8 | 126.685 | G3/Gov't-Cultural | x | Oneida | Town of Augusta | | Madison |
| 172 | 361.000-1-1.2 | 128.180 | G3/Gov't-Cultural | x | Oneida | Town of Augusta | | Madison |
| 173 | 83.-1-18 | 98.582 | G3/Gov't-Cultural | x | Madison | Town of Stockbridge | | Stockbridge Valley |
| 174 | 83.-1-6.1 | 40.186 | G3 | | Madison | Town of Stockbridge | | Stockbridge Valley |
| 175 | 324.013-1-18 | 1.409 | G2/Casino-Resort | x | Oneida | Village of Vernon | Vernon | Vernon-Verona-Sherrill |
| 176 | 297.000-1-17 | 70.783 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 176 | 297.000-1-23 | 11.700 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 176 | 297.000-1-16 | 32.700 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 177 | 310.000-1-23 | 1.490 | G2/Casino-Resort | x | Oneida | Town of Verona | | Oneida City |
| 177 | 310.000-1-24 | 2.195 | G2/Casino-Resort | x | Oneida | Town of Verona | | Oneida City |
| 177 | 310.000-1-22 | 1.818 | G2/Casino-Resort | x | Oneida | Town of Verona | | Oneida City |
| 178 | 54.-1-31 | 8.002 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | Stockbridge Valley |
| 179 | 310.000-2-8 | 1.837 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 180 | 298.002-3-22 | 0.732 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 181 | 310.000-2-4 | 1.240 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 182 | 310.000-2-3.2 | 1.033 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| # | Parcel ID | Acres | Code | X | County | Town | Village | School District |
|---|---|---|---|---|---|---|---|---|
| 183 | 323.012-1-39 | 1.149 | G2/Casino-Resort | x | Oneida | Village of Vernon | Vernon | Vernon-Verona-Sherrill |
| 183 | 323.008-1-1.1 | 3.000 | G2/Casino-Resort | x | Oneida | Village of Vernon | Vernon | Vernon-Verona-Sherrill |
| 184 | 323.000-1-34.3 | 12.030 | G3/Casino-Resort | x | Oneida | Town of Vernon | | Vernon-Verona-Sherrill |
| 184 | 323.000-1-34.5 | 85.526 | G3/Casino-Resort | x | Oneida | Town of Vernon | | Vernon-Verona-Sherrill |
| 185 | 13.-1-1.11 | 88.870 | G3 | | Madison | Town of Lenox | | Canastota |
| 185 | 13.-1-1.13 | 4.900 | G3 | | Madison | Town of Lenox | | Canastota |
| 185 | 12.-2-25.12 | 60.780 | G3 | | Madison | Town of Lenox | | Canastota |
| 186 | 298.000-1-51 | 1.721 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 186 | 298.000-1-50.11 | 17.647 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 187 | 310.000-1-6 | 8.415 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 188 | 310.000-2-6 | 1.315 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 189 | 299.000-1-31.2 | 1.032 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 190 | 299.000-1-31.1 | 131.230 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 190 | 299.000-1-25 | 34.723 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 191 | 13.-1-1.14 | 12.588 | G3 | | Madison | Town of Lenox | | Canastota |
| 192 | 310.000-2-3.1 | 6.881 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 193 | 298.002-3-4.3 | 16.893 | G1/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 194 | 285.000-1-31 | 8.590 | G2/Casino-Resort | x | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 195 | 7.79-1-81.2 | 0.047 | G2 | | Madison | Town of Lenox | | Canastota |
| 196 | 83.-1-3 | 0.918 | G3/Gov't-Cultural | x | Madison | Town of Stockbridge | | Stockbridge Valley |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| # | Parcel | Acreage | Classification | | County | | Town | | Municipality |
|---|---|---|---|---|---|---|---|---|---|
| 197 | 310.000-2-2 | 2.056 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 198 | 35.8-1-5 | 19.810 | G2 | | Madison | | Village of Canastota | Canastota | Canastota |
| 199 | 284.000-1-26 | 0.174 | G2/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 200 | 89-1-5 | 128.243 | G3 | | Madison | | Town of Smithfield | | Morrisville |
| 201 | 312.000-1-1 | 82.883 | G1/Casino-Resort | x | Oneida | | Town of Vernon | | Vernon-Verona-Sherrill |
| 202 | 310.000-2-7 | 0.803 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 203 | 298.002-2-2 | 1.673 | G2/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 203 | 298.002-2-1 | 0.610 | G2/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 204 | 13.22-1-3 | 0.566 | G3 | | Madison | | Town of Lenox | | Canastota |
| 205 | 239.000-2-31 | 106.071 | G2 | | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 206 | 288.000-1-31 | 193.382 | G3 | | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 208 | 288.000-1-18 | 7.000 | G3 | | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 207 | 54.-1-29.1 | 1.250 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Oneida City |
| 208 | 54.-1-32.1 | 15.675 | G2/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Stockbridge Valley |
| 209 | 55.-1-4.1 | 8.430 | G3/Gov't-Cultural | x | Madison | Oneida | City of Oneida | | Stockbridge Valley |
| 210 | 56.-2-5.11 | 125.773 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 211 | 65.-2-7 | 139.450 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 212 | 55.-2-8.1 | 110.630 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 213 | 84.-1-1 | 90.468 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 214 | 64.-1-13.1 | 81.822 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | | Stockbridge Valley |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 215 | 13.22-1-11 | 0.148 | G2 | | Madison | Town of Lenox | | Canastota |
| 216 | 13.22-1-8 | 2.199 | G2 | | Madison | Town of Lenox | | Canastota |
| 217 | 13.22-1-7 | 0.490 | G2 | | Madison | Town of Lenox | | Canastota |
| 218 | 13.22-1-6 | 0.890 | G2 | | Madison | Town of Lenox | | Canastota |
| 219 | 13.5-1-10 | 4.522 | G2 | | Madison | Town of Lenox | | Canastota |
| 220 | 270.000-1-23 | 157.800 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 221 | 270.000-1-33.3 | 121.014 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 222 | 270.000-1-35.5 | 37.300 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 223 | 286.000-1-9 | 193.512 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 224 | 285.000-1-10 | 10.013 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 225 | 285.000-1-11 | 59.699 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 226 | 13.6-1-12 | 2.009 | G2 | | Madison | Town of Lenox | | Canastota |
| 227 | 54.-1-29 | 43.222 | G2/Gov't-Cultural | X | Madison | City of Oneida | Oneida | Oneida City |
| 228 | 271.000-3-65.1 | 282.581 | G3/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 229 | 38.57-1-15.2 | 0.183 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 230 | 297.000-1-37.2 | 51.218 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 231 | 38.55-1-14 | 1.092 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 232 | 262.015-2-48 | 0.904 | G2 | | Oneida | Town of Verona | | Oneida City |
| 233 | 299.000-1-50 | 0.918 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 234 | 310.000-3-48.1 | 2.784 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| ID | Parcel | Acreage | Code | X | County | Town/City | District | School |
|----|--------|---------|------|---|--------|-----------|----------|--------|
| 235 | 283.000-1-3 | 17.090 | G3 | | Oneida | Town of Verona | | Oneida City |
| 236 | 38.49-1-65 | 0.565 | G3 | | Madison | City of Oneida | Oneida | Oneida City |
| 237 | 38.49-1-67 | 0.564 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 238 | 298.000-1-53 | 4.245 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 239 | 283.000-1-7.1 | 88.620 | G3 | | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 239 | 283.000-1-8 | 70.000 | G3 | | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 239 | 283.000-1-59.1 | 86.090 | G3 | | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 239 | 283.000-1-82 | 40.040 | G3 | | Oneida | Town of Verona | | Oneida City |
| 240 | 324.000-1-7.2 | 85.991 | G1/Casino-Resort | X | Oneida | Town of Vernon | | Vernon-Verona-Sherrill |
| 240 | 324.000-1-7.1 | 43.145 | G1/Casino-Resort | X | Oneida | Town of Vernon | | Vernon-Verona-Sherrill |
| 241 | 13.22-1-9 | 0.175 | G2 | | Madison | Town of Lenox | | Canastota |
| 241 | 13.22-1-12 | 0.530 | G2 | | Madison | Town of Lenox | | Canastota |
| 242 | 310.000-1-8 | 7.218 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 243 | 38.57-1-15.3 | 0.130 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 244 | 312.000-1-82.1 | 182.579 | G1/Casino-Resort | X | Oneida | Town of Vernon | | Vernon-Verona-Sherrill |
| 244 | 312.000-1-63.1 | 10.150 | G1/Casino-Resort | X | Oneida | Town of Vernon | | Vernon-Verona-Sherrill |
| 245 | 30.81-1-70 | 0.344 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 246 | 38.57-1-15 | 2.091 | G2 | | Madison | City of Oneida | Oneida | Oneida City |
| 247 | 298.000-1-17 | 26.981 | G2/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |
| 248 | 298.002-3-23 | 0.766 | G1/Casino-Resort | X | Oneida | Town of Verona | | Vernon-Verona-Sherrill |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 249 | 30.81-1-69 | 0.273 | G2 | | Madison | Oneida | City of Oneida | Oneida City |
| 250 | 38.62-1-3 | 0.743 | G2 | | Madison | Oneida | City of Oneida | Oneida City |
| 251 | 283.000-1-1.1 | 1.000 | G2 | | Oneida | | Town of Verona | Oneida City |
| 252 | 298.000-1-20 | 3.127 | G2/Casino-Resort | X | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 253 | 298.000-1-15 | 20.054 | G2/Casino-Resort | X | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 254 | 299.000-1-52 | 0.918 | G2/Casino-Resort | X | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 255 | 70.-1-17 | 27.910 | G3 | | Madison | | Town of Fenner | Canastota |
| 255 | 61.-1-27 | 0.400 | G3 | | Madison | | Town of Lincoln | Canastota |
| 255 | 61.-1-28 | 12.290 | G3 | | Madison | | Town of Lincoln | Canastota |
| 256 | 252.011-2-2 | 14.873 | G2 | | Oneida | | Town of Verona | Oneida City |
| 256 | 252.012-1-1 | 11.200 | G2 | | Oneida | | Town of Verona | Oneida City |
| 258 | 252.015-2-30 | 15.467 | G2 | | Oneida | | Town of Verona | Oneida City |
| 257 | 299.001-1-48.2 | 37.376 | G1/Casino-Resort | X | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 258 | 38.57-1-19 | 0.454 | G2 | | Madison | Oneida | City of Oneida | Oneida City |
| 259 | 297.000-1-2 | 136.536 | G2/Casino-Resort | X | Oneida | | Town of Verona | Oneida City |
| 259 | 287.001-1-5.2 | 25.309 | G2/Casino-Resort | X | Oneida | | Town of Verona | Oneida City |
| 260 | 299.000-1-45 | 0.918 | G2/Casino-Resort | X | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 261 | 310.000-2-16 | 0.866 | G1/Casino-Resort | X | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 262 | 310.000-2-28.2 | 0.490 | G1/Casino-Resort | X | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 263 | 310.000-2-26.1 | 26.850 | G1/Casino-Resort | X | Oneida | | Town of Verona | Vernon-Verona-Sherrill |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 283 | 310.000-2-28 | 31.080 | G1/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 284 | 271.000-3-58 | 90.340 | G2/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 285 | 371.000-2-32.1 | 0.244 | G2 | | Oneida | Town of Augusta | Madison |
| 285 | 371.000-2-31 | 0.683 | G2 | | Oneida | Town of Augusta | Madison |
| 266 | 299.000-1-46 | 0.916 | G2/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 267 | 310.000-2-15.1 | 1.887 | G1/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 268 | 298.000-1-12 | 159.860 | G2/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 268 | 298.000-1-13.2 | 11.386 | G2/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 268 | 298.000-1-13.1 | 21.000 | G2/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 268 | 285.000-1-21 | 5.000 | G2/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 268 | 285.000-1-22 | 54.394 | G2/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 269 | 310.000-2-18 | 8.865 | G1/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 270 | 310.000-2-27 | 4.151 | G1/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 271 | 299.000-1-5 | 15.931 | G2/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 272 | 311.000-1-14.2 | 53.301 | G1/Casino-Resort | x | Oneida | Town of Vernon | Vernon-Verona-Sherrill |
| 273 | 310.000-3-52 | 55.546 | G1/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 273 | 310.000-2-24 | 9.867 | G1/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 274 | 310.000-3-53.3 | 22.053 | G1/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 274 | 310.000-3-53.3 | 89.221 | G1/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 275 | 311.000-2-25.2 | 5.206 | G2/Casino-Resort | x | Oneida | Town of Verona | Vernon-Verona-Sherrill |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 276 | 311.000-2-24.14 | 14.932 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 277 | 310.000-2-17 | 0.807 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 278 | 311.000-2-21.2 | 4.249 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 278 | 311.000-2-21.8 | 14.574 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 279 | 299.000-1-22.1 | 106.530 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 280 | 310.000-2-14 | 1.877 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 281 | 322.014-1-22 | 0.251 | G3 | | Oneida | Sherrill | City of Sherrill | | Vernon-Verona-Sherrill |
| 282 | 85.-1-10 | 142.913 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 283 | 74.-1-16.5 | 10.000 | G3/Gov't-Cultural | x | Madison | | Town of Stockbridge | | Stockbridge Valley |
| 284 | 299.000-1-49 | 1.837 | G2/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 285 | 310.000-3-53.3 | 2.003 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 286 | 285.000-1-24 | 20.930 | G2/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 287 | 310.000-2-15.2 | 0.841 | G1/Casino-Resort | x | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 288 | 28.-1-77.1 | 5.050 | G2 | | Madison | | Town of Lenox | | Canastota |
| 288 | 28.-1-77.2 | 156.820 | G2 | | Madison | | Town of Lenox | | Canastota |
| 289 | 35.-1-28.1 | 20.283 | G2 | | Madison | | Town of Lenox | | Canastota |
| 290 | 35.8-1-6 | 18.249 | G2 | | Madison | | Village of Canastota | Canastota | Canastota |
| 291 | 46.-1-62.2 | 98.957 | G3/Gov't-Cultural | x | Madison | | Village of Canastota | Canastota | Canastota |
| 291 | 27.-3-23 | 4.920 | G3 | | Madison | | Town of Lenox | | Canastota |
| 291 | 27.-3-22 | 10.150 | G3 | | Madison | | Town of Lenox | | Canastota |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 291 | 27.-3-21 | 23.960 | G3 | | Madison | | Town of Lenox | Canastota |
| 291 | 27.-3-20 | 3.900 | G3 | | Madison | | Town of Lenox | Canastota |
| 291 | 27.20-1-6 | 116.243 | G3 | | Madison | Oneida | City of Oneida | Oneida City |
| 292 | 298.000-1-59.1 | 31.650 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 293 | 297.000-1-27.1 | 1.854 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 294 | 297.000-1-27.3 | 2.221 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 294 | 297.000-1-27.4 | 1.861 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 295 | 299.000-1-21 | 0.775 | G1/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 296 | 298.000-1-34.1 | 0.548 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 297 | 322.000-1-67.1 | 20.410 | G2 | | Oneida | | Town of Vernon | Oneida City |
| 298 | 311.000-1-13 | 6.063 | G1/Casino-Resort | x | Oneida | | Town of Vernon | Vernon-Verona-Sherrill |
| 299 | 38.49-1-69 | 0.367 | G2 | | Madison | Oneida | City of Oneida | Oneida City |
| 300 | 297.000-1-12.1 | 13.330 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 301 | 298.000-1-16 | 1.561 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 302 | 299.001-1-48.1 | 0.783 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 303 | 298.000-1-34.2 | 0.684 | G2/Casino-Resort | x | Oneida | | Town of Verona | Vernon-Verona-Sherrill |
| 304 | 54.-3-5.11 | 120.694 | G3/Gov't-Cultural | x | Madison | | Town of Lincoln | Stockbridge Valley |
| 304 | 83.-2-2 | 81.779 | G3/Gov't-Cultural | x | Madison | | Town of Lincoln | Stockbridge Valley |
| 305 | 252.015-2-35 | 4.051 | G2 | | Oneida | | Town of Verona | Oneida City |
| 305 | 252.015-2-34 | 1.200 | G2 | | Oneida | | Town of Verona | Oneida City |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 306 | 300.000-3-7.3 | 56.050 | G2/Casino-Resort | X | Oneida | Town of Verona | Vernon-Verona-Sherrill |
| 307 | 36.-1-26 | 9.437 | G2 | | Madison | Town of Lenox | Canastota |
| 308 | 252.016-2-47 | 0.334 | G2 | | Oneida | Town of Verona | Oneida City |
| 309 | 283.000-1-2 | 3.087 | G3 | | Oneida | Town of Verona | Oneida City |
| 310 | 92.-1-15.2 | 118.720 | G3 | | Madison | Town of Stockbridge | Stockbridge Valley |
| 310 | 92.-1-16 | 82.008 | G3 | | Madison | Town of Stockbridge | Stockbridge Valley |
| 310 | 83.-1-10 | 183.070 | G3 | | Madison | Town of Stockbridge | Stockbridge Valley |
| 310 | 83.-1-14.1 | 77.101 | G3 | | Madison | Town of Stockbridge | Stockbridge Valley |
| 311 | 28.-2-14 | 21.131 | G2 | | Madison | Town of Lenox | Canastota |
| 312 | 311.000-1-13 | 1.000 | G2/Casino-Resort | X | Oneida | Town of Vernon | Vernon-Verona-Sherrill |
| 313 | 252.012-1-2 | 0.245 | G2 | | Oneida | Town of Verona | Oneida City |
| 314 | 72.-1-1.21 | 2.756 | G3 | | Madison | Town of Smithfield | Morrisville |
| 314 | 72.-1-1.22 | 84.352 | G3 | | Madison | Town of Smithfield | Morrisville |
| 315 | 84.-1-15.2 | 159.886 | G3/Gov't-Cultural | X | Madison | Town of Smithfield | Stockbridge Valley |
| 315 | 72.-1-38 | 81.075 | G3 | | Madison | Town of Stockbridge | Stockbridge Valley |
| 316 | 324.000-1-75.4 | 25.820 | G1/Casino-Resort | X | Oneida | Town of Vernon | Vernon-Verona-Sherrill |
| 316 | 324.000-1-75.2 | 17.980 | G1/Casino-Resort | X | Oneida | Town of Vernon | Vernon-Verona-Sherrill |
| 317 | 92.-1-15.1 | 22.236 | G3 | | Madison | Town of Stockbridge | Stockbridge Valley |
| 318 | 252.016-2-48.1 | 0.248 | G2 | | Oneida | Town of Verona | Oneida City |
| 319 | 371.000-2-33 | 0.458 | G2 | | Oneida | Town of Augusta | Madison |

Case 1:13-cv-01100-LEK-DEP   Document 1-1   Filed 09/06/13   Page 121 of 261

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 319 | 371.000-2-30 | 0.190 | G2 | | Oneida | | Town of Augusta | | Madison |
| 320 | 310.000-2-12 | 3.448 | G1/Casino-Resort | X | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 321 | 284.000-1-32 | 22.705 | G2/Casino-Resort | X | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 322 | 47.-1-81 | 87.405 | G2/Gov't-Cultural | X | Madison | Oneida | City of Oneida | | Stockbridge Valley |
| 323 | 298.000-1-33 | 0.346 | G2/Casino-Resort | X | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 324 | 252.015-2-38 | 0.438 | G2 | | Oneida | | Town of Verona | | Oneida City |
| 325 | 263.000-1-17.1 | 184.350 | G2 | | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 325 | 237.000-3-8 | 19.350 | G2 | | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 325 | 254.000-1-2.1 | 42.100 | G2 | | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 326 | 252.007-3-32.2 | 6.130 | G2 | | Oneida | | Village of Sylvan Beach | Sylvan Beach | Oneida City |
| 326 | 252.007-3-32.272 | 0.000 | G2 | | Oneida | | Village of Sylvan Beach | Sylvan Beach | Oneida City |
| 326 | 252.007-3-32.287 | 0.000 | G2 | | Oneida | | Village of Sylvan Beach | Sylvan Beach | Oneida City |
| 326 | 252.007-3-32.269 | 0.000 | G2 | | Oneida | | Village of Sylvan Beach | Sylvan Beach | Oneida City |
| 326 | 252.007-3-32.270 | 0.000 | G2 | | Oneida | | Village of Sylvan Beach | Sylvan Beach | Oneida City |
| 326 | 252.007-3-29 | 0.313 | G2 | | Oneida | | Village of Sylvan Beach | Sylvan Beach | Oneida City |
| 326 | 252.007-3-30 | 0.168 | G2 | | Oneida | | Village of Sylvan Beach | Sylvan Beach | Oneida City |
| 327 | 252.012-1-24 | 0.609 | G2 | | Oneida | | Town of Vernon | | Oneida City |
| 328 | 323.000-1-40 | 8.390 | G1/Casino-Resort | X | Oneida | | Town of Vernon | | Vernon-Verona-Sherrill |
| 328 | 323.000-1-45 | 92.700 | G1/Casino-Resort | X | Oneida | | Town of Vernon | | Vernon-Verona-Sherrill |
| 329 | 36.5-1-7.5 | 3.280 | G2 | | Madison | | Village of Canastota | Canastota | Canastota |

Oneida NY Fee-to-Trust
Record of Decision
Appendix A

LIST OF LANDS TO BE ACQUIRED IN TRUST

| # | Parcel | Acres | G2 | | Madison | Oneida | | | |
|---|--------|-------|-----|---|---------|--------|---|---|---|
| 330 | 30.47-1-1.1 | 1.508 | G2 | | | | City of Oneida | | Oneida City |
| 331 | 288.000-3-47 | 2.088 | G2/Casino-Resort | X | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 331 | 288.000-3-44 | 2.000 | G2/Casino-Resort | X | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |
| 332 | 284.000-1-17 | 19.584 | G2/Casino-Resort | X | Oneida | | Town of Verona | | Vernon-Verona-Sherrill |

Totals: 17,370 (All Lands)   13,004 (Acquisition)

EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

STATE OF NEW YORK,

      Plaintiffs,

   v.

KENNETH L. SALAZAR, et al.,

      Defendants.

_____

6:08-cv-644 (LEK/GJD)

## STIPULATION AND ORDER OF DISMISSAL

   Pursuant to Fed. R. Civ. P. 41(a)(2), all Plaintiffs, the federal defendants and defendant-intervenor Oneida Nation of New York, stipulate to the dismissal of this action, upon an order of the Court on the terms contained in the form of order set forth below.

           Respectfully Submitted,

           Signature Blocks for the Parties' Counsel

So Ordered:

    Upon consideration of the foregoing stipulation, and finding that there is good cause to grant the stipulated dismissal of this action, and that it is proper to include certain terms in an order of dismissal, it is, accordingly, ORDERED that:

    (1) the Settlement Agreement attached hereto as Exhibit 1 is APPROVED;

    (2) the terms of the attached Settlement Agreement are incorporated into this Order;

    (3) this Court RETAINS JURISDICTION to enforce the Settlement Agreement; and

    (4) all Plaintiffs are DISMISSED AS PARTIES, and their claims are DISMISSED WITH PREJUDICE, each party to bear its own costs.

SIGNED and ENTERED this _____ day of _____, 2013.

                    _____
                    Lawrence E. Kahn
                    United States District Judge

2

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

(PROPOSED) AMENDED JUDGMENT IN A CIVIL CASE

ONEIDA INDIAN NATION,

    Plaintiff,

v.

MADISON COUNTY, NEW YORK,

    Defendant.

Case No.
5:00-cv-506 (DNH/GJD)

[ ]  Jury Verdict. This action came before the Court for trial by jury. The issues have been tried and the jury has rendered its verdict.

[x]  Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1. The judgment previously entered in this action on October 27, 2005, including the permanent injunctions contained therein, is vacated;

2. The Oneida Nation's motion for summary judgment is granted in part and denied in part;

3. Madison County's cross-motion for summary judgment is granted in part and denied in part;

4. Based on the terms of the Oneida Nation's waiver of sovereign immunity to property tax foreclosure with respect to reacquired lands, which was submitted to the United States Supreme Court in connection with this action and which is irrevocable, and on the Oneida Nation's representation to the Second Circuit that it would not assert the Nonintercourse Act, 25 U.S.C. § 177, as a bar to foreclosure with respect to such lands, the Oneida Nation's claims with respect to tribal sovereign immunity and the Nonintercourse Act are dismissed with prejudice;

5. The Oneida Nation's claims challenging the timing of Madison County's redemption notices on due process grounds are dismissed with prejudice;

6.  Because of the availability of a state court forum for resolution of the Oneida Nation's claims that it is entitled under New York law to exemptions from state and local property taxes, and also on the pendency of state court litigation, the Court declines to exercise supplemental jurisdiction over those claims and dismisses them without prejudice to their being brought in state court or adjudicated in existing state court proceedings;

7.  It is declared that the Oneida Nation is not liable by or through any assessment, collection, foreclosure, tax sale, elimination of redemption rights or transfer of title or property that is based in whole or in part on the Oneida Nation's non-payment of penalties or interest imposed because of the Nation's non-payment of real property taxes prior to March 29, 2005 or because of the non-payment of penalties and interest based on tax non-payment prior to March 29, 2005; and that any of the foregoing tax collection or enforcement steps that were based in whole or in part on non-payment of such penalties and interest prior to March 29, 2005 were void;

8.  Madison County's motion for abstention is denied; Madison County's motion for leave to file a Rule 19 motion to dismiss is denied; and Madison County's declaratory counterclaims are dismissed with prejudice; and

9.  It is declared that the Oneida Nation's reservation was not disestablished.

All in accordance with the Order of the Honorable David N. Hurd, United States District Judge, dated October 27, 2005, and the direction of the United States Court of Appeals for the Second Circuit in its decision on appeal on October 20, 2011, 665 F.3d 408 (2011).

May___, 2013

                                        _____

                                        Clerk of Court

# EXHIBIT D

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

(PROPOSED) AMENDED JUDGMENT IN A CIVIL CASE

ONEIDA INDIAN NATION,

                    Plaintiff,                    Case No.
                                                  6:05-cv-0945 (DNH/GJD)

           v.

ONEIDA COUNTY, NEW YORK

                    Defendant.

[]     Jury Verdict. This action came before the Court for trial by jury. The issues have been
           tried and the jury has rendered its verdict.

[x]     Decision by Court. This action came to trial or hearing before the Court. The issues
           have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1. The judgment previously entered in this action on June 2, 2006, and the amended
   judgment previously entered on November 2, 2006, including the permanent injunctions
   contained therein, are vacated;

2. The Oneida Nation's motion for summary judgment is granted in part and denied in part;

3. Oneida County's cross-motion for summary judgment is granted in part and denied in
   part;

4. Based on the terms of the Oneida Nation's waiver of sovereign immunity to property tax
   foreclosure with respect to reacquired lands, which was submitted to the United States
   Supreme Court in connection with this action and which is irrevocable, and on the
   Oneida Nation's representation to the Second Circuit that it would not assert the
   Nonintercourse Act, 25 U.S.C. § 177, as a bar to foreclosure with respect to such lands,
   the Oneida Nation's claims with respect to tribal sovereign immunity and the
   Nonintercourse Act are dismissed with prejudice;

5. The Oneida Nation's claims challenging the timing of Oneida County's redemption
   notices on due process grounds are dismissed with prejudice;

6. Because of the availability of a state court forum for resolution of the Oneida Nation's claims that it is entitled under New York law to exemptions from state and local property taxes, and also on the pendency of state court litigation, the Court declines to exercise supplemental jurisdiction over those claims and dismisses them without prejudice to their being brought in state court or adjudicated in existing state court proceedings;

7. It is declared that the Oneida Nation is not liable by or through any assessment, collection, foreclosure, tax sale, elimination of redemption rights or transfer of title or property that is based in whole or in part on the Oneida Nation's non-payment of penalties or interest imposed because of the Nation's non-payment of real property taxes prior to March 29, 2005 or because of the non-payment of penalties and interest based on tax non-payment prior to March 29, 2005; and that any of the foregoing tax collection or enforcement steps that were based in whole or in part on non-payment of such penalties and interest prior to March 29, 2005 were void;

8. Oneida County's motion for abstention is denied; the motion by the Stockbridge-Munsee Band of Mohican Indians to intervene is denied; and Oneida County's declaratory counterclaims are dismissed with prejudice; and

9. It is declared that the Oneida Nation's reservation was not disestablished.

All in accordance with the Orders of the Honorable David N. Hurd, United States District Judge, dated June 2, 2006 and November 2, 2006, and the direction of the United States Court of Appeals for the Second Circuit in its decision on appeal on October 20, 2011, 665 F.3d 408 (2011).

May ___, 2013

_____
Clerk of Court

2

# EXHIBIT G



# Bill A8112-2013

## Amends commercial gaming bill, as proposed in S. 5883 and A. 8101, to make provisions relating to casino gaming expenditures take effect immediately; repealer

Enacts chapter amendments to the commercial gaming bill, as proposed in S. 5883 and A. 8101, to make provisions relating to casino gaming expenditures take effect immediately and makes certain technical corrections to the effective date thereof; repeals the power of the New York state resort gaming facility location board to make determinations on whether tribal-state gaming compacts are in good standing; makes a technical correction to the penal law relating to casino gaming.

## Details

- Same as: S5904-2013
- Versions A8112-2013
- Sponsor:Pretlow
- Co-sponsor(s): Gunther
- Committee: RULES
- Law Section: Racing, Pari-Mutuel Wagering and Breeding Law
- Law: Rpld §1300 subs 9 & 15, §1306 sub 5, amd §§1300, 1306, 1340 & 1311, RWB L (as proposed in S. 5883 and A. 8101); amd §§225.00, Pen L (as proposed in S. 5883 and A. 8101); amd §52, Chap of 2013 (as proposed in S. 5883 and A. 8101); amd §§1612 & 1617-a, rpld §1612 sub b ¶1 sub b ¶1 sub¶ (ii) Cl (H), Cl (G) & Cl (G-1), Tax L (as proposed in S. 5883 and A. 8101)

## Actions

- Jul 30, 2013: signed chap.175
- Jul 30, 2013: delivered to governor
- Jun 21, 2013: RETURNED TO ASSEMBLY
- Jun 21, 2013: PASSED SENATE
- Jun 21, 2013: MESSAGE OF NECESSITY
- Jun 21, 2013: 3RD READING CAL.1592
- Jun 21, 2013: SUBSTITUTED FOR S5904
- Jun 21, 2013: REFERRED TO RULES
- Jun 21, 2013: delivered to senate
- Jun 21, 2013: passed assembly
- Jun 21, 2013: message of necessity - 3 day message
- Jun 20, 2013: ordered to third reading rules cal.713

- Jun 20, 2013: rules report cal.713
- Jun 20, 2013: reported
- Jun 20, 2013: reported referred to rules
- Jun 20, 2013: referred to ways and means

---

## Votes

### VOTE: FLOOR VOTE: - Jun 21, 2013

**Ayes (54):** Adams, Addabbo, Avella, Ball, Bonacic, Boyle, Breslin, Carlucci, DeFrancisco, Dilan, Farley, Felder, Flanagan, Fuschillo, Gallivan, Gianaris, Gipson, Golden, Griffo, Grisanti, Hannon, Hassell-Thomps, Kennedy, Klein, Lanza, Larkin, Latimer, Libous, Little, Marcellino, Marchione, Martins, Maziarz, Montgomery, O'Brien, O'Mara, Peralta, Ranzenhofer, Ritchie, Rivera, Robach, Sampson, Savino, Serrano, Seward, Skelos, Smith, Squadron, Stavisky, Stewart-Cousin, Tkaczyk, Valesky, Young, Zeldin

**Nays (9):** Diaz, Espaillat, Hoylman, Krueger, LaValle, Nozzolio, Parker, Perkins, Sanders

## Text

STATE OF NEW YORK

S. 5904                                                                        A. 8112

2013-2014 Regular Sessions

S E N A T E - A S S E M B L Y

June 20, 2013

IN SENATE -- Introduced by Sen. BONACIC -- (at request of the Governor)
-- read twice and ordered printed, and when printed to be committed to
the Committee on Rules

IN ASSEMBLY -- Introduced by M. of A. PRETLOW, GUNTHER -- (at request of
the Governor) -- read once and referred to the Committee on Ways and
Means

AN ACT to amend the racing, pari-mutuel wagering and breeding law, the
penal law and the tax law, in relation to commercial gaming; to amend
a chapter of the laws of 2013 amending the racing, pari-mutuel wager-
ing and breeding law and other laws relating to commercial gaming, as
proposed in legislative bill numbers S. 5883 and A. 8101, in relation
to the effective date of certain provisions thereof; to repeal certain
provisions of the racing, pari-mutuel wagering and breeding law relat-
ing to the tribes that have gaming compacts with the state; and to
repeal certain provisions of the tax law relating to disposition of
revenues

THE PEOPLE OF THE STATE OF NEW YORK, REPRESENTED IN SENATE AND ASSEM-
BLY, DO ENACT AS FOLLOWS:

Section 1. Subdivisions 9 and 15 of section 1300 of the racing, pari-
mutuel wagering and breeding law, as added by section 2 of a chapter of
the laws of 2013 amending the racing, pari-mutuel wagering and breeding
law and other laws relating to commercial gaming, as proposed in legis-
lative bill numbers S. 5883 and A. 8101, are REPEALED, and subdivisions
10, 11, 12, 13, 14 and 16 are renumbered subdivisions 9, 10, 11, 12, 13
and 14.

S 2. Subdivision 5 of section 1306 of the racing, pari-mutuel wagering
and breeding law, as added by section 2 of a chapter of the laws of 2013
amending the racing, pari-mutuel wagering and breeding law and other
laws relating to commercial gaming, as proposed in legislative bill

EXPLANATION--Matter in ITALICS (underscored) is new; matter in brackets
[ ] is old law to be omitted.

LBD12052-09-3

S. 5904                          2                          A. 8112

numbers S.5883 and A.8101, is REPEALED, and subdivisions 6, 7, 8, 9, 10
and 11 are renumbered subdivisions 5, 6, 7, 8, 9 and 10.

  S  3.  Subdivision  15 of section 225.00 of the penal law, as added by
section 3 of a chapter of the laws of 2013 amending the racing, pari-mu-
tuel wagering and breeding law and other  laws  relating  to  commercial
gaming,  as proposed in legislative bill numbers S. 5883 and A. 8101, is
amended to read as follows:

  15. "Casino gaming" means games authorized to be played pursuant to  a
license  granted under article thirteen of the racing, pari-mutuel wager-
ing and breeding law or by federally recognized Indian nations or tribes
pursuant  to  a  [valid]  gaming  compact reached in accordance with the
federal Indian Gaming Regulatory Act of 1988, Pub. L. 100-497, 102 Stat.
2467, codified at 25 U.S.C. SS 2701-21 and 18 U.S.C. SS 1166-68.

  S 4. Subdivision (f) of section 52 of a chapter of the  laws  of  2013
amending  the  racing,  pari-mutuel  wagering and breeding law and other
laws relating to commercial gaming, as proposed in  legislative  bill
numbers  S.  5883 and A. 8101, is amended and a new subdivision (a-1) is
added to read as follows:

  (A-1) NOTWITHSTANDING SUBDIVISION (A) OF THIS SECTION, SECTION  1330-A
OF  THE  RACING,  PARI-MUTUEL  WAGERING  AND  BREEDING LAW, AS ADDED BY
SECTION TWO OF THIS ACT, SHALL TAKE EFFECT IMMEDIATELY;

  (f) [section forty] SECTIONS FORTY-THREE through [forty-eight]  FIFTY-
ONE  of  this act shall take effect January 1, 2014; except that the New
York state gaming commission may  accept  and  review  applications  for
licenses  for  account  wagering  and  for  multi-jurisdictional account
wagering providers commencing on October 1, 2013.

  S 5. The opening paragraph, the second,  fourth,  fifth  undesignated
paragraphs  and  the opening paragraph of the 7th undesignated paragraph
of clause (G) of subparagraph (ii) of paragraph 1 of  subdivision  b  of
section  1612  of  the tax law, as amended by section 40 of a chapter of
the laws of 2013 amending the racing, pari-mutuel wagering and  breeding
law  and other laws relating to commercial gaming, as proposed in legis-
lative bill numbers S. 5883 and A. 8101, are amended to read as follows:

  notwithstanding clauses (A), (B),  (C),  (D),  (E)  and  (F)  of  this
subparagraph,  when no more than one vendor track located in the town of
Thompson in Sullivan county at the site of the former Concord Resort  at
which a qualified capital investment has been made and no fewer than one
thousand  full-time,  permanent  employees  have  been  newly hired, is
located in Sullivan county and is within sixty  miles  from  any  gaming
facility  in  a  contiguous  state, then for a period of forty years the
vendor's fee shall equal the total revenue wagered at the  vendor  track
after  payout  of  prizes  pursuant  to  this subdivision reduced by the
greater of (i) twenty-five percent of total  revenue  after  payout  for
prizes  for  "video  lottery games" or (ii) for the first eight years of
operation thirty-eight million dollars, and beginning in the ninth  year
of  operation  such  amount shall increase annually by the lesser of the
increase in the consumer price index or two percent, plus seven  percent
of  total  revenue after payout of prizes. In addition, in the event the
vendor fee is calculated pursuant to subclause (i) of this  clause,  the
vendor's  fee shall be further reduced by 11.11 percent of the amount by
which total revenue after payout for prizes exceeds two hundred  fifteen
million  dollars,  but  in  no event shall such reduction exceed five
million dollars.  [Provided, further, no vendor is  eligible  for  the
vendor's  fee  described  in  this  clause who operates or invests in or
owns, in whole or in part, another vendor license or is  licensed  as  a

S. 5904 — — — — — — 3 — — — — — A. 8112

~~vendor track that currently receives a vendor fee for the operation of~~
~~video lottery gaming pursuant to this article.]~~

Provided, however, that in the case of [a resort facility] NO MORE
THAN ONE VENDOR TRACK located IN THE TOWN OF THOMPSON in Sullivan county
AT THE SITE OF THE FORMER CONCORD RESORT with a qualified capital
investment, and one thousand full-time, permanent employees if at any
time after three years of opening operations of the licensed video
gaming facility OR LICENSED VENDOR TRACK, the [resort facility] VENDOR
TRACK experiences an employment shortfall, then the recapture amount
shall apply, for only such period as the shortfall exists.

For the purposes of this section, "full-time, permanent employee"
shall mean an employee who has worked at the video gaming facility,
VENDOR TRACK or related and adjacent facilities for a minimum of thir-
ty-five hours per week for not less than four consecutive weeks and who
is entitled to receive the usual and customary fringe benefits extended
to other employees with comparable rank and duties; or two part-time
employees who have worked at the video gaming facility, vendor track or
related and adjacent facilities for a combined minimum of thirty-five
hours per week for not less than four consecutive weeks and who are
entitled to receive the usual and customary fringe benefits extended to
other employees with comparable rank and duties.

For the purpose of this section "employment goal" shall mean one thou-
sand five hundred full-time permanent employees after three years of
opening operations of the licensed video gaming facility OR LICENSED
VENDOR TRACK.

For the purposes of this section "recapture amount" shall mean the
difference between the amount of the vendor's fee paid to a vendor TRACK
with a qualified capital investment, and the vendor fee otherwise paya-
ble to a vendor TRACK pursuant to clause (F) of this subparagraph, that
is reimbursable by the vendor track to the division for payment into the
state treasury, to the credit of the state lottery fund created by
section ninety-two-c of the state finance law, due to an employment
shortfall pursuant to the following schedule only for the period of the
employment shortfall:

S 6. Clause (H) of subparagraph (ii) of paragraph 1 of subdivision b
of section 1612 of the tax law, as added by section 40 of a chapter of
the laws of 2013 amending the racing, pari-mutuel wagering and breeding
law and other laws relating to commercial gaming, as proposed in legis-
lative bill numbers S. 5883 and A. 8101, is REPEALED.

S 7. Clauses (I) and (J) of subparagraph (ii) of paragraph 1 of subdi-
vision b of section 1612 of the tax law, as added by section 40 of a
chapter of the laws of 2013 amending the racing, pari-mutuel wagering
and breeding law and other laws relating to commercial gaming, as
proposed in legislative bill numbers S. 5883 and A. 8101, are amended to
read as follows:

[(I)] (H) notwithstanding clauses (A), (B), (C), (D), (E), (F)[,] and
[(G-1)] (G) of this subparagraph, the track operator of a vendor track
shall be eligible for a vendor's capital award of up to four percent of
the total revenue wagered at the vendor track after payout for prizes
pursuant to this chapter, which shall be used exclusively for capital
project investments to improve the facilities of the vendor track which
promote or encourage increased attendance at the video lottery gaming
facility including, but not limited to hotels, other lodging facilities,
entertainment facilities, retail facilities, dining facilities, events
arenas, parking garages and other improvements that enhance facility
amenities; provided that such capital investments shall be approved by

S. 5904                                4                             A. 8112

the division, in consultation with the state racing and wagering board,
and that such vendor track demonstrates that such capital expenditures
will increase patronage at such vendor track's facilities and increase
the amount of revenue generated to support state education programs. The
annual amount of such vendor's capital awards that a vendor track shall
be eligible to receive shall be limited to two million five hundred
thousand dollars, except for Aqueduct racetrack, for which there shall
be no vendor's capital awards. Except for tracks having less than one
thousand one hundred video gaming machines, each track operator shall be
required to co-invest an amount of capital expenditure equal to its
cumulative vendor's capital award. For all tracks, except for Aqueduct
racetrack, the amount of any vendor's capital award that is not used
during any one year period may be carried over into subsequent years
ending before April first, two thousand fourteen. Any amount attribut-
able to a capital expenditure approved prior to April first, two thou-
sand fourteen and completed before April first, two thousand sixteen
shall be eligible to receive the vendor's capital award. In the event
that a vendor track's capital expenditures, approved by the division
prior to April first, two thousand fourteen and completed prior to April
first, two thousand sixteen, exceed the vendor track's cumulative capi-
tal award during the five year period ending April first, two thousand
fourteen, the vendor shall continue to receive the capital award after
April first, two thousand fourteen until such approved capital expendi-
tures are paid to the vendor track subject to any required co-invest-
ment. In no event shall any vendor track that receives a vendor fee
pursuant to clause (F) or (G) of this subparagraph be eligible for a
vendor's capital award under this section. Any operator of a vendor
track which has received a vendor's capital award, choosing to divest
the capital improvement toward which the award was applied, prior to the
full depreciation of the capital improvement in accordance with general-
ly accepted accounting principles, shall reimburse the state in amounts
equal to the total of any such awards. Any capital award not approved
for a capital expenditure at a video lottery gaming facility by April
first, two thousand fourteen shall be deposited into the state lottery
fund for education aid; and

  [(J)] (I) Notwithstanding any provision of law to the contrary, free
play allowance credits authorized by the division pursuant to subdivi-
sion f of section sixteen hundred seventeen-a of this article shall not
be included in the calculation of the total amount wagered on video
lottery games, the total amount wagered after payout of prizes, the
vendor fees payable to the operators of video lottery facilities,
vendor's capital awards, fees payable to the division's video lottery
gaming equipment contractors, or racing support payments.

  S 8. Subparagraph (iii) of paragraph l of subdivision b of section
1612 of the tax law, as added by section 40 of a chapter of the laws of
2013 amending the racing, pari-mutuel wagering and breeding law and
other laws relating to commercial gaming, as proposed in legislative
bill numbers S. 5883 and A. 8101, is amended to read as follows:

  (iii) less an additional vendor's marketing allowance at a rate of ten
percent for the first one hundred million dollars annually and eight
percent thereafter of the total revenue wagered at the vendor track
after payout for prizes to be used by the vendor track for the marketing
and promotion and associated costs of its video lottery gaming oper-
ations and pari-mutuel horse racing operations, as long as any such
costs associated with pari-mutuel horse racing operations simultaneously
encourage increased attendance at such vendor's video lottery gaming

S. 5904                              5                         A. 8112

facilities, consistent with the customary manner of marketing comparable
operations in the industry and subject to the overall supervision of the
division; provided, however, that the additional vendor's marketing
allowance shall not exceed eight percent in any year for any operator of
a racetrack located in the county of Westchester or Queens; provided,
however, a vendor track that receives a vendor fee pursuant to clause
(G) of subparagraph (ii) of this paragraph shall not receive the addi-
tional vendor's marketing allowance provided, however, a vendor that
receives a vendor fee pursuant to clause (G-1) of subparagraph (ii) of
this paragraph shall receive an additional marketing allowance at a rate
of ten percent of the total revenue wagered at the video lottery gaming
facility after payout for prizes. [the division shall ensure the maxi-
mum lottery support for education while also ensuring the effective
implementation of section sixteen hundred seventeen-a of this article
through the provision of reasonable reimbursements and compensation to
vendor tracks for participation in such program. Within twenty days
after any award of lottery prizes, the division shall pay into the state
treasury, to the credit of the state lottery fund, the balance of all
moneys received from the sale of all tickets for the lottery in which
such prizes were awarded remaining after provision for the payment of
prizes as herein provided. Any revenues derived from the sale of adver-
tising on lottery tickets shall be deposited in the state lottery fund.]

  S 9. The opening paragraph of paragraph 2 of subdivision b of section
1612 of the tax law, as added by section 40 of a chapter of the laws of
2013 amending the racing, pari-mutuel wagering and breeding law and
other laws relating to commercial gaming, as proposed in legislative
bill numbers S. 5883 and A. 8101, is amended to read as follows:

  As consideration for the operation of a video lottery gaming facility,
the division, shall cause the investment in the racing industry of a
portion of the vendor fee received pursuant to paragraph one of this
subdivision in the manner set forth in this subdivision.    With the
exception of Aqueduct racetrack or a facility in the county of Nassau or
Suffolk operated by a corporation established pursuant to section five
hundred two of the racing, pari-mutuel wagering and breeding law [or a
facility in the county of Nassau or Suffolk operated by a corporation
established pursuant to section five hundred two of the racing, pari-mu-
tuel wagering and breeding law], each such track shall dedicate a
portion of its vendor fees, received pursuant to clause (A), (B), (C),
(D), (E), (F), or (G) of subparagraph (ii) of paragraph one of this
subdivision, solely for the purpose of enhancing purses at such track,
in an amount equal to eight and three-quarters percent of the total
revenue wagered at the vendor track after pay out for prizes. One
percent of such purse enhancement amount shall be paid to the gaming
commission to be used exclusively to promote and ensure equine health
and safety in New York. Any portion of such funding to the gaming
commission unused during a fiscal year shall be returned to the video
lottery gaming operators on a pro rata basis in accordance with the
amounts originally contributed by each operator and shall be used for
the purpose of enhancing purses at such track. In addition, with the
exception of Aqueduct racetrack OR A FACILITY IN THE COUNTY OF NASSAU OR
SUFFOLK OPERATED BY A CORPORATION ESTABLISHED PURSUANT TO SECTION FIVE
HUNDRED TWO OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW, one
and one-quarter percent of total revenue wagered at the vendor track
after pay out for prizes, received pursuant to clause (A), (B), (C),
(D), (E), (F), or (G) of subparagraph (ii) of paragraph one of this

S. 5904                                    6                                 A. 8112

subdivision, shall be distributed to the appropriate breeding fund for
the manner of racing conducted by such track.

  S 10. Subdivision (f-1) of section 1612 of the tax law, as added by
section 40 of a chapter of the laws of 2013 amending the racing, pari-
mutuel wagering and breeding law and other laws relating to commercial
gaming, as proposed in legislative bill numbers S. 5883 and A. 8101, is
amended to read as follows:

  [(f-1)] F-1. As consideration for operation of video lottery gaming
facility located in the county of Nassau [of] OR Suffolk and operated by
a corporation established pursuant to section five hundred two of the
racing, pari-mutuel wagering and breeding law, the division shall cause
the INVESTMENT in the racing industry of the following percentages of
the vendor fee to be deposited or paid as follows:

  [(1)] 1. Two and three tenths percent of the total wagered after
payout of prizes for the purpose of enhancing purses at Aqueduct race-
track, Belmont Park racetrack and Saratoga race course, provided, howev-
er, that any amount that is in excess of the amount necessary to main-
tain purse support from video lottery gaming at Aqueduct racetrack,
Belmont Park racetrack and Saratoga race course at the same level real-
ized [in] in two thousand thirteen, to be adjusted by the consumer price
index for all urban consumers, as published annually by the United
States department of LABOR, bureau of labor statistics, shall [be]
instead be returned to the commission.

  [(2)] 2. five tenths percent of the total wagered after payout of
prizes for the appropriate breeding fund for the manner of racing at
Aqueduct racetrack, Belmont Park racetrack and Saratoga race course,
provided, however, that any amount that is in excess of the amount
necessary to maintain payments from video lottery gaming at Aqueduct
racetrack at the same level realized [in] in two thousand thirteen, to
be adjusted by the consumer price index for all urban consumers, as
published annually by the United States department of LABOR, bureau of
labor statistics, shall [be] instead be returned to the commission.

  [(3)] 3. one and three tenths percent of the total revenue wagered
after payout of prizes to be deposited into an account of the franchised
corporation established pursuant to section two hundred six of the
racing, pari-mutuel wagering and breeding law to be used for capital
expenditures in maintaining and upgrading Aqueduct racetrack, Belmont
Park racetrack and Saratoga race course, provided, however, that any
amount that is in excess of the amount necessary to maintain payments
for capital expenditures from video lottery gaming at Aqueduct racetrack
at the same level realized [in] in two thousand thirteen, to be adjusted
by the consumer price index for all urban consumers, as published annu-
ally by the United States department of LABOR, bureau of labor statis-
tics, shall [be] instead be returned to the commission.

  [(4)] 4. Nine tenths percent of the total revenue wagered after payout
for prizes to be deposited into an account of the franchised corporation
established pursuant to section two hundred six of the racing, pari-mu-
tuel wagering and breeding law to be used for general thoroughbred
racing operations at Aqueduct racetrack, Belmont Park racetrack and
Saratoga race course, provided, however, that any amount that is in
excess of the amount necessary to maintain payments for general
thoroughbred racing operations from video lottery gaming at Aqueduct
racetrack at the same level realized [in] in two thousand thirteen, to
be adjusted by the consumer price index for all urban consumers, as
published annually by the United States department of LABOR, bureau of
labor statistics, shall [be] instead be returned to the commission.

S. 5904                                7                              A. 8112

S 11. The opening paragraph of the first clause (G) of subparagraph
(ii) of paragraph 1 of subdivision b of section 1612 of the tax law, as
amended by section 42 of a chapter of the laws of 2013 amending the
racing, pari-mutuel wagering and breeding law and other laws relating to
commercial gaming, as proposed in legislative bill numbers S. 5883 and
A. 8101, is amended to read as follows:

notwithstanding clauses (A), (B), (C), (D), (E) and (F) of this
subparagraph, when [a resort facility to be operated by other than a
presently licenced video lottery gaming operator or any entity affil-
iated therewith selected by the division following a competitive process
located] NOT MORE THAN ONE VENDOR TRACK LOCATED IN THE TOWN OF THOMPSON
in Sullivan county AT THE SITE OF THE FORMER CONCORD RESORT at which a
qualified capital investment has been made and no fewer than one thou-
sand full-time, permanent employees have been newly hired, is located in
Sullivan county and is within sixty miles from any gaming facility in a
contiguous state, then for a period of forty years the vendor's fee
shall equal the total revenue wagered at the vendor track after payout
of prizes pursuant to this subdivision reduced by the greater of (i)
twenty-five percent of total revenue after payout for prizes for "video
lottery games" or (ii) for the first eight years of operation thirty-
eight million dollars, and beginning in the ninth year of operation such
amount shall increase annually by the lesser of the increase in the
consumer price index or two percent, plus seven percent of total revenue
after payout of prizes. In addition, in the event the vendor fee is
calculated pursuant to subclause (i) of this clause, the vendor's fee
shall be further reduced by 11.11 percent of the amount by which total
revenue after payout for prizes exceeds two hundred fifteen million
dollars, but in no event shall such reduction exceed five million
dollars. PROVIDED, FURTHER, NO VENDOR IS ELIGIBLE FOR THE VENDOR'S FEE
DESCRIBED IN THIS CLAUSE WHO OPERATES OR INVESTS IN OR OWNS, IN WHOLE OR
IN PART, ANOTHER VENDOR LICENSE OR IS LICENSED AS A VENDOR TRACK THAT
CURRENTLY RECEIVES A VENDOR FEE FOR THE OPERATION OF VIDEO LOTTERY
GAMING PURSUANT TO THIS ARTICLE.

S 12. The second clause (G) of subparagraph (ii) of paragraph 1 of
subdivision b of section 1612 of the tax law, as amended by section 42
of a chapter of the laws of 2013 amending the racing, pari-mutuel wager-
ing and breeding law and other laws relating to commercial gaming, as
proposed in legislative bill numbers S. 5883 and A. 8101, is REPEALED.

S 13. Clause (G-1) of subparagraph (ii) of paragraph 1 of subdivision
b of section 1612 of the tax law, as amended by section 42 of a chapter
of the laws of 2013 amending the racing, pari-mutuel wagering and breed-
ing law and other laws relating to commercial gaming, as proposed in
legislative bill numbers S. 5883 and A. 8101, is REPEALED.

S 14. Paragraph 2 of subdivision b of section 1612 of the tax law, as
amended by section 42 of a chapter of the laws of 2013 amending the
racing, pari-mutuel wagering and breeding law and other laws relating to
commercial gaming, as proposed in legislative bill numbers S. 5883 and
A. 8101, is amended to read as follows:

2. As consideration for the operation of a video lottery gaming facil-
ity, the division, shall cause the investment in the racing industry of
a portion of the vendor fee received pursuant to paragraph one of this
subdivision in the manner set forth in this subdivision. With the
exception of Aqueduct racetrack AND A FACILITY LOCATED IN NASSAU COUNTY
AUTHORIZED PURSUANT TO PARAGRAPH FIVE OF SUBDIVISION A OF SECTION ONE
THOUSAND SIX HUNDRED SEVENTEEN-A OF THIS ARTICLE, each such track shall
dedicate a portion of its vendor fees, received pursuant to clause (A),

S. 5904                               8                            A. 8112

(B), (C), (D), (E), (F), or (G) of subparagraph (ii) of paragraph one of
this subdivision, solely for the purpose of enhancing purses at such
track, in an amount equal to eight and three-quarters percent of the
total revenue wagered at the vendor track after pay out for prizes. One
percent of such purse enhancement amount shall be paid to the gaming
commission to be used exclusively to promote and ensure equine health
and safety in New York. Any portion of such funding to the gaming
commission unused during a fiscal year shall be returned to the video
lottery gaming operators on a pro rata basis in accordance with the
amounts originally contributed by each operator and shall be used for
the purpose of enhancing purses at such track. In addition, with the
exception of Aqueduct racetrack AND A FACILITY LOCATED IN NASSAU COUNTY
AUTHORIZED PURSUANT TO PARAGRAPH FIVE OF SUBDIVISION A OF SECTION ONE
THOUSAND SIX HUNDRED SEVENTEEN-A OF THIS ARTICLE, one and one-quarter
percent of total revenue wagered at the vendor track after pay out for
prizes, received pursuant to clause (A), (B), (C), (D), (E), (F), or (G)
of subparagraph (ii) of paragraph one of this subdivision, shall be
distributed to the appropriate breeding fund for the manner of racing
conducted by such track.

     Provided, further, that nothing in this paragraph shall prevent each
track from entering into an agreement, not to exceed five years, with
the organization authorized to represent its horsemen to increase or
decrease the portion of its vendor fee dedicated to enhancing purses at
such track during the years of participation by such track, or to race
fewer dates than required herein.

     S 15. Subdivision (f-2) of section 1612 of the tax law, as added by
section 42 of a chapter of the laws of 2013 amending the racing, pari-
mutuel wagering and breeding law and other laws relating to commercial
gaming, as proposed in legislative bill numbers S. 5883 and A. 8101, is
amended to read as follows:

     [(f-2)] F-2. As consideration for operation of a video lottery gaming
facility located in the county of Nassau established pursuant to a
competitive process pursuant to paragraph [(5)] FIVE OF SUBDIVISION A of
section [six] ONE thousand [seventeen-a] SIX HUNDRED SEVENTEEN-A of this
article, the division shall cause the INVESTMENT in the racing industry
of the following percentages of the vendor fee to be deposited or paid
as follows:

     [(1)] 1. Two and three tenths percent of the total wagered after
payout of prizes for the purpose of enhancing purses at Aqueduct race-
track, Belmont Park racetrack and Saratoga race course, provided, howev-
er, that any amount that is in excess of the amount necessary to main-
tain purse support from video lottery gaming at Aqueduct racetrack,
Belmont Park racetrack and Saratoga race course at the same level real-
ized [in] in two thousand thirteen, to be adjusted by the consumer price
index for all urban consumers, as published annually by the United
States department of LABOR, bureau of labor statistics, shall [be]
instead be returned to the commission.

     [(2)] 2. five tenths percent of the total wagered after payout of
prizes for the appropriate breeding fund for the manner of racing at
Aqueduct racetrack, Belmont Park racetrack and Saratoga race course,
provided, however, that any amount that is in excess of the amount
necessary to maintain payments from video lottery gaming at Aqueduct
racetrack at the same level realized [in] in two thousand thirteen, to
be adjusted by the consumer price index for all urban consumers, as
published annually by the United States department of LABOR, bureau of
labor statistics, shall [be] instead be returned to the commission.

S. 5904                                  9                            A. 8112

[(3)] 3. one and three tenths percent of the total revenue wagered
after payout of prizes to be deposited into an account of the franchised
corporation established pursuant to section two hundred six of the
racing, pari-mutuel wagering and breeding law to be used for capital
expenditures in maintaining and upgrading Aqueduct racetrack, Belmont
Park racetrack and Saratoga race course, provided, however, that any
amount that is in excess of the amount necessary to maintain payments
for capital expenditures from video lottery gaming at Aqueduct racetrack
at the same level realized [in] in two thousand thirteen, to be adjusted
by the consumer price index for all urban consumers, as published annu-
ally by the United States department of LABOR, bureau of labor statis-
tics, shall [be] instead be returned to the commission.

[(4)] 4. Nine tenths percent of the total revenue wagered after payout
for prizes to be deposited into an account of the franchised corporation
established pursuant to section two hundred six of the racing, pari-mu-
tuel wagering and breeding law to be used for general thoroughbred
racing operations at Aqueduct racetrack, Belmont Park racetrack and
Saratoga race course, provided, however, that any amount that is in
excess of the amount necessary to maintain payments for general
thoroughbred racing operations from video lottery gaming at Aqueduct
racetrack at the same level realized [in] in two thousand thirteen, to
be adjusted by the consumer price index for all urban consumers, as
published annually by the United States department of LABOR, bureau of
labor statistics, shall [be] instead be returned to the commission.

    S 16. Subdivision 6 of section 1340 of the racing, pari-mutuel wager-
ing and breeding law, as added by section 2 of a chapter of the laws of
2013 amending the racing, pari-mutuel wagering and breeding law and
other laws relating to commercial gaming, as proposed in legislative
bill numbers S. 5883 and A. 8101, is amended to read as follows:

    6. Notwithstanding any provision of law to the contrary, any manufac-
turer or wholesaler licensed under the alcoholic beverage control law
may, as authorized under the alcoholic beverage control law, sell alco-
holic beverages to a gaming facility holding a retail license or permit
to sell alcoholic beverages for consumption on the premises issued under
this section, and any gaming facility holding a retail license or permit
to sell alcoholic beverages FOR CONSUMPTION ON THE PREMISES issued under
this section may, as authorized under the alcoholic beverage control
law, purchase alcoholic beverages from a manufacturer or wholesaler
licensed under the alcoholic beverage control law.

    S 17. Paragraph 3 of subdivision a of section 1617-a of the tax law,
as amended by section 32 of a chapter of the laws of 2013 amending the
racing, pari-mutuel wagering and breeding law and other laws relating to
commercial gaming, as proposed in legislative bill numbers S. 5883 and
A. 8101, is amended to read as follows:

    (3) at [facilities] ONE FACILITY PER REGION established, pursuant to a
competitive process to be determined by the state gaming commission
within regions one, two, and five of zone two as established by section
one thousand three hundred ten of the racing, pari-mutuel wagering and
breeding law following local governmental consultation and consideration
of market factors including potential revenue impact, anticipated job
development and capital investment to be made. The facilities authorized
pursuant to this paragraph shall be deemed vendors for all purposes
under this article, and need not be operated by licensed thoroughbred or
harness racing associations or corporations.

    S 18. Clause (G-1) of subparagraph (ii) of paragraph 1 of subdivision
b of section 1612 of the tax law, as added by section 40 of a chapter of

S. 5904                          10                          A. 8112

the laws of 2013 amending the racing, pari-mutuel wagering and breeding
law  and other laws relating to commercial gaming, as proposed in legis-
lative bill numbers S. 5883 and A. 8101, is amended to read as follows:

(G-1)  Notwithstanding clause (A) and (B) of this subparagraph, when a
video lottery gaming facility is located in either the county of  Nassau
or  Suffolk  and  is  operated  by a corporation established pursuant to
section five hundred two of the racing, pari-mutuel wagering and  breed-
ing law at a rate of thirty-five percent of the total revenue wagered at
the vendor [track] after payout for prizes pursuant to this chapter;

S  19. Clause (G-2) of subparagraph (ii) of paragraph 1 of subdivision
b of section 1612 of the tax law, as added by section 42 of a chapter of
the laws of 2013 amending the racing, pari-mutuel wagering and  breeding
law  and other laws relating to commercial gaming, as proposed in legis-
lative bill numbers S. 5883 and A. 8101, are amended to read as follows:

(G-2) Notwithstanding clause (A) and (B) of this subparagraph, when  a
video  lottery gaming facility is located in the county of Nassau estab-
lished pursuant to a competitive process  pursuant  to  paragraph  [(5)]
FIVE  OF  SUBDIVISION A of section [six] ONE thousand SIX HUNDRED seven-
teen-a of this article at a rate of thirty-five percent of  the  total
revenue  wagered  at the vendor [track] after payout for prizes pursuant
to this chapter;

S 20. Subdivision 1 of section 1311 of the racing, pari-mutuel  wager-
ing  and breeding law, as added by section 2 of a chapter of the laws of
2013 amending the racing, pari-mutuel wagering  and  breeding  law  and
other  laws  relating  to  commercial gaming, as proposed in legislative
bill numbers S. 5883 and A. 8101, is amended to read as follows:

1. The commission is authorized to award up to  four  gaming  facility
licenses, in regions one, two and five of zone two. The duration of such
initial  license shall be ten years. The term of renewal shall be deter-
mined by the commission.  The commission may award a second license to a
qualified applicant in no more than a single region.  The commission  is
not  empowered to award any license in zone one. No gaming facilities are
authorized  under  this  article  for  the city of New York or any other
portion of zone one.

As a condition of licensure, licensees are required to commence gaming
operations no [less] MORE than  twenty-four  months  following  license
award.  No  additional  licenses  may  be awarded during the twenty-four
month period, nor for an additional sixty months following  the  end  of
the  twenty-four month period. Should the state legislatively authorize
additional gaming facility licenses  within  these  periods,  licensees
shall  have the right to recover the license fee paid pursuant to section
one thousand three hundred six of this article.

This right  shall  be incorporated into the license itself, vest upon
the opening of a gaming facility in zone one or in the  same  region  as
the  licensee  and entitle the holder of such license to bring an action
in the court of claims to recover  the  license  fee  paid  pursuant  to
section  one thousand three hundred fifteen of this article in the event
that any gaming facility license in excess of the number  authorized  by
this  section as of the effective date of this section is awarded within
seven years from the date that the initial gaming  facility  license  is
awarded.    This right to recover any such fee shall be proportionate to
the length of the respective period that is  still  remaining  upon  the
vesting of such right.

Additionally,  the  right to bring an action in the court of claims to
recover the fee paid to the state on the twenty-fourth day of September,
two thousand ten, by the operator of a video lottery gaming facility  in

S. 5904                          11                        A. 8112

a  city  of more than one million shall vest with such operator upon the
opening of any gaming facility licensed by the commission  in  zone  one
within  seven  years  from  the  date  that  the initial gaming facility
license  is  awarded; provided however that the amount recoverable shall
be limited to the pro rata amount of the time remaining until the end of
the seven year exclusivity period, proportionate to the period  of  time
between  the  date  of  opening  of the video lottery facility until the
conclusion of the seven year period.

  S 21. This act shall take effect on the same  date  and  in  the  same
manner as a chapter of the laws of 2013 amending the racing, pari-mutuel
wagering  and breeding law and other laws relating to commercial gaming,
as proposed in legislative bill numbers  S.  5883  and  A.  8101,  takes
effect.

## Comments



This content is licensed under Creative Commons BY-NC-ND 3.0. Permissions beyond the scope of
this license are available here.

The software and services provided under this site are offered under the BSD License and the GPL
v3 License.

# EXHIBIT H



# Bill A8101-2013

## Enacts the upstate New York gaming economic development act of 2013

Enacts the upstate New York gaming economic development act of 2013.

## Details

- Same as: S5883-2013
- Versions A8101-2013
- Sponsor:Pretlow
- Co-sponsor(s): Gunther
- Committee: RULES
- Law Section: Racing, Pari-Mutuel Wagering and Breeding Law
- Law: Amd Various Laws, generally

## Actions

- Jul 30, 2013: signed chap.174
- Jul 30, 2013: delivered to governor
- Jun 21, 2013: RETURNED TO ASSEMBLY
- Jun 21, 2013: PASSED SENATE
- Jun 21, 2013: 3RD READING CAL.1590
- Jun 21, 2013: SUBSTITUTED FOR S5883
- Jun 21, 2013: REFERRED TO RULES
- Jun 21, 2013: delivered to senate
- Jun 21, 2013: passed assembly
- Jun 20, 2013: ordered to third reading rules cal.678
- Jun 20, 2013: rules report cal.678
- Jun 20, 2013: reported
- Jun 20, 2013: reported referred to rules
- Jun 20, 2013: reported referred to ways and means
- Jun 20, 2013: reported referred to codes
- Jun 18, 2013: referred to racing and wagering

## Votes

VOTE: FLOOR VOTE: - Jun 21, 2013

**Ayes (48):** Adams, Addabbo, Avella, Ball, Bonacic, Boyle, Breslin, Carlucci, Dilan, Farley, Flanagan, Fuschillo, Gallivan, Gianaris, Gipson, Golden, Griffo, Grisanti, Hannon, Hassell-Thomps, Kennedy, Klein, Lanza, Larkin, Latimer, Libous, Little, Marchione, Martins, Maziarz, Montgomery, O'Brien, O'Mara, Ranzenhofer, Ritchie, Robach, Savino, Serrano, Seward, Skelos, Smith, Squadron, Stavisky, Stewart-Cousin, Tkaczyk, Valesky, Young, Zeldin
**Nays (11):** DeFrancisco, Espaillat, Hoylman, Krueger, LaValle, Marcellino, Nozzolio, Parker, Perkins, Rivera, Sanders
**Absent (3):** Diaz, Peralta, Sampson
**Excused (1):** Felder

# Text

STATE OF NEW YORK

S. 5883                                         A. 8101

2013-2014 Regular Sessions

S E N A T E - A S S E M B L Y

June 18, 2013

IN SENATE -- Introduced by Sen. BONACIC -- (at request of the Governor)
-- read twice and ordered printed, and when printed to be committed to
the Committee on Rules

IN ASSEMBLY -- Introduced by M. of A. PRETLOW, GUNTHER -- (at request of
the Governor) -- read once and referred to the Committee on Racing and
Wagering

AN ACT to amend the racing, pari-mutuel wagering and breeding law, the
penal law and the state finance law, in relation to commercial gaming;
to amend the executive law, the state finance law and the Indian law,
in relation to authorizing the settlement of disputes between the
Oneida Nation of New York, the state, Oneida county and Madison coun-
ty; to amend the Indian law and the tax law, in relation to identify-
ing nations and tribes; to amend the tax law and the state finance
law, in relation to video lottery gaming; to amend part HH of chapter
57 of the laws of 2013 relating to providing for the administration of
certain funds and accounts related to the 2013-14 budget, in relation
to the commercial gaming revenue fund; to amend chapter 50 of the laws
of 2013 enacting the state operations budget, in relation to commer-
cial gaming revenues; to amend the racing, pari-mutual wagering and
breeding law, in relation to directing the state gaming commission to
annually evaluate video lottery gaming; to amend the racing, pari-mu-
tuel wagering and breeding law and the state finance law, in relation
to account wagering on simulcast horse races; to repeal section 11 of
the executive law relating to fuel and energy shortage state of emer-
gency; and to repeal clause (G) of subparagraph (ii) of paragraph 1 of
subdivision b of section 1612 of the tax law relating to vendor's fees

THE PEOPLE OF THE STATE OF NEW YORK, REPRESENTED IN SENATE AND ASSEM-
BLY, DO ENACT AS FOLLOWS:

Section 1. This act shall be known and may be cited as the "upstate
New York gaming economic development act of 2013."

EXPLANATION--Matter in ITALICS (underscored) is new; matter in brackets
[ ] is old law to be omitted.

LBD12052-02-3

S. 5883                           2                       A. 8101

    S  2.  The racing, pari-mutuel wagering and breeding law is amended by
adding a new article 13 to read as follows:
                         ARTICLE 13
                    DESTINATION RESORT GAMING
TITLE 1.  GENERAL PROVISIONS
       2.  FACILITY DETERMINATION AND LICENSING
       3.  OCCUPATIONAL LICENSING
       4.  ENTERPRISE AND VENDOR LICENSING AND REGISTRATION
       5.  REQUIREMENTS FOR CONDUCT AND OPERATION OF GAMING
       6.  TAXATION AND FEES
       7.  PROBLEM GAMBLING
       8.  MISCELLANEOUS PROVISIONS
       9.  GAMING INSPECTOR GENERAL
                           TITLE 1
                      GENERAL PROVISIONS
SECTION 1300. LEGISLATIVE FINDINGS AND PURPOSE.
          1301. DEFINITIONS.
          1302. AUDITING DUTIES OF THE COMMISSION.
          1303. EQUIPMENT TESTING.
          1304. COMMISSION REPORTING.
          1305. SUPPLEMENTAL POWER OF THE COMMISSION.
          1306. POWERS OF THE BOARD.
          1307. REQUIRED REGULATIONS.
          1308. REPORTS AND RECOMMENDATIONS.
          1309. SEVERABILITY AND PREEMPTION.
    S  1300.  LEGISLATIVE  FINDINGS  AND  PURPOSE.   THE LEGISLATURE HEREBY
FINDS AND DECLARES THAT:
    1. NEW YORK STATE IS ALREADY IN THE BUSINESS OF  GAMBLING  WITH  NINE
VIDEO  LOTTERY  FACILITIES,  FIVE  TRIBAL  CLASS  III CASINOS, AND THREE
TRIBAL CLASS II FACILITIES;
    2. NEW YORK STATE HAS MORE ELECTRONIC GAMING MACHINES THAN  ANY  STATE
IN THE NORTHEAST OR MIDEAST;
    3.  WHILE GAMBLING ALREADY EXISTS THROUGHOUT THE STATE, THE STATE DOES
NOT FULLY CAPITALIZE ON THE ECONOMIC DEVELOPMENT POTENTIAL OF  LEGALIZED
GAMBLING;
    4.  THE  STATE  SHOULD  AUTHORIZE  FOUR  DESTINATION RESORT CASINOS IN
UPSTATE NEW YORK;
    5. FOUR UPSTATE CASINOS CAN BOOST ECONOMIC DEVELOPMENT,  CREATE  THOU-
SANDS OF WELL-PAYING JOBS AND PROVIDE ADDED REVENUE TO THE STATE;
    6.  THE  UPSTATE  TOURISM INDUSTRY CONSTITUTES A CRITICAL COMPONENT OF
OUR STATE'S ECONOMIC INFRASTRUCTURE AND THAT FOUR UPSTATE  CASINOS  WILL
ATTRACT  NON-NEW  YORK  RESIDENTS  AND  BRING  DOWNSTATE  NEW YORKERS TO
UPSTATE;
    7. THE CASINO SITES AND THE  LICENSED  OWNERS  SHALL  BE  SELECTED  ON
MERIT;
    8.  LOCAL  IMPACT OF THE CASINO SITES WILL BE CONSIDERED IN THE CASINO
EVALUATION PROCESS;
    9. TRIBES WHOSE GAMING COMPACTS ARE IN GOOD STANDING  WITH  THE  STATE
WILL HAVE THEIR GEOGRAPHIC EXCLUSIVITY PROTECTED BY THIS ARTICLE;
    10.  REVENUE  REALIZED  FROM CASINOS SHALL BE UTILIZED TO INCREASE
SUPPORT FOR EDUCATION BEYOND THAT OF THE STATE'S EDUCATION FORMULAE  AND
TO PROVIDE REAL PROPERTY TAX RELIEF TO LOCALITIES;
    11.  CASINOS  WILL BE TIGHTLY AND STRICTLY REGULATED BY THE COMMISSION
TO GUARANTEE PUBLIC CONFIDENCE AND TRUST IN THE CREDIBILITY AND INTEGRI-
TY OF ALL CASINO GAMBLING IN THE STATE AND TO  PREVENT  ORGANIZED  CRIME
FROM ANY INVOLVEMENT IN THE CASINO INDUSTRY;

12. THE NEED FOR STRICT STATE CONTROLS EXTENDS TO REGULATION OF ALL
PERSONS, LOCATIONS, PRACTICES AND ASSOCIATIONS RELATED TO THE OPERATION
OF LICENSED ENTERPRISES AND ALL RELATED SERVICE INDUSTRIES AS PROVIDED
IN THIS ARTICLE;

13. THE STATE AND THE CASINOS WILL DEVELOP PROGRAMS AND RESOURCES TO
COMBAT COMPULSIVE AND PROBLEM GAMBLING;

14. THE STATE WILL ENSURE THAT HOST MUNICIPALITIES OF CASINOS ARE
PROVIDED WITH FUNDING TO LIMIT ANY POTENTIAL ADVERSE IMPACTS OF CASINOS;

15. POLITICAL CONTRIBUTIONS FROM THE CASINO INDUSTRY WILL BE MINIMIZED
TO REDUCE THE POTENTIAL OF POLITICAL CORRUPTION FROM CASINOS; AND

16. AS THOROUGHLY AND PERVASIVELY REGULATED BY THE STATE, FOUR UPSTATE
CASINOS WILL WORK TO THE BETTERMENT OF ALL NEW YORK.

S 1301. DEFINITIONS.   AS USED IN THIS ARTICLE THE FOLLOWING TERMS
SHALL, UNLESS THE CONTEXT CLEARLY REQUIRES OTHERWISE, HAVE THE FOLLOWING
MEANINGS:

1. "AFFILIATE". A PERSON THAT DIRECTLY OR INDIRECTLY, THROUGH ONE OR
MORE INTERMEDIARIES, CONTROLS OR IS CONTROLLED BY, OR IS UNDER COMMON
CONTROL WITH, A SPECIFIED PERSON.

2. "APPLICANT". ANY PERSON WHO ON HIS OR HER OWN BEHALF OR ON BEHALF
OF ANOTHER HAS APPLIED FOR PERMISSION TO ENGAGE IN ANY ACT OR ACTIVITY
WHICH IS REGULATED UNDER THE PROVISIONS OF THIS ARTICLE.

3. "APPLICATION". A WRITTEN REQUEST FOR PERMISSION TO ENGAGE IN ANY
ACT OR ACTIVITY WHICH IS REGULATED UNDER THE PROVISIONS OF THIS ARTICLE.

4. "AUTHORIZED GAME". ANY GAME DETERMINED BY THE COMMISSION TO BE
COMPATIBLE WITH THE PUBLIC INTEREST AND TO BE SUITABLE FOR CASINO USE
AFTER SUCH APPROPRIATE TEST OR EXPERIMENTAL PERIOD AS THE COMMISSION MAY
DEEM APPROPRIATE. AN AUTHORIZED GAME MAY INCLUDE GAMING TOURNAMENTS IN
WHICH PLAYERS COMPETE AGAINST ONE ANOTHER IN ONE OR MORE OF THE GAMES
AUTHORIZED HEREIN OR BY THE COMMISSION OR IN APPROVED VARIATIONS OR
COMPOSITES THEREOF IF THE TOURNAMENTS ARE AUTHORIZED.

5. "BOARD". THE NEW YORK STATE GAMING FACILITY LOCATION BOARD ESTAB-
LISHED BY THE COMMISSION PURSUANT TO SECTION ONE HUNDRED NINE-A OF THIS
CHAPTER.

6. "BUSINESS". A CORPORATION, SOLE PROPRIETORSHIP, PARTNERSHIP, LIMIT-
ED LIABILITY COMPANY OR ANY OTHER ORGANIZATION FORMED FOR THE PURPOSE OF
CARRYING ON A COMMERCIAL ENTERPRISE.

7. "CASINO". ONE OR MORE LOCATIONS OR ROOMS IN A GAMING FACILITY THAT
HAVE BEEN APPROVED BY THE COMMISSION FOR THE CONDUCT OF GAMING IN
ACCORDANCE WITH THE PROVISIONS OF THIS ARTICLE.

8. "CASINO KEY EMPLOYEE". ANY NATURAL PERSON EMPLOYED BY A GAMING
FACILITY LICENSEE, OR HOLDING OR INTERMEDIARY COMPANY OF A GAMING FACIL-
ITY LICENSEE, AND INVOLVED IN THE OPERATION OF A LICENSED GAMING FACILI-
TY IN A SUPERVISORY CAPACITY AND EMPOWERED TO MAKE DISCRETIONARY DECI-
SIONS WHICH REGULATE GAMING FACILITY OPERATIONS; OR ANY OTHER EMPLOYEE
SO DESIGNATED BY THE COMMISSION FOR REASONS CONSISTENT WITH THE POLICIES
OF THIS ARTICLE.

9. "CASINO VENDOR ENTERPRISE". ANY VENDOR OFFERING GOODS OR SERVICES
WHICH DIRECTLY RELATE TO CASINO OR GAMING ACTIVITY, OR ANY VENDOR
PROVIDING TO GAMING FACILITY LICENSEES OR APPLICANTS GOODS AND SERVICES
ANCILLARY TO GAMING ACTIVITY. NOTWITHSTANDING THE FOREGOING, ANY FORM OF
ENTERPRISE ENGAGED IN THE MANUFACTURE, SALE, DISTRIBUTION, TESTING OR
REPAIR OF SLOT MACHINES WITHIN THE STATE, OTHER THAN ANTIQUE SLOT
MACHINES, SHALL BE CONSIDERED A CASINO VENDOR ENTERPRISE FOR THE
PURPOSES OF THIS ARTICLE REGARDLESS OF THE NATURE OF ITS BUSINESS
RELATIONSHIP, IF ANY, WITH GAMING FACILITY APPLICANTS AND LICENSEES IN
THIS STATE.

10. "CLOSE ASSOCIATE". A PERSON WHO HOLDS A RELEVANT FINANCIAL INTER-
EST IN, OR IS ENTITLED TO EXERCISE POWER IN, THE BUSINESS OF AN APPLI-
CANT OR LICENSEE AND, BY VIRTUE OF THAT INTEREST OR POWER, IS ABLE TO
EXERCISE A SIGNIFICANT INFLUENCE OVER THE MANAGEMENT OR OPERATION OF A
GAMING FACILITY OR BUSINESS LICENSED UNDER THIS ARTICLE.

11. "COMMISSION". THE NEW YORK STATE GAMING COMMISSION.

12. "COMPLIMENTARY SERVICE OR ITEM". A SERVICE OR ITEM PROVIDED AT NO
COST OR AT A REDUCED COST TO A PATRON OF A GAMING FACILITY.

13. "CONSERVATOR". A PERSON APPOINTED BY THE COMMISSION TO TEMPORARILY
MANAGE THE OPERATION OF A GAMING FACILITY.

14. "CREDIT CARD". A CARD, CODE OR OTHER DEVICE WITH WHICH A PERSON
MAY DEFER PAYMENT OF DEBT, INCUR DEBT AND DEFER ITS PAYMENT, OR PURCHASE
PROPERTY OR SERVICES AND DEFER PAYMENT THEREFOR, BUT NOT A CARD, CODE OR
OTHER DEVICE USED TO ACTIVATE A PREEXISTING AGREEMENT BETWEEN A PERSON
AND A FINANCIAL INSTITUTION TO EXTEND CREDIT WHEN THE PERSON'S ACCOUNT
AT THE FINANCIAL INSTITUTION IS OVERDRAWN OR TO MAINTAIN A SPECIFIED
MINIMUM BALANCE IN THE PERSON'S ACCOUNT AT THE FINANCIAL INSTITUTION.

15. "DEBT". ANY LEGAL LIABILITY, WHETHER MATURED OR UNMATURED, LIQUI-
DATED OR UNLIQUIDATED, ABSOLUTE, FIXED OR CONTINGENT, INCLUDING DEBT
CONVERTIBLE INTO AN EQUITY SECURITY WHICH HAS NOT YET BEEN SO CONVERTED,
AND ANY OTHER DEBT CARRYING ANY WARRANT OR RIGHT TO SUBSCRIBE TO OR
PURCHASE AN EQUITY SECURITY WHICH WARRANT OR RIGHT HAS NOT YET BEEN
EXERCISED.

16. "ENCUMBRANCE". A MORTGAGE, SECURITY INTEREST, LIEN OR CHARGE OF
ANY NATURE IN OR UPON PROPERTY.

17. "EXECUTIVE DIRECTOR". THE EXECUTIVE DIRECTOR OF THE NEW YORK STATE
GAMING COMMISSION.

18. "FAMILY". SPOUSE, DOMESTIC PARTNER, PARTNER IN A CIVIL UNION,
PARENTS, GRANDPARENTS, CHILDREN, GRANDCHILDREN, SIBLINGS, UNCLES, AUNTS,
NEPHEWS, NIECES, FATHERS-IN-LAW, MOTHERS-IN-LAW, DAUGHTERS-IN-LAW,
SONS-IN-LAW, BROTHERS-IN-LAW AND SISTERS-IN-LAW, WHETHER BY THE WHOLE OR
HALF BLOOD, BY MARRIAGE, ADOPTION OR NATURAL RELATIONSHIP.

19. "GAME". ANY BANKING OR PERCENTAGE GAME LOCATED WITHIN THE GAMING
FACILITY PLAYED WITH CARDS, DICE, TILES, DOMINOES, OR ANY ELECTRONIC,
ELECTRICAL, OR MECHANICAL DEVICE OR MACHINE FOR MONEY, PROPERTY, OR ANY
REPRESENTATIVE OF VALUE WHICH HAS BEEN APPROVED BY THE COMMISSION.

20. "GAMING" OR "GAMBLING". THE DEALING, OPERATING, CARRYING ON,
CONDUCTING, MAINTAINING OR EXPOSING FOR PAY OF ANY GAME.

21. "GAMING DEVICE" OR "GAMING EQUIPMENT". ANY ELECTRONIC, ELECTRICAL,
OR MECHANICAL CONTRIVANCE OR MACHINE USED IN CONNECTION WITH GAMING OR
ANY GAME.

22. "GAMING EMPLOYEE". ANY NATURAL PERSON, NOT OTHERWISE INCLUDED IN
THE DEFINITION OF CASINO KEY EMPLOYEE, WHO IS EMPLOYED BY A GAMING
FACILITY LICENSEE, OR A HOLDING OR INTERMEDIARY COMPANY OF A GAMING
FACILITY LICENSEE, AND IS INVOLVED IN THE OPERATION OF A LICENSED GAMING
FACILITY OR PERFORMS SERVICES OR DUTIES IN A GAMING FACILITY OR A
RESTRICTED CASINO AREA; OR ANY OTHER NATURAL PERSON WHOSE EMPLOYMENT
DUTIES PREDOMINANTLY INVOLVE THE MAINTENANCE OR OPERATION OF GAMING
ACTIVITY OR EQUIPMENT AND ASSETS ASSOCIATED THEREWITH OR WHO, IN THE
JUDGMENT OF THE COMMISSION, IS SO REGULARLY REQUIRED TO WORK IN A
RESTRICTED CASINO AREA THAT REGISTRATION AS A GAMING EMPLOYEE IS APPRO-
PRIATE.

23. "GAMING FACILITY". THE PREMISES APPROVED UNDER A GAMING LICENSE
WHICH INCLUDES A GAMING AREA AND ANY OTHER NONGAMING STRUCTURE RELATED
TO THE GAMING AREA AND MAY INCLUDE, BUT SHALL NOT BE LIMITED TO, HOTELS,
RESTAURANTS OR OTHER AMENITIES.

S. 5883                                      5                                      A. 8101

24. "GAMING FACILITY LICENSE". ANY LICENSE ISSUED PURSUANT TO THIS
ARTICLE WHICH AUTHORIZES THE HOLDER THEREOF TO OWN OR OPERATE A GAMING
FACILITY.

25. "GROSS GAMING REVENUE". THE TOTAL OF ALL SUMS ACTUALLY RECEIVED BY
A GAMING FACILITY LICENSEE FROM GAMING OPERATIONS LESS THE TOTAL OF ALL
SUMS PAID OUT AS WINNINGS TO PATRONS; PROVIDED, HOWEVER, THAT THE TOTAL
OF ALL SUMS PAID OUT AS WINNINGS TO PATRONS SHALL NOT INCLUDE THE CASH
EQUIVALENT VALUE OF ANY MERCHANDISE OR THING OF VALUE INCLUDED IN A
JACKPOT OR PAYOUT; PROVIDED FURTHER, THAT THE ISSUANCE TO OR WAGERING BY
PATRONS OF A GAMING FACILITY OF ANY PROMOTIONAL GAMING CREDIT SHALL NOT
BE TAXABLE FOR THE PURPOSES OF DETERMINING GROSS REVENUE.

26. "HOLDING COMPANY". A CORPORATION, ASSOCIATION, FIRM, PARTNERSHIP,
TRUST OR OTHER FORM OF BUSINESS ORGANIZATION, OTHER THAN A NATURAL
PERSON, WHICH, DIRECTLY OR INDIRECTLY, OWNS, HAS THE POWER OR RIGHT TO
CONTROL, OR HAS THE POWER TO VOTE ANY SIGNIFICANT PART OF THE OUTSTAND-
ING VOTING SECURITIES OF A CORPORATION OR ANY OTHER FORM OF BUSINESS
ORGANIZATION WHICH HOLDS OR APPLIES FOR A GAMING LICENSE; PROVIDED,
HOWEVER, THAT A "HOLDING COMPANY", IN ADDITION TO ANY OTHER REASONABLE
USE OF THE TERM, SHALL INDIRECTLY HAVE, HOLD OR OWN ANY SUCH POWER,
RIGHT OR SECURITY IF IT DOES SO THROUGH AN INTEREST IN A SUBSIDIARY OR
ANY SUCCESSIVE SUBSIDIARIES, NOTWITHSTANDING HOW MANY SUCH SUBSIDIARIES
MAY INTERVENE BETWEEN THE HOLDING COMPANY AND THE GAMING FACILITY LICEN-
SEE OR APPLICANT.

27. "HOST MUNICIPALITY". A CITY, TOWN OR VILLAGE IN WHICH A GAMING
FACILITY IS LOCATED OR IN WHICH AN APPLICANT HAS PROPOSED LOCATING A
GAMING FACILITY.

28. "INTERMEDIARY COMPANY". A CORPORATION, ASSOCIATION, FIRM, PARTNER-
SHIP, TRUST OR OTHER FORM OF BUSINESS ORGANIZATION, OTHER THAN A NATURAL
PERSON, WHICH IS A HOLDING COMPANY WITH RESPECT TO A CORPORATION OR
OTHER FORM OF BUSINESS ORGANIZATION WHICH HOLDS OR APPLIES FOR A GAMING
LICENSE, AND IS A SUBSIDIARY WITH RESPECT TO A HOLDING COMPANY.

29. "JUNKET". AN ARRANGEMENT INTENDED TO INDUCE A PERSON TO COME TO A
GAMING FACILITY TO GAMBLE, WHERE THE PERSON IS SELECTED OR APPROVED FOR
PARTICIPATION ON THE BASIS OF THE PERSON'S ABILITY TO SATISFY A FINAN-
CIAL QUALIFICATION OBLIGATION RELATED TO THE PERSON'S ABILITY OR WILL-
INGNESS TO GAMBLE OR ON ANY OTHER BASIS RELATED TO THE PERSON'S PROPEN-
SITY TO GAMBLE AND PURSUANT TO WHICH AND AS CONSIDERATION FOR WHICH, ANY
OF THE COST OF TRANSPORTATION, FOOD, LODGING, AND ENTERTAINMENT FOR THE
PERSON IS DIRECTLY OR INDIRECTLY PAID BY A GAMING FACILITY LICENSEE OR
AN AFFILIATE OF THE GAMING FACILITY LICENSEE.

30. "JUNKET ENTERPRISE". A PERSON, OTHER THAN A GAMING FACILITY LICEN-
SEE OR AN APPLICANT FOR A GAMING FACILITY LICENSE, WHO EMPLOYS OR OTHER-
WISE ENGAGES THE SERVICES OF A JUNKET REPRESENTATIVE IN CONNECTION WITH
A JUNKET TO A LICENSED GAMING FACILITY, REGARDLESS OF WHETHER OR NOT
THOSE ACTIVITIES OCCUR WITHIN THE STATE.

31. "JUNKET REPRESENTATIVE". A PERSON WHO NEGOTIATES THE TERMS OF, OR
ENGAGES IN THE REFERRAL, PROCUREMENT OR SELECTION OF PERSONS WHO MAY
PARTICIPATE IN, A JUNKET TO A GAMING FACILITY, REGARDLESS OF WHETHER OR
NOT THOSE ACTIVITIES OCCUR WITHIN THE STATE.

32. "OPERATION CERTIFICATE". A CERTIFICATE ISSUED BY THE COMMISSION
WHICH CERTIFIES THAT OPERATION OF A GAMING FACILITY CONFORMS TO THE
REQUIREMENTS OF THIS ARTICLE AND APPLICABLE REGULATIONS AND THAT ITS
PERSONNEL AND PROCEDURES ARE SUFFICIENT AND PREPARED TO ENTERTAIN THE
PUBLIC.

S. 5883                                6                                A. 8101

33. "PERSON". ANY CORPORATION, ASSOCIATION, OPERATION, FIRM, PARTNER-
SHIP, TRUST OR OTHER FORM OF BUSINESS ASSOCIATION, AS WELL AS A NATURAL
PERSON.

34. "REGISTRATION". ANY REQUIREMENT OTHER THAN ONE WHICH REQUIRES A
LICENSE AS A PREREQUISITE TO CONDUCT A PARTICULAR BUSINESS AS SPECIFIED
BY THIS ARTICLE.

35. "REGISTRANT". ANY PERSON WHO IS REGISTERED PURSUANT TO THE
PROVISIONS OF THIS ARTICLE.

36. "RESTRICTED CASINO AREAS". THE CASHIER'S CAGE, THE SOFT COUNT
ROOM, THE HARD COUNT ROOM, THE SLOT CAGE BOOTHS AND RUNWAY AREAS, THE
INTERIOR OF TABLE GAME PITS, THE SURVEILLANCE ROOM AND CATWALK AREAS,
THE SLOT MACHINE REPAIR ROOM AND ANY OTHER AREA SPECIFICALLY DESIGNATED
BY THE COMMISSION AS RESTRICTED IN A LICENSEE'S OPERATION CERTIFICATE.

37. "QUALIFICATION" OR "QUALIFIED". THE PROCESS OF LICENSURE SET FORTH
BY THE COMMISSION TO DETERMINE THAT ALL PERSONS WHO HAVE A PROFESSIONAL
INTEREST IN A GAMING FACILITY LICENSE, OR CASINO VENDOR ENTERPRISE
LICENSE, OR THE BUSINESS OF A GAMING FACILITY LICENSEE OR GAMING VENDOR,
MEET THE SAME STANDARDS OF SUITABILITY TO OPERATE OR CONDUCT BUSINESS
WITH A GAMING FACILITY.

38. "SLOT MACHINE". A MECHANICAL, ELECTRICAL OR OTHER DEVICE, CONTRI-
VANCE OR MACHINE WHICH, UPON INSERTION OF A COIN, TOKEN OR SIMILAR
OBJECT THEREIN, OR UPON PAYMENT OF ANY CONSIDERATION WHATSOEVER, IS
AVAILABLE TO PLAY OR OPERATE, THE PLAY OR OPERATION OF WHICH, WHETHER BY
REASON OF THE SKILL OF THE OPERATOR OR APPLICATION OF THE ELEMENT OF
CHANCE, OR BOTH, MAY DELIVER OR ENTITLE THE INDIVIDUAL PLAYING OR OPER-
ATING THE MACHINE TO RECEIVE CASH, OR TOKENS TO BE EXCHANGED FOR CASH,
OR TO RECEIVE MERCHANDISE OR ANY OTHER THING OF VALUE, WHETHER THE
PAYOFF IS MADE AUTOMATICALLY FROM THE MACHINE OR IN ANY OTHER MANNER,
EXCEPT THAT THE CASH EQUIVALENT VALUE OF ANY MERCHANDISE OR OTHER THING
OF VALUE SHALL NOT BE INCLUDED IN DETERMINING THE PAYOUT PERCENTAGE OF A
SLOT MACHINE.

39. "SPORTS WAGERING". THE ACTIVITY AUTHORIZED BY SECTION ONE THOUSAND
THREE HUNDRED SIXTY-SEVEN OF THIS ARTICLE, PROVIDED THAT THERE HAS BEEN
A CHANGE IN FEDERAL LAW AUTHORIZING SUCH ACTIVITY OR UPON RULING OF A
COURT OF COMPETENT JURISDICTION THAT SUCH ACTIVITY IS LAWFUL.

40. "SUBSIDIARY". A CORPORATION, A SIGNIFICANT PART OF WHOSE OUTSTAND-
ING EQUITY SECURITIES ARE OWNED, SUBJECT TO A POWER OR RIGHT OF CONTROL,
OR HELD WITH POWER TO VOTE, BY A HOLDING COMPANY OR AN INTERMEDIARY
COMPANY, OR A SIGNIFICANT INTEREST IN A FIRM, ASSOCIATION, PARTNERSHIP,
TRUST OR OTHER FORM OF BUSINESS ORGANIZATION, OTHER THAN A NATURAL
PERSON, WHICH IS OWNED, SUBJECT TO A POWER OR RIGHT OF CONTROL, OR HELD
WITH POWER TO VOTE, BY A HOLDING COMPANY OR AN INTERMEDIARY COMPANY.

41. "TABLE GAME". A GAME, OTHER THAN A SLOT MACHINE, WHICH IS AUTHOR-
IZED BY THE COMMISSION TO BE PLAYED IN A GAMING FACILITY.

42. "TRANSFER". THE SALE OR OTHER METHOD, EITHER DIRECTLY OR INDIRECT-
LY, OF DISPOSING OF OR PARTING WITH PROPERTY OR AN INTEREST THEREIN, OR
THE POSSESSION THEREOF, OR OF FIXING A LIEN UPON PROPERTY OR UPON AN
INTEREST THEREIN, ABSOLUTELY OR CONDITIONALLY, VOLUNTARILY OR INVOLUN-
TARILY, BY OR WITHOUT JUDICIAL PROCEEDINGS, AS A CONVEYANCE, SALE,
PAYMENT, PLEDGE, MORTGAGE, LIEN, ENCUMBRANCE, GIFT, SECURITY OR OTHER-
WISE; PROVIDED, HOWEVER, THAT THE RETENTION OF A SECURITY INTEREST IN
PROPERTY DELIVERED TO A CORPORATION SHALL BE DEEMED A TRANSFER SUFFERED
BY SUCH CORPORATION.

S 1302. AUDITING DUTIES OF THE COMMISSION. THE COMMISSION SHALL AUDIT
AS OFTEN AS THE COMMISSION DETERMINES NECESSARY, BUT NOT LESS THAN ANNU-
ALLY, THE ACCOUNTS, PROGRAMS, ACTIVITIES, AND FUNCTIONS OF ALL GAMING

S. 5883                                7                           A. 8101

FACILITY LICENSEES, INCLUDING THE AUDIT OF PAYMENTS MADE PURSUANT TO
SECTION ONE THOUSAND THREE HUNDRED FIFTY-ONE OF THIS CHAPTER. TO
CONDUCT THE AUDIT, AUTHORIZED OFFICERS AND EMPLOYEES OF THE COMMISSION
SHALL HAVE ACCESS TO SUCH ACCOUNTS AT REASONABLE TIMES AND THE COMMIS-
SION MAY REQUIRE THE PRODUCTION OF BOOKS, DOCUMENTS, VOUCHERS AND OTHER
RECORDS RELATING TO ANY MATTER WITHIN THE SCOPE OF THE AUDIT. ALL AUDITS
SHALL BE CONDUCTED IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STAND-
ARDS ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNT-
ANTS. IN ANY AUDIT REPORT OF THE ACCOUNTS, FUNDS, PROGRAMS, ACTIVITIES
AND FUNCTIONS OF A GAMING FACILITY LICENSEE ISSUED BY THE COMMISSION
CONTAINING ADVERSE OR CRITICAL AUDIT RESULTS, THE COMMISSION MAY REQUIRE
A RESPONSE, IN WRITING, TO THE AUDIT RESULTS. THE RESPONSE SHALL BE
FORWARDED TO THE COMMISSION WITHIN FIFTEEN DAYS OF NOTIFICATION BY THE
COMMISSION.

   S 1303. EQUIPMENT TESTING. UNLESS THE COMMISSION OTHERWISE DETERMINES
IT TO BE IN THE BEST INTERESTS OF THE STATE, THE COMMISSION SHALL
UTILIZE THE SERVICES OF AN INDEPENDENT TESTING LABORATORY THAT HAS BEEN
QUALIFIED AND APPROVED BY THE COMMISSION PURSUANT TO THIS ARTICLE TO
PERFORM THE TESTING OF SLOT MACHINES AND OTHER GAMING EQUIPMENT AND MAY
ALSO UTILIZE APPLICABLE DATA FROM THE INDEPENDENT TESTING LABORATORY, OR
FROM A GOVERNMENTAL AGENCY OF A STATE OTHER THAN NEW YORK, AUTHORIZED TO
REGULATE SLOT MACHINES AND OTHER GAMING EQUIPMENT.

   S 1304. COMMISSION REPORTING. THE COMMISSION SHALL REPORT MONTHLY TO
THE GOVERNOR, THE SENATE AND THE ASSEMBLY, THE SENATE FINANCE COMMITTEE
AND THE ASSEMBLY WAYS AND MEANS COMMITTEE, AND THE CHAIRS OF THE SENATE
RACING, GAMING AND WAGERING COMMITTEE AND THE ASSEMBLY RACING AND WAGER-
ING COMMITTEE ON ECONOMIC DEVELOPMENT AND EMERGING TECHNOLOGIES ON THE
TOTAL GAMING REVENUES, PRIZE DISBURSEMENTS AND OTHER EXPENSES FOR THE
PRECEDING MONTH AND SHALL MAKE AN ANNUAL REPORT TO THE SAME RECIPIENTS
WHICH SHALL INCLUDE A FULL AND COMPLETE STATEMENT OF GAMING REVENUES,
PRIZE DISBURSEMENTS AND OTHER EXPENSES, INCLUDING SUCH RECOMMENDATIONS
AS THE COMMISSION CONSIDERS NECESSARY OR ADVISABLE. THE COMMISSION SHALL
ALSO REPORT IMMEDIATELY TO THE AFOREMENTIONED ON ANY MATTER WHICH
REQUIRES IMMEDIATE CHANGES IN THE LAWS IN ORDER TO PREVENT ABUSES OR
EVASIONS OF THE LAWS, RULES OR REGULATIONS RELATED TO GAMING OR TO
RECTIFY UNDESIRABLE CONDITIONS IN CONNECTION WITH THE ADMINISTRATION OR
OPERATION OF GAMING IN THE STATE.

   S 1305. SUPPLEMENTAL POWER OF THE COMMISSION. THE COMMISSION SHALL
HAVE ALL POWERS NECESSARY OR CONVENIENT TO CARRY OUT AND EFFECTUATE ITS
PURPOSES INCLUDING, BUT NOT LIMITED TO, THE POWER TO:

   1. EXECUTE ALL INSTRUMENTS NECESSARY OR CONVENIENT FOR ACCOMPLISHING
THE PURPOSES OF THIS ARTICLE;

   2. ENTER INTO AGREEMENTS OR OTHER TRANSACTIONS WITH A PERSON, INCLUD-
ING, BUT NOT LIMITED TO, A PUBLIC ENTITY OR OTHER GOVERNMENTAL INSTRU-
MENTALITY OR AUTHORITY IN CONNECTION WITH ITS POWERS AND DUTIES UNDER
THIS ARTICLE;

   3. REQUIRE AN APPLICANT FOR A POSITION WHICH REQUIRES A LICENSE UNDER
THIS ARTICLE TO APPLY FOR SUCH LICENSE AND APPROVE OR DISAPPROVE ANY
SUCH APPLICATION OR OTHER TRANSACTIONS, EVENTS AND PROCESSES AS PROVIDED
IN THIS ARTICLE;

   4. REQUIRE A PERSON WHO HAS A BUSINESS ASSOCIATION OF ANY KIND WITH A
GAMING LICENSEE OR APPLICANT TO BE QUALIFIED FOR LICENSURE UNDER THIS
ARTICLE;

   5. DETERMINE A SUITABLE DEBT-TO-EQUITY RATIO FOR APPLICANTS FOR A
GAMING LICENSE;

S. 5883                                  8                                  A. 8101

6. DENY AN APPLICATION OR LIMIT, CONDITION, RESTRICT, REVOKE OR
SUSPEND A LICENSE, REGISTRATION, FINDING OF SUITABILITY OR APPROVAL, OR
FINE A PERSON LICENSED, REGISTERED, FOUND SUITABLE OR APPROVED FOR ANY
CAUSE THAT THE COMMISSION DEEMS REASONABLE;

7. MONITOR THE CONDUCT OF LICENSEES AND OTHER PERSONS HAVING A MATERI-
AL INVOLVEMENT, DIRECTLY OR INDIRECTLY, WITH A LICENSEE FOR THE PURPOSE
OF ENSURING THAT LICENSES ARE NOT ISSUED TO OR HELD BY AND THAT THERE IS
NO DIRECT OR INDIRECT MATERIAL INVOLVEMENT WITH A LICENSEE, BY AN
UNQUALIFIED OR UNSUITABLE PERSON OR BY A PERSON WHOSE OPERATIONS ARE
CONDUCTED IN AN UNSUITABLE MANNER OR IN UNSUITABLE OR PROHIBITED PLACES
AS PROVIDED IN THIS ARTICLE;

8. GATHER FACTS AND INFORMATION APPLICABLE TO THE COMMISSION'S OBLI-
GATION TO ISSUE, SUSPEND OR REVOKE LICENSES, WORK PERMITS OR REGISTRA-
TIONS FOR:

(A) A VIOLATION OF THIS ARTICLE OR ANY REGULATION ADOPTED BY THE
COMMISSION;

(B) WILLFULLY VIOLATING AN ORDER OF THE COMMISSION DIRECTED TO A
LICENSEE;

(C) THE CONVICTION OF CERTAIN CRIMINAL OFFENSES; OR

(D) THE VIOLATION OF ANY OTHER OFFENSE WHICH WOULD DISQUALIFY SUCH A
LICENSEE FROM HOLDING A LICENSE, WORK PERMIT OR REGISTRATION;

9. CONDUCT INVESTIGATIONS INTO THE QUALIFICATIONS OF ANY REGULATED
ENTITY AND ALL APPLICANTS FOR LICENSURE;

10. REQUEST AND RECEIVE FROM THE DIVISION OF CRIMINAL JUSTICE SERVICES
AND THE FEDERAL BUREAU OF INVESTIGATION, CRIMINAL HISTORY INFORMATION AS
DEFINED IN PARAGRAPH (C) OF SUBDIVISION ONE OF SECTION EIGHT HUNDRED
FORTY-FIVE-B OF THE EXECUTIVE LAW FOR THE PURPOSE OF EVALUATING APPLI-
CANTS FOR EMPLOYMENT BY ANY REGULATED ENTITY, AND EVALUATING LICENSEES
AND APPLICANTS FOR LICENSURE UNDER THIS ARTICLE;

11. BE PRESENT, THROUGH ITS AGENTS, AT ALL TIMES, IN A GAMING FACILITY
FOR THE PURPOSES OF:

(A) CERTIFYING REVENUE;

(B) RECEIVING COMPLAINTS FROM THE PUBLIC RELATING TO THE CONDUCT OF
GAMING AND WAGERING OPERATIONS;

(C) EXAMINING RECORDS OF REVENUES AND PROCEDURES AND INSPECTING AND
AUDITING ALL BOOKS, DOCUMENTS AND RECORDS OF LICENSEES;

(D) CONDUCTING PERIODIC REVIEWS OF OPERATIONS AND FACILITIES FOR THE
PURPOSE OF REGULATIONS ADOPTED HEREUNDER; AND

(E) EXERCISING ITS OVERSIGHT RESPONSIBILITIES WITH RESPECT TO GAMING;

12. INSPECT AND HAVE ACCESS TO ALL EQUIPMENT AND SUPPLIES IN A GAMING
FACILITY OR ON PREMISES WHERE GAMING EQUIPMENT IS MANUFACTURED, SOLD OR
DISTRIBUTED;

13. SEIZE AND REMOVE FROM THE PREMISES OF A GAMING LICENSEE AND
IMPOUND ANY EQUIPMENT, SUPPLIES, DOCUMENTS AND RECORDS FOR THE PURPOSE
OF EXAMINATION AND INSPECTION;

14. DEMAND ACCESS TO AND INSPECT, EXAMINE, PHOTOCOPY AND AUDIT ALL
PAPERS, BOOKS AND RECORDS OF ANY AFFILIATE OF A GAMING LICENSEE OR
GAMING VENDOR WHOM THE COMMISSION SUSPECTS IS INVOLVED IN THE FINANCING,
OPERATION OR MANAGEMENT OF THE GAMING LICENSEE OR GAMING VENDOR;
PROVIDED, HOWEVER, THAT THE INSPECTION, EXAMINATION, PHOTOCOPYING AND
AUDIT MAY TAKE PLACE ON THE AFFILIATE'S PREMISES OR ELSEWHERE AS PRACTI-
CABLE AND IN THE PRESENCE OF THE AFFILIATE OR ITS AGENT;

15. REQUIRE THAT THE BOOKS AND FINANCIAL OR OTHER RECORDS OR STATE-
MENTS OF A GAMING LICENSEE OR GAMING VENDOR BE KEPT IN A MANNER THAT THE
COMMISSION CONSIDERS PROPER;

S. 5883                              9                              A. 8101

16. LEVY AND COLLECT ASSESSMENTS, FEES, FINES AND INTEREST AND IMPOSE
PENALTIES AND SANCTIONS AS AUTHORIZED BY LAW FOR A VIOLATION OF THIS
ARTICLE OR ANY REGULATIONS PROMULGATED BY THE COMMISSION;

17. COLLECT TAXES, FEES AND INTEREST UNDER THIS ARTICLE;

18. RESTRICT, SUSPEND OR REVOKE LICENSES ISSUED UNDER THIS ARTICLE;

19. REFER CASES FOR CRIMINAL PROSECUTION TO THE APPROPRIATE FEDERAL,
STATE OR LOCAL AUTHORITIES;

20. ADOPT, AMEND OR REPEAL REGULATIONS FOR THE IMPLEMENTATION, ADMIN-
ISTRATION AND ENFORCEMENT OF THIS ARTICLE; AND

21. DETERMINE A SUITABLE DURATION FOR EACH LICENSE, REGISTRATION OR
FINDING OF SUITABILITY OR APPROVAL.

S 1306. POWERS OF THE BOARD. THE NEW YORK STATE RESORT GAMING FACILITY
LOCATION BOARD SHALL SELECT, FOLLOWING A COMPETITIVE PROCESS AND SUBJECT
TO THE RESTRICTIONS OF THIS ARTICLE, NO MORE THAN FOUR ENTITIES TO APPLY
TO THE COMMISSION FOR GAMING FACILITY LICENSES. IN EXERCISING ITS
AUTHORITY, THE BOARD SHALL HAVE ALL POWERS NECESSARY OR CONVENIENT TO
FULLY CARRY OUT AND EFFECTUATE ITS PURPOSES INCLUDING, BUT NOT LIMITED
TO, THE FOLLOWING POWERS. THE BOARD SHALL:

1. ISSUE A REQUEST FOR APPLICATIONS FOR ZONE TWO GAMING FACILITY
LICENSES PURSUANT TO SECTION ONE THOUSAND THREE HUNDRED TWELVE OF THIS
ARTICLE;

2. ASSIST THE COMMISSION IN PRESCRIBING THE FORM OF THE APPLICATION
FOR ZONE TWO GAMING FACILITY LICENSES INCLUDING INFORMATION TO BE
FURNISHED BY AN APPLICANT CONCERNING AN APPLICANT'S ANTECEDENTS, HABITS,
CHARACTER, ASSOCIATES, CRIMINAL RECORD, BUSINESS ACTIVITIES AND FINAN-
CIAL AFFAIRS, PAST OR PRESENT PURSUANT TO SECTION ONE THOUSAND THREE
HUNDRED THIRTEEN OF THIS ARTICLE;

3. DEVELOP CRITERIA, IN ADDITION TO THOSE OUTLINED IN THIS ARTICLE, TO
ASSESS WHICH APPLICATIONS PROVIDE THE HIGHEST AND BEST VALUE TO THE
STATE, THE ZONE AND THE REGION IN WHICH A GAMING FACILITY IS TO BE
LOCATED;

4. DETERMINE A GAMING FACILITY LICENSE FEE TO BE PAID BY AN APPLICANT;

5. DETERMINE, FROM TIME TO TIME, WHETHER TRIBAL-STATE GAMING COMPACTS
ARE IN OR REMAIN IN GOOD STANDING FOR THE PURPOSES OF DETERMINING WHETH-
ER A GAMING FACILITY MAY BE LOCATED IN AREAS DESIGNATED BY SUBDIVISION
TWO OF SECTION ONE THOUSAND THREE HUNDRED ELEVEN OF THIS ARTICLE;

6. DETERMINE, WITH THE ASSISTANCE OF THE COMMISSION, THE SOURCES AND
TOTAL AMOUNT OF AN APPLICANT'S PROPOSED CAPITALIZATION TO DEVELOP,
CONSTRUCT, MAINTAIN AND OPERATE A PROPOSED GAMING FACILITY LICENSE UNDER
THIS ARTICLE;

7. HAVE THE AUTHORITY TO CONDUCT INVESTIGATIVE HEARINGS CONCERNING THE
CONDUCT OF GAMING AND GAMING OPERATIONS IN ACCORDANCE WITH ANY PROCE-
DURES SET FORTH IN THIS ARTICLE AND ANY APPLICABLE IMPLEMENTING REGU-
LATIONS;

8. ISSUE DETAILED FINDINGS OF FACTS AND CONCLUSIONS DEMONSTRATING THE
REASONS SUPPORTING ITS DECISIONS TO SELECT APPLICANTS FOR COMMISSION
LICENSURE;

9. REPORT ANNUALLY TO THE GOVERNOR, THE SPEAKER OF THE ASSEMBLY AND
THE TEMPORARY PRESIDENT OF THE SENATE, ITS PROCEEDINGS FOR THE PRECEDING
CALENDAR YEAR AND ANY SUGGESTIONS AND RECOMMENDATIONS AS IT SHALL DEEM
DESIRABLE;

10. PROMULGATE ANY RULES AND REGULATIONS THAT IT DEEMS NECESSARY TO
CARRY OUT ITS RESPONSIBILITIES;

11. HAVE THE POWER TO ADMINISTER OATHS AND EXAMINE WITNESSES; AND
REQUEST AND RECEIVE CRIMINAL HISTORY INFORMATION AS DEFINED IN PARAGRAPH
(C) OF SUBDIVISION ONE OF SECTION EIGHT HUNDRED FORTY-FIVE-B OF THE

EXECUTIVE LAW OF THE DIVISION OF CRIMINAL JUSTICE SERVICES, PURSUANT TO
SUBDIVISION EIGHT-A OF SECTION EIGHT HUNDRED THIRTY-SEVEN OF THE EXECU-
TIVE LAW, IN CONNECTION WITH EXECUTING THE RESPONSIBILITIES OF THE BOARD
RELATING TO LICENSING INCLUDING FINGERPRINTING, CRIMINAL HISTORY INFOR-
MATION AND BACKGROUND INVESTIGATIONS, OF ENTITIES APPLYING FOR A GAMING
FACILITY LICENSE. AT THE REQUEST OF THE BOARD, THE DIVISION OF CRIMINAL
JUSTICE SERVICES SHALL SUBMIT A FINGERPRINT CARD, ALONG WITH THE
SUBJECT'S PROCESSING FEE, TO THE FEDERAL BUREAU OF INVESTIGATION FOR THE
PURPOSE OF CONDUCTING A CRIMINAL HISTORY SEARCH AND RETURNING A REPORT
THEREON. THE BOARD SHALL ALSO BE ENTITLED TO REQUEST AND RECEIVE, PURSU-
ANT TO A WRITTEN MEMORANDUM OF UNDERSTANDING FILED WITH THE DEPARTMENT
OF STATE, ANY INFORMATION IN THE POSSESSION OF THE STATE ATTORNEY GENER-
AL RELATING TO THE INVESTIGATION OF ORGANIZED CRIME, GAMING OFFENSES,
OTHER REVENUE CRIMES OR TAX EVASION. PROVIDED HOWEVER, THE ATTORNEY
GENERAL MAY WITHHOLD ANY INFORMATION THAT (A) WOULD IDENTIFY A CONFIDEN-
TIAL SOURCE OR DISCLOSE CONFIDENTIAL INFORMATION RELATING TO A CRIMINAL
INVESTIGATION, (B) WOULD INTERFERE WITH LAW ENFORCEMENT INVESTIGATIONS
OR JUDICIAL PROCEEDINGS, (C) REVEAL CRIMINAL INVESTIGATIVE TECHNIQUES OR
PROCEDURES, THAT, IF DISCLOSED, COULD ENDANGER THE LIFE OR SAFETY OF ANY
PERSON, OR (D) CONSTITUTES RECORDS RECEIVED FROM OTHER STATE, LOCAL OR
FEDERAL AGENCIES THAT THE ATTORNEY GENERAL IS PROHIBITED BY LAW, REGU-
LATION OR AGREEMENT FROM DISCLOSING.

  S 1307. REQUIRED REGULATIONS. 1. THE COMMISSION IS AUTHORIZED:

  (A) TO ADOPT, AMEND OR REPEAL SUCH REGULATIONS, CONSISTENT WITH THE
POLICY AND OBJECTIVES OF THIS ARTICLE, AS AMENDED AND SUPPLEMENTED, AS
IT MAY DEEM NECESSARY TO PROTECT THE PUBLIC INTEREST IN CARRYING OUT THE
PROVISIONS OF THIS ARTICLE; AND

  (B) TO ADOPT, AMEND OR REPEAL SUCH REGULATIONS AS MAY BE NECESSARY FOR
THE CONDUCT OF HEARINGS BEFORE THE COMMISSION AND FOR THE MATTERS WITHIN
ALL OTHER RESPONSIBILITIES AND DUTIES OF THE COMMISSION IMPOSED BY THIS
ARTICLE.

  2. THE COMMISSION SHALL, WITHOUT LIMITATION, INCLUDE THE FOLLOWING
SPECIFIC PROVISIONS IN ITS REGULATIONS IN ACCORDANCE WITH THE PROVISIONS
OF THIS ARTICLE:

  (A) PRESCRIBING THE METHODS AND FORMS OF APPLICATION AND REGISTRATION
WHICH ANY APPLICANT OR REGISTRANT SHALL FOLLOW AND COMPLETE;

  (B) PRESCRIBING THE METHODS, PROCEDURES AND FORM FOR DELIVERY OF
INFORMATION CONCERNING ANY PERSON'S FAMILY, HABITS, CHARACTER, ASSOCI-
ATES, CRIMINAL RECORD, BUSINESS ACTIVITIES AND FINANCIAL AFFAIRS;  ·

  (C) PRESCRIBING SUCH PROCEDURES FOR THE FINGERPRINTING OF AN APPLI-
CANT, EMPLOYEE OF A LICENSEE, OR REGISTRANT, AND METHODS OF IDENTIFICA-
TION WHICH MAY BE NECESSARY TO ACCOMPLISH EFFECTIVE ENFORCEMENT OF
RESTRICTIONS ON ACCESS TO THE CASINO AND OTHER RESTRICTED CASINO AREAS
OF THE GAMING FACILITY;

  (D) PRESCRIBING THE METHOD OF NOTICE TO AN APPLICANT, REGISTRANT OR
LICENSEE CONCERNING THE RELEASE OF ANY INFORMATION OR DATA PROVIDED TO
THE COMMISSION BY SUCH APPLICANT, REGISTRANT OR LICENSEE;

  (E) PRESCRIBING THE MANNER AND PROCEDURE OF ALL HEARINGS CONDUCTED BY
THE COMMISSION OR ANY PRESIDING OFFICER;

  (F) PRESCRIBING THE MANNER AND METHOD OF COLLECTION OF PAYMENTS OF
TAXES, FEES, INTEREST AND PENALTIES;

  (G) DEFINING AND LIMITING THE AREAS OF OPERATION, THE RULES OF AUTHOR-
IZED GAMES, ODDS, AND DEVICES PERMITTED, AND THE METHOD OF OPERATION OF
SUCH GAMES AND DEVICES;

  (H) REGULATING THE PRACTICE AND PROCEDURES FOR NEGOTIABLE TRANSACTIONS
INVOLVING PATRONS, INCLUDING LIMITATIONS ON THE CIRCUMSTANCES AND

S. 5883                                    11                              A. 8101

AMOUNTS OF SUCH TRANSACTIONS, AND THE ESTABLISHMENT OF FORMS AND PROCE-
DURES FOR NEGOTIABLE INSTRUMENT TRANSACTIONS, REDEMPTIONS, AND CONSOL-
IDATIONS;

(I) PRESCRIBING GROUNDS AND PROCEDURES FOR THE REVOCATION OR SUSPEN-
SION OF OPERATING CERTIFICATES, LICENSES AND REGISTRATIONS;

(J) GOVERNING THE MANUFACTURE, DISTRIBUTION, SALE, DEPLOYMENT, AND
SERVICING OF GAMING DEVICES AND EQUIPMENT;

(K) PRESCRIBING FOR GAMING OPERATIONS THE PROCEDURES, FORMS AND METH-
ODS OF MANAGEMENT CONTROLS, INCLUDING EMPLOYEE AND SUPERVISORY TABLES OF
ORGANIZATION AND RESPONSIBILITY, AND MINIMUM SECURITY AND SURVEILLANCE
STANDARDS, INCLUDING SECURITY PERSONNEL STRUCTURE, ALARM AND OTHER ELEC-
TRICAL OR VISUAL SECURITY MEASURES; PROVIDED, HOWEVER, THAT THE COMMIS-
SION SHALL GRANT AN APPLICANT BROAD DISCRETION CONCERNING THE ORGANIZA-
TION AND RESPONSIBILITIES OF MANAGEMENT PERSONNEL WHO ARE NOT DIRECTLY
INVOLVED IN THE SUPERVISION OF GAMING OPERATIONS;

(L) PRESCRIBING THE QUALIFICATIONS OF, AND THE CONDITIONS PURSUANT TO
WHICH, ENGINEERS, ACCOUNTANTS, AND OTHERS SHALL BE PERMITTED TO PRACTICE
BEFORE THE COMMISSION OR TO SUBMIT MATERIALS ON BEHALF OF ANY APPLICANT
OR LICENSEE;

(M) PRESCRIBING MINIMUM PROCEDURES FOR THE EXERCISE OF EFFECTIVE
CONTROL OVER THE INTERNAL FISCAL AFFAIRS OF A LICENSEE, INCLUDING
PROVISIONS FOR THE SAFEGUARDING OF ASSETS AND REVENUES, THE RECORDING OF
CASH AND EVIDENCE OF INDEBTEDNESS, AND THE MAINTENANCE OF RELIABLE
RECORDS, ACCOUNTS, AND REPORTS OF TRANSACTIONS, OPERATIONS AND EVENTS,
INCLUDING REPORTS TO THE COMMISSION;

(N) PROVIDING FOR A MINIMUM UNIFORM STANDARD OF ACCOUNTANCY METHODS,
PROCEDURES AND FORMS; A UNIFORM CODE OF ACCOUNTS AND ACCOUNTING CLASSI-
FICATIONS; AND SUCH OTHER STANDARD OPERATING PROCEDURES, AS MAY BE
NECESSARY TO ASSURE CONSISTENCY, COMPARABILITY, AND EFFECTIVE DISCLOSURE
OF ALL FINANCIAL INFORMATION, INCLUDING CALCULATIONS OF PERCENTAGES OF
PROFIT BY GAMES, TABLES, GAMING DEVICES AND SLOT MACHINES;

(O) REQUIRING QUARTERLY FINANCIAL REPORTS AND THE FORM THEREOF, AND AN
ANNUAL AUDIT PREPARED BY A CERTIFIED PUBLIC ACCOUNTANT LICENSED TO DO
BUSINESS IN THIS STATE, ATTESTING TO THE FINANCIAL CONDITION OF A LICEN-
SEE AND DISCLOSING WHETHER THE ACCOUNTS, RECORDS AND CONTROL PROCEDURES
EXAMINED ARE MAINTAINED BY THE LICENSEE AS REQUIRED BY THIS ARTICLE AND
THE REGULATIONS PROMULGATED HEREUNDER;

(P) GOVERNING THE GAMING-RELATED ADVERTISING OF LICENSEES, THEIR
EMPLOYEES AND AGENTS, WITH THE VIEW TOWARD ASSURING THAT SUCH ADVERTISE-
MENTS ARE NOT DECEPTIVE; AND

(Q) GOVERNING THE DISTRIBUTION AND CONSUMPTION OF ALCOHOLIC BEVERAGES
ON THE PREMISES OF THE LICENSEE.

3. THE COMMISSION SHALL, IN ITS REGULATIONS, PRESCRIBE THE MANNER AND
PROCEDURE OF ALL HEARINGS CONDUCTED BY THE COMMISSION.

S 1308. REPORTS AND RECOMMENDATIONS. THE COMMISSION SHALL CARRY ON A
CONTINUOUS STUDY OF THE OPERATION AND ADMINISTRATION OF CASINO CONTROL
LAWS WHICH MAY BE IN EFFECT IN OTHER JURISDICTIONS, LITERATURE ON THIS
SUBJECT WHICH MAY FROM TIME TO TIME BECOME AVAILABLE, AND FEDERAL LAWS
WHICH MAY AFFECT THE OPERATION OF CASINO GAMING IN THIS STATE. IT SHALL
BE RESPONSIBLE FOR ASCERTAINING ANY DEFECTS IN THIS ARTICLE OR IN THE
RULES AND REGULATIONS ISSUED THEREUNDER, FORMULATING RECOMMENDATIONS FOR
CHANGES IN THIS ARTICLE. THE COMMISSION SHALL MAKE AVAILABLE TO THE
GOVERNOR AND THE LEGISLATURE WITHIN ITS ANNUAL REPORT AN ACCOUNTING OF
ALL REVENUES, EXPENSES AND DISBURSEMENTS, A REVIEW OF ITS LICENSING AND
ENFORCEMENT ACTIVITIES CONDUCTED PURSUANT TO SECTION ONE THOUSAND THREE
HUNDRED FORTY OF THIS ARTICLE AND SHALL INCLUDE THEREIN SUCH RECOMMENDA-

S. 5883                                    12                                    A. 8101

TIONS FOR CHANGES IN THIS ARTICLE AS THE COMMISSION DEEMS NECESSARY OR
DESIRABLE.

 S 1309. SEVERABILITY AND PREEMPTION.  1. IF ANY CLAUSE, SENTENCE,
SUBPARAGRAPH, PARAGRAPH, SUBDIVISION, SECTION, ARTICLE OR OTHER PORTION
OF THIS ARTICLE OR THE APPLICATION THEREOF TO ANY PERSON OR CIRCUM-
STANCES SHALL BE HELD TO BE INVALID, SUCH HOLDING SHALL NOT AFFECT,
IMPAIR OR INVALIDATE THE REMAINDER OF THIS ARTICLE OR THE APPLICATION OF
SUCH PORTION HELD INVALID TO ANY OTHER PERSON OR CIRCUMSTANCES, BUT
SHALL BE CONFINED IN ITS OPERATION TO THE CLAUSE, SENTENCE, PARAGRAPH,
SUBPARAGRAPH, SUBDIVISION, SECTION, ARTICLE OR OTHER PORTION THEREOF
DIRECTLY INVOLVED IN SUCH HOLDING OR TO THE PERSON OR CIRCUMSTANCE THER-
EIN INVOLVED.

 2. IF ANY PROVISION OF THIS ARTICLE IS INCONSISTENT WITH, IN CONFLICT
WITH, OR CONTRARY TO ANY OTHER PROVISION OF LAW, SUCH PROVISION OF THIS
ARTICLE SHALL PREVAIL OVER SUCH OTHER PROVISION AND SUCH OTHER PROVISION
SHALL BE DEEMED TO BE SUPERSEDED TO THE EXTENT OF SUCH INCONSISTENCY OR
CONFLICT. NOTWITHSTANDING THE PROVISIONS OF ANY OTHER LAW TO THE CONTRA-
RY, NO LOCAL GOVERNMENT UNIT OF THIS STATE MAY ENACT OR ENFORCE ANY
ORDINANCE OR RESOLUTION CONFLICTING WITH ANY PROVISION OF THIS ARTICLE
OR WITH ANY POLICY OF THIS STATE EXPRESSED OR IMPLIED HEREIN, WHETHER BY
EXCLUSION OR INCLUSION. THE COMMISSION SHALL HAVE EXCLUSIVE JURISDICTION
OVER ALL MATTERS DELEGATED TO IT OR WITHIN THE SCOPE OF ITS POWERS UNDER
THE PROVISIONS OF THIS ARTICLE.

                                  TITLE 2

                 FACILITY DETERMINATION AND LICENSING

SECTION 1310. DEVELOPMENT ZONES AND REGIONS.

         1311. LICENSE AUTHORIZATION; RESTRICTIONS.

         1312. REQUESTS FOR APPLICATIONS.

         1313. FORM OF APPLICATION.

         1314. LICENSE APPLICANT ELIGIBILITY.

         1315. REQUIRED CAPITAL INVESTMENT.

         1316. MINIMUM LICENSE THRESHOLDS.

         1317. INVESTIGATION OF LICENSE APPLICANTS.

         1318. DISQUALIFYING CRITERIA.

         1319. INVESTIGATIVE HEARINGS.

         1320. SITING EVALUATION.

         1321. INTENTIONALLY OMITTED.

 S 1310. DEVELOPMENT ZONES AND REGIONS.  1. THERE ARE HEREBY CREATED
TWO DEVELOPMENT ZONES TO BE KNOWN AS THE ZONE ONE AND ZONE TWO. ZONE ONE
SHALL INCLUDE THE CITY OF NEW YORK AND THE COUNTIES OF NASSAU, PUTNAM,
ROCKLAND, SUFFOLK AND WESTCHESTER. ZONE TWO SHALL INCLUDE ALL THE OTHER
COUNTIES OF THE STATE.

 2. EACH ZONE SHALL BE DIVIDED INTO DEVELOPMENT REGIONS. (A) THE THREE
DEVELOPMENT REGIONS IN ZONE ONE SHALL BE COMPRISED OF THE FOLLOWING
COUNTIES:

 (1) REGION ONE SHALL CONSIST OF PUTNAM, ROCKLAND AND WESTCHESTER COUN-
TIES;

 (2) REGION TWO SHALL CONSIST OF BRONX, KINGS, NEW YORK, QUEENS AND
RICHMOND COUNTIES. NO GAMING FACILITY SHALL BE AUTHORIZED IN REGION
TWO; AND

 (3) REGION THREE SHALL CONSIST OF NASSAU AND SUFFOLK COUNTIES.

 (B) THE SIX DEVELOPMENT REGIONS IN ZONE TWO SHALL BE COMPRISED OF THE
FOLLOWING COUNTIES:

 (1) REGION ONE SHALL CONSIST OF COLUMBIA, DELAWARE, DUTCHESS, GREENE,
ORANGE, SULLIVAN AND ULSTER COUNTIES;

(2) REGION TWO SHALL CONSIST OF ALBANY, FULTON, MONTGOMERY, RENSSE-
LAER, SARATOGA, SCHENECTADY, SCHOHARIE AND WASHINGTON COUNTIES.

(3) REGION THREE SHALL CONSIST OF CLINTON, ESSEX, FRANKLIN, HAMILTON,
JEFFERSON, SAINT LAWRENCE AND WARREN COUNTIES;

(4) REGION FOUR SHALL CONSIST OF CAYUGA, CHENANGO, CORTLAND, HERKIMER,
LEWIS, MADISON, ONEIDA, ONONDAGA, OSWEGO AND OTSEGO COUNTIES;

(5) REGION FIVE SHALL CONSIST OF BROOME, CHEMUNG (EAST OF STATE ROUTE
14), SCHUYLER (EAST OF STATE ROUTE 14), SENECA, TIOGA, TOMPKINS, AND
WAYNE (EAST OF STATE ROUTE 14) COUNTIES; AND

(6) REGION SIX SHALL CONSIST OF ALLEGANY, CATTARAUGUS, CHAUTAUQUA,
CHEMUNG (WEST OF STATE ROUTE 14), ERIE, GENESEE, LIVINGSTON, MONROE,
NIAGARA, ONTARIO, ORLEANS, SCHUYLER (WEST OF STATE ROUTE 14), STEUBEN,
WAYNE (WEST OF STATE ROUTE 14), WYOMING, AND YATES COUNTIES.

S 1311. LICENSE AUTHORIZATION; RESTRICTIONS. 1. THE COMMISSION IS
AUTHORIZED TO AWARD UP TO FOUR GAMING FACILITY LICENSES, IN REGIONS ONE,
TWO AND FIVE OF ZONE TWO. THE DURATION OF SUCH INITIAL LICENSE SHALL BE
TEN YEARS. THE TERM OF RENEWAL SHALL BE DETERMINED BY THE COMMISSION.
THE COMMISSION MAY AWARD A SECOND LICENSE TO A QUALIFIED APPLICANT IN NO
MORE THAN A SINGLE REGION. THE COMMISSION IS NOT EMPOWERED TO AWARD ANY
LICENSE IN ZONE ONE. NO GAMING FACILITIES ARE AUTHORIZED UNDER THIS
ARTICLE FOR THE CITY OF NEW YORK OR ANY OTHER PORTION OF ZONE ONE.

AS A CONDITION OF LICENSURE, LICENSEES ARE REQUIRED TO COMMENCE GAMING
OPERATIONS NO LESS THAN TWENTY-FOUR MONTHS FOLLOWING LICENSE AWARD. NO
ADDITIONAL LICENSES MAY BE AWARDED DURING THE TWENTY-FOUR MONTH PERIOD,
NOR FOR AN ADDITIONAL SIXTY MONTHS FOLLOWING THE END OF THE TWENTY-FOUR
MONTH PERIOD. SHOULD THE STATE LEGISLATIVELY AUTHORIZE ADDITIONAL
GAMING FACILITY LICENSES WITHIN THESE PERIODS, LICENSEES SHALL HAVE THE
RIGHT TO RECOVER THE LICENSE FEE PAID PURSUANT TO SECTION ONE THOUSAND
THREE HUNDRED SIX OF THIS ARTICLE.

THIS RIGHT SHALL BE INCORPORATED INTO THE LICENSE ITSELF, VEST UPON
THE OPENING OF A GAMING FACILITY IN ZONE ONE OR IN THE SAME REGION AS
THE LICENSEE AND ENTITLE THE HOLDER OF SUCH LICENSE TO BRING AN ACTION
IN THE COURT OF CLAIMS TO RECOVER THE LICENSE FEE PAID PURSUANT TO
SECTION ONE THOUSAND THREE HUNDRED FIFTEEN OF THIS ARTICLE IN THE EVENT
THAT ANY GAMING FACILITY LICENSE IN EXCESS OF THE NUMBER AUTHORIZED BY
THIS SECTION AS OF THE EFFECTIVE DATE OF THIS SECTION IS AWARDED WITHIN
SEVEN YEARS FROM THE DATE THAT THE INITIAL GAMING FACILITY LICENSE IS
AWARDED. THIS RIGHT TO RECOVER ANY SUCH FEE SHALL BE PROPORTIONATE TO
THE LENGTH OF THE RESPECTIVE PERIOD THAT IS STILL REMAINING UPON THE
VESTING OF SUCH RIGHT.

ADDITIONALLY, THE RIGHT TO BRING AN ACTION IN THE COURT OF CLAIMS TO
RECOVER THE FEE PAID TO THE STATE ON THE TWENTY-FOURTH DAY OF SEPTEMBER,
TWO THOUSAND TEN, BY THE OPERATOR OF A VIDEO LOTTERY GAMING FACILITY IN
A CITY OF MORE THAN ONE MILLION SHALL VEST WITH SUCH OPERATOR UPON THE
OPENING OF ANY GAMING FACILITY LICENSED BY THE COMMISSION IN ZONE ONE
WITHIN SEVEN YEARS FROM THE DATE THAT THE INITIAL GAMING FACILITY
LICENSE IS AWARDED; PROVIDED HOWEVER THAT THE AMOUNT RECOVERABLE SHALL
BE LIMITED TO THE PRO RATA AMOUNT OF THE TIME REMAINING UNTIL THE END OF
THE SEVEN YEAR EXCLUSIVITY PERIOD, PROPORTIONATE TO THE PERIOD OF TIME
BETWEEN THE DATE OF OEPNING OF THE VIDEO LOTTERY FACILITY UNTIL THE
CONCLUSION OF THE SEVEN YEAR PERIOD.

2. NOTWITHSTANDING THE FOREGOING, NO CASINO GAMING FACILITY SHALL BE
AUTHORIZED:

(A) IN THE COUNTIES OF CLINTON, ESSEX, FRANKLIN, HAMILTON, JEFFERSON,
LEWIS, SAINT LAWRENCE AND WARREN;

S. 5883                              14                              A. 8101

(B) WITHIN THE FOLLOWING AREA: (1) TO THE EAST, STATE ROUTE 14 FROM
SODUS POINT TO THE PENNSYLVANIA BORDER WITH NEW YORK; (2) TO THE NORTH,
THE BORDER BETWEEN NEW YORK AND CANADA; (3) TO THE SOUTH, THE PENNSYLVA-
NIA BORDER WITH NEW YORK; AND (4) TO THE WEST, THE BORDER BETWEEN NEW
YORK AND CANADA AND THE BORDER BETWEEN PENNSYLVANIA AND NEW YORK; AND

(C) IN THE COUNTIES OF CAYUGA, CHENANGO, CORTLAND, HERKIMER, LEWIS,
MADISON, ONEIDA, ONONDAGA, OSWEGO AND OTSEGO.

S 1312. REQUESTS FOR APPLICATIONS. 1. THE BOARD SHALL ISSUE WITHIN
NINETY DAYS OF A MAJORITY OF MEMBERS BEING APPOINTED A REQUEST FOR
APPLICATIONS FOR A GAMING FACILITY LICENSE IN REGIONS ONE, TWO AND FIVE
IN ZONE TWO; PROVIDED, HOWEVER, THAT THE BOARD SHALL NOT ISSUE ANY
REQUESTS FOR APPLICATIONS FOR ANY REGION IN ZONE ONE; AND FURTHER
PROVIDED THAT THE BOARD SHALL NOT ISSUE ANY REQUESTS FOR APPLICATIONS
WITH RESPECT TO ANY GAMING FACILITY SUBSEQUENTLY LEGISLATIVELY AUTHOR-
IZED UNTIL SEVEN YEARS FOLLOWING THE COMMENCEMENT OF GAMING ACTIVITIES
IN ZONE TWO. ALL REQUESTS FOR APPLICATIONS SHALL INCLUDE:

(A) THE TIME AND DATE FOR RECEIPT OF RESPONSES TO THE REQUEST FOR
APPLICATIONS, THE MANNER THEY ARE TO BE RECEIVED AND THE ADDRESS OF THE
OFFICE TO WHICH THE APPLICATIONS SHALL BE DELIVERED;

(B) THE FORM OF THE APPLICATION AND THE METHOD FOR SUBMISSION;

(C) A GENERAL DESCRIPTION OF THE ANTICIPATED SCHEDULE FOR PROCESSING
THE APPLICATION;

(D) THE CONTACT INFORMATION OF BOARD EMPLOYEES RESPONSIBLE FOR HANDL-
ING APPLICANT QUESTIONS; AND

(E) ANY OTHER INFORMATION THAT THE BOARD DETERMINES.

2. BOARD ACTIVITIES SHALL BE SUBJECT TO SECTION ONE HUNDRED
THIRTY-NINE-J AND SECTION ONE HUNDRED THIRTY-NINE-K OF THE STATE FINANCE
LAW.

3. REQUESTS FOR APPLICATIONS PURSUANT TO SUBDIVISION ONE OF THIS
SECTION SHALL BE ADVERTISED IN A NEWSPAPER OF GENERAL CIRCULATION AND ON
THE OFFICIAL INTERNET WEBSITE OF THE COMMISSION AND THE BOARD.

4. THE BOARD SHALL ESTABLISH DEADLINES FOR THE RECEIPT OF ALL APPLICA-
TIONS. APPLICATIONS RECEIVED AFTER THE DEADLINE SHALL NOT BE REVIEWED BY
THE BOARD.

S 1313. FORM OF APPLICATION. 1. THE COMMISSION AND THE BOARD SHALL
PRESCRIBE THE INITIAL FORM OF THE APPLICATION FOR GAMING LICENSES WHICH
SHALL REQUIRE, BUT NOT BE LIMITED TO:

(A) THE NAME OF THE APPLICANT;

(B) THE MAILING ADDRESS AND, IF A CORPORATION, THE NAME OF THE STATE
UNDER THE LAWS OF WHICH IT IS INCORPORATED, THE LOCATION OF ITS PRINCI-
PAL PLACE OF BUSINESS AND THE NAMES AND ADDRESSES OF ITS DIRECTORS AND
SUCH STOCKHOLDERS AS TO BE DETERMINED BY THE COMMISSION;

(C) THE IDENTITY OF EACH PERSON HAVING A DIRECT OR INDIRECT INTEREST
IN THE BUSINESS AND THE NATURE OF SUCH INTEREST; PROVIDED, HOWEVER, THAT
IF THE DISCLOSED ENTITY IS A TRUST, THE APPLICATION SHALL DISCLOSE THE
NAMES AND ADDRESSES OF ALL BENEFICIARIES; PROVIDED FURTHER, THAT IF THE
DISCLOSED ENTITY IS A PARTNERSHIP, THE APPLICATION SHALL DISCLOSE THE
NAMES AND ADDRESSES OF ALL PARTNERS, BOTH GENERAL AND LIMITED; AND
PROVIDED FURTHER, THAT IF THE DISCLOSED ENTITY IS A LIMITED LIABILITY
COMPANY, THE APPLICATION SHALL DISCLOSE THE NAMES AND ADDRESSES OF ALL
MEMBERS;

(D) AN INDEPENDENT AUDIT REPORT OF ALL FINANCIAL ACTIVITIES AND INTER-
ESTS INCLUDING, BUT NOT LIMITED TO, THE DISCLOSURE OF ALL CONTRIBUTIONS,
DONATIONS, LOANS OR ANY OTHER FINANCIAL TRANSACTIONS TO OR FROM A GAMING
ENTITY OR OPERATOR IN THE PAST FIVE YEARS;

S. 5883                                15                            A. 8101

(E) CLEAR AND CONVINCING EVIDENCE OF FINANCIAL STABILITY INCLUDING, BUT NOT LIMITED TO, BANK REFERENCES, BUSINESS AND PERSONAL INCOME AND DISBURSEMENT SCHEDULES, TAX RETURNS AND OTHER REPORTS FILED BY GOVERN- MENT AGENCIES AND BUSINESS AND PERSONAL ACCOUNTING CHECK RECORDS AND LEDGERS;

(F) INFORMATION AND DOCUMENTATION TO DEMONSTRATE THAT THE APPLICANT HAS SUFFICIENT BUSINESS ABILITY AND EXPERIENCE TO CREATE THE LIKELIHOOD OF ESTABLISHING AND MAINTAINING A SUCCESSFUL GAMING FACILITY;

(G) A FULL DESCRIPTION OF THE PROPOSED INTERNAL CONTROLS AND SECURITY SYSTEMS FOR THE PROPOSED GAMING FACILITY AND ANY RELATED FACILITIES;

(H) THE DESIGNS FOR THE PROPOSED GAMING FACILITY, INCLUDING THE NAMES AND ADDRESSES OF THE ARCHITECTS, ENGINEERS AND DESIGNERS, AND A TIMELINE OF CONSTRUCTION THAT INCLUDES DETAILED STAGES OF CONSTRUCTION FOR THE GAMING FACILITY AND NON-GAMING STRUCTURES, WHERE APPLICABLE, AND A PROPOSED DATE TO OPEN FOR GAMING;

(I) THE NUMBER OF CONSTRUCTION HOURS ESTIMATED TO COMPLETE THE WORK;

(J) A DESCRIPTION OF THE ANCILLARY ENTERTAINMENT SERVICES AND AMEN- ITIES TO BE PROVIDED AT THE PROPOSED GAMING FACILITY;

(K) THE NUMBER OF EMPLOYEES TO BE EMPLOYED AT THE PROPOSED GAMING FACILITY, INCLUDING DETAILED INFORMATION ON THE PAY RATE AND BENEFITS FOR EMPLOYEES;

(L) COMPLETED STUDIES AND REPORTS AS REQUIRED BY THE COMMISSION, WHICH SHALL INCLUDE, BUT NOT BE LIMITED TO, AN EXAMINATION OF THE PROPOSED GAMING FACILITY'S:

(1) ECONOMIC BENEFITS TO THE REGION AND THE STATE;

(2) LOCAL AND REGIONAL SOCIAL, ENVIRONMENTAL, TRAFFIC AND INFRASTRUC- TURE IMPACTS;

(3) IMPACT ON THE LOCAL AND REGIONAL ECONOMY, INCLUDING THE IMPACT ON CULTURAL INSTITUTIONS AND ON SMALL BUSINESSES IN THE HOST MUNICIPALITY AND NEARBY MUNICIPALITIES;

(4) COST TO THE HOST MUNICIPALITY, NEARBY MUNICIPALITIES AND THE STATE FOR THE PROPOSED GAMING FACILITY TO BE LOCATED AT THE PROPOSED LOCATION; AND

(5) THE ESTIMATED STATE TAX REVENUE TO BE GENERATED BY THE GAMING FACILITY;

(M) THE NAMES OF PROPOSED VENDORS OF GAMING EQUIPMENT;

(N) THE LOCATION OF THE PROPOSED GAMING FACILITY, WHICH SHALL INCLUDE THE ADDRESS, MAPS, BOOK AND PAGE NUMBERS FROM THE APPROPRIATE REGISTRY OF DEEDS, ASSESSED VALUE OF THE LAND AT THE TIME OF APPLICATION AND OWNERSHIP INTERESTS OVER THE PAST TWENTY YEARS, INCLUDING ALL INTERESTS, OPTIONS, AGREEMENTS IN PROPERTY AND DEMOGRAPHIC, GEOGRAPHIC AND ENVIRON- MENTAL INFORMATION AND ANY OTHER INFORMATION REQUESTED BY THE COMMIS- SION;

(O) THE TYPE AND NUMBER OF GAMES TO BE CONDUCTED AT THE PROPOSED GAMING FACILITY AND THE SPECIFIC LOCATION OF THE GAMES IN THE PROPOSED GAMING FACILITY;

(P) THE NUMBER OF HOTELS AND ROOMS, RESTAURANTS AND OTHER AMENITIES LOCATED AT THE PROPOSED GAMING FACILITY AND HOW THEY MEASURE IN QUALITY TO OTHER AREA HOTELS AND AMENITIES;

(Q) WHETHER THE APPLICANT'S PROPOSED GAMING FACILITY IS PART OF A REGIONAL OR LOCAL ECONOMIC PLAN; AND

(R) WHETHER THE APPLICANT PURCHASED OR INTENDS TO PURCHASE PUBLICLY-OWNED LAND FOR THE PROPOSED GAMING FACILITY.

2. APPLICATIONS FOR LICENSES SHALL BE PUBLIC RECORDS; PROVIDED HOWEV- ER, THAT TRADE SECRETS, COMPETITIVELY-SENSITIVE OR OTHER PROPRIETARY INFORMATION PROVIDED IN THE COURSE OF AN APPLICATION FOR A GAMING

LICENSE UNDER THIS ARTICLE, THE DISCLOSURE OF WHICH WOULD PLACE THE
APPLICANT AT A COMPETITIVE DISADVANTAGE, MAY BE WITHHELD FROM DISCLOSURE
PURSUANT TO PARAGRAPH (D) OF SUBDIVISION TWO OF SECTION EIGHTY-SEVEN OF
THE PUBLIC OFFICERS LAW.

  S 1314. LICENSE APPLICANT ELIGIBILITY.  1. GAMING FACILITY LICENSES
SHALL ONLY BE ISSUED TO APPLICANTS WHO ARE QUALIFIED UNDER THE CRITERIA
SET FORTH IN THIS ARTICLE, AS DETERMINED BY THE COMMISSION.

  2. AS A CONDITION OF FILING, EACH POTENTIAL LICENSE APPLICANT MUST
DEMONSTRATE TO THE BOARD'S SATISFACTION THAT LOCAL SUPPORT HAS BEEN
DEMONSTRATED.

  3. WITHIN ANY DEVELOPMENT REGION, IF THE COMMISSION IS NOT CONVINCED
THAT THERE IS AN APPLICANT THAT HAS MET THE ELIGIBILITY CRITERIA OR THE
BOARD FINDS THAT NO APPLICANT HAS PROVIDED SUBSTANTIAL EVIDENCE THAT ITS
PROPOSAL WILL PROVIDE VALUE TO THE REGION IN WHICH THE GAMING FACILITY
IS PROPOSED TO BE LOCATED, NO GAMING FACILITY LICENSE SHALL BE AWARDED
IN THAT REGION.

  S 1315. REQUIRED CAPITAL INVESTMENT. 1. THE BOARD SHALL ESTABLISH THE
MINIMUM CAPITAL INVESTMENT FOR A GAMING FACILITY BY ZONE AND REGION.
SUCH INVESTMENT SHALL INCLUDE, BUT NOT BE LIMITED TO, A CASINO AREA, AT
LEAST ONE HOTEL AND OTHER AMENITIES; AND PROVIDED FURTHER, THAT THE
BOARD SHALL DETERMINE WHETHER IT WILL INCLUDE THE PURCHASE OR LEASE
PRICE OF THE LAND WHERE THE GAMING FACILITY WILL BE LOCATED OR ANY
INFRASTRUCTURE DESIGNED TO SUPPORT THE SITE INCLUDING, BUT NOT LIMITED
TO, DRAINAGE, UTILITY SUPPORT, ROADWAYS, INTERCHANGES, FILL AND SOIL OR
GROUNDWATER OR SURFACE WATER CONTAMINATION ISSUES.   THE BOARD MAY
CONSIDER PRIVATE CAPITAL INVESTMENT MADE PREVIOUS TO THE EFFECTIVE DATE
OF THIS SECTION, BUT MAY, IN ITS DISCRETION, DISCOUNT A PERCENTAGE OF
THE INVESTMENT MADE. UPON AWARD OF A GAMING LICENSE BY THE COMMISSION,
THE APPLICANT SHALL BE REQUIRED TO DEPOSIT TEN PERCENT OF THE TOTAL
INVESTMENT PROPOSED IN THE APPLICATION INTO AN INTEREST-BEARING ACCOUNT.
MONIES RECEIVED FROM THE APPLICANT SHALL BE HELD IN ESCROW UNTIL THE
FINAL STAGE OF CONSTRUCTION, AS DETAILED IN THE TIMELINE OF CONSTRUCTION
SUBMITTED WITH THE LICENSEE'S APPLICATION AND APPROVED BY THE COMMIS-
SION, AT WHICH TIME THE DEPOSIT PLUS INTEREST EARNED SHALL BE RETURNED
TO THE APPLICANT TO BE APPLIED FOR THE FINAL STAGE.  SHOULD THE APPLI-
CANT BE UNABLE TO COMPLETE THE GAMING FACILITY, THE DEPOSIT SHALL BE
FORFEITED TO THE STATE. IN PLACE OF A CASH DEPOSIT, THE COMMISSION MAY
ALLOW FOR AN APPLICANT TO SECURE A DEPOSIT BOND INSURING THAT TEN
PERCENT OF THE PROPOSED CAPITAL INVESTMENT SHALL BE FORFEITED TO THE
STATE IF THE APPLICANT IS UNABLE TO COMPLETE THE GAMING FACILITY.

  2. EACH APPLICANT SHALL SUBMIT ITS PROPOSED CAPITAL INVESTMENT WITH
ITS APPLICATION TO THE BOARD WHICH SHALL INCLUDE STAGES OF CONSTRUCTION
OF THE GAMING FACILITY AND THE DEADLINE BY WHICH THE STAGES AND OVERALL
CONSTRUCTION AND ANY INFRASTRUCTURE IMPROVEMENTS WILL BE COMPLETED. IN
AWARDING A LICENSE, THE COMMISSION SHALL DETERMINE AT WHAT STAGE OF
CONSTRUCTION A LICENSEE SHALL BE APPROVED TO OPEN FOR GAMING; PROVIDED,
HOWEVER, THAT A LICENSEE SHALL NOT BE APPROVED TO OPEN FOR GAMING UNTIL
THE COMMISSION HAS DETERMINED THAT AT LEAST THE GAMING AREA AND OTHER
ANCILLARY ENTERTAINMENT SERVICES AND NON-GAMING AMENITIES, AS REQUIRED
BY THE BOARD, HAVE BEEN BUILT AND ARE OF A SUPERIOR QUALITY AS SET FORTH
IN THE CONDITIONS OF LICENSURE.  THE COMMISSION SHALL NOT APPROVE A
GAMING FACILITY TO OPEN BEFORE THE COMPLETION OF THE PERMANENT CASINO
AREA.

  3. A LICENSEE WHO FAILS TO BEGIN GAMING OPERATIONS WITHIN TWENTY-FOUR
MONTHS FOLLOWING LICENSE AWARD SHALL BE SUBJECT TO SUSPENSION OR REVOCA-
TION OF THE GAMING LICENSE BY THE COMMISSION AND MAY, AFTER BEING FOUND

BY THE COMMISSION AFTER NOTICE AND OPPORTUNITY FOR A HEARING TO HAVE
ACTED IN BAD FAITH IN ITS APPLICATION, BE ASSESSED A FINE OF UP TO FIFTY
MILLION DOLLARS.

4. THE BOARD SHALL DETERMINE A LICENSING FEE TO BE PAID BY A LICENSEE
WITHIN THIRTY DAYS AFTER THE AWARD OF THE LICENSE WHICH SHALL BE DEPOS-
ITED INTO THE COMMERCIAL GAMING REVENUE FUND. THE LICENSE SHALL SET
FORTH THE CONDITIONS TO BE SATISFIED BY THE LICENSEE BEFORE THE GAMING
FACILITY SHALL BE OPENED TO THE PUBLIC. THE COMMISSION SHALL SET ANY
RENEWAL FEE FOR SUCH LICENSE BASED ON THE COST OF FEES ASSOCIATED WITH
THE EVALUATION OF A LICENSEE UNDER THIS ARTICLE WHICH SHALL BE DEPOSITED
INTO THE COMMERCIAL GAMING FUND. SUCH RENEWAL FEE SHALL BE EXCLUSIVE OF
ANY SUBSEQUENT LICENSING FEES UNDER THIS SECTION.

5. THE COMMISSION SHALL DETERMINE THE SOURCES AND TOTAL AMOUNT OF AN
APPLICANT'S PROPOSED CAPITALIZATION TO DEVELOP, CONSTRUCT, MAINTAIN AND
OPERATE A PROPOSED GAMING FACILITY UNDER THIS ARTICLE. UPON AWARD OF A
GAMING LICENSE, THE COMMISSION SHALL CONTINUE TO ASSESS THE CAPITALIZA-
TION OF A LICENSEE FOR THE DURATION OF CONSTRUCTION OF THE PROPOSED
GAMING FACILITY AND THE TERM OF THE LICENSE.

S 1316. MINIMUM LICENSE THRESHOLDS. NO APPLICANT SHALL BE ELIGIBLE TO
RECEIVE A GAMING LICENSE UNLESS THE APPLICANT MEETS THE FOLLOWING CRITE-
RIA AND CLEARLY STATES AS PART OF AN APPLICATION THAT THE APPLICANT
SHALL:

1. IN ACCORDANCE WITH THE DESIGN PLANS SUBMITTED WITH THE LICENSEE'S
APPLICATION TO THE BOARD, INVEST NOT LESS THAN THE REQUIRED CAPITAL
UNDER THIS ARTICLE INTO THE GAMING FACILITY;

2. OWN OR ACQUIRE, WITHIN SIXTY DAYS AFTER A LICENSE HAS BEEN AWARDED,
THE LAND WHERE THE GAMING FACILITY IS PROPOSED TO BE CONSTRUCTED;
PROVIDED, HOWEVER, THAT OWNERSHIP OF THE LAND SHALL INCLUDE A TENANCY
FOR A TERM OF YEARS UNDER A LEASE THAT EXTENDS NOT LESS THAN SIXTY YEARS
BEYOND THE TERM OF THE GAMING LICENSE ISSUED UNDER THIS ARTICLE;

3. MEET THE LICENSEE DEPOSIT REQUIREMENT;

4. DEMONSTRATE THAT IT IS ABLE TO PAY AND SHALL COMMIT TO PAYING THE
GAMING LICENSING FEE;

5. DEMONSTRATE TO THE COMMISSION HOW THE APPLICANT PROPOSES TO ADDRESS
PROBLEM GAMBLING CONCERNS, WORKFORCE DEVELOPMENT AND COMMUNITY DEVELOP-
MENT AND HOST AND NEARBY MUNICIPALITY IMPACT AND MITIGATION ISSUES;

6. IDENTIFY THE INFRASTRUCTURE COSTS OF THE HOST MUNICIPALITY INCURRED
IN DIRECT RELATION TO THE CONSTRUCTION AND OPERATION OF A GAMING FACILI-
TY AND COMMIT TO A COMMUNITY MITIGATION PLAN FOR THE HOST MUNICIPALITY;

7. IDENTIFY THE SERVICE COSTS OF THE HOST MUNICIPALITY INCURRED FOR
EMERGENCY SERVICES IN DIRECT RELATION TO THE OPERATION OF A GAMING
FACILITY AND COMMIT TO A COMMUNITY MITIGATION PLAN FOR THE HOST MUNICI-
PALITY;

8. PAY TO THE COMMISSION AN APPLICATION FEE OF ONE MILLION DOLLARS TO
DEFRAY THE COSTS ASSOCIATED WITH THE PROCESSING OF THE APPLICATION AND
INVESTIGATION OF THE APPLICANT; PROVIDED, HOWEVER, THAT IF THE COSTS OF
THE INVESTIGATION EXCEED THE INITIAL APPLICATION FEE, THE APPLICANT
SHALL PAY THE ADDITIONAL AMOUNT TO THE COMMISSION WITHIN THIRTY DAYS
AFTER NOTIFICATION OF INSUFFICIENT FEES OR THE APPLICATION SHALL BE
REJECTED AND FURTHER PROVIDED THAT SHOULD THE COSTS OF SUCH INVESTI-
GATION NOT EXCEED THE FEE REMITTED, ANY UNEXPENDED PORTION SHALL BE
RETURNED TO THE APPLICANT;

9. COMPLY WITH STATE BUILDING AND FIRE PREVENTION CODES;

10. FORMULATE FOR BOARD APPROVAL AND ABIDE BY AN AFFIRMATIVE ACTION
PROGRAM OF EQUAL OPPORTUNITY WHEREBY THE APPLICANT ESTABLISHES SPECIFIC

S. 5883                          18                          A. 8101

GOALS   FOR  THE  UTILIZATION  OF  MINORITIES,  WOMEN  AND  VETERANS  ON
CONSTRUCTION JOBS.

    S  1317.  INVESTIGATION  OF LICENSE APPLICANTS. 1. UPON RECEIPT OF AN
APPLICATION FOR A GAMING FACILITY LICENSE, THE COMMISSION SHALL CAUSE TO
BE COMMENCED AN INVESTIGATION INTO THE SUITABILITY OF THE APPLICANT.  IN
EVALUATING  THE  SUITABILITY  OF  THE  APPLICANT,  THE  COMMISSION SHALL
CONSIDER THE OVERALL REPUTATION OF THE  APPLICANT  INCLUDING,  WITHOUT
LIMITATION:

    (A)  THE  INTEGRITY,  HONESTY,  GOOD  CHARACTER  AND REPUTATION OF THE
APPLICANT;

    (B) THE FINANCIAL STABILITY, INTEGRITY AND BACKGROUND  OF  THE  APPLI-
CANT;

    (C)  THE  BUSINESS PRACTICES AND THE BUSINESS ABILITY OF THE APPLICANT
TO ESTABLISH AND MAINTAIN A SUCCESSFUL GAMING FACILITY;

    (D) WHETHER THE APPLICANT HAS A  HISTORY  OF  COMPLIANCE  WITH  GAMING
LICENSING REQUIREMENTS IN OTHER JURISDICTIONS;

    (E)  WHETHER THE APPLICANT, AT THE TIME OF APPLICATION, IS A DEFENDANT
IN LITIGATION INVOLVING ITS BUSINESS PRACTICES;

    (F) THE SUITABILITY OF ALL PARTIES IN INTEREST TO THE GAMING  FACILITY
LICENSE,  INCLUDING  AFFILIATES  AND  CLOSE ASSOCIATES AND THE FINANCIAL
RESOURCES OF THE APPLICANT; AND

    (G) WHETHER THE APPLICANT IS DISQUALIFIED  FROM  RECEIVING  A  LICENSE
UNDER THIS ARTICLE; PROVIDED, HOWEVER, THAT IN CONSIDERING THE REHABILI-
TATION  OF  AN  APPLICANT  FOR A GAMING FACILITY LICENSE, THE COMMISSION
SHALL NOT AUTOMATICALLY DISQUALIFY AN APPLICANT IF THE APPLICANT  AFFIR-
MATIVELY DEMONSTRATES, BY CLEAR AND CONVINCING EVIDENCE, THAT THE APPLI-
CANT  HAS FINANCIAL RESPONSIBILITY, CHARACTER, REPUTATION, INTEGRITY AND
GENERAL FITNESS AS SUCH TO WARRANT BELIEF BY  THE  COMMISSION  THAT  THE
APPLICANT  WILL  ACT  HONESTLY,  FAIRLY, SOUNDLY AND EFFICIENTLY AS A GAMING
LICENSEE.

    2. IF THE INVESTIGATION REVEALS THAT AN APPLICANT HAS FAILED TO:

    (A) ESTABLISH THE APPLICANT'S INTEGRITY OR THE INTEGRITY OF ANY AFFIL-
IATE,  CLOSE  ASSOCIATE,  FINANCIAL  SOURCE  OR ANY PERSON REQUIRED TO BE
QUALIFIED BY THE COMMISSION;

    (B) DEMONSTRATE RESPONSIBLE BUSINESS PRACTICES IN ANY JURISDICTION; OR

    (C) OVERCOME ANY OTHER REASON, AS DETERMINED BY THE COMMISSION, AS  TO
WHY  IT  WOULD  BE INJURIOUS TO THE INTERESTS OF THE STATE IN AWARDING THE
APPLICANT A GAMING FACILITY  LICENSE,  THE  COMMISSION  SHALL  DENY  THE
APPLICATION, SUBJECT TO NOTICE AND AN OPPORTUNITY FOR HEARING.

    3.  IF  THE  INVESTIGATION REVEALS THAT AN APPLICANT IS SUITABLE TO
RECEIVE A GAMING FACILITY LICENSE, THE ENTITY SHALL RECOMMEND  THAT  THE
COMMISSION COMMENCE A REVIEW OF THE APPLICANT'S ENTIRE APPLICATION.

    S  1318.  DISQUALIFYING  CRITERIA.  1.  THE  COMMISSION SHALL DENY A
LICENSE TO ANY APPLICANT WHO THE COMMISSION DETERMINES  IS  DISQUALIFIED
ON  THE  BASIS OF ANY OF THE FOLLOWING CRITERIA, SUBJECT TO NOTICE AND AN
OPPORTUNITY FOR HEARING:

    (A) FAILURE OF THE APPLICANT TO PROVE BY CLEAR AND CONVINCING EVIDENCE
THAT THE APPLICANT IS QUALIFIED IN ACCORDANCE  WITH  THE  PROVISIONS  OF
THIS ARTICLE;

    (B) FAILURE OF THE APPLICANT TO PROVIDE INFORMATION, DOCUMENTATION AND
ASSURANCES  REQUIRED  BY THIS ARTICLE OR REQUESTED BY THE COMMISSION, OR
FAILURE OF THE APPLICANT TO REVEAL ANY FACT MATERIAL  TO  QUALIFICATION,
OR  THE  SUPPLYING  OF INFORMATION WHICH IS UNTRUE OR MISLEADING AS TO A
MATERIAL FACT PERTAINING TO THE QUALIFICATION CRITERIA;

    (C) THE CONVICTION OF THE APPLICANT, OR OF ANY PERSON REQUIRED  TO  BE
QUALIFIED UNDER THIS ARTICLE AS A CONDITION OF A LICENSE, OF ANY OFFENSE

S. 5883                                    19                                    A. 8101

IN ANY JURISDICTION WHICH IS OR WOULD BE A FELONY OR OTHER CRIME INVOLV-
ING PUBLIC INTEGRITY, EMBEZZLEMENT, THEFT, FRAUD OR PERJURY;

(D) COMMITTED PRIOR ACTS WHICH HAVE NOT BEEN PROSECUTED OR IN WHICH
THE APPLICANT, OR OF ANY PERSON REQUIRED TO BE QUALIFIED UNDER THIS
ARTICLE AS A CONDITION OF A LICENSE, WAS NOT CONVICTED BUT FORM A
PATTERN OF MISCONDUCT THAT MAKES THE APPLICANT UNSUITABLE FOR A LICENSE
UNDER THIS ARTICLE; OR

(E) IF THE APPLICANT, OR OF ANY PERSON REQUIRED TO BE QUALIFIED UNDER
THIS ARTICLE AS A CONDITION OF A LICENSE, HAS AFFILIATES OR CLOSE ASSO-
CIATES THAT WOULD NOT QUALIFY FOR A LICENSE OR WHOSE RELATIONSHIP WITH
THE APPLICANT MAY POSE AN INJURIOUS THREAT TO THE INTERESTS OF THE STATE
IN AWARDING A GAMING FACILITY LICENSE TO THE APPLICANT;

(F) ANY OTHER OFFENSE UNDER PRESENT STATE OR FEDERAL LAW WHICH INDI-
CATES THAT LICENSURE OF THE APPLICANT WOULD BE INIMICAL TO THE POLICY OF
THIS ARTICLE; PROVIDED, HOWEVER, THAT THE DISQUALIFICATION PROVISIONS OF
THIS SECTION SHALL NOT APPLY WITH REGARD TO ANY MISDEMEANOR CONVICTION;

(G) CURRENT PROSECUTION OR PENDING CHARGES IN ANY JURISDICTION OF THE
APPLICANT OR OF ANY PERSON WHO IS REQUIRED TO BE QUALIFIED UNDER THIS
ARTICLE AS A CONDITION OF A LICENSE, FOR ANY OF THE OFFENSES ENUMERATED
IN PARAGRAPH (C) OF SUBDIVISION ONE OF THIS SECTION; PROVIDED, HOWEVER,
THAT AT THE REQUEST OF THE APPLICANT OR THE PERSON CHARGED, THE COMMIS-
SION MAY DEFER DECISION UPON SUCH APPLICATION DURING THE PENDENCY OF
SUCH CHARGE;

(H) THE PURSUIT BY THE APPLICANT OR ANY PERSON WHO IS REQUIRED TO BE
QUALIFIED UNDER THIS ARTICLE AS A CONDITION OF A LICENSE OF ECONOMIC
GAIN IN AN OCCUPATIONAL MANNER OR CONTEXT WHICH IS IN VIOLATION OF THE
CRIMINAL OR CIVIL PUBLIC POLICIES OF THIS STATE, IF SUCH PURSUIT CREATES
A REASONABLE BELIEF THAT THE PARTICIPATION OF SUCH PERSON IN GAMING
FACILITY OPERATIONS WOULD BE INIMICAL TO THE POLICIES OF THIS ARTICLE.
FOR PURPOSES OF THIS SECTION, OCCUPATIONAL MANNER OR CONTEXT SHALL BE
DEFINED AS THE SYSTEMATIC PLANNING, ADMINISTRATION, MANAGEMENT, OR
EXECUTION OF AN ACTIVITY FOR FINANCIAL GAIN;

(I) THE IDENTIFICATION OF THE APPLICANT OR ANY PERSON WHO IS REQUIRED
TO BE QUALIFIED UNDER THIS ARTICLE AS A CONDITION OF A LICENSE AS A
CAREER OFFENDER OR A MEMBER OF A CAREER OFFENDER CARTEL OR AN ASSOCIATE
OF A CAREER OFFENDER OR CAREER OFFENDER CARTEL IN SUCH A MANNER WHICH
CREATES A REASONABLE BELIEF THAT THE ASSOCIATION IS OF SUCH A NATURE AS
TO BE INIMICAL TO THE POLICY OF THIS ARTICLE. FOR PURPOSES OF THIS
SECTION, CAREER OFFENDER SHALL BE DEFINED AS ANY PERSON WHOSE BEHAVIOR
IS PURSUED IN AN OCCUPATIONAL MANNER OR CONTEXT FOR THE PURPOSE OF
ECONOMIC GAIN, UTILIZING SUCH METHODS AS ARE DEEMED CRIMINAL VIOLATIONS
OF THE PUBLIC POLICY OF THIS STATE. A CAREER OFFENDER CARTEL SHALL BE
DEFINED AS ANY GROUP OF PERSONS WHO OPERATE TOGETHER AS CAREER OFFEN-
DERS;

(J) THE COMMISSION BY THE APPLICANT OR ANY PERSON WHO IS REQUIRED TO
BE QUALIFIED UNDER THIS ARTICLE AS A CONDITION OF A LICENSE OF ANY ACT
OR ACTS WHICH WOULD CONSTITUTE ANY OFFENSE UNDER PARAGRAPH (C) OF SUBDI-
VISION ONE OF THIS SECTION, EVEN IF SUCH CONDUCT HAS NOT BEEN OR MAY NOT
BE PROSECUTED UNDER THE CRIMINAL LAWS OF THIS STATE OR ANY OTHER JURIS-
DICTION;

(K) FLAGRANT DEFIANCE BY THE APPLICANT OR ANY PERSON WHO IS REQUIRED
TO BE QUALIFIED UNDER THIS ARTICLE OF ANY LEGISLATIVE INVESTIGATORY BODY
OR OTHER OFFICIAL INVESTIGATORY BODY OF ANY STATE OR OF THE UNITED
STATES WHEN SUCH BODY IS ENGAGED IN THE INVESTIGATION OF CRIMES RELATING
TO GAMING, OFFICIAL CORRUPTION, OR ORGANIZED CRIME ACTIVITY; AND

(L) FAILURE BY THE APPLICANT OR ANY PERSON REQUIRED TO BE QUALIFIED UNDER THIS ARTICLE AS A CONDITION OF A LICENSE TO MAKE REQUIRED PAYMENTS IN ACCORDANCE WITH A CHILD SUPPORT ORDER, REPAY AN OVERPAYMENT FOR PUBLIC ASSISTANCE BENEFITS, OR REPAY ANY OTHER DEBT OWED TO THE STATE UNLESS SUCH APPLICANT PROVIDES PROOF TO THE EXECUTIVE DIRECTOR'S SATIS-FACTION OF PAYMENT OF OR ARRANGEMENT TO PAY ANY SUCH DEBTS PRIOR TO LICENSURE.

S 1319. HEARINGS. THE COMMISSION AND THE BOARD SHALL HAVE THE INDE-PENDENT AUTHORITY TO CONDUCT HEARINGS CONCERNING THE CONDUCT OF GAMING AND APPLICANTS FOR GAMING FACILITY LICENSES IN ACCORDANCE WITH ANY PROCEDURES SET FORTH IN THIS ARTICLE AND ANY APPLICABLE IMPLEMENTING REGULATIONS.

S 1320. SITING EVALUATION. IN DETERMINING WHETHER AN APPLICANT SHALL BE ELIGIBLE FOR A GAMING FACILITY LICENSE, THE BOARD SHALL EVALUATE AND ISSUE A FINDING OF HOW EACH APPLICANT PROPOSES TO ADVANCE THE FOLLOWING OBJECTIVES.

1. THE DECISION BY THE BOARD TO SELECT A GAMING FACILITY LICENSE APPLICANT SHALL BE WEIGHTED BY SEVENTY PERCENT BASED ON ECONOMIC ACTIV-ITY AND BUSINESS DEVELOPMENT FACTORS INCLUDING:

(A) REALIZING MAXIMUM CAPITAL INVESTMENT EXCLUSIVE OF LAND ACQUISITION AND INFRASTRUCTURE IMPROVEMENTS;

(B) MAXIMIZING REVENUES RECEIVED BY THE STATE AND LOCALITIES;

(C) PROVIDING THE HIGHEST NUMBER OF QUALITY JOBS IN THE GAMING FACILI-TY;

(D) BUILDING A GAMING FACILITY OF THE HIGHEST CALIBER WITH A VARIETY OF QUALITY AMENITIES TO BE INCLUDED AS PART OF THE GAMING FACILITY;

(E) OFFERING THE HIGHEST AND BEST VALUE TO PATRONS TO CREATE A SECURE AND ROBUST GAMING MARKET IN THE REGION AND THE STATE;

(F) PROVIDING A MARKET ANALYSIS DETAILING THE BENEFITS OF THE SITE LOCATION OF THE GAMING FACILITY AND THE ESTIMATED RECAPTURE RATE OF GAMING-RELATED SPENDING BY RESIDENTS TRAVELLING TO AN OUT-OF-STATE GAMING FACILITY;

(G) OFFERING THE FASTEST TIME TO COMPLETION OF THE FULL GAMING FACILI-TY;

(H) DEMONSTRATING THE ABILITY TO FULLY FINANCE THE GAMING FACILITY; AND

(I) DEMONSTRATING EXPERIENCE IN THE DEVELOPMENT AND OPERATION OF A QUALITY GAMING FACILITY.

2. THE DECISION BY THE BOARD TO SELECT A GAMING FACILITY LICENSE APPLICANT SHALL BE WEIGHTED BY TWENTY PERCENT BASED ON LOCAL IMPACT AND SITING FACTORS INCLUDING:

(A) MITIGATING POTENTIAL IMPACTS ON HOST AND NEARBY MUNICIPALITIES WHICH MIGHT RESULT FROM THE DEVELOPMENT OR OPERATION OF THE GAMING FACILITY;

(B) GAINING PUBLIC SUPPORT IN THE HOST AND NEARBY MUNICIPALITIES WHICH MAY BE DEMONSTRATED THROUGH THE PASSAGE OF LOCAL LAWS OR PUBLIC COMMENT RECEIVED BY THE BOARD OR GAMING APPLICANT;

(C) OPERATING IN PARTNERSHIP WITH AND PROMOTING LOCAL HOTELS, RESTAU-RANTS AND RETAIL FACILITIES SO THAT PATRONS EXPERIENCE THE FULL DIVERSI-FIED REGIONAL TOURISM INDUSTRY; AND

(D) ESTABLISHING A FAIR AND REASONABLE PARTNERSHIP WITH LIVE ENTER-TAINMENT VENUES THAT MAY BE IMPACTED BY A GAMING FACILITY UNDER WHICH THE GAMING FACILITY ACTIVELY SUPPORTS THE MISSION AND THE OPERATION OF THE IMPACTED ENTERTAINMENT VENUES.

3. THE DECISION BY THE BOARD TO SELECT A GAMING FACILITY LICENSE APPLICANT SHALL BE WEIGHTED BY TEN PERCENT BASED ON WORKFORCE ENHANCEMENT FACTORS INCLUDING:

(A) IMPLEMENTING A WORKFORCE DEVELOPMENT PLAN THAT UTILIZES THE EXISTING LABOR FORCE, INCLUDING THE ESTIMATED NUMBER OF CONSTRUCTION JOBS A PROPOSED GAMING FACILITY WILL GENERATE, THE DEVELOPMENT OF WORKFORCE TRAINING PROGRAMS THAT SERVE THE UNEMPLOYED AND METHODS FOR ACCESSING EMPLOYMENT AT THE GAMING FACILITY;

(B) TAKING ADDITIONAL MEASURES TO ADDRESS PROBLEM GAMBLING INCLUDING, BUT NOT LIMITED TO, TRAINING OF GAMING EMPLOYEES TO IDENTIFY PATRONS EXHIBITING PROBLEMS WITH GAMBLING;

(C) UTILIZING SUSTAINABLE DEVELOPMENT PRINCIPLES INCLUDING, BUT NOT LIMITED TO:

(1) HAVING NEW AND RENOVATION CONSTRUCTION CERTIFIED UNDER THE APPROPRIATE CERTIFICATION CATEGORY IN THE LEADERSHIP IN ENERGY AND ENVIRONMENTAL DESIGN GREEN BUILDING RATING SYSTEM CREATED BY THE UNITED STATES GREEN BUILDING COUNCIL;

(2) EFFORTS TO MITIGATE VEHICLE TRIPS;

(3) EFFORTS TO CONSERVE WATER AND MANAGE STORM WATER;

(4) DEMONSTRATING THAT ELECTRICAL AND HVAC EQUIPMENT AND APPLIANCES WILL BE ENERGY STAR LABELED WHERE AVAILABLE;

(5) PROCURING OR GENERATING ON-SITE TEN PERCENT OF ITS ANNUAL ELECTRICITY CONSUMPTION FROM RENEWABLE SOURCES; AND

(6) DEVELOPING AN ONGOING PLAN TO SUBMETER AND MONITOR ALL MAJOR SOURCES OF ENERGY CONSUMPTION AND UNDERTAKE REGULAR EFFORTS TO MAINTAIN AND IMPROVE ENERGY EFFICIENCY OF BUILDINGS IN THEIR SYSTEMS;

(D) ESTABLISHING, FUNDING AND MAINTAINING HUMAN RESOURCE HIRING AND TRAINING PRACTICES THAT PROMOTE THE DEVELOPMENT OF A SKILLED AND DIVERSE WORKFORCE AND ACCESS TO PROMOTION OPPORTUNITIES THROUGH A WORKFORCE TRAINING PROGRAM THAT:

(1) ESTABLISHES TRANSPARENT CAREER PATHS WITH MEASURABLE CRITERIA WITHIN THE GAMING FACILITY THAT LEAD TO INCREASED RESPONSIBILITY AND HIGHER PAY GRADES THAT ARE DESIGNED TO ALLOW EMPLOYEES TO PURSUE CAREER ADVANCEMENT AND PROMOTION;

(2) PROVIDES EMPLOYEE ACCESS TO ADDITIONAL RESOURCES, SUCH AS TUITION REIMBURSEMENT OR STIPEND POLICIES, TO ENABLE EMPLOYEES TO ACQUIRE THE EDUCATION OR JOB TRAINING NEEDED TO ADVANCE CAREER PATHS BASED ON INCREASED RESPONSIBILITY AND PAY GRADES; AND

(3) ESTABLISHES AN ON-SITE CHILD DAY CARE PROGRAM;

(E) PURCHASING, WHENEVER POSSIBLE, DOMESTICALLY MANUFACTURED SLOT MACHINES FOR INSTALLATION IN THE GAMING FACILITY;

(F) IMPLEMENTING A WORKFORCE DEVELOPMENT PLAN THAT:

(1) INCORPORATES AN AFFIRMATIVE ACTION PROGRAM OF EQUAL OPPORTUNITY BY WHICH THE APPLICANT GUARANTEES TO PROVIDE EQUAL EMPLOYMENT OPPORTUNITIES TO ALL EMPLOYEES QUALIFIED FOR LICENSURE IN ALL EMPLOYMENT CATEGORIES, INCLUDING PERSONS WITH DISABILITIES;

(2) UTILIZES THE EXISTING LABOR FORCE IN THE STATE;

(3) ESTIMATES THE NUMBER OF CONSTRUCTION JOBS A GAMING FACILITY WILL GENERATE AND PROVIDES FOR EQUAL EMPLOYMENT OPPORTUNITIES AND WHICH INCLUDES SPECIFIC GOALS FOR THE UTILIZATION OF MINORITIES, WOMEN AND VETERANS ON THOSE CONSTRUCTION JOBS;

(4) IDENTIFIES WORKFORCE TRAINING PROGRAMS OFFERED BY THE GAMING FACILITY; AND

(5) IDENTIFIES THE METHODS FOR ACCESSING EMPLOYMENT AT THE GAMING FACILITY; AND

S. 5883                                22                              A. 8101

(G) DEMONSTRATING THAT THE APPLICANT HAS AN AGREEMENT WITH ORGANIZED
LABOR, INCLUDING HOSPITALITY SERVICES, AND HAS THE SUPPORT OF ORGANIZED
LABOR FOR ITS APPLICATION, WHICH SPECIFIES:

(1) THE NUMBER OF EMPLOYEES TO BE EMPLOYED AT THE GAMING FACILITY,
INCLUDING DETAILED INFORMATION ON THE PAY RATE AND BENEFITS FOR EMPLOY-
EES AND CONTRACTORS IN THE GAMING FACILITY AND ALL INFRASTRUCTURE
IMPROVEMENTS RELATED TO THE PROJECT; AND

(2) DETAILED PLANS FOR ASSURING LABOR HARMONY DURING ALL PHASES OF THE
CONSTRUCTION, RECONSTRUCTION, RENOVATION, DEVELOPMENT AND OPERATION OF
THE GAMING FACILITY.

S 1321. INTENTIONALLY OMITTED.

                              TITLE 3
                       OCCUPATIONAL LICENSING

SECTION 1322. GENERAL PROVISIONS.

        1323. KEY EMPLOYEE LICENSES.

        1324. GAMING EMPLOYEE REGISTRATION.

        1325. APPROVAL, DENIAL AND RENEWAL OF EMPLOYEE LICENSES AND
              REGISTRATIONS.

S 1322. GENERAL PROVISIONS. 1. IT SHALL BE THE AFFIRMATIVE RESPONSI-
BILITY OF EACH APPLICANT OR LICENSEE TO ESTABLISH BY CLEAR AND CONVINC-
ING EVIDENCE ITS INDIVIDUAL QUALIFICATIONS, AND FOR A GAMING FACILITY
LICENSE THE QUALIFICATIONS OF EACH PERSON WHO IS REQUIRED TO BE QUALI-
FIED UNDER THIS ARTICLE.

2. ANY APPLICANT, LICENSEE, REGISTRANT, OR ANY OTHER PERSON WHO MUST
BE QUALIFIED PURSUANT TO THIS ARTICLE SHALL PROVIDE ALL LEGALLY REQUIRED
INFORMATION AND SATISFY ALL LAWFUL REQUESTS FOR INFORMATION PERTAINING
TO QUALIFICATION AND IN THE FORM SPECIFIED BY REGULATION. ALL APPLI-
CANTS, REGISTRANTS, AND LICENSEES SHALL WAIVE LIABILITY AS TO THE STATE,
AND ITS INSTRUMENTALITIES AND AGENTS, FOR ANY DAMAGES RESULTING FROM ANY
DISCLOSURE OR PUBLICATION IN ANY MANNER, OTHER THAN A WILLFULLY UNLAWFUL
DISCLOSURE OR PUBLICATION, OF ANY MATERIAL OR INFORMATION ACQUIRED
DURING INQUIRIES, INVESTIGATIONS OR HEARINGS.

3. ALL APPLICANTS, LICENSEES, REGISTRANTS, INTERMEDIARY COMPANIES, AND
HOLDING COMPANIES SHALL CONSENT TO INSPECTIONS, SEARCHES AND SEIZURES
WHILE AT A GAMING FACILITY AND THE SUPPLYING OF HANDWRITING EXEMPLARS AS
AUTHORIZED BY THIS ARTICLE AND REGULATIONS PROMULGATED HEREUNDER.

4. ALL APPLICANTS, LICENSEES, REGISTRANTS, AND ANY OTHER PERSON WHO
SHALL BE QUALIFIED PURSUANT TO THIS ARTICLE SHALL HAVE THE CONTINUING
DUTY TO PROVIDE ANY ASSISTANCE OR INFORMATION REQUIRED BY THE COMMIS-
SION, AND TO COOPERATE IN ANY INQUIRY, INVESTIGATION OR HEARING
CONDUCTED BY THE COMMISSION. IF, UPON ISSUANCE OF A FORMAL REQUEST TO
ANSWER OR PRODUCE INFORMATION, EVIDENCE OR TESTIMONY, ANY APPLICANT,
LICENSEE, REGISTRANT, OR ANY OTHER PERSON WHO SHALL BE QUALIFIED PURSU-
ANT TO THIS ARTICLE REFUSES TO COMPLY, THE APPLICATION, LICENSE, REGIS-
TRATION OR QUALIFICATION OF SUCH PERSON MAY BE DENIED OR REVOKED.

5. EACH APPLICANT OR PERSON WHO MUST BE QUALIFIED UNDER THIS ARTICLE
SHALL BE PHOTOGRAPHED AND FINGERPRINTED FOR IDENTIFICATION AND INVESTI-
GATION PURPOSES IN ACCORDANCE WITH PROCEDURES SET FORTH BY REGULATION.

6. ALL LICENSEES, ALL REGISTRANTS, AND ALL OTHER PERSONS REQUIRED TO
BE QUALIFIED UNDER THIS ARTICLE SHALL HAVE A DUTY TO INFORM THE COMMIS-
SION OF ANY ACTION WHICH THEY BELIEVE WOULD CONSTITUTE A VIOLATION OF
THIS ARTICLE. NO PERSON WHO SO INFORMS THE COMMISSION SHALL BE DISCRIMI-
NATED AGAINST BY AN APPLICANT, LICENSEE OR REGISTRANT BECAUSE OF THE
SUPPLYING OF SUCH INFORMATION.

S 1323. KEY EMPLOYEE LICENSES. 1. NO LICENSEE OR A HOLDING OR INTER-
MEDIARY COMPANY OF A LICENSEE MAY EMPLOY ANY PERSON AS A CASINO KEY

EMPLOYEE UNLESS THE PERSON IS THE HOLDER OF A VALID CASINO KEY EMPLOYEE
LICENSE ISSUED BY THE COMMISSION.

    2. EACH APPLICANT FOR A CASINO KEY EMPLOYEE LICENSE MUST, PRIOR TO THE
ISSUANCE OF ANY CASINO KEY EMPLOYEE LICENSE, PRODUCE INFORMATION,
DOCUMENTATION AND ASSURANCES CONCERNING THE FOLLOWING QUALIFICATION
CRITERIA:

    (A) EACH APPLICANT FOR A CASINO KEY EMPLOYEE LICENSE SHALL PRODUCE
SUCH INFORMATION, DOCUMENTATION AND ASSURANCES AS MAY BE LAWFULLY
REQUIRED TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THE FINANCIAL
STABILITY, INTEGRITY AND RESPONSIBILITY OF THE APPLICANT, INCLUDING BUT
NOT LIMITED TO BANK REFERENCES, BUSINESS AND PERSONAL INCOME AND
DISBURSEMENTS SCHEDULES, TAX RETURNS AND OTHER REPORTS FILED WITH
GOVERNMENTAL AGENCIES, AND BUSINESS AND PERSONAL ACCOUNTING AND CHECK
RECORDS AND LEDGERS.  IN ADDITION, EACH APPLICANT SHALL, IN WRITING,
AUTHORIZE THE EXAMINATION OF ALL BANK ACCOUNTS AND RECORDS AS MAY BE
DEEMED NECESSARY BY THE COMMISSION.

    (B) EACH APPLICANT FOR A CASINO KEY EMPLOYEE LICENSE SHALL PRODUCE
SUCH INFORMATION, DOCUMENTATION AND ASSURANCES AS MAY BE REQUIRED TO
ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THE APPLICANT'S GOOD CHARAC-
TER, HONESTY AND INTEGRITY. SUCH INFORMATION SHALL INCLUDE DATA PERTAIN-
ING TO FAMILY, HABITS, CHARACTER, REPUTATION, CRIMINAL HISTORY INFORMA-
TION, BUSINESS ACTIVITIES, FINANCIAL AFFAIRS, AND BUSINESS, PROFESSIONAL
AND PERSONAL ASSOCIATES, COVERING AT LEAST THE TEN YEAR PERIOD IMME-
DIATELY PRECEDING THE FILING OF THE APPLICATION. EACH APPLICANT SHALL
NOTIFY THE COMMISSION OF ANY CIVIL JUDGMENTS OBTAINED AGAINST SUCH
APPLICANT PERTAINING TO ANTITRUST OR SECURITY REGULATION LAWS OF THE
FEDERAL GOVERNMENT, OF THIS STATE OR OF ANY OTHER STATE, JURISDICTION,
PROVINCE OR COUNTRY. IN ADDITION, EACH APPLICANT SHALL, UPON REQUEST OF
THE COMMISSION, PRODUCE LETTERS OF REFERENCE FROM LAW ENFORCEMENT AGEN-
CIES HAVING JURISDICTION IN THE APPLICANT'S PLACE OF RESIDENCE AND PRIN-
CIPAL PLACE OF BUSINESS, WHICH LETTERS OF REFERENCE SHALL INDICATE THAT
SUCH LAW ENFORCEMENT AGENCIES DO NOT HAVE ANY PERTINENT NON-SEALED
INFORMATION CONCERNING THE APPLICANT, OR IF SUCH LAW ENFORCEMENT AGENCY
DOES HAVE SUCH INFORMATION PERTAINING TO THE APPLICANT, SHALL SPECIFY
WHAT THAT INFORMATION IS. IF THE APPLICANT HAS BEEN ASSOCIATED WITH
GAMING OPERATIONS IN ANY CAPACITY, POSITION OR EMPLOYMENT IN A JURISDIC-
TION WHICH PERMITS SUCH ACTIVITY, THE APPLICANT SHALL, UPON REQUEST OF
THE COMMISSION, PRODUCE LETTERS OF REFERENCE FROM THE GAMING ENFORCEMENT
OR CONTROL AGENCY, WHICH SHALL SPECIFY THE EXPERIENCE OF SUCH AGENCY
WITH THE APPLICANT, HIS OR HER ASSOCIATES AND HIS OR HER PARTICIPATION
IN THE GAMING OPERATIONS OF THAT JURISDICTION; PROVIDED, HOWEVER, THAT
IF NO SUCH LETTERS ARE RECEIVED FROM THE APPROPRIATE LAW ENFORCEMENT
AGENCIES WITHIN SIXTY DAYS OF THE APPLICANT'S REQUEST THEREFOR, THE
APPLICANT MAY SUBMIT A STATEMENT UNDER OATH THAT HE OR SHE IS OR WAS
DURING THE PERIOD SUCH ACTIVITIES WERE CONDUCTED IN GOOD STANDING WITH
SUCH GAMING ENFORCEMENT OR CONTROL AGENCY.

    (C) EACH APPLICANT EMPLOYED BY A GAMING FACILITY LICENSEE SHALL BE A
RESIDENT OF THE STATE PRIOR TO THE ISSUANCE OF A CASINO KEY EMPLOYEE
LICENSE; PROVIDED, HOWEVER, THAT UPON PETITION BY THE HOLDER OF A
LICENSE, THE COMMISSION MAY WAIVE THIS RESIDENCY REQUIREMENT FOR ANY
APPLICANT WHOSE PARTICULAR POSITION WILL REQUIRE HIM TO BE EMPLOYED
OUTSIDE THE STATE; AND PROVIDED FURTHER THAT NO APPLICANT EMPLOYED BY A
HOLDING OR INTERMEDIARY COMPANY OF A LICENSEE SHALL BE REQUIRED TO
ESTABLISH RESIDENCY IN THIS STATE.

    (D) FOR THE PURPOSES OF THIS SECTION, EACH APPLICANT SHALL SUBMIT TO
THE COMMISSION THE APPLICANT'S NAME, ADDRESS, FINGERPRINTS AND WRITTEN

S. 5883                                24                                A. 8101

CONSENT FOR A CRIMINAL HISTORY INFORMATION AS DEFINED IN PARAGRAPH (C)
OF SUBDIVISION ONE OF SECTION EIGHT HUNDRED FORTY-FIVE-B OF THE EXECU-
TIVE LAW, TO BE PERFORMED. THE COMMISSION IS HEREBY AUTHORIZED TO
EXCHANGE FINGERPRINT DATA WITH AND RECEIVE CRIMINAL HISTORY RECORD
INFORMATION FROM THE STATE DIVISION OF CRIMINAL JUSTICE SERVICES AND THE
FEDERAL BUREAU OF INVESTIGATION CONSISTENT WITH APPLICABLE STATE AND
FEDERAL LAWS, RULES AND REGULATIONS. THE APPLICANT SHALL PAY THE FEE FOR
SUCH CRIMINAL HISTORY INFORMATION AS ESTABLISHED PURSUANT TO ARTICLE
THIRTY-FIVE OF THE EXECUTIVE LAW.   THE STATE DIVISION OF CRIMINAL
JUSTICE SERVICES SHALL PROMPTLY NOTIFY THE COMMISSION IN THE EVENT A
CURRENT OR PROSPECTIVE LICENSEE, WHO WAS THE SUBJECT OF SUCH CRIMINAL
HISTORY INFORMATION PURSUANT TO THIS SECTION, IS ARRESTED FOR A CRIME OR
OFFENSE IN THIS STATE AFTER THE DATE THE CHECK WAS PERFORMED.

3. THE COMMISSION SHALL DENY A CASINO KEY EMPLOYEE LICENSE TO ANY
APPLICANT WHO IS DISQUALIFIED ON THE BASIS OF THE CRITERIA CONTAINED  IN
SECTION ONE THOUSAND THREE HUNDRED EIGHTEEN OF THIS TITLE, SUBJECT TO
NOTICE AND HEARING.

4. UPON RECEIPT OF SUCH CRIMINAL HISTORY INFORMATION, THE COMMISSION
SHALL PROVIDE SUCH APPLICANT WITH A COPY OF SUCH CRIMINAL HISTORY INFOR-
MATION, TOGETHER WITH A COPY OF ARTICLE TWENTY-THREE-A OF THE CORRECTION
LAW, AND INFORM SUCH APPLICANT OF HIS OR HER RIGHT TO SEEK CORRECTION OF
ANY INCORRECT INFORMATION CONTAINED IN SUCH CRIMINAL HISTORY INFORMATION
PURSUANT TO REGULATIONS AND PROCEDURES ESTABLISHED BY THE DIVISION OF
CRIMINAL JUSTICE SERVICES. EXCEPT AS OTHERWISE PROVIDED BY LAW, SUCH
CRIMINAL HISTORY INFORMATION SHALL BE CONFIDENTIAL AND ANY PERSON WHO
WILLFULLY PERMITS THE RELEASE OF SUCH CONFIDENTIAL CRIMINAL HISTORY
INFORMATION TO PERSONS NOT PERMITTED TO RECEIVE SUCH INFORMATION SHALL
BE GUILTY OF A MISDEMEANOR.

5. UPON PETITION BY THE HOLDER OF A LICENSE, THE COMMISSION MAY ISSUE
A TEMPORARY LICENSE TO AN APPLICANT FOR A CASINO KEY EMPLOYEE LICENSE,
PROVIDED THAT:

(A) THE APPLICANT FOR THE CASINO KEY EMPLOYEE LICENSE HAS FILED A
COMPLETED APPLICATION AS REQUIRED BY THE COMMISSION;

(B) THE PETITION FOR A TEMPORARY CASINO KEY EMPLOYEE LICENSE CERTI-
FIES, AND THE COMMISSION FINDS, THAT AN EXISTING CASINO KEY EMPLOYEE
POSITION OF THE PETITIONER IS VACANT OR WILL BECOME VACANT WITHIN SIXTY
DAYS OF THE DATE OF THE PETITION AND THAT THE ISSUANCE OF A TEMPORARY
KEY EMPLOYEE LICENSE IS NECESSARY TO FILL THE SAID VACANCY ON AN EMER-
GENCY BASIS TO CONTINUE THE EFFICIENT OPERATION OF THE CASINO, AND THAT
SUCH CIRCUMSTANCES ARE EXTRAORDINARY AND NOT DESIGNED TO CIRCUMVENT THE
NORMAL LICENSING PROCEDURES OF THIS ARTICLE;

6. UNLESS OTHERWISE TERMINATED PURSUANT TO THIS ARTICLE, ANY TEMPORARY
CASINO KEY EMPLOYEE LICENSE ISSUED PURSUANT TO THIS SECTION SHALL EXPIRE
NINE MONTHS FROM THE DATE OF ITS ISSUANCE.

S 1324. GAMING EMPLOYEE REGISTRATION.    1. NO PERSON MAY COMMENCE
EMPLOYMENT AS A GAMING EMPLOYEE UNLESS SUCH PERSON HAS A VALID REGISTRA-
TION ON FILE WITH THE COMMISSION, WHICH REGISTRATION SHALL BE PREPARED
AND FILED IN ACCORDANCE WITH THE REGULATIONS PROMULGATED HEREUNDER.

2. A GAMING EMPLOYEE REGISTRANT SHALL PRODUCE SUCH INFORMATION AS THE
COMMISSION BY REGULATION MAY REQUIRE. SUBSEQUENT TO THE REGISTRATION OF
A GAMING EMPLOYEE, THE EXECUTIVE DIRECTOR MAY REVOKE, SUSPEND, LIMIT, OR
OTHERWISE RESTRICT THE REGISTRATION UPON A FINDING THAT THE REGISTRANT
IS DISQUALIFIED ON THE BASIS OF THE CRITERIA CONTAINED IN SECTION ONE
THOUSAND THREE HUNDRED EIGHTEEN OF THIS TITLE.  IF A GAMING EMPLOYEE
REGISTRANT HAS NOT BEEN EMPLOYED IN ANY POSITION WITHIN A GAMING FACILI-

TY FOR A PERIOD OF THREE YEARS, THE REGISTRATION OF THAT GAMING EMPLOYEE
SHALL LAPSE.

3.   NO GAMING EMPLOYEE REGISTRATION SHALL BE DENIED OR REVOKED ON THE
BASIS OF A MISDEMEANOR CONVICTION OF ANY OF THE OFFENSES  ENUMERATED  IN
THIS  ARTICLE  AS DISQUALIFICATION CRITERIA OR THE COMMISSION OF ANY ACT
OR ACTS WHICH WOULD CONSTITUTE ANY OFFENSE UNDER  SECTION  ONE  THOUSAND
THREE  HUNDRED  EIGHTEEN OF THIS TITLE, PROVIDED THAT THE REGISTRANT HAS
AFFIRMATIVELY DEMONSTRATED THE REGISTRANT'S REHABILITATION,  PURSUANT  TO
ARTICLE TWENTY-THREE-A OF THE CORRECTION LAW.

4.   FOR  THE PURPOSES OF THIS SECTION, EACH REGISTRANT SHALL SUBMIT TO
THE COMMISSION THE REGISTRANT'S NAME,  ADDRESS,  FINGERPRINTS  AND  WRITTEN
CONSENT  FOR A CRIMINAL HISTORY INFORMATION TO BE PERFORMED. THE COMMIS-
SION IS HEREBY AUTHORIZED TO EXCHANGE FINGERPRINT DATA WITH AND  RECEIVE
CRIMINAL  HISTORY INFORMATION AS DEFINED IN PARAGRAPH (C) OF SUBDIVISION
ONE OF SECTION EIGHT HUNDRED FORTY-FIVE-B OF THE EXECUTIVE LAW FROM  THE
STATE  DIVISION  OF  CRIMINAL JUSTICE SERVICES AND THE FEDERAL BUREAU OF
INVESTIGATION CONSISTENT WITH APPLICABLE STATE AND FEDERAL  LAWS,  RULES
AND  REGULATIONS.  THE  REGISTRANT  SHALL  PAY THE FEE FOR SUCH CRIMINAL
HISTORY INFORMATION AS ESTABLISHED PURSUANT TO  ARTICLE  THIRTY-FIVE  OF
THE  EXECUTIVE  LAW.    THE  STATE DIVISION OF CRIMINAL JUSTICE SERVICES
SHALL PROMPTLY NOTIFY THE COMMISSION IN THE EVENT A CURRENT OR  PROSPEC-
TIVE  LICENSEE,  WHO  WAS  THE SUBJECT OF A CRIMINAL HISTORY INFORMATION
PURSUANT TO THIS SECTION, IS ARRESTED FOR A CRIME  OR  OFFENSE  IN  THIS
STATE AFTER THE DATE THE CHECK WAS PERFORMED.

5.   UPON  RECEIPT OF SUCH CRIMINAL HISTORY INFORMATION, THE COMMISSION
SHALL PROVIDE SUCH APPLICANT WITH A COPY OF SUCH CRIMINAL HISTORY INFOR-
MATION, TOGETHER WITH A COPY OF ARTICLE TWENTY-THREE-A OF THE CORRECTION
LAW, AND INFORM SUCH APPLICANT OF HIS OR HER RIGHT TO SEEK CORRECTION OF
ANY INCORRECT INFORMATION CONTAINED IN SUCH CRIMINAL HISTORY INFORMATION
PURSUANT TO REGULATIONS AND PROCEDURES ESTABLISHED BY  THE  DIVISION  OF
CRIMINAL  JUSTICE  SERVICES.  EXCEPT  AS OTHERWISE PROVIDED BY LAW, SUCH
CRIMINAL HISTORY INFORMATION SHALL BE CONFIDENTIAL AND  ANY  PERSON  WHO
WILLFULLY  PERMITS  THE  RELEASE  OF  SUCH CONFIDENTIAL CRIMINAL HISTORY
INFORMATION TO PERSONS NOT PERMITTED TO RECEIVE SUCH  INFORMATION  SHALL
BE GUILTY OF A MISDEMEANOR.

S 1325.  APPROVAL, DENIAL AND RENEWAL OF EMPLOYEE LICENSES AND REGIS-
TRATIONS.  1. UPON THE FILING OF AN APPLICATION FOR A CASINO KEY EMPLOY-
EE LICENSE OR GAMING EMPLOYEE REGISTRATION REQUIRED BY THIS ARTICLE  AND
AFTER  SUBMISSION OF SUCH SUPPLEMENTAL INFORMATION AS THE COMMISSION MAY
REQUIRE, THE COMMISSION SHALL CONDUCT OR  CAUSE  TO  BE  CONDUCTED  SUCH
INVESTIGATION  INTO  THE QUALIFICATION OF THE APPLICANT, AND THE COMMIS-
SION SHALL CONDUCT SUCH HEARINGS CONCERNING  THE  QUALIFICATION  OF  THE
APPLICANT,  IN  ACCORDANCE  WITH ITS REGULATIONS, AS MAY BE NECESSARY TO
DETERMINE QUALIFICATION FOR SUCH LICENSE.

2.   AFTER SUCH INVESTIGATION, THE COMMISSION MAY EITHER DENY THE APPLI-
CATION OR GRANT A LICENSE TO AN APPLICANT WHOM IT DETERMINES TO BE QUAL-
IFIED TO HOLD SUCH LICENSE.

3.  THE COMMISSION SHALL HAVE THE AUTHORITY  TO  DENY  ANY  APPLICATION
PURSUANT TO THE PROVISIONS OF THIS ARTICLE FOLLOWING NOTICE AND OPPORTU-
NITY FOR HEARING.

4.   WHEN THE COMMISSION GRANTS AN APPLICATION, THE COMMISSION MAY LIMIT
OR  PLACE  SUCH  RESTRICTIONS  THEREUPON AS IT MAY DEEM NECESSARY IN THE
PUBLIC INTEREST.

5.  AFTER AN APPLICATION FOR A CASINO KEY EMPLOYEE LICENSE  IS  SUBMIT-
TED,  FINAL  ACTION  OF THE COMMISSION SHALL BE TAKEN WITHIN NINETY DAYS

AFTER COMPLETION OF ALL HEARINGS AND INVESTIGATIONS AND THE RECEIPT OF
ALL INFORMATION REQUIRED BY THE COMMISSION.

  6.  LICENSES  AND  REGISTRATIONS  OF  CASINO  KEY EMPLOYEES AND GAMING
EMPLOYEES ISSUED PURSUANT TO THIS ARTICLE SHALL REMAIN  VALID  FOR  FIVE
YEARS UNLESS SUSPENDED, REVOKED OR VOIDED PURSUANT TO LAW. SUCH LICENSES
AND REGISTRATIONS MAY BE RENEWED BY THE HOLDER THEREOF UPON APPLICATION,
ON  A  FORM  PRESCRIBED  BY THE COMMISSION, AND PAYMENT OF THE APPLICABLE
FEE.  NOTWITHSTANDING THE FORGOING, IF A GAMING EMPLOYEE REGISTRANT  HAS
NOT  BEEN EMPLOYED IN ANY POSITION WITHIN A GAMING FACILITY FOR A PERIOD
OF THREE YEARS, THE REGISTRATION OF THAT GAMING EMPLOYEE SHALL LAPSE.

  8. THE COMMISSION SHALL ESTABLISH BY REGULATION APPROPRIATE FEES TO BE
PAID UPON THE FILING OF THE REQUIRED APPLICATIONS. SUCH FEES  SHALL  BE
DEPOSITED INTO THE COMMERCIAL GAMING REVENUE FUND.

                            TITLE 4

            ENTERPRISE AND VENDOR LICENSING AND REGISTRATION
SECTION 1326. LICENSING OF VENDOR ENTERPRISES.

        1327. DURATION AND RENEWAL OF VENDOR REGISTRATION.

        1328. JUNKET OPERATOR LICENSING.

        1329. LOBBYIST REGISTRATION.

        1330. REGISTRATION OF LABOR ORGANIZATIONS.

        1330-A. CASINO GAMING EXPENDITURES.

  S  1326.  LICENSING  OF  VENDOR  ENTERPRISES.  1. ANY BUSINESS TO BE
CONDUCTED WITH A GAMING FACILITY  APPLICANT  OR  LICENSEE  BY  A  VENDOR
OFFERING  GOODS  OR  SERVICES  WHICH DIRECTLY RELATE TO GAMING ACTIVITY,
INCLUDING GAMING  EQUIPMENT  MANUFACTURERS,  SUPPLIERS,  REPAIRERS,  AND
INDEPENDENT  TESTING  LABORATORIES,  SHALL BE LICENSED AS A CASINO VENDOR
ENTERPRISE IN ACCORDANCE WITH THE PROVISIONS OF THIS  ARTICLE  PRIOR  TO
CONDUCTING  ANY  BUSINESS WHATSOEVER WITH A GAMING FACILITY APPLICANT OR
LICENSEE, ITS EMPLOYEES OR AGENTS; PROVIDED, HOWEVER, THAT UPON A  SHOW-
ING OF GOOD CAUSE BY A GAMING FACILITY APPLICANT OR LICENSEE, THE EXECU-
TIVE  DIRECTOR  MAY  PERMIT  AN APPLICANT FOR A CASINO VENDOR ENTERPRISE
LICENSE TO CONDUCT  BUSINESS  TRANSACTIONS  WITH  SUCH  GAMING  FACILITY
APPLICANT  OR  LICENSEE  PRIOR  TO  THE  LICENSURE OF THAT CASINO VENDOR
ENTERPRISE APPLICANT UNDER THIS SUBDIVISION FOR  SUCH  PERIODS  AS  THE
COMMISSION MAY ESTABLISH BY REGULATION.

  2. IN ADDITION TO THE REQUIREMENTS OF SUBDIVISION ONE OF THIS SECTION,
ANY CASINO VENDOR ENTERPRISE INTENDING TO MANUFACTURE, SELL, DISTRIBUTE,
TEST  OR  REPAIR  SLOT  MACHINES  WITHIN  THE STATE SHALL BE LICENSED IN
ACCORDANCE WITH THE PROVISIONS OF THIS ARTICLE PRIOR TO ENGAGING IN  ANY
SUCH ACTIVITIES; PROVIDED, HOWEVER, THAT UPON A SHOWING OF GOOD CAUSE BY
A  GAMING  FACILITY  APPLICANT  OR  LICENSEE, THE EXECUTIVE DIRECTOR MAY
PERMIT AN APPLICANT FOR A CASINO VENDOR ENTERPRISE  LICENSE  TO  CONDUCT
BUSINESS  TRANSACTIONS  WITH  THE  GAMING FACILITY APPLICANT OR LICENSEE
PRIOR TO THE LICENSURE OF THAT CASINO VENDOR ENTERPRISE APPLICANT  UNDER
THIS  SUBDIVISION  FOR  SUCH PERIODS AS THE COMMISSION MAY ESTABLISH BY
REGULATION; AND PROVIDED FURTHER, HOWEVER, THAT UPON A SHOWING OF  GOOD
CAUSE  BY AN APPLICANT REQUIRED TO BE LICENSED AS A CASINO VENDOR ENTER-
PRISE PURSUANT TO THIS SUBDIVISION, THE EXECUTIVE  DIRECTOR  MAY  PERMIT
THE  CASINO  VENDOR  ENTERPRISE APPLICANT TO INITIATE THE MANUFACTURE OF
SLOT MACHINES OR ENGAGE IN THE SALE, DISTRIBUTION, TESTING OR REPAIR  OF
SLOT  MACHINES WITH ANY PERSON OTHER THAN A GAMING FACILITY APPLICANT OR
LICENSEE, ITS EMPLOYEES OR AGENTS, PRIOR TO THE LICENSURE OF THAT CASINO
VENDOR ENTERPRISE APPLICANT UNDER THIS SUBDIVISION.

  3. VENDORS PROVIDING GOODS AND SERVICES TO GAMING  FACILITY  LICENSEES
OR APPLICANTS ANCILLARY TO GAMING SHALL BE REQUIRED TO BE LICENSED AS AN

ANCILLARY CASINO VENDOR ENTERPRISE AND SHALL COMPLY WITH THE STANDARDS
FOR CASINO VENDOR LICENSE APPLICANTS.

4. EACH CASINO VENDOR ENTERPRISE REQUIRED TO BE LICENSED PURSUANT TO
SUBDIVISION ONE OF THIS SECTION, AS WELL AS ITS OWNERS; MANAGEMENT AND
SUPERVISORY PERSONNEL; AND EMPLOYEES IF SUCH EMPLOYEES HAVE RESPONSIBIL-
ITY FOR SERVICES TO A GAMING FACILITY APPLICANT OR LICENSEE, MUST QUALI-
FY UNDER THE STANDARDS, EXCEPT RESIDENCY, ESTABLISHED FOR QUALIFICATION
OF A CASINO KEY EMPLOYEE UNDER THIS ARTICLE.

5. ANY VENDOR THAT OFFERS GOODS OR SERVICES TO A GAMING FACILITY
APPLICANT OR LICENSEE THAT IS NOT INCLUDED IN SUBDIVISION ONE OR TWO OF
THIS SECTION INCLUDING, BUT NOT LIMITED TO SITE CONTRACTORS AND SUBCON-
TRACTORS, SHOPKEEPERS LOCATED WITHIN THE FACILITY, GAMING SCHOOLS THAT
POSSESS SLOT MACHINES FOR THE PURPOSE OF INSTRUCTION, AND ANY NON-SUPER-
VISORY EMPLOYEE OF A JUNKET ENTERPRISE LICENSED UNDER SUBDIVISION THREE
OF THIS SECTION, SHALL BE REQUIRED TO REGISTER WITH THE COMMISSION IN
ACCORDANCE WITH THE REGULATIONS PROMULGATED UNDER THIS ARTICLE.

NOTWITHSTANDING THE PROVISIONS AFOREMENTIONED, THE EXECUTIVE DIRECTOR
MAY, CONSISTENT WITH THE PUBLIC INTEREST AND THE POLICIES OF THIS ARTI-
CLE, DIRECT THAT INDIVIDUAL VENDORS REGISTERED PURSUANT TO THIS SUBDIVI-
SION BE REQUIRED TO APPLY FOR EITHER A CASINO VENDOR ENTERPRISE LICENSE
PURSUANT TO SUBDIVISION ONE OF THIS SECTION, OR AN ANCILLARY VENDOR
INDUSTRY ENTERPRISE LICENSE PURSUANT TO SUBDIVISION THREE OF THIS
SECTION, AS DIRECTED BY THE COMMISSION. THE EXECUTIVE DIRECTOR MAY ALSO
ORDER THAT ANY ENTERPRISE LICENSED AS OR REQUIRED TO BE LICENSED AS AN
ANCILLARY CASINO VENDOR ENTERPRISE PURSUANT TO SUBDIVISION THREE OF THIS
SECTION BE REQUIRED TO APPLY FOR A CASINO VENDOR ENTERPRISE LICENSE
PURSUANT TO SUBDIVISION ONE OF THIS SECTION. THE EXECUTIVE DIRECTOR MAY
ALSO, IN HIS OR HER DISCRETION, ORDER THAT AN INDEPENDENT SOFTWARE
CONTRACTOR NOT OTHERWISE REQUIRED TO BE REGISTERED BE EITHER REGISTERED
AS A VENDOR PURSUANT TO THIS SUBDIVISION OR BE LICENSED PURSUANT TO
EITHER SUBDIVISION ONE OR THREE OF THIS SECTION.

EACH ANCILLARY CASINO VENDOR ENTERPRISE REQUIRED TO BE LICENSED PURSU-
ANT TO SUBDIVISION THREE OF THIS SECTION, AS WELL AS ITS OWNERS, MANAGE-
MENT AND SUPERVISORY PERSONNEL, AND EMPLOYEES IF SUCH EMPLOYEES HAVE
RESPONSIBILITY FOR SERVICES TO A GAMING FACILITY APPLICANT OR LICENSEE,
SHALL ESTABLISH THEIR GOOD CHARACTER, HONESTY AND INTEGRITY BY CLEAR AND
CONVINCING EVIDENCE AND SHALL PROVIDE SUCH FINANCIAL INFORMATION AS MAY
BE REQUIRED BY THE COMMISSION. ANY ENTERPRISE REQUIRED TO BE LICENSED
AS AN ANCILLARY CASINO VENDOR ENTERPRISE PURSUANT TO THIS SECTION SHALL
BE PERMITTED TO TRANSACT BUSINESS WITH A GAMING FACILITY LICENSEE UPON
FILING OF THE APPROPRIATE VENDOR REGISTRATION FORM AND APPLICATION FOR
SUCH LICENSURE.

6. ANY APPLICANT, LICENSEE OR QUALIFIER OF A CASINO VENDOR ENTERPRISE
LICENSE OR OF AN ANCILLARY CASINO VENDOR ENTERPRISE LICENSE UNDER SUBDI-
VISION ONE OF THIS SECTION, AND ANY VENDOR REGISTRANT UNDER SUBDIVISION
FIVE OF THIS SECTION SHALL BE DISQUALIFIED IN ACCORDANCE WITH THE CRITE-
RIA CONTAINED IN SECTION ONE THOUSAND THREE HUNDRED EIGHTEEN OF THIS
ARTICLE, EXCEPT THAT NO SUCH ANCILLARY CASINO VENDOR ENTERPRISE LICENSE
UNDER SUBDIVISION THREE OF THIS SECTION OR VENDOR REGISTRATION UNDER
SUBDIVISION FIVE OF THIS SECTION SHALL BE DENIED OR REVOKED IF SUCH
VENDOR REGISTRANT CAN AFFIRMATIVELY DEMONSTRATE REHABILITATION PURSUANT
TO ARTICLE TWENTY-THREE-A OF THE CORRECTION LAW.

7. NO CASINO VENDOR ENTERPRISE LICENSE OR ANCILLARY CASINO VENDOR
ENTERPRISE LICENSE SHALL BE ISSUED PURSUANT TO SUBDIVISION ONE OF THIS
SECTION TO ANY PERSON UNLESS THAT PERSON SHALL PROVIDE PROOF OF VALID
BUSINESS REGISTRATION WITH THE DEPARTMENT OF STATE.

8. FOR THE PURPOSES OF THIS SECTION, EACH APPLICANT SHALL SUBMIT TO
THE COMMISSION THE NAME, ADDRESS, FINGERPRINTS AND A WRITTEN CONSENT FOR
A CRIMINAL HISTORY INFORMATION TO BE PERFORMED, FOR EACH PERSON REQUIRED
TO QUALIFY AS PART OF THE APPLICATION. THE COMMISSION IS HEREBY AUTHOR-
IZED TO EXCHANGE FINGERPRINT DATA WITH AND RECEIVE CRIMINAL HISTORY
RECORD INFORMATION FROM THE STATE DIVISION OF CRIMINAL JUSTICE SERVICES
AND THE FEDERAL BUREAU OF INVESTIGATION CONSISTENT WITH APPLICABLE STATE
AND FEDERAL LAWS, RULES AND REGULATIONS. THE APPLICANT SHALL PAY THE FEE
FOR SUCH CRIMINAL HISTORY INFORMATION AS ESTABLISHED PURSUANT TO ARTICLE
THIRTY-FIVE OF THE EXECUTIVE LAW.   THE STATE DIVISION OF CRIMINAL
JUSTICE SERVICES SHALL PROMPTLY NOTIFY THE COMMISSION IN THE EVENT A
CURRENT OR PROSPECTIVE QUALIFIER, WHO WAS THE SUBJECT OF A CRIMINAL
HISTORY RECORD CHECK PURSUANT TO THIS SECTION, IS ARRESTED FOR A CRIME
OR OFFENSE IN THIS STATE AFTER THE DATE THE CHECK WAS PERFORMED.

9. SUBSEQUENT TO THE LICENSURE OF ANY ENTITY PURSUANT TO SUBDIVISION
ONE OF THIS SECTION, INCLUDING ANY FINDING OF QUALIFICATION AS MAY BE
REQUIRED AS A CONDITION OF LICENSURE, OR THE REGISTRATION OF ANY VENDOR
PURSUANT TO SUBDIVISION THREE OF THIS SECTION, THE EXECUTIVE DIRECTOR
MAY REVOKE, SUSPEND, LIMIT, OR OTHERWISE RESTRICT THE LICENSE, REGISTRA-
TION OR QUALIFICATION STATUS UPON A FINDING THAT THE LICENSEE, REGIS-
TRANT OR QUALIFIER IS DISQUALIFIED ON THE BASIS OF THE CRITERIA SET
FORTH IN SECTION ONE THOUSAND THREE HUNDRED EIGHTEEN OF THIS ARTICLE.

10. AFTER NOTICE AND HEARING PRIOR TO THE SUSPENSION OF ANY LICENSE,
REGISTRATION OR QUALIFICATION ISSUED PURSUANT TO SUBDIVISION SEVEN OF
THIS SECTION THE COMMISSION SHALL HAVE THE OBLIGATION TO PROVE BY
SUBSTANTIAL EVIDENCE THAT THE LICENSEE, REGISTRANT OR QUALIFIER IS
DISQUALIFIED ON THE BASIS OF THE CRITERIA SET FORTH IN SECTION ONE THOU-
SAND THREE HUNDRED EIGHTEEN OF THIS ARTICLE.

S 1327. DURATION AND RENEWAL OF VENDOR REGISTRATION.  1. A CASINO
VENDOR REGISTRATION SHALL BE EFFECTIVE UPON ISSUANCE, AND SHALL REMAIN
VALID FOR FIVE YEARS UNLESS REVOKED, SUSPENDED, VOIDED BY LAW, LIMITED,
OR OTHERWISE RESTRICTED BY THE COMMISSION.  SUCH REGISTRATIONS MAY BE
RENEWED BY THE HOLDER THEREOF UPON APPLICATION, ON A FORM PRESCRIBED BY
THE COMMISSION, AND PAYMENT OF THE APPLICABLE FEE. NOTWITHSTANDING THE
FOREGOING, IF A VENDOR REGISTRANT HAS NOT CONDUCTED BUSINESS WITH A
GAMING FACILITY FOR A PERIOD OF THREE YEARS, THE REGISTRATION OF THAT
VENDOR REGISTRANT SHALL LAPSE.

2. THE COMMISSION SHALL ESTABLISH BY REGULATION REASONABLE AND APPRO-
PRIATE FEES TO BE IMPOSED ON EACH VENDOR REGISTRANT WHO PROVIDES GOODS
OR SERVICES TO A GAMING FACILITY, REGARDLESS OF THE NATURE OF ANY
CONTRACTUAL RELATIONSHIP BETWEEN THE VENDOR REGISTRANT AND GAMING FACIL-
ITY, IF ANY. SUCH FEES SHALL BE PAID TO THE COMMISSION.

S 1328. JUNKET OPERATOR LICENSING. 1. NO JUNKETS MAY BE ORGANIZED OR
PERMITTED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THIS ARTICLE. NO
PERSON MAY ACT AS A JUNKET REPRESENTATIVE OR JUNKET ENTERPRISE EXCEPT IN
ACCORDANCE WITH THIS SECTION.

2. A JUNKET REPRESENTATIVE EMPLOYED BY A GAMING FACILITY LICENSEE, AN
APPLICANT FOR A GAMING FACILITY LICENSE OR AN AFFILIATE OF A GAMING
FACILITY LICENSEE SHALL BE LICENSED AS A CASINO KEY EMPLOYEE; PROVIDED,
HOWEVER, THAT SAID LICENSEE NEED NOT BE A RESIDENT OF THIS STATE. NO
GAMING FACILITY LICENSEE OR APPLICANT FOR A GAMING FACILITY LICENSE MAY
EMPLOY OR OTHERWISE ENGAGE A JUNKET REPRESENTATIVE WHO IS NOT SO
LICENSED.

3. JUNKET ENTERPRISES THAT, AND JUNKET REPRESENTATIVES NOT EMPLOYED BY
A GAMING FACILITY LICENSEE OR AN APPLICANT FOR A GAMING FACILITY LICENSE
OR BY A JUNKET ENTERPRISE WHO, ENGAGE IN ACTIVITIES GOVERNED BY THIS

SECTION SHALL BE LICENSED AS AN ANCILLARY CASINO VENDOR ENTERPRISE IN ACCORDANCE WITH SUBDIVISION THREE OF SECTION ONE THOUSAND THREE HUNDRED TWENTY-SIX OF THIS TITLE, UNLESS OTHERWISE DIRECTED BY THE COMMISSION; PROVIDED, HOWEVER, THAT ANY SUCH JUNKET ENTERPRISE OR JUNKET REPRESEN-TATIVE WHO HAS DISQUALIFIED SHALL BE ENTITLED TO ESTABLISH HIS OR HER REHABILITATION FROM SUCH DISQUALIFICATION PURSUANT TO ARTICLE TWENTY-THREE-A OF THE CORRECTION LAW. ANY NON-SUPERVISORY EMPLOYEE OF A JUNKET ENTERPRISE OR JUNKET REPRESENTATIVE LICENSED AS AN ANCILLARY CASINO VENDOR ENTERPRISE IN ACCORDANCE WITH SUBDIVISION THREE OF SECTION ONE THOUSAND THREE HUNDRED TWENTY-SIX OF THIS TITLE SHALL BE REGISTERED.

4. PRIOR TO THE ISSUANCE OF ANY LICENSE REQUIRED BY THIS SECTION, AN APPLICANT FOR LICENSURE SHALL SUBMIT TO THE JURISDICTION OF THE STATE AND SHALL DEMONSTRATE THAT HE OR SHE IS AMENABLE TO SERVICE OF PROCESS WITHIN THIS STATE. FAILURE TO ESTABLISH OR MAINTAIN COMPLIANCE WITH THE REQUIREMENTS OF THIS SUBDIVISION SHALL CONSTITUTE SUFFICIENT CAUSE FOR THE DENIAL, SUSPENSION OR REVOCATION OF ANY LICENSE ISSUED PURSUANT TO THIS SECTION.

5. UPON PETITION BY THE HOLDER OF A GAMING FACILITY LICENSE, AN APPLI-CANT FOR A CASINO KEY EMPLOYEE LICENSE INTENDING TO BE EMPLOYED AS A JUNKET REPRESENTATIVE MAY BE ISSUED A TEMPORARY LICENSE BY THE COMMIS-SION IN ACCORDANCE WITH REGULATIONS PROMULGATED, PROVIDED THAT:

(A) THE APPLICANT FOR LICENSURE IS EMPLOYED BY A GAMING FACILITY LICENSEE; AND

(B) THE APPLICANT FOR LICENSURE HAS FILED A COMPLETED APPLICATION AS REQUIRED BY THE COMMISSION.

6. THE COMMISSION SHALL HAVE THE AUTHORITY TO IMMEDIATELY SUSPEND, LIMIT OR CONDITION ANY TEMPORARY LICENSE ISSUED PURSUANT TO THIS SECTION, PENDING A HEARING ON THE QUALIFICATIONS OF THE JUNKET REPRESEN-TATIVE.

7. UNLESS OTHERWISE TERMINATED, ANY TEMPORARY LICENSE ISSUED PURSUANT TO THIS SECTION SHALL EXPIRE TWELVE MONTHS FROM THE DATE OF ITS ISSU-ANCE, AND SHALL BE RENEWABLE BY THE COMMISSION FOR ONE ADDITIONAL SIX MONTH PERIOD.

8. EVERY AGREEMENT CONCERNING JUNKETS ENTERED INTO BY A GAMING FACILI-TY LICENSEE AND A JUNKET REPRESENTATIVE OR JUNKET ENTERPRISE SHALL BE DEEMED TO INCLUDE A PROVISION FOR ITS TERMINATION WITHOUT LIABILITY ON THE PART OF THE GAMING FACILITY LICENSEE, IF THE COMMISSION ORDERS THE TERMINATION UPON THE SUSPENSION, LIMITATION, CONDITIONING, DENIAL OR REVOCATION OF THE LICENSURE OF THE JUNKET REPRESENTATIVE OR JUNKET ENTERPRISE. FAILURE TO EXPRESSLY INCLUDE SUCH A CONDITION IN THE AGREE-MENT SHALL NOT CONSTITUTE A DEFENSE IN ANY ACTION BROUGHT TO TERMINATE THE AGREEMENT.

9. A GAMING FACILITY LICENSEE SHALL BE RESPONSIBLE FOR THE CONDUCT OF ANY JUNKET REPRESENTATIVE OR JUNKET ENTERPRISE ASSOCIATED WITH IT AND FOR THE TERMS AND CONDITIONS OF ANY JUNKET ENGAGED IN ON ITS PREMISES, REGARDLESS OF THE FACT THAT THE JUNKET MAY INVOLVE PERSONS NOT EMPLOYED BY SUCH A GAMING FACILITY LICENSEE.

10. A GAMING FACILITY LICENSEE SHALL BE RESPONSIBLE FOR ANY VIOLATION OR DEVIATION FROM THE TERMS OF A JUNKET. NOTWITHSTANDING ANY OTHER PROVISIONS OF THIS ARTICLE, THE COMMISSION MAY ORDER RESTITUTION TO JUNKET PARTICIPANTS, ASSESS PENALTIES FOR SUCH VIOLATIONS OR DEVIATIONS, PROHIBIT FUTURE JUNKETS BY THE GAMING FACILITY LICENSEE, JUNKET ENTER-PRISE OR JUNKET REPRESENTATIVE, AND ORDER SUCH FURTHER RELIEF AS IT DEEMS APPROPRIATE.

11. THE COMMISSION SHALL, BY REGULATION, PRESCRIBE METHODS, PROCEDURES AND FORMS FOR THE DELIVERY AND RETENTION OF INFORMATION CONCERNING THE

CONDUCT OF JUNKETS BY GAMING FACILITY LICENSEES. WITHOUT LIMITATION OF
THE FOREGOING, EACH GAMING FACILITY LICENSEE, IN ACCORDANCE WITH THE
RULES OF THE COMMISSION, SHALL:

(A) MAINTAIN ON FILE A REPORT DESCRIBING THE OPERATION OF ANY JUNKET
ENGAGED IN ON ITS PREMISES; AND

(B) SUBMIT TO THE COMMISSION A LIST OF ALL ITS EMPLOYEES WHO ARE
ACTING AS JUNKET REPRESENTATIVES.

12. EACH GAMING FACILITY LICENSEE, JUNKET REPRESENTATIVE OR JUNKET
ENTERPRISE SHALL, IN ACCORDANCE WITH THE RULES OF THE COMMISSION, FILE A
REPORT WITH THE COMMISSION WITH RESPECT TO EACH LIST OF JUNKET PATRONS
OR POTENTIAL JUNKET PATRONS PURCHASED DIRECTLY OR INDIRECTLY BY THE
GAMING FACILITY LICENSEE, JUNKET REPRESENTATIVE OR ENTERPRISE.

13. THE COMMISSION SHALL HAVE THE AUTHORITY TO DETERMINE, EITHER BY
REGULATION, OR UPON PETITION BY THE HOLDER OF A GAMING FACILITY LICENSE,
THAT A TYPE OF ARRANGEMENT OTHERWISE INCLUDED WITHIN THE DEFINITION OF
"JUNKET" SHALL NOT REQUIRE COMPLIANCE WITH ANY OR ALL OF THE REQUIRE-
MENTS OF THIS SECTION. IN GRANTING EXEMPTIONS, THE COMMISSION SHALL
CONSIDER SUCH FACTORS AS THE NATURE, VOLUME AND SIGNIFICANCE OF THE
PARTICULAR TYPE OF ARRANGEMENT, AND WHETHER THE EXEMPTION WOULD BE
CONSISTENT WITH THE PUBLIC POLICIES ESTABLISHED BY THIS ARTICLE. IN
APPLYING THE PROVISIONS OF THIS SUBDIVISION, THE COMMISSION MAY CONDI-
TION, LIMIT, OR RESTRICT ANY EXEMPTION AS IT MAY DEEM APPROPRIATE.

14. NO JUNKET ENTERPRISE OR JUNKET REPRESENTATIVE OR PERSON ACTING AS
A JUNKET REPRESENTATIVE MAY:

(A) ENGAGE IN EFFORTS TO COLLECT UPON CHECKS THAT HAVE BEEN RETURNED
BY BANKS WITHOUT FULL AND FINAL PAYMENT;

(B) EXERCISE APPROVAL AUTHORITY WITH REGARD TO THE AUTHORIZATION OR
ISSUANCE OF CREDIT;

(C) ACT ON BEHALF OF OR UNDER ANY ARRANGEMENT WITH A GAMING FACILITY
LICENSEE OR A GAMING PATRON WITH REGARD TO THE REDEMPTION, CONSOL-
IDATION, OR SUBSTITUTION OF THE GAMING PATRON'S CHECKS AWAITING DEPOSIT;

(D) INDIVIDUALLY RECEIVE OR RETAIN ANY FEE FROM A PATRON FOR THE PRIV-
ILEGE OF PARTICIPATING IN A JUNKET; AND

(E) PAY FOR ANY SERVICES, INCLUDING TRANSPORTATION, OR OTHER ITEMS OF
VALUE PROVIDED TO, OR FOR THE BENEFIT OF, ANY PATRON PARTICIPATING IN A
JUNKET.

S 1329. LOBBYIST REGISTRATION. 1. FOR PURPOSES OF THIS SECTION, THE
TERMS "LOBBYIST", "LOBBYING", "LOBBYING ACTIVITIES" AND "CLIENT" SHALL
HAVE THE SAME MEANING AS THOSE TERMS ARE DEFINED BY SECTION ONE-C OF THE
LEGISLATIVE LAW.

2. IN ADDITION TO ANY OTHER REGISTRATION AND REPORTING REQUIRED BY
LAW, EACH LOBBYIST SEEKING TO ENGAGE IN LOBBYING ACTIVITY ON BEHALF OF A
CLIENT OR A CLIENT'S INTEREST BEFORE THE COMMISSION SHALL FIRST REGISTER
WITH THE SECRETARY OF THE COMMISSION. THE SECRETARY SHALL CAUSE A REGIS-
TRATION TO BE AVAILABLE ON THE COMMISSION'S WEBSITE WITHIN FIVE DAYS OF
SUBMISSION.

S 1330. REGISTRATION OF LABOR ORGANIZATIONS. 1. EACH LABOR ORGANIZA-
TION, UNION OR AFFILIATE SEEKING TO REPRESENT EMPLOYEES WHO ARE EMPLOYED
IN A GAMING FACILITY BY A GAMING FACILITY LICENSEE SHALL REGISTER WITH
THE COMMISSION BIENNIALLY, AND SHALL DISCLOSE SUCH INFORMATION AS THE
COMMISSION MAY REQUIRE, INCLUDING THE NAMES OF ALL AFFILIATED ORGANIZA-
TIONS, PENSION AND WELFARE SYSTEMS AND ALL OFFICERS AND AGENTS OF SUCH
ORGANIZATIONS AND SYSTEMS; PROVIDED, HOWEVER, THAT NO LABOR ORGANIZA-
TION, UNION, OR AFFILIATE SHALL BE REQUIRED TO FURNISH SUCH INFORMATION
TO THE EXTENT SUCH INFORMATION IS INCLUDED IN A REPORT FILED BY ANY
LABOR ORGANIZATION, UNION, OR AFFILIATE WITH THE SECRETARY OF LABOR

PURSUANT TO 29 U.S.C. S 431 ET SEQ. OR S 1001 ET SEQ. IF A COPY OF SUCH
REPORT, OR OF THE PORTION THEREOF CONTAINING SUCH INFORMATION, IS
FURNISHED TO THE COMMISSION PURSUANT TO THE AFORESAID FEDERAL
PROVISIONS. THE COMMISSION MAY IN ITS DISCRETION EXEMPT ANY LABOR ORGAN-
IZATION, UNION, OR AFFILIATE FROM THE REGISTRATION REQUIREMENTS OF THIS
SUBDIVISION WHERE THE COMMISSION FINDS THAT SUCH ORGANIZATION, UNION OR
AFFILIATE IS NOT THE CERTIFIED BARGAINING REPRESENTATIVE OF ANY EMPLOYEE
WHO IS EMPLOYED IN A GAMING FACILITY BY A GAMING FACILITY LICENSEE, IS
NOT INVOLVED ACTIVELY, DIRECTLY OR SUBSTANTIALLY IN THE CONTROL OR
DIRECTION OF THE REPRESENTATION OF ANY SUCH EMPLOYEE, AND IS NOT SEEKING
TO DO SO.

  2. NO PERSON MAY ACT AS AN OFFICER, AGENT OR PRINCIPAL EMPLOYEE OF A
LABOR ORGANIZATION, UNION OR AFFILIATE REGISTERED OR REQUIRED TO BE
REGISTERED PURSUANT TO THIS SECTION IF THE PERSON HAS BEEN FOUND
DISQUALIFIED BY THE COMMISSION IN ACCORDANCE WITH THE CRITERIA CONTAINED
IN SECTION ONE THOUSAND THREE HUNDRED EIGHTEEN OF THIS ARTICLE. THE
COMMISSION MAY, FOR PURPOSES OF THIS SUBDIVISION, WAIVE ANY DISQUALI-
FICATION CRITERION CONSISTENT WITH THE PUBLIC POLICY OF THIS ARTICLE AND
UPON A FINDING THAT THE INTERESTS OF JUSTICE SO REQUIRE.

  3. NEITHER A LABOR ORGANIZATION, UNION OR AFFILIATE NOR ITS OFFICERS
AND AGENTS NOT OTHERWISE INDIVIDUALLY LICENSED OR REGISTERED UNDER THIS
ARTICLE AND EMPLOYED BY A GAMING FACILITY LICENSEE MAY HOLD ANY FINAN-
CIAL INTEREST WHATSOEVER IN THE GAMING FACILITY OR GAMING FACILITY
LICENSEE WHOSE EMPLOYEES THEY REPRESENT.

  4. THE COMMISSION MAY MAINTAIN A CIVIL ACTION AND PROCEED IN A SUMMARY
MANNER, WITHOUT POSTING BOND, AGAINST ANY PERSON, INCLUDING ANY LABOR
ORGANIZATION, UNION OR AFFILIATE, TO COMPEL COMPLIANCE WITH THIS
SECTION, OR TO PREVENT ANY VIOLATIONS, THE AIDING AND ABETTING THEREOF,
OR ANY ATTEMPT OR CONSPIRACY TO VIOLATE THIS SECTION.

  5. IN ADDITION TO ANY OTHER REMEDIES PROVIDED IN THIS SECTION, A LABOR
ORGANIZATION, UNION OR AFFILIATE REGISTERED OR REQUIRED TO BE REGISTERED
PURSUANT TO THIS SECTION MAY BE PROHIBITED BY THE COMMISSION FROM
RECEIVING ANY DUES FROM ANY EMPLOYEE LICENSED OR REGISTERED UNDER THIS
ARTICLE AND EMPLOYED BY A GAMING FACILITY LICENSEE OR ITS AGENT, IF ANY
OFFICER, AGENT OR PRINCIPAL EMPLOYEE OF THE LABOR ORGANIZATION, UNION OR
AFFILIATE HAS BEEN FOUND DISQUALIFIED AND IF SUCH DISQUALIFICATION HAS
NOT BEEN WAIVED BY THE COMMISSION IN ACCORDANCE WITH SUBDIVISION TWO OF
THIS SECTION.

  S 1330-A. CASINO GAMING EXPENDITURES. 1. (A) IN ADDITION TO ANY OTHER
REGISTRATION OR REPORTING REQUIRED BY LAW, ANY ENTITY LICENSED UNDER
SECTION SIXTEEN HUNDRED SEVENTEEN-A OF THE TAX LAW, OR WHICH POSSESSES A
PARI-MUTUEL WAGERING LICENSE OR FRANCHISE AWARDED PURSUANT TO ARTICLE
TWO OR THREE OF THIS CHAPTER THAT MAKES AN EXPENDITURE OF MORE THAN ONE
THOUSAND DOLLARS FOR ANY WRITTEN, TYPED, OR OTHER PRINTED COMMUNICATION,
OR ANY INTERNET-BASED COMMUNICATION, OR ANY TELEVISION OR RADIO COMMUNI-
CATION, OR ANY AUTOMATED OR PAID TELEPHONE COMMUNICATIONS, IN SUPPORT OF
OPPOSITION TO ANY REFERENDUM AUTHORIZED BY THE STATE LEGISLATURE FOLLOW-
ING SECOND PASSAGE OF A CONCURRENT RESOLUTION TO AMEND THE STATE CONSTI-
TUTION TO PERMIT OR AUTHORIZE CASINO GAMING TO A GENERAL PUBLIC AUDI-
ENCE, SHALL FILE ANY REPORTS REQUIRED PURSUANT TO THE ELECTION LAW
SIMULTANEOUSLY WITH THE GAMING COMMISSION AND SHALL PROVIDE SUCH ADDI-
TIONAL REPORTS AS REQUIRED BY THE GAMING COMMISSION. THIS REQUIREMENT
SHALL APPLY IRRESPECTIVE OF WHETHER SUCH ENTITY MAKES SUCH EXPENDITURE
DIRECTLY OR INDIRECTLY VIA ONE OR MORE PERSONS. THE GAMING COMMISSION
SHALL PROMULGATE REGULATIONS TO IMPLEMENT THE REQUIREMENTS OF THIS
SECTION.

(B) CASINO GAMING EXPENDITURES DO NOT INCLUDE EXPENDITURES IN
CONNECTION WITH:

(I) A WRITTEN NEWS STORY, COMMENTARY, OR EDITORIAL OR A NEWS STORY,
COMMENTARY, OR EDITORIAL DISTRIBUTED THROUGH THE FACILITIES OF ANY
BROADCASTING STATION, CABLE OR SATELLITE UNLESS SUCH PUBLICATION OR
FACILITIES ARE OWNED OR CONTROLLED DIRECTLY OR INDIRECTLY BY THE PERSON
MAKING SUCH EXPENDITURE; OR

(II) A COMMUNICATION PUBLISHED ON THE INTERNET, UNLESS THE COMMUNI-
CATION IS A PAID ADVERTISEMENT.

(C) FOR PURPOSES OF THIS SECTION, THE TERM "PERSON" SHALL MEAN PERSON,
GROUP OF PERSONS, CORPORATION, UNINCORPORATED BUSINESS ENTITY, LABOR
ORGANIZATION OR BUSINESS, TRADE OR PROFESSIONAL ASSOCIATION OR ORGANIZA-
TION, OR POLITICAL COMMITTEE.

(D) A KNOWING OR WILLFUL VIOLATION OF THE PROVISIONS OF THIS SECTION
SHALL SUBJECT THE PERSON TO A CIVIL PENALTY EQUAL TO UP TO ONE HUNDRED
THOUSAND DOLLARS OR THE COST OF THE COMMUNICATION, WHICHEVER IS GREATER,
IMPOSED BY THE GAMING COMMISSION FOR EACH VIOLATION.

2. A COPY OF ALL COMMUNICATIONS PAID FOR BY THE CASINO GAMING EXPENDI-
TURE, INCLUDING BUT NOT LIMITED TO BROADCAST, CABLE OR SATELLITE SCHED-
ULES AND SCRIPTS, ADVERTISEMENTS, PAMPHLETS, CIRCULARS, FLYERS,
BROCHURES, LETTERHEADS AND OTHER PRINTED MATTER AND STATEMENTS OR INFOR-
MATION CONVEYED TO ONE THOUSAND OR MORE MEMBERS OF A GENERAL PUBLIC
AUDIENCE SHALL BE FILED WITH THE GAMING COMMISSION WITH THE STATEMENTS
REQUIRED THIS ARTICLE.

### TITLE 5

REQUIREMENTS FOR CONDUCT AND OPERATION OF GAMING

SECTION 1331. OPERATION CERTIFICATE.

1332. AGE FOR GAMING PARTICIPATION.

1333. HOURS OF OPERATION.

1334. INTERNAL CONTROLS.

1335. GAMES AND GAMING EQUIPMENT.

1336. CERTAIN WAGERING PROHIBITED.

1337. GRATUITIES.

1338. LIMITATION ON CERTAIN FINANCIAL ACCESS.

1339. CREDIT.

1340. ALCOHOLIC BEVERAGES.

1341. LICENSEE LEASES AND CONTRACTS.

1342. REQUIRED EXCLUSION OF CERTAIN PERSONS.

1343. EXCLUSION, EJECTION OF CERTAIN PERSONS.

1344. LIST OF PERSONS SELF-EXCLUDED FROM GAMING ACTIVITIES.

1345. EXCLUDED PERSON; FORFEITURE OF WINNINGS; OTHER SANCTIONS.

1346. LABOR PEACE AGREEMENTS FOR CERTAIN FACILITIES

S 1331. OPERATION CERTIFICATE. 1. NOTWITHSTANDING THE ISSUANCE OF A
LICENSE THEREFOR, NO GAMING FACILITY MAY BE OPENED OR REMAIN OPEN TO THE
PUBLIC, AND NO GAMING ACTIVITY, EXCEPT FOR TEST PURPOSES, MAY BE
CONDUCTED THEREIN, UNLESS AND UNTIL A VALID OPERATION CERTIFICATE HAS
BEEN ISSUED TO THE GAMING FACILITY LICENSEE BY THE COMMISSION. SUCH
CERTIFICATE SHALL BE ISSUED BY THE EXECUTIVE DIRECTOR UPON A DETERMI-
NATION THAT A GAMING FACILITY COMPLIES IN ALL RESPECTS WITH THE REQUIRE-
MENTS OF THIS ARTICLE AND REGULATIONS PROMULGATED HEREUNDER, AND THAT
THE GAMING FACILITY IS PREPARED IN ALL RESPECTS TO RECEIVE AND ENTERTAIN
THE PUBLIC.

2. AN OPERATION CERTIFICATE SHALL REMAIN IN FORCE AND EFFECT UNLESS
REVOKED, SUSPENDED, LIMITED, OR OTHERWISE ALTERED BY THE COMMISSION IN
ACCORDANCE WITH THIS ARTICLE.

3. IT SHALL BE AN EXPRESS CONDITION OF CONTINUED OPERATION UNDER THIS
ARTICLE THAT A GAMING FACILITY LICENSEE SHALL MAINTAIN EITHER ELECTRON-
ICALLY OR IN HARD COPY AT THE DISCRETION OF THE GAMING FACILITY LICEN-
SEE, COPIES OF ALL BOOKS, RECORDS, AND DOCUMENTS PERTAINING TO THE
LICENSEE'S OPERATIONS AND APPROVED HOTEL IN A MANNER AND LOCATION
APPROVED BY THE COMMISSION, PROVIDED, HOWEVER, THAT THE ORIGINALS OF
SUCH BOOKS, RECORDS AND DOCUMENTS, WHETHER IN ELECTRONIC OR HARD COPY
FORM, MAY BE MAINTAINED AT THE OFFICES OR ELECTRONIC SYSTEM OF AN AFFIL-
IATE OF THE GAMING FACILITY LICENSEE, AT THE DISCRETION OF THE GAMING
FACILITY LICENSEE. ALL SUCH BOOKS, RECORDS AND DOCUMENTS SHALL BE IMME-
DIATELY AVAILABLE FOR INSPECTION DURING ALL HOURS OF OPERATION IN
ACCORDANCE WITH THE RULES OF THE COMMISSION AND SHALL BE MAINTAINED FOR
SUCH PERIOD OF TIME AS THE COMMISSION SHALL REQUIRE.

S 1332. AGE FOR GAMING PARTICIPATION. 1. NO PERSON UNDER THE AGE AT
WHICH A PERSON IS AUTHORIZED TO PURCHASE AND CONSUME ALCOHOLIC BEVERAGES
SHALL ENTER, OR WAGER IN, A LICENSED GAMING FACILITY; PROVIDED, HOWEVER,
THAT SUCH A PERSON MAY ENTER A GAMING FACILITY BY WAY OF PASSAGE TO
ANOTHER ROOM, AND PROVIDED FURTHER, HOWEVER, THAT ANY SUCH PERSON WHO IS
LICENSED OR REGISTERED UNDER THE PROVISIONS OF THIS ARTICLE MAY ENTER A
GAMING FACILITY IN THE REGULAR COURSE OF THE PERSON'S PERMITTED ACTIV-
ITIES.

2. ANY PERSON DISQUALIFIED PURSUANT TO SUBDIVISION ONE OF THIS SECTION
ENTITLED TO FUNDS, CASH OR PRIZES FROM GAMBLING ACTIVITY SHALL FORFEIT
SAME. SUCH FORFEITED FUNDS, CASH OR PRIZES SHALL BE REMITTED TO THE
COMMISSION AND DEPOSITED INTO THE COMMERCIAL GAMING REVENUE FUND.

S 1333. HOURS OF OPERATION. 1. EACH GAMING FACILITY LICENSED PURSUANT
TO THIS ARTICLE SHALL BE PERMITTED TO OPERATE TWENTY-FOUR HOURS A DAY
UNLESS OTHERWISE DIRECTED BY THE COMMISSION.

2. A GAMING FACILITY LICENSEE SHALL FILE WITH THE COMMISSION A SCHED-
ULE OF HOURS PRIOR TO THE ISSUANCE OF AN INITIAL OPERATION CERTIFICATE.
IF THE GAMING FACILITY LICENSEE PROPOSES ANY CHANGE IN SCHEDULED HOURS,
SUCH CHANGE MAY NOT BE EFFECTED UNTIL SUCH LICENSEE FILES A NOTICE OF
THE NEW SCHEDULE OF HOURS WITH THE COMMISSION. SUCH FILING MUST BE MADE
THIRTY DAYS PRIOR TO THE EFFECTIVE DATE OF THE PROPOSED CHANGE IN HOURS.

3. NOTHING IN THIS SECTION SHALL BE CONSTRUED TO LIMIT A GAMING FACIL-
ITY LICENSEE IN OPENING ITS CASINO LATER THAN, OR CLOSING ITS CASINO
EARLIER THAN, THE TIMES STATED IN ITS SCHEDULE OF OPERATING HOURS;
PROVIDED, HOWEVER, THAT ANY SUCH ALTERATIONS IN ITS HOURS SHALL COMPLY
WITH THE PROVISIONS OF SUBDIVISION ONE OF THIS SECTION AND WITH REGU-
LATIONS OF THE COMMISSION PERTAINING TO SUCH ALTERATIONS.

S 1334. INTERNAL CONTROLS. 1. EACH APPLICANT FOR A GAMING FACILITY
LICENSE SHALL CREATE, MAINTAIN, AND FILE WITH THE COMMISSION A
DESCRIPTION OF ITS INTERNAL PROCEDURES AND ADMINISTRATIVE AND ACCOUNTING
CONTROLS FOR GAMING OPERATIONS THAT CONFORM TO COMMISSION REGULATIONS
AND PROVIDE ADEQUATE AND EFFECTIVE CONTROLS, ESTABLISH A CONSISTENT
OVERALL SYSTEM OF INTERNAL PROCEDURES AND ADMINISTRATIVE AND ACCOUNTING
CONTROLS AND CONFORM TO GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, AND
ENSURE THAT GAMING FACILITY PROCEDURES ARE CARRIED OUT AND SUPERVISED BY
PERSONNEL WHO DO NOT HAVE INCOMPATIBLE FUNCTIONS. A GAMING FACILITY
LICENSEE'S INTERNAL CONTROLS SHALL CONTAIN A NARRATIVE DESCRIPTION OF
THE INTERNAL CONTROL SYSTEM TO BE UTILIZED BY THE GAMING FACILITY,
INCLUDING, BUT NOT LIMITED TO:

(A) ACCOUNTING CONTROLS, INCLUDING THE STANDARDIZATION OF FORMS AND
DEFINITION OF TERMS TO BE UTILIZED IN THE GAMING OPERATIONS;

(B) PROCEDURES, FORMS, AND, WHERE APPROPRIATE, FORMULAS COVERING THE
CALCULATION OF HOLD PERCENTAGES; REVENUE DROP; EXPENSE AND OVERHEAD

SCHEDULES; COMPLIMENTARY SERVICE OR ITEM; JUNKETS; AND CASH EQUIVALENT
TRANSACTIONS;

(C)  PROCEDURES WITHIN THE CASHIER'S CAGE FOR THE RECEIPT, STORAGE AND
DISBURSAL OF CHIPS, CASH, AND OTHER CASH EQUIVALENTS USED IN GAMING; THE
CASHING OF CHECKS; THE REDEMPTION OF CHIPS AND  OTHER  CASH  EQUIVALENTS
USED  IN  GAMING;  THE  PAY-OFF OF JACKPOTS; AND THE RECORDING OF TRANS-
ACTIONS PERTAINING TO GAMING OPERATIONS;

(D) PROCEDURES FOR THE COLLECTION AND SECURITY OF MONEYS AT THE GAMING
TABLES;

(E) PROCEDURES FOR THE TRANSFER AND RECORDATION OF CHIPS  BETWEEN  THE
GAMING TABLES AND THE CASHIER'S CAGE;

(F)  PROCEDURES  FOR  THE TRANSFER OF MONEYS FROM THE GAMING TABLES TO
THE COUNTING PROCESS;

(G) PROCEDURES AND SECURITY FOR THE COUNTING AND RECORDATION OF REVEN-
UE;

(H) PROCEDURES FOR THE SECURITY, STORAGE  AND  RECORDATION  OF  CASH,
CHIPS AND OTHER CASH EQUIVALENTS UTILIZED IN THE GAMING;

(I)  PROCEDURES  FOR  THE  TRANSFER OF MONEYS OR CHIPS FROM AND TO THE
SLOT MACHINES;

(J) PROCEDURES AND STANDARDS FOR THE  OPENING  AND  SECURITY  OF  SLOT
MACHINES;

(K)  PROCEDURES  FOR THE PAYMENT AND RECORDATION OF SLOT MACHINE JACK-
POTS;

(L) PROCEDURES FOR THE CASHING AND RECORDATION OF CHECKS EXCHANGED  BY
CASINO PATRONS;

(M) PROCEDURES GOVERNING THE UTILIZATION OF THE PRIVATE SECURITY FORCE
WITHIN THE GAMING FACILITY;

(N)  PROCEDURES AND SECURITY STANDARDS FOR THE HANDLING AND STORAGE OF
GAMING APPARATUS INCLUDING CARDS, DICE, MACHINES, WHEELS AND  ALL  OTHER
GAMING EQUIPMENT;

(O) PROCEDURES AND RULES GOVERNING THE CONDUCT OF PARTICULAR GAMES AND
THE RESPONSIBILITY OF GAMING FACILITY PERSONNEL IN RESPECT THERETO;

(P)  PROCEDURES FOR THE ORDERLY SHUTDOWN OF GAMING FACILITY OPERATIONS
IN THE EVENT THAT A STATE OF EMERGENCY IS DECLARED AND THE GAMING FACIL-
ITY LICENSEE IS UNABLE OR  INELIGIBLE  TO  CONTINUE  TO  CONDUCT  GAMING
FACILITY  OPERATIONS  DURING SUCH A STATE OF EMERGENCY, WHICH PROCEDURES
SHALL INCLUDE, WITHOUT LIMITATION, THE SECURING OF ALL KEYS  AND  GAMING
ASSETS.

2.  NO MINIMUM STAFFING REQUIREMENTS SHALL BE INCLUDED IN THE INTERNAL
CONTROLS CREATED IN ACCORDANCE WITH SUBDIVISION ONE OF THIS SECTION.

S 1335. GAMES AND GAMING EQUIPMENT.  1. THIS  ARTICLE  SHALL  NOT  BE
CONSTRUED  TO  PERMIT  ANY GAMING EXCEPT THE CONDUCT OF AUTHORIZED GAMES IN
A CASINO IN ACCORDANCE WITH THIS ARTICLE AND THE REGULATIONS PROMULGATED
HEREUNDER.

2. GAMING EQUIPMENT SHALL NOT BE POSSESSED, MAINTAINED OR EXHIBITED BY
ANY PERSON ON THE PREMISES OF A GAMING FACILITY EXCEPT IN A CASINO OR IN
RESTRICTED  CASINO  AREAS  USED FOR THE INSPECTION, REPAIR OR STORAGE OF
SUCH EQUIPMENT AND SPECIFICALLY  DESIGNATED  FOR  THAT  PURPOSE  BY  THE
GAMING  FACILITY  LICENSEE  WITH  THE APPROVAL OF THE COMMISSION. GAMING
EQUIPMENT THAT SUPPORTS THE CONDUCT OF GAMING IN A GAMING  FACILITY  BUT
DOES  NOT  PERMIT  OR  REQUIRE  PATRON ACCESS, SUCH AS COMPUTERS, MAY BE
POSSESSED AND MAINTAINED BY A GAMING FACILITY LICENSEE  OR  A  QUALIFIED
HOLDING  OR  INTERMEDIARY  COMPANY  OF  A  GAMING  FACILITY LICENSEE IN
RESTRICTED AREAS SPECIFICALLY APPROVED BY THE  COMMISSION.  NO  GAMING
EQUIPMENT  SHALL  BE  POSSESSED,  MAINTAINED, EXHIBITED, BROUGHT INTO OR
REMOVED FROM A GAMING FACILITY BY ANY PERSON UNLESS SUCH  EQUIPMENT  IS

NECESSARY TO THE CONDUCT OF AN AUTHORIZED GAME, HAS PERMANENTLY AFFIXED,
IMPRINTED, IMPRESSED OR ENGRAVED THEREON AN IDENTIFICATION NUMBER OR
SYMBOL AUTHORIZED BY THE COMMISSION, IS UNDER THE EXCLUSIVE CONTROL OF A
GAMING  FACILITY LICENSEE OR GAMING FACILITY LICENSEE'S EMPLOYEES, OR OF
ANY INDIVIDUALLY QUALIFIED EMPLOYEE  OF  A  HOLDING  COMPANY  OR  GAMING
FACILITY LICENSEE AND IS BROUGHT INTO OR REMOVED FROM THE GAMING FACILI-
TY  FOLLOWING TWENTY-FOUR HOUR PRIOR NOTICE GIVEN TO AN AUTHORIZED AGENT
OF THE COMMISSION.

  NOTWITHSTANDING ANY OTHER PROVISION OF THIS SECTION,  COMPUTER  EQUIP-
MENT USED BY THE SLOT SYSTEM OPERATOR OF A MULTI-CASINO PROGRESSIVE SLOT
SYSTEM  TO  LINK  AND  COMMUNICATE WITH THE SLOT MACHINES OF TWO OR MORE
GAMING FACILITY LICENSEES FOR THE PURPOSE OF CALCULATING AND  DISPLAYING
THE  AMOUNT  OF  A  PROGRESSIVE JACKPOT, MONITORING THE OPERATION OF THE
SYSTEM, AND ANY OTHER PURPOSE THAT THE COMMISSION  DEEMS  NECESSARY  AND
APPROPRIATE TO THE OPERATION OR MAINTENANCE OF THE MULTI-CASINO PROGRES-
SIVE SLOT MACHINE SYSTEM MAY, WITH THE PRIOR APPROVAL OF THE COMMISSION,
BE POSSESSED, MAINTAINED AND OPERATED BY THE SLOT SYSTEM OPERATOR EITHER
IN A RESTRICTED AREA ON THE PREMISES OF A GAMING FACILITY OR IN A SECURE
FACILITY  INACCESSIBLE  TO THE PUBLIC AND SPECIFICALLY DESIGNED FOR THAT
PURPOSE OFF THE PREMISES OF A GAMING FACILITY WITH THE  WRITTEN  PERMIS-
SION  OF  THE COMMISSION.  NOTWITHSTANDING THE FOREGOING, A PERSON MAY,
WITH THE PRIOR APPROVAL OF THE  COMMISSION  AND  UNDER  SUCH  TERMS  AND
CONDITIONS  AS  MAY  BE REQUIRED BY THE COMMISSION, POSSESS, MAINTAIN OR
EXHIBIT GAMING EQUIPMENT IN ANY  OTHER  AREA  OF  THE  GAMING  FACILITY,
PROVIDED  THAT  SUCH EQUIPMENT IS USED FOR NONGAMING PURPOSES. NOTWITH-
STANDING ANY OTHER PROVISION  OF  THIS  ARTICLE  TO  THE  CONTRARY,  THE
COMMISSION MAY, BY REGULATION, AUTHORIZE THE LINKING OF SLOT MACHINES OF
ONE OR MORE GAMING FACILITY LICENSEES AND SLOT MACHINES LOCATED IN CASI-
NOS LICENSED BY ANOTHER STATE OF THE UNITED STATES. WAGERING AND ACCOUNT
INFORMATION  FOR  A  MULTI-STATE SLOT SYSTEM SHALL BE TRANSMITTED BY THE
OPERATOR OF SUCH MULTI-STATE SLOT SYSTEM TO EITHER A RESTRICTED AREA  ON
  THE  PREMISES  OF A GAMING FACILITY OR TO A SECURE FACILITY INACCESSIBLE
TO THE PUBLIC AND SPECIFICALLY DESIGNED FOR THAT PURPOSE WITH THE  WRIT-
TEN  PERMISSION  OF  THE  COMMISSION, AND FROM THERE TO SLOT MACHINES OF
GAMING FACILITY LICENSEES, PROVIDED ALL LOCATIONS ARE  APPROVED  BY  THE
COMMISSION.

  3.  EACH  GAMING  FACILITY  SHALL  CONTAIN A COUNT ROOM AND SUCH OTHER
SECURE FACILITIES AS MAY BE REQUIRED BY THE COMMISSION FOR THE  COUNTING
AND  STORAGE  OF  CASH,  COINS, TOKENS, CHECKS, PLAQUES, GAMING VOUCHERS,
COUPONS, AND OTHER DEVICES OR  ITEMS  OF  VALUE  USED  IN  WAGERING  AND
APPROVED  BY  THE  COMMISSION THAT ARE RECEIVED IN THE CONDUCT OF GAMING
AND FOR THE INSPECTION, COUNTING AND STORAGE OF DICE, CARDS,  CHIPS  AND
OTHER  REPRESENTATIVES  OF  VALUE. THE COMMISSION SHALL PROMULGATE REGU-
LATIONS FOR THE SECURITY OF DROP BOXES AND OTHER DEVICES  IN  WHICH  THE
FOREGOING  ITEMS  ARE  DEPOSITED AT THE GAMING TABLES OR IN SLOT MACHINES,
AND ALL AREAS WHEREIN SUCH BOXES AND DEVICES ARE  KEPT  WHILE  IN  USE,
WHICH  REGULATIONS  MAY INCLUDE CERTAIN LOCKING DEVICES. SAID DROP BOXES
AND OTHER DEVICES SHALL NOT BE BROUGHT INTO OR  REMOVED  FROM  A  GAMING
FACILITY,  OR  LOCKED OR UNLOCKED, EXCEPT AT SUCH TIMES, IN SUCH PLACES,
AND ACCORDING TO SUCH PROCEDURES AS THE COMMISSION MAY REQUIRE.

  4. ALL CHIPS USED IN GAMING SHALL BE OF SUCH SIZE AND UNIFORM COLOR BY
DENOMINATION AS THE COMMISSION SHALL REQUIRE BY REGULATION.

  5. ALL GAMING SHALL BE CONDUCTED ACCORDING TO RULES PROMULGATED BY THE
COMMISSION. ALL WAGERS AND PAY-OFFS OF  WINNING  WAGERS  SHALL  BE  MADE
ACCORDING  TO RULES PROMULGATED BY THE COMMISSION, WHICH SHALL ESTABLISH
SUCH LIMITATIONS AS MAY BE NECESSARY TO ASSURE THE  VITALITY  OF  CASINO

OPERATIONS AND FAIR ODDS TO PATRONS. EACH SLOT MACHINE SHALL HAVE A
MINIMUM PAYOUT OF EIGHTY-FIVE PERCENT.

  6. EACH GAMING FACILITY LICENSEE SHALL MAKE AVAILABLE IN PRINTED FORM
TO ANY PATRON UPON REQUEST THE COMPLETE TEXT OF THE RULES OF THE COMMIS-
SION REGARDING GAMES AND THE CONDUCT OF GAMING, PAY-OFFS OF WINNING
WAGERS, AN APPROXIMATION OF THE ODDS OF WINNING FOR EACH WAGER, AND SUCH
OTHER ADVICE TO THE PLAYER AS THE COMMISSION SHALL REQUIRE. EACH GAMING
FACILITY LICENSEE SHALL PROMINENTLY POST WITHIN A CASINO, ACCORDING TO
REGULATIONS OF THE COMMISSION SUCH INFORMATION ABOUT GAMING RULES, PAY-
OFFS OF WINNING WAGERS, THE ODDS OF WINNING FOR EACH WAGER, AND SUCH
OTHER ADVICE TO THE PLAYER AS THE COMMISSION SHALL REQUIRE.

  7. EACH GAMING TABLE SHALL BE EQUIPPED WITH A SIGN INDICATING THE
PERMISSIBLE MINIMUM AND MAXIMUM WAGERS PERTAINING THERETO. IT SHALL BE
UNLAWFUL FOR A GAMING FACILITY LICENSEE TO REQUIRE ANY WAGER TO BE
GREATER THAN THE STATED MINIMUM OR LESS THAN THE STATED MAXIMUM;
PROVIDED, HOWEVER, THAT ANY WAGER ACTUALLY MADE BY A PATRON AND NOT
REJECTED BY A GAMING FACILITY LICENSEE PRIOR TO THE COMMENCEMENT OF PLAY
SHALL BE TREATED AS A VALID WAGER.

  8. TESTING OF SLOT MACHINES AND ASSOCIATED DEVICES.     (A) EXCEPT AS
HEREIN PROVIDED, NO SLOT MACHINE SHALL BE USED TO CONDUCT GAMING UNLESS
IT IS IDENTICAL IN ALL ELECTRICAL, MECHANICAL AND OTHER ASPECTS TO A
MODEL THEREOF WHICH HAS BEEN SPECIFICALLY TESTED AND LICENSED FOR USE BY
THE COMMISSION. THE COMMISSION SHALL ALSO TEST OR CAUSE TO BE TESTED ANY
OTHER GAMING DEVICE, GAMING EQUIPMENT, GAMING-RELATED DEVICE OR
GROSS-REVENUE RELATED DEVICE, SUCH AS A SLOT MANAGEMENT SYSTEM, ELEC-
TRONIC TRANSFER CREDIT SYSTEM OR GAMING VOUCHER SYSTEM AS IT DEEMS
APPROPRIATE. IN ITS DISCRETION AND FOR THE PURPOSE OF EXPEDITING THE
APPROVAL PROCESS, THE COMMISSION MAY UTILIZE THE SERVICES OF A PRIVATE
TESTING LABORATORY THAT HAS OBTAINED A PLENARY LICENSE AS A CASINO
VENDOR ENTERPRISE TO PERFORM THE TESTING, AND MAY ALSO UTILIZE APPLICA-
BLE DATA FROM ANY SUCH PRIVATE TESTING LABORATORY OR FROM A GOVERNMENTAL
AGENCY OF A STATE AUTHORIZED TO REGULATE SLOT MACHINES AND OTHER GAMING
DEVICES, GAMING EQUIPMENT, GAMING-RELATED DEVICES AND GROSS-REVENUE
RELATED DEVICES USED IN GAMING, IF THE PRIVATE TESTING LABORATORY OR
GOVERNMENTAL AGENCY USES A TESTING METHODOLOGY SUBSTANTIALLY SIMILAR TO
THE METHODOLOGY APPROVED OR UTILIZED BY THE COMMISSION. THE COMMISSION,
IN ITS DISCRETION, MAY RELY UPON THE DATA PROVIDED BY THE PRIVATE TEST-
ING LABORATORY OR GOVERNMENTAL AGENCY AND ADOPT THE CONCLUSIONS OF SUCH
PRIVATE TESTING LABORATORY OR GOVERNMENTAL AGENCY REGARDING ANY SUBMIT-
TED DEVICE.

  (B) EXCEPT AS OTHERWISE PROVIDED IN PARAGRAPH (E) OF THIS SUBDIVISION,
THE COMMISSION SHALL, WITHIN SIXTY DAYS OF ITS RECEIPT OF A COMPLETE
APPLICATION FOR THE TESTING OF A SLOT MACHINE OR OTHER GAMING EQUIPMENT
MODEL, APPROVE OR REJECT THE SLOT MACHINE OR OTHER GAMING EQUIPMENT
MODEL. IN SO DOING, THE COMMISSION SHALL SPECIFY WHETHER AND TO WHAT
EXTENT ANY DATA FROM A PRIVATE TESTING LABORATORY OR GOVERNMENTAL AGENCY
OF A STATE WAS USED IN REACHING ITS CONCLUSIONS AND RECOMMENDATION. IF
THE COMMISSION IS UNABLE TO COMPLETE THE TESTING OF A SLOT MACHINE OR
OTHER GAMING EQUIPMENT MODEL WITHIN THIS SIXTY DAY PERIOD, THE COMMIS-
SION MAY CONDITIONALLY APPROVE THE SLOT MACHINE OR OTHER GAMING EQUIP-
MENT MODEL FOR TEST USE BY A GAMING FACILITY LICENSEE PROVIDED THAT THE
COMMISSION REPRESENTS THAT THE USE OF THE SLOT MACHINE OR OTHER GAMING
EQUIPMENT MODEL WILL NOT HAVE A DIRECT AND MATERIALLY ADVERSE IMPACT ON
THE INTEGRITY OF GAMING OR THE CONTROL OF GROSS REVENUE. THE COMMISSION
SHALL GIVE PRIORITY TO THE TESTING OF SLOT MACHINES OR OTHER GAMING

EQUIPMENT THAT A GAMING FACILITY LICENSEE HAS CERTIFIED IT WILL USE IN ITS GAMING FACILITY IN THIS STATE.

(C) THE COMMISSION SHALL, BY REGULATION, ESTABLISH SUCH TECHNICAL STANDARDS FOR LICENSURE OF SLOT MACHINES, INCLUDING MECHANICAL AND ELEC- TRICAL RELIABILITY, SECURITY AGAINST TAMPERING, THE COMPREHENSIBILITY OF WAGERING, AND NOISE AND LIGHT LEVELS, AS IT MAY DEEM NECESSARY TO PROTECT THE PLAYER FROM FRAUD OR DECEPTION AND TO INSURE THE INTEGRITY OF GAMING. THE DENOMINATIONS OF SUCH MACHINES SHALL BE SET BY THE LICEN- SEE; THE LICENSEE SHALL SIMULTANEOUSLY NOTIFY THE COMMISSION OF THE SETTINGS.

(D) THE COMMISSION SHALL, BY REGULATION, DETERMINE THE PERMISSIBLE NUMBER AND DENSITY OF SLOT MACHINES IN A LICENSED GAMING FACILITY SO AS TO:

(1) PROMOTE OPTIMUM SECURITY FOR GAMING FACILITY OPERATIONS;

(2) AVOID DECEPTION OR FREQUENT DISTRACTION TO PLAYERS AT GAMING TABLES;

(3) PROMOTE THE COMFORT OF PATRONS;

(4) CREATE AND MAINTAIN A GRACIOUS PLAYING ENVIRONMENT IN THE GAMING FACILITY; AND

(5) ENCOURAGE AND PRESERVE COMPETITION IN GAMING FACILITY OPERATIONS BY ASSURING THAT A VARIETY OF GAMING OPPORTUNITIES IS OFFERED TO THE PUBLIC.

ANY SUCH REGULATION PROMULGATED BY THE COMMISSION WHICH DETERMINES THE PERMISSIBLE NUMBER AND DENSITY OF SLOT MACHINES IN A LICENSED GAMING FACILITY SHALL PROVIDE THAT ALL CASINOS SHALL BE INCLUDED IN ANY CALCU- LATION OF THE PERMISSIBLE NUMBER AND DENSITY OF SLOT MACHINES IN A LICENSED GAMING FACILITY.

(E) ANY NEW GAMING EQUIPMENT THAT IS SUBMITTED FOR TESTING TO THE COMMISSION OR TO A STATE LICENSED INDEPENDENT TESTING LABORATORY PRIOR TO OR SIMULTANEOUSLY WITH SUBMISSION OF SUCH NEW EQUIPMENT FOR TESTING IN A JURISDICTION OTHER THAN THIS STATE, MAY, CONSISTENT WITH REGU- LATIONS PROMULGATED BY THE COMMISSION, BE DEPLOYED BY A GAMING FACILITY LICENSEE ON THE CASINO FOURTEEN DAYS AFTER SUBMISSION OF SUCH EQUIPMENT FOR TESTING. IF THE GAMING FACILITY OR CASINO VENDOR ENTERPRISE LICENSEE HAS NOT RECEIVED APPROVAL FOR THE EQUIPMENT FOURTEEN DAYS AFTER SUBMISSION FOR TESTING, ANY INTERESTED GAMING FACILITY LICENSEE MAY, CONSISTENT WITH COMMISSION REGULATIONS, DEPLOY THE EQUIPMENT ON A FIELD TEST BASIS, UNLESS OTHERWISE DIRECTED BY THE EXECUTIVE DIRECTOR.

9. IT SHALL BE UNLAWFUL FOR ANY PERSON TO EXCHANGE OR REDEEM CHIPS FOR ANYTHING WHATSOEVER, EXCEPT FOR CURRENCY, NEGOTIABLE PERSONAL CHECKS, NEGOTIABLE COUNTER CHECKS, OTHER CHIPS, COUPONS, SLOT VOUCHERS OR COMPLIMENTARY VOUCHERS DISTRIBUTED BY THE GAMING FACILITY LICENSEE, OR, IF AUTHORIZED BY REGULATION OF THE COMMISSION, A VALID CHARGE TO A CRED- IT OR DEBIT CARD ACCOUNT. A GAMING FACILITY LICENSEE SHALL, UPON THE REQUEST OF ANY PERSON, REDEEM THAT LICENSEE'S GAMING CHIPS SURRENDERED BY THAT PERSON IN ANY AMOUNT OVER ONE HUNDRED DOLLARS WITH A CHECK DRAWN UPON THE LICENSEE'S ACCOUNT AT ANY BANKING INSTITUTION IN THIS STATE AND MADE PAYABLE TO THAT PERSON.

10. IT SHALL BE UNLAWFUL FOR ANY GAMING FACILITY LICENSEE OR ITS AGENTS OR EMPLOYEES TO EMPLOY, CONTRACT WITH, OR USE ANY SHILL OR BARKER TO INDUCE ANY PERSON TO ENTER A GAMING FACILITY OR PLAY AT ANY GAME OR FOR ANY PURPOSE WHATSOEVER.

11. IT SHALL BE UNLAWFUL FOR A DEALER IN ANY AUTHORIZED GAME IN WHICH CARDS ARE DEALT TO DEAL CARDS BY HAND OR OTHER THAN FROM A DEVICE SPECIFICALLY DESIGNED FOR THAT PURPOSE, UNLESS OTHERWISE PERMITTED BY THE RULES OF THE COMMISSION.

S 1336. CERTAIN WAGERING PROHIBITED. 1. IT SHALL BE UNLAWFUL FOR ANY CASINO KEY EMPLOYEE LICENSEE TO WAGER IN ANY GAMING FACILITY IN THIS STATE.

2. IT SHALL BE UNLAWFUL FOR ANY OTHER EMPLOYEE OF A GAMING FACILITY LICENSEE WHO, IN THE JUDGMENT OF THE COMMISSION, IS DIRECTLY INVOLVED WITH THE CONDUCT OF GAMING OPERATIONS, INCLUDING BUT NOT LIMITED TO DEALERS, FLOOR PERSONS, BOX PERSONS, SECURITY AND SURVEILLANCE EMPLOY- EES, TO ENGAGE IN GAMBLING IN ANY GAMING FACILITY IN WHICH THE EMPLOYEE IS EMPLOYED OR IN ANY OTHER GAMING FACILITY IN THIS STATE WHICH IS OWNED OR OPERATED BY THE GAMING FACILITY LICENSEE OR AN AFFILIATED LICENSEE.

3. THE PROHIBITION AGAINST WAGERING SET FORTH IN SUBDIVISIONS ONE AND TWO OF THIS SECTION SHALL CONTINUE FOR A PERIOD OF THIRTY DAYS COMMENC- ING UPON THE DATE THAT THE EMPLOYEE EITHER LEAVES EMPLOYMENT WITH A GAMING FACILITY LICENSEE OR IS TERMINATED FROM EMPLOYMENT WITH A GAMING FACILITY LICENSEE.

S 1337. GRATUITIES. 1. IT SHALL BE UNLAWFUL FOR ANY CASINO KEY EMPLOYEE OR BOXMAN, FLOORMAN, OR ANY OTHER GAMING EMPLOYEE WHO SHALL SERVE IN A SUPERVISORY POSITION TO SOLICIT OR ACCEPT, AND FOR ANY OTHER GAMING EMPLOYEE TO SOLICIT, ANY TIP OR GRATUITY FROM ANY PLAYER OR PATRON AT THE GAMING FACILITY WHERE HE IS EMPLOYED.

2. A DEALER MAY ACCEPT TIPS OR GRATUITIES FROM A PATRON AT THE TABLE AT WHICH SUCH DEALER IS CONDUCTING PLAY, SUBJECT TO THE PROVISIONS OF THIS SECTION. ALL SUCH TIPS OR GRATUITIES SHALL BE IMMEDIATELY DEPOSIT- ED IN A LOCKBOX RESERVED FOR THAT PURPOSE, UNLESS THE TIP OR GRATUITY IS AUTHORIZED BY A PATRON UTILIZING AN AUTOMATED WAGERING SYSTEM APPROVED BY THE COMMISSION. ALL TIPS OR GRATUITIES SHALL BE ACCOUNTED FOR, AND PLACED IN A POOL FOR DISTRIBUTION PRO RATA AMONG THE DEALERS, WITH THE DISTRIBUTION BASED UPON THE NUMBER OF HOURS EACH DEALER HAS WORKED, EXCEPT THAT THE COMMISSION MAY, BY REGULATION, PERMIT A SEPARATE POOL TO BE ESTABLISHED FOR DEALERS IN THE GAME OF POKER, OR MAY PERMIT TIPS OR GRATUITIES TO BE RETAINED BY INDIVIDUAL DEALERS IN THE GAME OF POKER.

3. NOTWITHSTANDING THE PROVISIONS OF SUBDIVISION ONE OF THIS SECTION, A GAMING FACILITY LICENSEE MAY REQUIRE THAT A PERCENTAGE OF THE PRIZE POOL OFFERED TO PARTICIPANTS PURSUANT TO AN AUTHORIZED POKER TOURNAMENT BE WITHHELD FOR DISTRIBUTION TO THE TOURNAMENT DEALERS AS TIPS OR GRATU- ITIES AS THE COMMISSION BY REGULATION MAY APPROVE.

S 1338. LIMITATION ON CERTAIN FINANCIAL ACCESS. IN ORDER TO PROTECT THE PUBLIC INTEREST, THE COMMISSION SHALL ADOPT REGULATIONS THAT INCLUDE PROVISIONS THAT:

1. LIMIT THE NUMBER AND LOCATION OF AND MAXIMUM WITHDRAWAL AMOUNTS FROM AUTOMATED TELLER MACHINES;

2. PROHIBIT AUTHORIZED AUTOMATED TELLER MACHINES FROM ACCEPTING ELEC- TRONIC BENEFIT CARDS, DEBIT CARDS, OR SIMILAR NEGOTIABLE INSTRUMENTS ISSUED BY THE STATE OR POLITICAL SUBDIVISIONS FOR THE PURPOSE OF ACCESS- ING TEMPORARY PUBLIC ASSISTANCE;

3. PROHIBIT THE USE OF SPECIFIED NEGOTIABLE INSTRUMENTS AT GAMING FACILITIES AND THE USE OF CREDIT CARDS, DEBIT CARDS, AND SIMILAR DEVICES IN SLOT MACHINES OR AT TABLE GAMES; AND

4. PROHIBIT CONSUMERS FROM CASHING PAYCHECKS AT GAMING FACILITIES.

S 1339. CREDIT. 1. EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION, NO GAMING FACILITY LICENSEE OR ANY PERSON LICENSED UNDER THIS ARTICLE, AND NO PERSON ACTING ON BEHALF OF OR UNDER ANY ARRANGEMENT WITH A GAMING FACILITY LICENSEE OR OTHER PERSON LICENSED UNDER THIS ARTICLE, SHALL:

(A) CASH ANY CHECK, MAKE ANY LOAN, OR OTHERWISE PROVIDE OR ALLOW TO ANY PERSON ANY CREDIT OR ADVANCE OF ANYTHING OF VALUE OR WHICH REPRES-

ENTS VALUE TO ENABLE ANY PERSON TO TAKE PART IN GAMING ACTIVITY AS A
PLAYER; OR

(B) RELEASE OR DISCHARGE ANY DEBT, EITHER IN WHOLE OR IN PART, OR MAKE
ANY LOAN WHICH REPRESENTS ANY LOSSES INCURRED BY ANY PLAYER IN GAMING
ACTIVITY, WITHOUT MAINTAINING A WRITTEN RECORD THEREOF IN ACCORDANCE
WITH THE RULES OF THE COMMISSION.

2. NO GAMING FACILITY LICENSEE OR ANY PERSON LICENSED UNDER THIS ARTI-
CLE, AND NO PERSON ACTING ON BEHALF OF OR UNDER ANY ARRANGEMENT WITH A
GAMING FACILITY LICENSEE OR OTHER PERSON LICENSED UNDER THIS ARTICLE,
MAY ACCEPT A CHECK, OTHER THAN A RECOGNIZED TRAVELER'S CHECK OR OTHER
CASH EQUIVALENT FROM ANY PERSON TO ENABLE SUCH PERSON TO TAKE PART IN
GAMING ACTIVITY AS A PLAYER, OR MAY GIVE CASH OR CASH EQUIVALENTS IN
EXCHANGE FOR SUCH CHECK UNLESS:

(A) THE CHECK IS MADE PAYABLE TO THE GAMING FACILITY LICENSEE;

(B) THE CHECK IS DATED, BUT NOT POSTDATED;

(C) THE CHECK IS PRESENTED TO THE CASHIER OR THE CASHIER'S REPRESEN-
TATIVE AT A LOCATION IN THE GAMING FACILITY APPROVED BY THE COMMISSION
AND IS EXCHANGED FOR CASH OR SLOT TOKENS WHICH TOTAL AN AMOUNT EQUAL TO
THE AMOUNT FOR WHICH THE CHECK IS DRAWN, OR THE CHECK IS PRESENTED TO
THE CASHIER'S REPRESENTATIVE AT A GAMING TABLE IN EXCHANGE FOR CHIPS
WHICH TOTAL AN AMOUNT EQUAL TO THE AMOUNT FOR WHICH THE CHECK IS DRAWN;
AND

(D) THE REGULATIONS CONCERNING CHECK CASHING PROCEDURES ARE OBSERVED
BY THE GAMING FACILITY LICENSEE AND ITS EMPLOYEES AND AGENTS. NOTHING
IN THIS SUBDIVISION SHALL BE DEEMED TO PRECLUDE THE ESTABLISHMENT OF AN
ACCOUNT BY ANY PERSON WITH A GAMING FACILITY LICENSEE BY A DEPOSIT OF
CASH, RECOGNIZED TRAVELER'S CHECK OR OTHER CASH EQUIVALENT, OR A CHECK
WHICH MEETS THE REQUIREMENTS OF SUBDIVISION SEVEN OF THIS SECTION, OR TO
PRECLUDE THE WITHDRAWAL, EITHER IN WHOLE OR IN PART, OF ANY AMOUNT
CONTAINED IN SUCH ACCOUNT.

3. WHEN A GAMING FACILITY LICENSEE OR OTHER PERSON LICENSED UNDER THIS
ARTICLE, OR ANY PERSON ACTING ON BEHALF OF OR UNDER ANY ARRANGEMENT WITH
A GAMING FACILITY LICENSEE OR OTHER PERSON LICENSED UNDER THIS ARTICLE,
CASHES A CHECK IN CONFORMITY WITH THE REQUIREMENTS OF SUBDIVISION TWO OF
THIS SECTION, THE GAMING FACILITY LICENSEE SHALL CAUSE THE DEPOSIT OF
SUCH CHECK IN A BANK FOR COLLECTION OR PAYMENT, OR SHALL REQUIRE AN
ATTORNEY OR CASINO KEY EMPLOYEE WITH NO INCOMPATIBLE FUNCTIONS TO PRES-
ENT SUCH CHECK TO THE DRAWER'S BANK FOR PAYMENT, WITHIN:

(A) SEVEN CALENDAR DAYS OF THE DATE OF THE TRANSACTION FOR A CHECK IN
AN AMOUNT OF ONE THOUSAND DOLLARS OR LESS;

(B) FOURTEEN CALENDAR DAYS OF THE DATE OF THE TRANSACTION FOR A CHECK
IN AN AMOUNT GREATER THAN ONE THOUSAND DOLLARS BUT LESS THAN OR EQUAL TO
FIVE THOUSAND DOLLARS; OR

(C) FORTY-FIVE CALENDAR DAYS OF THE DATE OF THE TRANSACTION FOR A
CHECK IN AN AMOUNT GREATER THAN FIVE THOUSAND DOLLARS.

NOTWITHSTANDING THE FOREGOING, THE DRAWER OF THE CHECK MAY REDEEM THE
CHECK BY EXCHANGING CASH, CASH EQUIVALENTS, CHIPS, OR A CHECK WHICH
MEETS THE REQUIREMENTS OF SUBDIVISION SEVEN OF THIS SECTION IN AN AMOUNT
EQUAL TO THE AMOUNT FOR WHICH THE CHECK IS DRAWN; OR HE OR SHE MAY
REDEEM THE CHECK IN PART BY EXCHANGING CASH, CASH EQUIVALENTS, CHIPS, OR
A CHECK WHICH MEETS THE REQUIREMENTS OF SUBDIVISION SEVEN OF THIS
SECTION AND ANOTHER CHECK WHICH MEETS THE REQUIREMENTS OF SUBDIVISION
TWO OF THIS SECTION FOR THE DIFFERENCE BETWEEN THE ORIGINAL CHECK AND
THE CASH, CASH EQUIVALENTS, CHIPS, OR CHECK TENDERED; OR HE OR SHE MAY
ISSUE ONE CHECK WHICH MEETS THE REQUIREMENTS OF SUBDIVISION TWO OF THIS
SECTION IN AN AMOUNT SUFFICIENT TO REDEEM TWO OR MORE CHECKS DRAWN TO

THE ORDER OF THE GAMING FACILITY LICENSEE. IF THERE HAS BEEN A PARTIAL
REDEMPTION OR A CONSOLIDATION IN CONFORMITY WITH THE PROVISIONS OF THIS
SUBDIVISION, THE NEWLY ISSUED CHECK SHALL BE DELIVERED TO A BANK FOR
COLLECTION OR PAYMENT OR PRESENTED TO THE DRAWER'S BANK FOR PAYMENT BY
AN ATTORNEY OR CASINO KEY EMPLOYEE WITH NO INCOMPATIBLE FUNCTIONS WITHIN
THE PERIOD HEREIN SPECIFIED. NO GAMING FACILITY LICENSEE OR ANY PERSON
LICENSED OR REGISTERED UNDER THIS ARTICLE, AND NO PERSON ACTING ON
BEHALF OF OR UNDER ANY ARRANGEMENT WITH A GAMING FACILITY LICENSEE OR
OTHER PERSON LICENSED UNDER THIS ARTICLE, SHALL ACCEPT ANY CHECK OR
SERIES OF CHECKS IN REDEMPTION OR CONSOLIDATION OF ANOTHER CHECK OR
CHECKS IN ACCORDANCE WITH THIS SUBDIVISION FOR THE PURPOSE OF AVOIDING
OR DELAYING THE DEPOSIT OF A CHECK IN A BANK FOR COLLECTION OR PAYMENT
OR THE PRESENTMENT OF THE CHECK TO THE DRAWER'S BANK WITHIN THE TIME
PERIOD PRESCRIBED BY THIS SUBDIVISION.

IN COMPUTING A TIME PERIOD PRESCRIBED BY THIS SUBDIVISION, THE LAST
DAY OF THE PERIOD SHALL BE INCLUDED UNLESS IT IS A SATURDAY, SUNDAY, OR
A STATE OR FEDERAL HOLIDAY, IN WHICH EVENT THE TIME PERIOD SHALL RUN
UNTIL THE NEXT BUSINESS DAY.

4. NO GAMING FACILITY LICENSEE OR ANY OTHER PERSON LICENSED OR REGIS-
TERED UNDER THIS ARTICLE, OR ANY OTHER PERSON ACTING ON BEHALF OF OR
UNDER ANY ARRANGEMENT WITH A GAMING FACILITY LICENSEE OR OTHER PERSON
LICENSED OR REGISTERED UNDER THIS ARTICLE, SHALL TRANSFER, CONVEY, OR
GIVE, WITH OR WITHOUT CONSIDERATION, A CHECK CASHED IN CONFORMITY WITH
THE REQUIREMENTS OF THIS SECTION TO ANY PERSON OTHER THAN:

(A) THE DRAWER OF THE CHECK UPON REDEMPTION OR CONSOLIDATION IN
ACCORDANCE WITH SUBDIVISION THREE OF THIS SECTION;

(B) A BANK FOR COLLECTION OR PAYMENT OF THE CHECK;

(C) A PURCHASER OF THE GAMING FACILITY LICENSE AS APPROVED BY THE
COMMISSION; OR

(D) AN ATTORNEY OR CASINO KEY EMPLOYEE WITH NO INCOMPATIBLE FUNCTIONS
FOR PRESENTMENT TO THE DRAWER'S BANK.

THE LIMITATION ON TRANSFERABILITY OF CHECKS IMPOSED HEREIN SHALL APPLY
TO CHECKS RETURNED BY ANY BANK TO THE GAMING FACILITY LICENSEE WITHOUT
FULL AND FINAL PAYMENT.

5. NO PERSON OTHER THAN A CASINO KEY EMPLOYEE LICENSED UNDER THIS
ARTICLE OR A GAMING EMPLOYEE REGISTERED UNDER THIS ARTICLE MAY ENGAGE
IN EFFORTS TO COLLECT UPON CHECKS THAT HAVE BEEN RETURNED BY BANKS WITH-
OUT FULL AND FINAL PAYMENT, EXCEPT THAT AN ATTORNEY-AT-LAW REPRESENTING
A GAMING FACILITY LICENSEE MAY BRING ACTION FOR SUCH COLLECTION.

6. NOTWITHSTANDING THE PROVISIONS OF ANY LAW TO THE CONTRARY, CHECKS
CASHED IN CONFORMITY WITH THE REQUIREMENTS OF THIS ARTICLE SHALL BE
VALID INSTRUMENTS, ENFORCEABLE AT LAW IN THE COURTS OF THIS STATE. ANY
CHECK CASHED, TRANSFERRED, CONVEYED OR GIVEN IN VIOLATION OF THIS ARTI-
CLE SHALL BE INVALID AND UNENFORCEABLE FOR THE PURPOSES OF COLLECTION
BUT SHALL BE INCLUDED IN THE CALCULATION OF GROSS GAMING REVENUE.

7. NOTWITHSTANDING THE PROVISIONS OF SUBDIVISION TWO OF THIS SECTION
TO THE CONTRARY, A GAMING FACILITY LICENSEE MAY ACCEPT A CHECK FROM A
PERSON TO ENABLE THE PERSON TO TAKE PART IN GAMING ACTIVITY AS A PLAYER,
MAY GIVE CASH OR CASH EQUIVALENTS IN EXCHANGE FOR SUCH A CHECK, OR MAY
ACCEPT A CHECK IN REDEMPTION OR PARTIAL REDEMPTION OF A CHECK ISSUED IN
ACCORDANCE WITH SUBDIVISION TWO OF THIS SECTION, PROVIDED THAT:

(A) (1) THE CHECK IS ISSUED BY A GAMING FACILITY LICENSEE, IS MADE
PAYABLE TO THE PERSON PRESENTING THE CHECK, AND IS ISSUED FOR A PURPOSE
OTHER THAN EMPLOYMENT COMPENSATION OR AS PAYMENT FOR GOODS OR SERVICES
RENDERED;

(2) THE CHECK IS ISSUED BY A BANKING INSTITUTION WHICH IS CHARTERED IN A COUNTRY OTHER THAN THE UNITED STATES ON ITS ACCOUNT AT A FEDERALLY CHARTERED OR STATE-CHARTERED BANK AND IS MADE PAYABLE TO "CASH," "BEARER," A GAMING FACILITY LICENSEE, OR THE PERSON PRESENTING THE CHECK;

(3) THE CHECK IS ISSUED BY A BANKING INSTITUTION WHICH IS CHARTERED IN THE UNITED STATES ON ITS ACCOUNT AT ANOTHER FEDERALLY CHARTERED OR STATE-CHARTERED BANK AND IS MADE PAYABLE TO "CASH," "BEARER," A GAMING FACILITY LICENSEE, OR THE PERSON PRESENTING THE CHECK;

(4) THE CHECK IS ISSUED BY A SLOT SYSTEM OPERATOR OR PURSUANT TO AN ANNUITY JACKPOT GUARANTEE AS PAYMENT FOR WINNINGS FROM A MULTI-CASINO PROGRESSIVE SLOT MACHINE SYSTEM JACKPOT; OR

(5) THE CHECK IS ISSUED BY AN ENTITY THAT HOLDS A GAMING FACILITY LICENSE IN ANY JURISDICTION, IS MADE PAYABLE TO THE PERSON PRESENTING THE CHECK, AND IS ISSUED FOR A PURPOSE OTHER THAN EMPLOYMENT COMPENSATION OR AS PAYMENT FOR GOODS OR SERVICES RENDERED;

(B) THE CHECK IS IDENTIFIABLE IN A MANNER APPROVED BY THE COMMISSION AS A CHECK AUTHORIZED FOR ACCEPTANCE PURSUANT TO PARAGRAPH (A) OF THIS SUBDIVISION;

(C) THE CHECK IS DATED, BUT NOT POSTDATED;

(D) THE CHECK IS PRESENTED TO THE CASHIER OR THE CASHIER'S REPRESENTATIVE BY THE ORIGINAL PAYEE AND ITS VALIDITY IS VERIFIED BY THE DRAWER IN THE CASE OF A CHECK DRAWN PURSUANT TO SUBPARAGRAPH ONE OF PARAGRAPH (A) OF THIS SUBDIVISION, OR THE CHECK IS VERIFIED IN ACCORDANCE WITH REGULATIONS PROMULGATED UNDER THIS ARTICLE IN THE CASE OF A CHECK ISSUED PURSUANT TO SUBPARAGRAPH TWO, THREE, FOUR OR FIVE OF PARAGRAPH (A) OF THIS SUBDIVISION; AND

(E) THE REGULATIONS CONCERNING CHECK-CASHING PROCEDURES ARE OBSERVED BY THE GAMING FACILITY LICENSEE AND ITS EMPLOYEES AND AGENTS. NO GAMING FACILITY LICENSEE SHALL ISSUE A CHECK FOR THE PURPOSE OF MAKING A LOAN OR OTHERWISE PROVIDING OR ALLOWING ANY ADVANCE OR CREDIT TO A PERSON TO ENABLE THE PERSON TO TAKE PART IN GAMING ACTIVITY AS A PLAYER.

8. NOTWITHSTANDING THE PROVISIONS OF SUBDIVISIONS TWO AND THREE OF THIS SECTION TO THE CONTRARY, A GAMING FACILITY LICENSEE MAY, AT A LOCATION OUTSIDE THE GAMING FACILITY, ACCEPT A PERSONAL CHECK OR CHECKS FROM A PERSON FOR UP TO FIVE THOUSAND DOLLARS IN EXCHANGE FOR CASH OR CASH EQUIVALENTS, AND MAY, AT SUCH LOCATIONS WITHIN THE GAMING FACILITY AS MAY BE PERMITTED BY THE COMMISSION, ACCEPT A PERSONAL CHECK OR CHECKS FOR UP TO FIVE THOUSAND DOLLARS IN EXCHANGE FOR CASH, CASH EQUIVALENTS, TOKENS, CHIPS, OR PLAQUES TO ENABLE THE PERSON TO TAKE PART IN GAMING ACTIVITY AS A PLAYER, PROVIDED THAT:

(A) THE CHECK IS DRAWN ON THE PATRON'S BANK OR BROKERAGE CASH MANAGEMENT ACCOUNT;

(B) THE CHECK IS FOR A SPECIFIC AMOUNT;

(C) THE CHECK IS MADE PAYABLE TO THE GAMING FACILITY LICENSEE;

(D) THE CHECK IS DATED BUT NOT POST-DATED;

(E) THE PATRON'S IDENTITY IS ESTABLISHED BY EXAMINATION OF ONE OF THE FOLLOWING: VALID CREDIT CARD, DRIVER'S LICENSE, PASSPORT, OR OTHER FORM OF IDENTIFICATION CREDENTIAL WHICH CONTAINS, AT A MINIMUM, THE PATRON'S SIGNATURE;

(F) THE CHECK IS RESTRICTIVELY ENDORSED "FOR DEPOSIT ONLY" TO THE GAMING FACILITY LICENSEE'S BANK ACCOUNT AND DEPOSITED ON THE NEXT BANKING DAY FOLLOWING THE DATE OF THE TRANSACTION;

(G) THE TOTAL AMOUNT OF PERSONAL CHECKS ACCEPTED BY ANY ONE LICENSEE PURSUANT TO THIS SUBDIVISION THAT ARE OUTSTANDING AT ANY TIME, INCLUDING THE CURRENT CHECK BEING SUBMITTED, DOES NOT EXCEED FIVE THOUSAND DOLLARS;

(H) THE GAMING FACILITY LICENSEE HAS A SYSTEM OF INTERNAL CONTROLS IN
PLACE THAT WILL ENABLE IT TO DETERMINE THE AMOUNT OF OUTSTANDING
PERSONAL CHECKS RECEIVED FROM ANY PATRON PURSUANT TO THIS SUBDIVISION AT
ANY GIVEN POINT IN TIME; AND

(I) THE GAMING FACILITY LICENSEE MAINTAINS A RECORD OF EACH SUCH TRAN-
SACTION IN ACCORDANCE WITH REGULATIONS ESTABLISHED BY THE COMMISSION.

9. A PERSON MAY REQUEST THE COMMISSION TO PUT THAT PERSON'S NAME ON A
LIST OF PERSONS TO WHOM THE EXTENSION OF CREDIT BY A GAMING FACILITY AS
PROVIDED IN THIS SECTION WOULD BE PROHIBITED BY SUBMITTING TO THE
COMMISSION THE PERSON'S NAME, ADDRESS, AND DATE OF BIRTH. THE PERSON
DOES NOT NEED TO PROVIDE A REASON FOR THIS REQUEST. THE COMMISSION SHALL
PROVIDE THIS LIST TO THE CREDIT DEPARTMENT OF EACH GAMING FACILITY;
NEITHER THE COMMISSION NOR THE CREDIT DEPARTMENT OF A GAMING FACILITY
SHALL DIVULGE THE NAMES ON THIS LIST TO ANY PERSON OR ENTITY OTHER THAN
THOSE PROVIDED FOR IN THIS SUBDIVISION. IF SUCH A PERSON WISHES TO HAVE
THAT PERSON'S NAME REMOVED FROM THE LIST, THE PERSON SHALL SUBMIT THIS
REQUEST TO THE COMMISSION, WHICH SHALL SO INFORM THE CREDIT DEPARTMENTS
OF GAMING FACILITIES NO LATER THAN THREE DAYS AFTER THE SUBMISSION OF
THE REQUEST.

S 1340. ALCOHOLIC BEVERAGES. 1. NOTWITHSTANDING ANY LAW TO THE
CONTRARY, THE AUTHORITY TO GRANT ANY LICENSE OR PERMIT FOR, OR TO PERMIT
OR PROHIBIT THE PRESENCE OF, ALCOHOLIC BEVERAGES IN, ON, OR ABOUT ANY
PREMISES LICENSED AS PART OF A GAMING FACILITY SHALL EXCLUSIVELY BE
VESTED IN THE COMMISSION.

2. UNLESS OTHERWISE STATED, AND EXCEPT WHERE INCONSISTENT WITH THE
PURPOSE OR INTENT OF THIS ARTICLE OR THE COMMON UNDERSTANDING OF USAGE
THEREOF, DEFINITIONS CONTAINED IN THE ALCOHOLIC BEVERAGE CONTROL LAW
SHALL APPLY TO THIS SECTION. ANY DEFINITION CONTAINED THEREIN SHALL
APPLY TO THE SAME WORD IN ANY FORM.

3. NOTWITHSTANDING ANY PROVISION OF THE ALCOHOLIC BEVERAGE CONTROL LAW
TO THE CONTRARY, THE COMMISSION SHALL HAVE THE FUNCTIONS, POWERS AND
DUTIES OF THE STATE LIQUOR AUTHORITY BUT ONLY WITH RESPECT TO THE ISSU-
ANCE, RENEWAL, TRANSFER, SUSPENSION AND REVOCATION OF LICENSES AND
PERMITS FOR THE SALE OF ALCOHOLIC BEVERAGES AT RETAIL FOR ON-PREMISE
CONSUMPTION BY ANY HOLDER OF A GAMING FACILITY LICENSE ISSUED BY THE
COMMISSION INCLUDING, WITHOUT LIMITATION, THE POWER TO FINE OR PENALIZE
A CASINO ALCOHOLIC BEVERAGE LICENSEE OR PERMITTEE; TO ENFORCE ALL STAT-
UTES, LAWS, RULINGS, OR REGULATIONS RELATING TO SUCH LICENSE OR PERMIT;
AND TO COLLECT LICENSE AND PERMIT FEES AND ESTABLISH APPLICATION STAND-
ARDS THEREFOR.

4. EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION, THE PROVISIONS OF THE
ALCOHOLIC BEVERAGE CONTROL LAW AND THE RULES, REGULATIONS, BULLETINS,
ORDERS, AND ADVISORIES PROMULGATED BY THE STATE LIQUOR AUTHORITY SHALL
APPLY TO ANY GAMING FACILITY HOLDING A LICENSE OR PERMIT TO SELL ALCO-
HOLIC BEVERAGES UNDER THIS SECTION.

5. NOTWITHSTANDING ANY PROVISION TO THE CONTRARY, THE COMMISSION MAY
PROMULGATE ANY REGULATIONS AND SPECIAL RULINGS AND FINDINGS AS MAY BE
NECESSARY FOR THE PROPER ENFORCEMENT, REGULATION, AND CONTROL OF ALCO-
HOLIC BEVERAGES IN GAMING FACILITIES WHEN THE COMMISSION FINDS THAT THE
UNIQUENESS OF GAMING FACILITY OPERATIONS AND THE PUBLIC INTEREST REQUIRE
THAT SUCH REGULATIONS, RULINGS, AND FINDINGS ARE APPROPRIATE.

6. NOTWITHSTANDING ANY PROVISION OF LAW TO THE CONTRARY, ANY MANUFAC-
TURER OR WHOLESALER LICENSED UNDER THE ALCOHOLIC BEVERAGE CONTROL LAW
MAY AS AUTHORIZED UNDER THE ALCOHOLIC BEVERAGE CONTROL LAW, SELL ALCO-
HOLIC BEVERAGES TO A GAMING FACILITY HOLDING A RETAIL LICENSE OR PERMIT
TO SELL ALCOHOLIC BEVERAGES FOR CONSUMPTION ON THE PREMISES ISSUED UNDER

THIS SECTION, AND ANY GAMING FACILITY HOLDING A RETAIL LICENSE OR PERMIT
TO SELL ALCOHOLIC BEVERAGES ISSUED UNDER THIS SECTION MAY, AS AUTHORIZED
UNDER THE ALCOHOLIC BEVERAGE CONTROL LAW, PURCHASE ALCOHOLIC BEVERAGES
FROM A MANUFACTURER OR WHOLESALER LICENSED UNDER THE ALCOHOLIC BEVERAGE
CONTROL LAW.

  7. IT SHALL BE UNLAWFUL FOR ANY PERSON, INCLUDING ANY GAMING FACILITY
LICENSEE OR ANY OF ITS LESSEES, AGENTS OR EMPLOYEES, TO EXPOSE FOR SALE,
SOLICIT OR PROMOTE THE SALE OF, POSSESS WITH INTENT TO SELL, SELL, GIVE,
DISPENSE, OR OTHERWISE TRANSFER OR DISPOSE OF ALCOHOLIC BEVERAGES IN, ON
OR ABOUT ANY PORTION OF THE PREMISES OF A GAMING FACILITY, UNLESS SAID
PERSON POSSESSES A LICENSE OR PERMIT ISSUED UNDER THIS SECTION.

  8. IT SHALL BE UNLAWFUL FOR ANY PERSON HOLDING A LICENSE OR PERMIT TO
SELL ALCOHOLIC BEVERAGES UNDER THIS SECTION TO EXPOSE, POSSESS, SELL,
GIVE, DISPENSE, TRANSFER, OR OTHERWISE DISPOSE OF ALCOHOLIC BEVERAGES,
OTHER THAN WITHIN THE TERMS AND CONDITIONS OF SUCH LICENSE OR PERMIT,
THE PROVISIONS OF THE ALCOHOLIC BEVERAGE CONTROL LAW, THE RULES AND
REGULATIONS PROMULGATED BY THE STATE LIQUOR AUTHORITY, AND, WHEN APPLI-
CABLE, THE REGULATIONS PROMULGATED PURSUANT TO THIS ARTICLE.  NOTWITH-
STANDING ANY OTHER PROVISION OF LAW TO THE CONTRARY THE HOLDER OF A
LICENSE OR PERMIT ISSUED UNDER THIS SECTION MAY BE AUTHORIZED TO PROVIDE
COMPLIMENTARY ALCOHOLIC BEVERAGES UNDER REGULATIONS ISSUED BY THE
COMMISSION.

  9. IN ISSUING A CASINO ALCOHOLIC BEVERAGE LICENSE OR PERMIT, THE
COMMISSION SHALL DESCRIBE THE SCOPE OF THE PARTICULAR LICENSE OR PERMIT,
AND THE RESTRICTIONS AND LIMITATIONS THEREON AS IT DEEMS NECESSARY AND
REASONABLE.  THE COMMISSION MAY, IN A SINGLE CASINO ALCOHOLIC BEVERAGE
LICENSE, PERMIT THE HOLDER OF SUCH A LICENSE OR PERMIT TO PERFORM ANY OR
ALL OF THE FOLLOWING ACTIVITIES, SUBJECT TO APPLICABLE LAWS, RULES AND
REGULATIONS:

  (A) TO SELL ANY ALCOHOLIC BEVERAGE BY THE GLASS OR OTHER OPEN RECEPTA-
CLE INCLUDING, BUT NOT LIMITED TO, AN ORIGINAL CONTAINER, FOR ON-PREMISE
CONSUMPTION WITHIN A FACILITY; PROVIDED, HOWEVER, THAT NO ALCOHOLIC
BEVERAGE SHALL BE SOLD OR GIVEN FOR CONSUMPTION; DELIVERED OR OTHERWISE
BROUGHT TO A PATRON; OR CONSUMED AT A GAMING TABLE UNLESS SO REQUESTED
BY THE PATRON.

  (B) TO SELL ANY ALCOHOLIC BEVERAGE BY THE GLASS OR OTHER OPEN RECEPTA-
CLE FOR ON-PREMISE CONSUMPTION WITHIN A GAMING FACILITY.

  (C) TO SELL ANY ALCOHOLIC BEVERAGE BY THE GLASS OR OTHER OPEN RECEPTA-
CLE OR IN ORIGINAL CONTAINERS FROM A ROOM SERVICE LOCATION WITHIN AN
ENCLOSED ROOM NOT IN A GAMING FACILITY; PROVIDED, HOWEVER, THAT ANY SALE
OF ALCOHOLIC BEVERAGES IS DELIVERED ONLY TO A GUEST ROOM OR TO ANY OTHER
ROOM IN THE GAMING FACILITY AUTHORIZED BY THE COMMISSION.

  (D) TO POSSESS OR TO STORE ALCOHOLIC BEVERAGES IN ORIGINAL CONTAINERS
INTENDED BUT NOT ACTUALLY EXPOSED FOR SALE AT A FIXED LOCATION ON A
GAMING FACILITY PREMISES, NOT IN A GAMING FACILITY; AND TO TRANSFER OR
DELIVER SUCH ALCOHOLIC BEVERAGES ONLY TO A LOCATION APPROVED PURSUANT TO
THIS SECTION; PROVIDED, HOWEVER, THAT NO ACCESS TO OR FROM A STORAGE
LOCATION SHALL BE PERMITTED EXCEPT DURING THE NORMAL COURSE OF BUSINESS
BY EMPLOYEES OR AGENTS OF THE LICENSEE, OR BY LICENSED EMPLOYEES OR
AGENTS OF WHOLESALERS OR DISTRIBUTORS LICENSED PURSUANT TO THE ALCOHOLIC
BEVERAGE CONTROL LAW AND ANY APPLICABLE RULES AND REGULATIONS; AND
PROVIDED FURTHER, HOWEVER, THAT NO PROVISION OF THIS SECTION SHALL BE
CONSTRUED TO PROHIBIT A CASINO ALCOHOLIC BEVERAGE LICENSEE FROM OBTAIN-
ING AN OFF-SITE STORAGE LICENSE FROM THE STATE LIQUOR AUTHORITY.

  10. THE COMMISSION MAY REVOKE, SUSPEND, REFUSE TO RENEW OR REFUSE TO
TRANSFER ANY CASINO ALCOHOLIC BEVERAGE LICENSE OR PERMIT, AND MAY FINE

OR PENALIZE THE HOLDER OF ANY ALCOHOLIC BEVERAGE LICENSE OR PERMIT
ISSUED UNDER THIS SECTION FOR VIOLATIONS OF ANY PROVISION OF THE ALCO-
HOLIC BEVERAGE CONTROL LAW, THE RULES AND REGULATIONS PROMULGATED BY THE
STATE LIQUOR AUTHORITY, AND THE REGULATIONS PROMULGATED BY THE COMMIS-
SION.

11. JURISDICTION OVER ALL ALCOHOLIC BEVERAGE LICENSES AND PERMITS
PREVIOUSLY ISSUED WITH RESPECT TO THE GAMING FACILITY IS HEREBY VESTED
IN THE COMMISSION, WHICH IN ITS DISCRETION MAY BY REGULATION PROVIDE FOR
THE CONVERSION THEREOF INTO A CASINO ALCOHOLIC BEVERAGE LICENSE OR
PERMIT AS PROVIDED IN THIS SECTION.

12. (A) PRIOR TO ISSUING ANY LICENSE UNDER THIS SECTION, THE COMMIS-
SION, OR ITS DESIGNEE, SHALL CONSULT WITH THE STATE LIQUOR AUTHORITY, OR
ITS DESIGNEE, TO CONFIRM THAT SUCH APPLICATION AND SUCH GAMING FACILITY
CONFORMS WITH ALL APPLICABLE PROVISIONS OF THE ALCOHOLIC BEVERAGE
CONTROL LAW, AND ALL APPLICABLE RULES, REGULATIONS, BULLETINS, ORDERS
AND ADVISORIES PROMULGATED BY THE STATE LIQUOR AUTHORITY;

(B) PRIOR TO COMMENCING ENFORCEMENT ACTIONS AGAINST ANY GAMING FACILI-
TY LICENSED UNDER THIS SECTION, THE COMMISSION, OR ITS DESIGNEE, SHALL
CONSULT WITH THE STATE LIQUOR AUTHORITY, OR ITS DESIGNEE, WITH RESPECT
TO THE APPLICATION OF THE APPLICABLE PROVISIONS OF THE ALCOHOLIC BEVER-
AGE CONTROL LAW, AND ALL APPLICABLE RULES, REGULATIONS, BULLETINS,
ORDERS AND ADVISORIES PROMULGATED BY THE STATE LIQUOR AUTHORITY ON THE
ALLEGED CONDUCT OF SUCH LICENSEE; AND

(C) THE COMMISSION, OR ITS DESIGNEE, SHALL CONSULT WITH THE STATE
LIQUOR AUTHORITY, OR ITS DESIGNEE, ON A REGULAR BASIS, BUT NO LESS THAN
ONCE EVERY THREE MONTHS, REGARDING ANY PENDING APPLICATIONS AND ENFORCE-
MENT MATTERS.

S 1341. LICENSEE LEASES AND CONTRACTS. 1. UNLESS OTHERWISE PROVIDED
IN THIS SUBDIVISION, NO AGREEMENT SHALL BE LAWFUL WHICH PROVIDES FOR THE
PAYMENT, HOWEVER DEFINED, OF ANY DIRECT OR INDIRECT INTEREST, PERCENTAGE
OR SHARE OF: ANY MONEY OR PROPERTY GAMBLED AT A GAMING FACILITY; ANY
MONEY OR PROPERTY DERIVED FROM GAMING ACTIVITY; OR ANY REVENUES, PROFITS
OR EARNINGS OF A GAMING FACILITY. NOTWITHSTANDING THE FOREGOING:

(A) AGREEMENTS WHICH PROVIDE ONLY FOR THE PAYMENT OF A FIXED SUM WHICH
IS IN NO WAY AFFECTED BY THE AMOUNT OF ANY SUCH MONEY, PROPERTY, REVEN-
UES, PROFITS OR EARNINGS SHALL NOT BE SUBJECT TO THE PROVISIONS OF THIS
SUBDIVISION; AND RECEIPTS, RENTALS OR CHARGES FOR REAL PROPERTY,
PERSONAL PROPERTY OR SERVICES SHALL NOT LOSE THEIR CHARACTER AS PAYMENTS
OF A FIXED SUM BECAUSE OF CONTRACT, LEASE, OR LICENSE PROVISIONS FOR
ADJUSTMENTS IN CHARGES, RENTALS OR FEES ON ACCOUNT OF CHANGES IN TAXES
OR ASSESSMENTS, COST-OF-LIVING INDEX ESCALATIONS, EXPANSION OR IMPROVE-
MENT OF FACILITIES, OR CHANGES IN SERVICES SUPPLIED.

(B) AGREEMENTS BETWEEN A GAMING FACILITY LICENSEE AND A JUNKET ENTER-
PRISE OR JUNKET REPRESENTATIVE LICENSED, QUALIFIED OR REGISTERED IN
ACCORDANCE WITH THE PROVISIONS THIS ARTICLE AND THE REGULATIONS OF THE
COMMISSION WHICH PROVIDE FOR THE COMPENSATION OF THE JUNKET ENTERPRISE
OR JUNKET REPRESENTATIVE BY THE GAMING FACILITY LICENSEE BASED UPON THE
ACTUAL GAMING ACTIVITIES OF A PATRON PROCURED OR REFERRED BY THE JUNKET
ENTERPRISE OR JUNKET REPRESENTATIVE SHALL BE LAWFUL IF FILED WITH THE
COMMISSION PRIOR TO THE CONDUCT OF ANY JUNKET THAT IS GOVERNED BY THE
AGREEMENT.

(C) AGREEMENTS BETWEEN A GAMING FACILITY LICENSEE AND ITS EMPLOYEES
WHICH PROVIDE FOR GAMING EMPLOYEE OR CASINO KEY EMPLOYEE PROFIT SHARING
SHALL BE LAWFUL IF THE AGREEMENT IS IN WRITING AND FILED WITH THE
COMMISSION PRIOR TO ITS EFFECTIVE DATE. SUCH AGREEMENTS MAY BE REVIEWED
BY THE COMMISSION.

(D) AGREEMENTS TO LEASE AN APPROVED GAMING FACILITY OR THE LAND THERE-
UNDER AND AGREEMENTS FOR THE COMPLETE MANAGEMENT OF ALL GAMING OPER-
ATIONS IN A GAMING FACILITY SHALL NOT BE SUBJECT TO THE PROVISIONS OF
THIS SUBDIVISION.

(E) AGREEMENTS WHICH PROVIDE FOR PERCENTAGE CHARGES BETWEEN THE GAMING
FACILITY LICENSEE AND A HOLDING COMPANY OR INTERMEDIARY COMPANY OF THE
GAMING FACILITY LICENSEE SHALL BE IN WRITING AND FILED WITH THE COMMIS-
SION BUT SHALL NOT BE SUBJECT TO THE PROVISIONS OF THIS SUBDIVISION.

(F) WRITTEN AGREEMENTS RELATING TO THE OPERATION OF MULTI-CASINO OR
MULTI-STATE PROGRESSIVE SLOT MACHINE SYSTEMS BETWEEN ONE OR MORE GAMING
FACILITY LICENSEES AND A LICENSED CASINO VENDOR ENTERPRISE OR AN ELIGI-
BLE APPLICANT FOR SUCH LICENSE, WHICH PROVIDE FOR AN INTEREST, PERCENT-
AGE OR SHARE OF THE GAMING FACILITY LICENSEE'S REVENUES, PROFITS OR
EARNINGS FROM THE OPERATION OF SUCH MULTI-CASINO OR MULTI-STATE PROGRES-
SIVE SLOT MACHINES TO BE PAID TO THE CASINO VENDOR ENTERPRISE LICENSEE
OR APPLICANT SHALL NOT BE SUBJECT TO THE PROVISIONS OF THIS SUBDIVISION
IF THE AGREEMENTS ARE FILED WITH AND APPROVED BY THE COMMISSION.

2. EACH GAMING FACILITY APPLICANT OR LICENSEE SHALL MAINTAIN, IN
ACCORDANCE WITH THE RULES OF THE COMMISSION, A RECORD OF EACH WRITTEN OR
UNWRITTEN AGREEMENT REGARDING THE REALTY, CONSTRUCTION, MAINTENANCE, OR
BUSINESS OF A PROPOSED OR EXISTING GAMING FACILITY OR RELATED FACILITY.
THE FOREGOING OBLIGATION SHALL APPLY REGARDLESS OF WHETHER THE GAMING
FACILITY APPLICANT OR LICENSEE IS A PARTY TO THE AGREEMENT. ANY SUCH
AGREEMENT MAY BE REVIEWED BY THE COMMISSION ON THE BASIS OF THE REASON-
ABLENESS OF ITS TERMS, INCLUDING THE TERMS OF COMPENSATION, AND OF THE
QUALIFICATIONS OF THE OWNERS, OFFICERS, EMPLOYEES, AND DIRECTORS OF ANY
ENTERPRISE INVOLVED IN THE AGREEMENT, WHICH QUALIFICATIONS SHALL BE
REVIEWED ACCORDING TO THE STANDARDS ENUMERATED IN SECTION ONE THOUSAND
THREE HUNDRED TWENTY-THREE OF THIS ARTICLE. IF THE COMMISSION DISAP-
PROVES SUCH AN AGREEMENT OR THE OWNERS, OFFICERS, EMPLOYEES, OR DIREC-
TORS OF ANY ENTERPRISE INVOLVED THEREIN, THE COMMISSION MAY REQUIRE ITS
TERMINATION.

EVERY AGREEMENT REQUIRED TO BE MAINTAINED, AND EVERY RELATED AGREEMENT
THE PERFORMANCE OF WHICH IS DEPENDENT UPON THE PERFORMANCE OF ANY SUCH
AGREEMENT, SHALL BE DEEMED TO INCLUDE A PROVISION TO THE EFFECT THAT, IF
THE COMMISSION SHALL REQUIRE TERMINATION OF AN AGREEMENT, SUCH TERMI-
NATION SHALL OCCUR WITHOUT LIABILITY ON THE PART OF THE GAMING FACILITY
APPLICANT OR LICENSEE OR ANY QUALIFIED PARTY TO THE AGREEMENT OR ANY
RELATED AGREEMENT. FAILURE EXPRESSLY TO INCLUDE SUCH A PROVISION IN THE
AGREEMENT SHALL NOT CONSTITUTE A DEFENSE IN ANY ACTION BROUGHT TO TERMI-
NATE THE AGREEMENT. IF THE AGREEMENT IS NOT MAINTAINED OR PRESENTED TO
THE COMMISSION IN ACCORDANCE WITH COMMISSION REGULATIONS, OR THE DISAP-
PROVED AGREEMENT IS NOT TERMINATED, THE COMMISSION MAY PURSUE ANY REMEDY
OR COMBINATION OF REMEDIES PROVIDED IN THIS ARTICLE.

FOR THE PURPOSES OF THIS SUBDIVISION, "GAMING FACILITY APPLICANT"
INCLUDES ANY PERSON REQUIRED TO HOLD A GAMING FACILITY LICENSE WHO HAS
APPLIED TO THE COMMISSION FOR A GAMING FACILITY LICENSE OR ANY APPROVAL
REQUIRED.

3. NOTHING IN THIS ARTICLE SHALL BE DEEMED TO PERMIT THE TRANSFER OF
ANY LICENSE, OR ANY INTEREST IN ANY LICENSE, OR ANY CERTIFICATE OF
COMPLIANCE OR ANY COMMITMENT OR RESERVATION WITHOUT THE APPROVAL OF THE
COMMISSION.

S 1342. REQUIRED EXCLUSION OF CERTAIN PERSONS.    1. THE COMMISSION
SHALL, BY REGULATION, PROVIDE FOR THE ESTABLISHMENT OF A LIST OF PERSONS
WHO ARE TO BE EXCLUDED OR EJECTED FROM ANY LICENSED GAMING FACILITY.

SUCH PROVISIONS SHALL DEFINE THE STANDARDS FOR EXCLUSION, AND SHALL
INCLUDE STANDARDS RELATING TO PERSONS:

(A) WHO ARE CAREER OR PROFESSIONAL OFFENDERS AS DEFINED BY REGULATIONS
PROMULGATED HEREUNDER; OR

(B) WHO HAVE BEEN CONVICTED OF A CRIMINAL OFFENSE UNDER THE LAWS OF
ANY STATE OR OF THE UNITED STATES, WHICH IS PUNISHABLE BY MORE THAN
TWELVE MONTHS IN PRISON, OR ANY CRIME OR OFFENSE INVOLVING MORAL TURPI-
TUDE.

THE COMMISSION SHALL PROMULGATE DEFINITIONS ESTABLISHING THOSE CATEGO-
RIES OF PERSONS WHO SHALL BE EXCLUDED PURSUANT TO THIS SECTION, INCLUD-
ING CHEATS AND PERSONS WHOSE PRIVILEGES FOR LICENSURE OR REGISTRATION
HAVE BEEN REVOKED.

2. ANY ENUMERATED CLASS LISTED IN SUBDIVISION ONE OF SECTION TWO
HUNDRED NINETY-SIX OF THE HUMAN RIGHTS LAW SHALL NOT BE A REASON FOR
PLACING THE NAME OF ANY PERSON UPON SUCH LIST.

3. THE COMMISSION MAY IMPOSE SANCTIONS UPON A LICENSED GAMING FACILITY
OR INDIVIDUAL LICENSEE OR REGISTRANT IN ACCORDANCE WITH THE PROVISIONS
OF THIS ARTICLE IF SUCH GAMING FACILITY OR INDIVIDUAL LICENSEE OR REGIS-
TRANT KNOWINGLY FAILS TO EXCLUDE OR EJECT FROM THE PREMISES OF ANY
LICENSED GAMING FACILITY ANY PERSON PLACED BY THE COMMISSION ON THE LIST
OF PERSONS TO BE EXCLUDED OR EJECTED.

4. ANY LIST COMPILED BY THE COMMISSION OF PERSONS TO BE EXCLUDED OR
EJECTED SHALL NOT BE DEEMED AN ALL-INCLUSIVE LIST, AND LICENSED GAMING
FACILITIES SHALL HAVE A DUTY TO KEEP FROM THEIR PREMISES PERSONS KNOWN
TO THEM TO BE WITHIN THE CLASSIFICATIONS DECLARED IN SUBDIVISIONS ONE
AND TWO OF THIS SECTION AND THE REGULATIONS PROMULGATED THEREUNDER, OR
KNOWN TO THEM TO BE PERSONS WHOSE PRESENCE IN A LICENSED GAMING FACILITY
WOULD BE INIMICAL TO THE INTEREST OF THE STATE OR OF LICENSED GAMING
THEREIN, OR BOTH, AS DEFINED IN STANDARDS ESTABLISHED BY THE COMMISSION.

5. PRIOR TO PLACING THE NAME OF ANY PERSON ON A LIST PURSUANT TO THIS
SECTION, THE COMMISSION SHALL SERVE NOTICE OF SUCH FACT AND OF THE
OPPORTUNITY FOR A HEARING TO SUCH PERSON BY PERSONAL SERVICE OR BY
CERTIFIED MAIL AT THE LAST KNOWN ADDRESS OF SUCH PERSON.

6. WITHIN THIRTY DAYS AFTER SERVICE OF THE PETITION IN ACCORDANCE WITH
SUBDIVISION FIVE OF THIS SECTION, THE PERSON NAMED FOR EXCLUSION OR
EJECTION MAY DEMAND A HEARING BEFORE THE EXECUTIVE DIRECTOR OR THE EXEC-
UTIVE DIRECTOR'S DESIGNEE, AT WHICH HEARING THE EXECUTIVE DIRECTOR OR
THE EXECUTIVE DIRECTOR'S DESIGNEE SHALL HAVE THE AFFIRMATIVE OBLIGATION
TO DEMONSTRATE BY SUBSTANTIAL EVIDENCE THAT THE PERSON NAMED FOR EXCLU-
SION OR EJECTION SATISFIES THE CRITERIA FOR EXCLUSION ESTABLISHED BY
THIS SECTION AND THE APPLICABLE REGULATIONS. FAILURE TO DEMAND SUCH A
HEARING WITHIN THIRTY DAYS AFTER SERVICE SHALL PRECLUDE A PERSON FROM
HAVING AN ADMINISTRATIVE HEARING, BUT SHALL IN NO WAY AFFECT HIS OR HER
RIGHT TO JUDICIAL REVIEW AS PROVIDED HEREIN.

7. THE COMMISSION MAY MAKE A PRELIMINARY PLACEMENT ON THE LIST OF A
PERSON NAMED IN A PETITION FOR EXCLUSION OR EJECTION PENDING COMPLETION
OF A HEARING ON THE PETITION. THE HEARING ON THE APPLICATION FOR PRELIM-
INARY PLACEMENT SHALL BE A LIMITED PROCEEDING AT WHICH THE COMMISSION
SHALL HAVE THE AFFIRMATIVE OBLIGATION TO DEMONSTRATE BY SUBSTANTIAL
EVIDENCE THAT THE PERSON SATISFIES THE CRITERIA FOR EXCLUSION ESTAB-
LISHED BY THIS SECTION AND THE APPLICABLE REGULATIONS. IF A PERSON HAS
BEEN PLACED ON THE LIST AS A RESULT OF AN APPLICATION FOR PRELIMINARY
PLACEMENT, UNLESS OTHERWISE AGREED BY THE EXECUTIVE DIRECTOR AND THE
NAMED PERSON, A HEARING ON THE PETITION FOR EXCLUSION OR EJECTION SHALL
BE INITIATED WITHIN THIRTY DAYS AFTER THE RECEIPT OF A DEMAND FOR SUCH

HEARING OR THE DATE OF PRELIMINARY PLACEMENT ON THE LIST, WHICHEVER IS
LATER.

8. IF, UPON COMPLETION OF THE HEARING ON THE PETITION FOR EXCLUSION OR
EJECTION, THE EXECUTIVE DIRECTOR DETERMINES THAT THE PERSON NAMED THERE-
IN DOES NOT SATISFY THE CRITERIA FOR EXCLUSION ESTABLISHED BY THIS
SECTION AND THE APPLICABLE REGULATIONS, THE EXECUTIVE DIRECTOR SHALL
ISSUE AN ORDER DENYING THE PETITION. IF THE PERSON NAMED IN THE PETITION
FOR EXCLUSION OR EJECTION HAD BEEN PLACED ON THE LIST AS A RESULT OF AN
APPLICATION FOR PRELIMINARY PLACEMENT, THE EXECUTIVE DIRECTOR SHALL
NOTIFY ALL GAMING FACILITY LICENSEES OF THE PERSON'S REMOVAL FROM THE
LIST.

9. IF, UPON COMPLETION OF A HEARING ON THE PETITION FOR EXCLUSION OR
EJECTION, THE EXECUTIVE DIRECTOR DETERMINES THAT PLACEMENT OF THE NAME
OF THE PERSON ON THE EXCLUSION LIST IS APPROPRIATE, THE EXECUTIVE DIREC-
TOR SHALL MAKE AND ENTER AN ORDER TO THAT EFFECT, WHICH ORDER SHALL BE
SERVED ON ALL GAMING FACILITY LICENSEES. SUCH ORDER SHALL BE SUBJECT TO
REVIEW BY THE COMMISSION IN ACCORDANCE WITH REGULATIONS PROMULGATED
THEREUNDER, WHICH FINAL DECISION SHALL BE SUBJECT TO REVIEW PURSUANT TO
ARTICLE SEVENTY-EIGHT OF THE CIVIL PRACTICE LAW AND RULES.

S 1343. EXCLUSION, EJECTION OF CERTAIN PERSONS. 1. A GAMING FACILITY
LICENSEE MAY EXCLUDE OR EJECT FROM ITS GAMING FACILITY ANY PERSON WHO IS
KNOWN TO IT TO HAVE BEEN CONVICTED OF A CRIME OR DISORDERLY CONDUCT
COMMITTED IN OR ON THE PREMISES OF ANY GAMING FACILITY.

2. NOTHING IN THIS SECTION OR IN ANY OTHER LAW OF THIS STATE SHALL
LIMIT THE RIGHT OF A GAMING FACILITY LICENSEE TO EXERCISE ITS COMMON LAW
RIGHT TO EXCLUDE OR EJECT PERMANENTLY FROM ITS GAMING FACILITY ANY
PERSON WHO DISRUPTS THE OPERATIONS OF ITS PREMISES, THREATENS THE SECU-
RITY OF ITS PREMISES OR ITS OCCUPANTS, OR IS DISORDERLY OR INTOXICATED.

S 1344. LIST OF PERSONS SELF-EXCLUDED FROM GAMING ACTIVITIES. 1. THE
COMMISSION SHALL PROVIDE BY REGULATION FOR THE ESTABLISHMENT OF A LIST
OF PERSONS SELF-EXCLUDED FROM GAMING ACTIVITIES AT ALL LICENSED GAMING
FACILITIES. ANY PERSON MAY REQUEST PLACEMENT ON THE LIST OF SELF-EXCLUD-
ED PERSONS BY ACKNOWLEDGING IN A MANNER TO BE ESTABLISHED BY THE COMMIS-
SION THAT THE PERSON IS A PROBLEM GAMBLER AND BY AGREEING THAT, DURING
ANY PERIOD OF VOLUNTARY EXCLUSION, THE PERSON MAY NOT COLLECT ANY
WINNINGS OR RECOVER ANY LOSSES RESULTING FROM ANY GAMING ACTIVITY AT
SUCH GAMING FACILITIES.

2. THE REGULATIONS OF THE COMMISSION SHALL ESTABLISH PROCEDURES FOR
PLACEMENTS ON, AND REMOVALS FROM, THE LIST OF SELF-EXCLUDED PERSONS.
SUCH REGULATIONS SHALL ESTABLISH PROCEDURES FOR THE TRANSMITTAL TO
LICENSED GAMING FACILITIES OF IDENTIFYING INFORMATION CONCERNING
SELF-EXCLUDED PERSONS, AND SHALL REQUIRE LICENSED GAMING FACILITIES TO
ESTABLISH PROCEDURES DESIGNED, AT A MINIMUM, TO REMOVE SELF-EXCLUDED
PERSONS FROM TARGETED MAILINGS OR OTHER FORMS OF ADVERTISING OR
PROMOTIONS AND DENY SELF-EXCLUDED PERSONS ACCESS TO CREDIT, COMPLIMENTA-
RIES, CHECK CASHING PRIVILEGES, CLUB PROGRAMS, AND OTHER SIMILAR BENE-
FITS.

3. A LICENSED GAMING FACILITY OR EMPLOYEE THEREOF ACTING REASONABLY
AND IN GOOD FAITH SHALL NOT BE LIABLE TO ANY SELF-EXCLUDED PERSON OR TO
ANY OTHER PARTY IN ANY JUDICIAL PROCEEDING FOR ANY HARM, MONETARY OR
OTHERWISE, WHICH MAY ARISE AS A RESULT OF:

(A) THE FAILURE OF A LICENSED GAMING FACILITY TO WITHHOLD GAMING PRIV-
ILEGES FROM, OR RESTORE GAMING PRIVILEGES TO, A SELF-EXCLUDED PERSON; OR

(B) OTHERWISE PERMITTING A SELF-EXCLUDED PERSON TO ENGAGE IN GAMING
ACTIVITY IN SUCH LICENSED GAMING FACILITY WHILE ON THE LIST OF SELF-EX-
CLUDED PERSONS.

4. NOTWITHSTANDING ANY OTHER LAW TO THE CONTRARY, THE COMMISSION'S
LIST OF SELF-EXCLUDED PERSONS SHALL NOT BE OPEN TO PUBLIC INSPECTION.
NOTHING HEREIN, HOWEVER, SHALL BE CONSTRUED TO PROHIBIT A GAMING FACILI-
TY LICENSEE FROM DISCLOSING THE IDENTITY OF PERSONS SELF-EXCLUDED PURSU-
ANT TO THIS SECTION TO AFFILIATED GAMING ENTITIES IN THIS STATE OR OTHER
JURISDICTIONS FOR THE LIMITED PURPOSE OF ASSISTING IN THE PROPER ADMIN-
ISTRATION OF RESPONSIBLE GAMING PROGRAMS OPERATED BY SUCH GAMING AFFIL-
IATED ENTITIES.

5. A LICENSED GAMING FACILITY OR EMPLOYEE THEREOF SHALL NOT BE LIABLE
TO ANY SELF-EXCLUDED PERSON OR TO ANY OTHER PARTY IN ANY JUDICIAL
PROCEEDING FOR ANY HARM, MONETARY OR OTHERWISE, WHICH MAY ARISE AS A
RESULT OF DISCLOSURE OR PUBLICATION IN ANY MANNER, OTHER THAN A WILLFUL-
LY UNLAWFUL DISCLOSURE OR PUBLICATION, OF THE IDENTITY OF ANY SELF-EX-
CLUDED PERSON.

S 1345. EXCLUDED PERSON; FORFEITURE OF WINNINGS; OTHER SANCTIONS. 1.
A PERSON WHO IS PROHIBITED FROM GAMING IN A LICENSED GAMING FACILITY BY
ANY ORDER OF THE EXECUTIVE DIRECTOR, COMMISSION OR COURT OF COMPETENT
JURISDICTION, INCLUDING ANY PERSON ON THE SELF-EXCLUSION LIST PURSUANT
TO SUBDIVISION ONE OF SECTION ONE THOUSAND THREE HUNDRED FORTY-FOUR OF
THIS TITLE, SHALL NOT COLLECT, IN ANY MANNER OR PROCEEDING, ANY WINNINGS
OR RECOVER ANY LOSSES ARISING AS A RESULT OF ANY PROHIBITED GAMING
ACTIVITY.

2. FOR THE PURPOSES THIS SECTION, ANY GAMING ACTIVITY IN A LICENSED
GAMING FACILITY WHICH RESULTS IN A PROHIBITED PERSON OBTAINING ANY MONEY
OR THING OF VALUE FROM, OR BEING OWED ANY MONEY OR THING OF VALUE BY,
THE GAMING FACILITY SHALL BE CONSIDERED, SOLELY FOR PURPOSES OF THIS
SECTION, TO BE A FULLY EXECUTED GAMBLING TRANSACTION.

3. IN ADDITION TO ANY OTHER PENALTY PROVIDED BY LAW, ANY MONEY OR
THING OF VALUE WHICH HAS BEEN OBTAINED BY, OR IS OWED TO, ANY PROHIBITED
PERSON BY A LICENSED GAMING FACILITY AS A RESULT OF WAGERS MADE BY A
PROHIBITED PERSON SHALL BE SUBJECT TO FORFEITURE FOLLOWING NOTICE TO THE
PROHIBITED PERSON AND OPPORTUNITY TO BE HEARD. A LICENSED GAMING FACILI-
TY SHALL INFORM A PROHIBITED PERSON OF THE AVAILABILITY OF SUCH NOTICE
ON THE COMMISSION'S WEBSITE WHEN EJECTING THE PROHIBITED PERSON AND
SEIZING ANY CHIPS, VOUCHERS OR OTHER REPRESENTATIVE OF MONEY OWED BY A
GAMING FACILITY TO THE PROHIBITED PERSON AS AUTHORIZED BY THIS SUBDIVI-
SION. ALL FORFEITED AMOUNTS SHALL BE DEPOSITED INTO THE COMMERCIAL
GAMING REVENUE FUND.

4. IN ANY PROCEEDING BROUGHT BY THE COMMISSION AGAINST A LICENSEE OR
REGISTRANT FOR A WILLFUL VIOLATION OF THE COMMISSION'S SELF-EXCLUSION
REGULATIONS, THE COMMISSION MAY ORDER, IN ADDITION TO ANY OTHER SANCTION
AUTHORIZED, AN ADDITIONAL FINE OF DOUBLE THE AMOUNT OF ANY MONEY OR
THING OF VALUE OBTAINED BY THE LICENSEE OR REGISTRANT FROM ANY SELF-EX-
CLUDED PERSON. ANY MONEY OR THING OF VALUE SO FORFEITED SHALL BE
DISPOSED OF IN THE SAME MANNER AS ANY MONEY OR THING OF VALUE FORFEITED
PURSUANT TO SUBDIVISION THREE OF THIS SECTION.

S 1346. LABOR PEACE AGREEMENTS FOR CERTAIN FACILITIES. 1. AS USED IN
THIS SECTION:

(A) "GAMING FACILITY" MEANS ANY GAMING FACILITY LICENSED PURSUANT TO
THIS ARTICLE OR A VIDEO LOTTERY GAMING FACILITY AS MAY BE AUTHORIZED BY
PARAGRAPH THREE OF SUBDIVISION (A) OF SECTION ONE THOUSAND SIX HUNDRED
SEVENTEEN-A OF THE TAX LAW, AS AMENDED BY SECTION NINETEEN OF THE CHAP-
TER OF THE LAWS OF TWO THOUSAND THIRTEEN THAT ADDED THIS SECTION
LICENSED BY THE COMMISSION. A GAMING FACILITY SHALL NOT INCLUDE ANY
HORSE RACING, BINGO OR CHARITABLE GAMES OF CHANCE, THE STATE LOTTERY FOR
EDUCATION, OR ANY GAMING FACILITY OPERATING PURSUANT TO THE FEDERAL

INDIAN GAMING REGULATORY ACT, 25 U.S.C. S 2710 ET SEQ. A GAMING FACILITY
SHALL INCLUDE ANY HOSPITALITY OPERATION AT OR RELATED TO THE GAMING
FACILITY.

(B) "LABOR PEACE AGREEMENT" MEANS AN AGREEMENT ENFORCEABLE UNDER 29
U.S.C. S 185(A) THAT, AT A MINIMUM, PROTECTS THE STATE'S PROPRIETARY
INTERESTS BY PROHIBITING LABOR ORGANIZATIONS AND MEMBERS FROM ENGAGING
IN PICKETING, WORK STOPPAGES, BOYCOTTS, AND ANY OTHER ECONOMIC INTERFER-
ENCE WITH OPERATION OF THE RELEVANT GAMING FACILITY.

(C) "LICENSE" MEANS ANY PERMIT, LICENSE, FRANCHISE OR ALLOWANCE OF THE
COMMISSION AND SHALL INCLUDE ANY FRANCHISEE OR PERMITTEE.

(D) "PROPRIETARY INTEREST" MEANS AN ECONOMIC AND NON-REGULATORY INTER-
EST AT RISK IN THE FINANCIAL SUCCESS OF THE GAMING FACILITY THAT COULD
BE ADVERSELY AFFECTED BY LABOR-MANAGEMENT CONFLICT, INCLUDING BUT NOT
LIMITED TO PROPERTY INTERESTS, FINANCIAL INVESTMENTS AND REVENUE SHAR-
ING.

2. THE STATE LEGISLATURE FINDS THAT THE GAMING INDUSTRY CONSTITUTES A
VITAL SECTOR OF NEW YORK'S OVERALL ECONOMY AND THAT THE STATE THROUGH
ITS OPERATION OF LOTTERIES AND VIDEO LOTTERY FACILITIES AND THROUGH ITS
OWNERSHIP OF THE PROPERTIES UTILIZED FOR HORSE RACING BY THE NEW YORK
RACING ASSOCIATION INC. HAS A SIGNIFICANT AND ONGOING ECONOMIC AND NON-
REGULATORY INTEREST IN THE FINANCIAL VIABILITY AND COMPETITIVENESS OF
THE GAMING INDUSTRY. THE STATE LEGISLATURE FURTHER FINDS THAT THE AWARD
OR GRANT OF A LICENSE BY THE COMMISSION TO OPERATE A GAMING FACILITY IS
A SIGNIFICANT STATE ACTION AND THAT THE COMMISSION MUST MAKE PRUDENT AND
EFFICIENT DECISIONS TO MAXIMIZE THE BENEFITS AND MINIMIZE THE RISKS OF
GAMING. THE STATE LEGISLATURE FURTHER RECOGNIZES THAT CASINO GAMING
INDUSTRY INTEGRATION CAN PROVIDE A VITAL ECONOMIC ENGINE TO ASSIST,
NURTURE, DEVELOP, AND PROMOTE REGIONAL ECONOMIC DEVELOPMENT, THE STATE
TOURISM INDUSTRY AND THE GROWTH OF JOBS IN THE STATE. ADDITIONALLY, THE
STATE LEGISLATURE ALSO FINDS REVENUES DERIVED DIRECTLY BY THE STATE FROM
SUCH GAMING ACTIVITY WILL BE SHARED FROM GROSS GAMING RECEIPTS, AFTER
PAYOUT OF PRIZES BUT PRIOR TO DEDUCTIONS FOR OPERATIONAL EXPENSES.

THEREFORE, THE STATE LEGISLATURE FINDS THAT THE STATE HAS A SUBSTAN-
TIAL AND COMPELLING PROPRIETARY INTEREST IN ANY LICENSE AWARDED FOR THE
OPERATION OF A GAMING FACILITY WITHIN THE STATE.

3. THE COMMISSION SHALL REQUIRE ANY APPLICANT FOR A GAMING FACILITY
LICENSE WHO HAS NOT YET ENTERED INTO A LABOR PEACE AGREEMENT TO PRODUCE
AN AFFIDAVIT STATING IT SHALL ENTER INTO A LABOR PEACE AGREEMENT WITH
LABOR ORGANIZATIONS THAT ARE ACTIVELY ENGAGED IN REPRESENTING OR
ATTEMPTING TO REPRESENT GAMING OR HOSPITALITY INDUSTRY WORKERS IN THE
STATE. IN ORDER FOR THE COMMISSION TO ISSUE A GAMING FACILITY LICENSE
AND FOR OPERATIONS TO COMMENCE, THE APPLICANT FOR A GAMING FACILITY
LICENSE MUST PRODUCE DOCUMENTATION THAT IT HAS ENTERED INTO A LABOR
PEACE AGREEMENT WITH EACH LABOR ORGANIZATION THAT IS ACTIVELY ENGAGED IN
REPRESENTING AND ATTEMPTING TO REPRESENT GAMING AND HOSPITALITY INDUSTRY
WORKERS IN THE STATE. THE COMMISSION SHALL MAKE THE MAINTENANCE OF SUCH
A LABOR PEACE AGREEMENT AN ONGOING MATERIAL CONDITION OF LICENSURE.

A LICENSE HOLDER SHALL, AS A CONDITION OF ITS LICENSE, ENSURE THAT
OPERATIONS AT THE GAMING FACILITY THAT ARE CONDUCTED BY CONTRACTORS,
SUBCONTRACTORS, LICENSEES, ASSIGNEES, TENANTS OR SUBTENANTS AND THAT
INVOLVE GAMING OR HOSPITALITY INDUSTRY EMPLOYEES SHALL BE DONE UNDER A
LABOR PEACE AGREEMENT CONTAINING THE SAME PROVISIONS AS SPECIFIED ABOVE.

4. IF OTHERWISE APPLICABLE, CAPITAL PROJECTS UNDERTAKEN BY A GAMING
FACILITY SHALL BE SUBJECT TO ARTICLE EIGHT OF THE LABOR LAW AND SHALL BE
SUBJECT TO THE ENFORCEMENT OF PREVAILING WAGE REQUIREMENTS BY THE
DEPARTMENT OF LABOR.

5. IF OTHERWISE APPLICABLE, CAPITAL PROJECTS UNDERTAKEN BY A GAMING FACILITY SHALL BE SUBJECT TO SECTION ONE HUNDRED THIRTY- FIVE OF THE STATE FINANCE LAW.

6. IF OTHERWISE APPLICABLE, ANY GAMING FACILITY ENTERING INTO A CONTRACT FOR A GAMING FACILITY CAPITOL PROJECT SHALL BE DEEMED TO BE A STATE AGENCY, AND SUCH CONTRACT SHALL BE DEEMED TO BE A STATE CONTRACT, FOR PURPOSES OF ARTICLE FIFTEEN-A OF THE EXECUTIVE LAW AND SECTION TWO HUNDRED TWENTY-TWO OF THE LABOR LAW.

TITLE 6

TAXATION AND FEES

SECTION 1348. MACHINE AND TABLE FEES.
1349. REGULATORY INVESTIGATORY FEES.
1350. ADDITIONAL REGULATORY COSTS.
1351. TAX ON GAMING REVENUES; PERMISSIVE SUPPLEMENTAL FEE.
1352. COMMERCIAL GAMING REVENUE FUND.
1353. DETERMINATION OF TAX LIABILITY.
1354. UNCLAIMED FUNDS.
1355. RACING SUPPORT PAYMENTS.

S 1348. MACHINE AND TABLE FEES. IN ADDITION TO ANY OTHER TAX OR FEE IMPOSED BY THIS ARTICLE, THERE SHALL BE IMPOSED AN ANNUAL LICENSE FEE OF FIVE HUNDRED DOLLARS FOR EACH SLOT MACHINE AND TABLE APPROVED BY THE COMMISSION FOR USE BY A GAMING LICENSEE AT A GAMING FACILITY; PROVIDED, HOWEVER, THAT NOT SOONER THAN FIVE YEARS AFTER AWARD OF AN ORIGINAL GAMING LICENSE, THE COMMISSION MAY ANNUALLY ADJUST THE FEE FOR INFLATION. THE FEE SHALL BE IMPOSED AS OF JULY FIRST OF EACH YEAR FOR ALL APPROVED SLOT MACHINES AND TABLES ON THAT DATE AND SHALL BE ASSESSED ON A PRO RATA BASIS FOR ANY SLOT MACHINE OR TABLE APPROVED FOR USE THER-EAFTER.

SUCH ASSESSED FEES SHALL BE DEPOSITED INTO THE COMMERCIAL GAMING REVENUE FUND ESTABLISHED PURSUANT TO SECTION ONE THOUSAND THREE HUNDRED FIFTY-TWO OF THIS ARTICLE.

S 1349. REGULATORY INVESTIGATORY FEES. THE COMMISSION MAY ESTABLISH FEES FOR ANY INVESTIGATION INTO A VIOLATION OF THIS ARTICLE OR REGU-LATION PROMULGATED HEREUNDER BY A GAMING FACILITY LICENSEE TO BE PAID BY THE GAMING FACILITY LICENSEE INCLUDING, BUT NOT LIMITED TO, BILLABLE HOURS BY COMMISSION STAFF INVOLVED IN THE INVESTIGATION AND THE COSTS OF SERVICES, EQUIPMENT OR OTHER EXPENSES THAT ARE INCURRED BY THE COMMIS-SION DURING THE INVESTIGATION.

S 1350. ADDITIONAL REGULATORY COSTS. 1. ANY REMAINING COSTS OF THE COMMISSION NECESSARY TO MAINTAIN REGULATORY CONTROL OVER GAMING FACILI-TIES THAT ARE NOT COVERED BY THE FEES SET FORTH IN SECTION ONE THOUSAND THREE HUNDRED FORTY-NINE OF THIS TITLE; ANY OTHER FEES ASSESSED UNDER THIS ARTICLE; OR ANY OTHER DESIGNATED SOURCES OF FUNDING, SHALL BE ASSESSED ANNUALLY ON GAMING LICENSEES UNDER THIS ARTICLE IN PROPORTION TO THE NUMBER OF GAMING POSITIONS AT EACH GAMING FACILITY. EACH GAMING LICENSEE SHALL PAY THE AMOUNT ASSESSED AGAINST IT WITHIN THIRTY DAYS AFTER THE DATE OF THE NOTICE OF ASSESSMENT FROM THE COMMISSION.

2. IF THE FEES COLLECTED IN SECTION ONE THOUSAND THREE HUNDRED FORTY-NINE OF THIS TITLE EXCEED THE COST REQUIRED TO MAINTAIN REGULATORY CONTROL, THE SURPLUS FUNDS SHALL BE CREDITED IN PROPORTIONAL SHARES AGAINST EACH GAMING LICENSEE'S NEXT ASSESSMENT.

S 1351. TAX ON GAMING REVENUES; PERMISSIVE SUPPLEMENTAL FEE. 1. FOR A GAMING FACILITY IN ZONE TWO, THERE IS HEREBY IMPOSED A TAX ON GROSS GAMING REVENUES. THE AMOUNT OF SUCH TAX IMPOSED SHALL BE AS FOLLOWS; PROVIDED, HOWEVER, SHOULD A LICENSEE HAVE AGREED WITHIN ITS APPLICATION TO SUPPLEMENT THE TAX WITH A BINDING SUPPLEMENTAL FEE PAYMENT EXCEEDING

THE AFOREMENTIONED TAX RATE, SUCH TAX AND SUPPLEMENTAL FEE SHALL APPLY
FOR A GAMING FACILITY:

(A) IN REGION TWO, FORTY-FIVE PERCENT OF GROSS GAMING REVENUE FROM
SLOT MACHINES AND TEN PERCENT OF GROSS GAMING REVENUE FROM ALL OTHER
SOURCES.

(B) IN REGION ONE, THIRTY-NINE PERCENT OF GROSS GAMING REVENUE FROM
SLOT MACHINES AND TEN PERCENT OF GROSS GAMING REVENUE FROM ALL OTHER
SOURCES.

(C) IN REGION FIVE, THIRTY-SEVEN PERCENT OF GROSS GAMING REVENUE FROM
SLOT MACHINES AND TEN PERCENT OF GROSS GAMING REVENUE FROM ALL OTHER
SOURCES.

S 1352. COMMERCIAL GAMING REVENUE FUND. 1. THE COMMISSION SHALL PAY
INTO AN ACCOUNT, TO BE KNOWN AS THE COMMERCIAL GAMING REVENUE FUND AS
ESTABLISHED PURSUANT TO SECTION NINETY-SEVEN-NNNN OF THE STATE FINANCE
LAW, UNDER THE JOINT CUSTODY OF THE COMPTROLLER AND THE COMMISSIONER OF
TAXATION AND FINANCE, ALL TAXES AND FEES IMPOSED BY THIS ARTICLE; ANY
INTEREST AND PENALTIES IMPOSED BY THE COMMISSION RELATING TO THOSE
TAXES; THE APPROPRIATE PERCENTAGE OF THE VALUE OF EXPIRED GAMING RELATED
OBLIGATIONS; ALL PENALTIES LEVIED AND COLLECTED BY THE COMMISSION; AND
THE APPROPRIATE FUNDS, CASH OR PRIZES FORFEITED FROM GAMBLING ACTIVITY.

2. THE COMMISSION SHALL REQUIRE AT LEAST MONTHLY DEPOSITS BY THE
LICENSEE OF ANY PAYMENTS PURSUANT TO SECTION ONE THOUSAND THREE HUNDRED
FIFTY-ONE OF THIS ARTICLE, AT SUCH TIMES, UNDER SUCH CONDITIONS, AND IN
SUCH DEPOSITORIES AS SHALL BE PRESCRIBED BY THE STATE COMPTROLLER. THE
DEPOSITS SHALL BE DEPOSITED TO THE CREDIT OF THE COMMERCIAL GAMING
REVENUE FUND AS ESTABLISHED BY SECTION NINETY-SEVEN-NNNN OF THE STATE
FINANCE LAW. THE COMMISSION MAY REQUIRE A MONTHLY REPORT AND RECONCIL-
IATION STATEMENT TO BE FILED WITH IT ON OR BEFORE THE TENTH DAY OF EACH
MONTH, WITH RESPECT TO GROSS REVENUES AND DEPOSITS RECEIVED AND MADE,
RESPECTIVELY, DURING THE PRECEDING MONTH.

S 1353. DETERMINATION OF TAX LIABILITY. THE COMMISSION MAY PERFORM
AUDITS OF THE BOOKS AND RECORDS OF A GAMING FACILITY LICENSEE, AT SUCH
TIMES AND INTERVALS AS IT DEEMS APPROPRIATE, FOR THE PURPOSE OF DETER-
MINING THE SUFFICIENCY OF TAX OR FEE PAYMENTS. IF A RETURN OR DEPOSIT
REQUIRED WITH REGARD TO OBLIGATIONS IMPOSED IS NOT FILED OR PAID, OR IF
A RETURN OR DEPOSIT WHEN FILED OR PAID IS DETERMINED BY THE COMMISSION
TO BE INCORRECT OR INSUFFICIENT WITH OR WITHOUT AN AUDIT, THE AMOUNT OF
TAX, FEE OR DEPOSIT DUE SHALL BE DETERMINED BY THE COMMISSION. NOTICE
OF SUCH DETERMINATION SHALL BE GIVEN TO THE LICENSEE LIABLE FOR THE
PAYMENT OF THE TAX OR FEE OR DEPOSIT. SUCH DETERMINATION SHALL FINALLY
AND IRREVOCABLY FIX THE TAX OR FEE UNLESS THE PERSON AGAINST WHOM IT IS
ASSESSED, WITHIN THIRTY DAYS AFTER RECEIVING NOTICE OF SUCH DETERMI-
NATION, SHALL APPLY TO THE COMMISSION FOR A HEARING IN ACCORDANCE WITH
THE REGULATIONS OF THE COMMISSION.

S 1354. UNCLAIMED FUNDS. UNCLAIMED FUNDS, CASH AND PRIZES SHALL BE
RETAINED BY THE GAMING FACILITY LICENSEE FOR THE PERSON ENTITLED TO THE
FUNDS, CASH OR PRIZE FOR ONE YEAR AFTER THE GAME IN WHICH THE FUNDS,
CASH OR PRIZE WAS WON. IF NO CLAIM IS MADE FOR THE FUNDS, CASH OR PRIZE
WITHIN ONE YEAR, THE FUNDS, CASH OR EQUIVALENT CASH VALUE OF THE PRIZE
SHALL BE DEPOSITED IN THE COMMERCIAL GAMING REVENUE FUND.

S 1355. RACING SUPPORT PAYMENTS. 1. IF AN APPLICANT WHO POSSESSES A
PARI-MUTUEL WAGERING FRANCHISE OR LICENSE AWARDED PURSUANT TO ARTICLE
TWO OR THREE OF THIS CHAPTER, OR WHO POSSESSED IN TWO THOUSAND THIRTEEN
A FRANCHISE OR A LICENSE AWARDED PURSUANT TO ARTICLE TWO OR THREE OF
THIS CHAPTER OR IS AN ARTICULATED ENTITY OR SUCH APPLICANT, IS ISSUED A
GAMING FACILITY LICENSE PURSUANT TO THIS ARTICLE, THE LICENSEE SHALL:

(A) MAINTAIN PAYMENTS MADE FROM VIDEO LOTTERY GAMING OPERATIONS TO THE RELEVANT HORSEMEN AND BREEDERS ORGANIZATIONS AT THE SAME DOLLAR LEVEL REALIZED IN TWO THOUSAND THIRTEEN, TO BE ADJUSTED ANNUALLY PURSUANT TO CHANGES IN THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT OF LABOR BUREAU OF LABOR STATISTICS;

(B) ALL RACETRACKS LOCATIONS AWARDED A GAMING FACILITY LICENSE SHALL MAINTAIN RACING ACTIVITY AND RACE DATES PURSUANT TO ARTICLES TWO AND THREE OF THIS CHAPTER.

2. IF AN APPLICANT THAT DOES NOT POSSESS EITHER A PARI-MUTUEL WAGERING LICENSE OR FRANCHISE AWARDED PURSUANT TO ARTICLE TWO OR THREE OF THIS CHAPTER IS ISSUED A GAMING FACILITY LICENSE PURSUANT TO THIS ARTICLE, THE LICENSEE SHALL PAY:

(A) AN AMOUNT TO HORSEMEN FOR PURSES AT THE LICENSED RACETRACKS IN THE REGION THAT WILL ASSURE THE PURSE SUPPORT FROM VIDEO LOTTERY GAMING FACILITIES IN THE REGION TO THE LICENSED RACETRACKS IN THE REGION TO BE MAINTAINED AT THE SAME DOLLAR LEVELS REALIZED IN TWO THOUSAND THIRTEEN TO BE ADJUSTED BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT OF LABOR BUREAU OF LABOR STATISTICS; AND

(B) AMOUNTS TO THE AGRICULTURAL AND NEW YORK STATE HORSE BREEDING DEVELOPMENT FUND AND THE NEW YORK STATE THOROUGHBRED BREEDING AND DEVEL- OPMENT FUND TO MAINTAIN PAYMENTS FROM VIDEO LOTTERY GAMING FACILITIES IN THE REGION TO SUCH FUNDS TO BE MAINTAINED AT THE SAME DOLLAR LEVELS REALIZED IN TWO THOUSAND THIRTEEN TO BE ADJUSTED BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT OF LABOR BUREAU OF LABOR STATISTICS.

TITLE 7

PROBLEM GAMBLING

SECTION 1362. PREVENTION AND OUTREACH EFFORTS.

1363. ADVERTISING RESTRICTIONS.

S 1362. PREVENTION AND OUTREACH EFFORTS. 1. EACH GAMING FACILITY LICENSEE, MANAGEMENT COMPANY, AND HOLDING COMPANY INVOLVED IN THE APPLI- CATION AND OWNERSHIP OR MANAGEMENT OF A GAMING FACILITY SHALL PROVIDE TO THE COMMISSION, AS APPLICABLE, AN APPLICANT'S PROBLEM GAMBLING PLAN. AN APPLICANT'S PROBLEM GAMBLING PLAN SHALL BE APPROVED BY THE COMMISSION BEFORE THE COMMISSION ISSUES OR RENEWS A LICENSE. EACH PLAN SHALL AT MINIMUM INCLUDE THE FOLLOWING:

(A) THE GOALS OF THE PLAN AND PROCEDURES AND TIMETABLES TO IMPLEMENT THE PLAN;

(B) THE IDENTIFICATION OF THE INDIVIDUAL WHO WILL BE RESPONSIBLE FOR THE IMPLEMENTATION AND MAINTENANCE OF THE PLAN;

(C) POLICIES AND PROCEDURES INCLUDING THE FOLLOWING:

(1) THE COMMITMENT OF THE APPLICANT AND THE GAMING FACILITY LICENSEE TO TRAIN APPROPRIATE EMPLOYEES;

(2) THE DUTIES AND RESPONSIBILITIES OF THE EMPLOYEES DESIGNATED TO IMPLEMENT OR PARTICIPATE IN THE PLAN;

(3) THE RESPONSIBILITY OF PATRONS WITH RESPECT TO RESPONSIBLE GAMBL- ING;

(4) PROCEDURES FOR COMPLIANCE WITH THE VOLUNTARY EXCLUSION PROGRAM;

(5) PROCEDURES TO IDENTIFY PATRONS AND EMPLOYEES WITH SUSPECTED OR KNOWN PROBLEM GAMBLING BEHAVIOR, INCLUDING PROCEDURES SPECIFIC TO LOYAL- TY AND OTHER REWARDS AND MARKETING PROGRAMS;

(6) PROCEDURES FOR PROVIDING INFORMATION TO INDIVIDUALS REGARDING THE VOLUNTARY EXCLUSION PROGRAM AND COMMUNITY, PUBLIC AND PRIVATE TREATMENT SERVICES, GAMBLERS ANONYMOUS PROGRAMS AND SIMILAR TREATMENT OR ADDICTION

THERAPY PROGRAMS DESIGNED TO PREVENT, TREAT, OR MONITOR PROBLEM GAMBLERS
AND TO COUNSEL FAMILY MEMBERS;

(7) PROCEDURES FOR RESPONDING TO PATRON AND EMPLOYEE REQUESTS FOR
INFORMATION REGARDING THE VOLUNTARY EXCLUSION PROGRAM AND COMMUNITY,
PUBLIC AND PRIVATE TREATMENT SERVICES, GAMBLERS ANONYMOUS PROGRAMS AND
SIMILAR TREATMENT OR ADDICTION THERAPY PROGRAMS DESIGNED TO PREVENT,
TREAT, OR MONITOR COMPULSIVE AND PROBLEM GAMBLERS AND TO COUNSEL FAMILY
MEMBERS;

(8) THE PROVISION OF PRINTED MATERIAL TO EDUCATE PATRONS AND EMPLOYEES
ABOUT PROBLEM GAMBLING AND TO INFORM THEM ABOUT THE VOLUNTARY EXCLUSION
PROGRAM AND TREATMENT SERVICES AVAILABLE TO PROBLEM GAMBLERS AND THEIR
FAMILIES. THE APPLICANT SHALL PROVIDE EXAMPLES OF THE MATERIALS TO BE
USED AS PART OF ITS PLAN, INCLUDING, BROCHURES AND OTHER PRINTED MATERI-
AL AND A DESCRIPTION OF HOW THE MATERIAL WILL BE DISSEMINATED;

(9) ADVERTISING AND OTHER MARKETING AND OUTREACH TO EDUCATE THE GENER-
AL PUBLIC ABOUT THE VOLUNTARY EXCLUSION PROGRAM AND PROBLEM GAMBLING;

(10) AN EMPLOYEE TRAINING PROGRAM, INCLUDING TRAINING MATERIALS TO BE
UTILIZED AND A PLAN FOR PERIODIC REINFORCEMENT TRAINING AND A CERTIF-
ICATION PROCESS ESTABLISHED BY THE APPLICANT TO VERIFY THAT EACH EMPLOY-
EE HAS COMPLETED THE TRAINING REQUIRED BY THE PLAN;

(11) PROCEDURES TO PREVENT UNDERAGE GAMBLING;

(12) PROCEDURES TO PREVENT PATRONS IMPAIRED BY DRUGS OR ALCOHOL, OR
BOTH, FROM GAMBLING; AND

(13) THE PLAN FOR POSTING SIGNS WITHIN THE GAMING FACILITY, CONTAINING
INFORMATION ON GAMBLING TREATMENT AND ON THE VOLUNTARY EXCLUSION
PROGRAM. THE APPLICANT SHALL PROVIDE EXAMPLES OF THE LANGUAGE AND GRAPH-
ICS TO BE USED ON THE SIGNS AS PART OF ITS PLAN;

(D) A LIST OF COMMUNITY, PUBLIC AND PRIVATE TREATMENT SERVICES,
GAMBLERS ANONYMOUS PROGRAMS AND SIMILAR TREATMENT OR ADDICTION THERAPY
PROGRAMS DESIGNED TO PREVENT, TREAT, OR MONITOR PROBLEM GAMBLERS AND TO
COUNSEL FAMILY MEMBERS; AND

(E) ANY OTHER INFORMATION, DOCUMENTS, AND POLICIES AND PROCEDURES THAT
THE COMMISSION REQUIRES.

2. EACH APPLICANT OR GAMING FACILITY LICENSEE SHALL SUBMIT ANY AMEND-
MENTS TO THE PROBLEM GAMBLING PLAN TO THE COMMISSION FOR REVIEW AND
APPROVAL BEFORE IMPLEMENTING THE AMENDMENTS.

3. EACH GAMING FACILITY LICENSEE SHALL SUBMIT AN ANNUAL SUMMARY OF ITS
PROBLEM GAMBLING PLAN TO THE COMMISSION.

4. EACH GAMING FACILITY LICENSEE SHALL SUBMIT QUARTERLY UPDATES AND AN
ANNUAL REPORT TO THE COMMISSION OF ITS ADHERENCE TO THE PLANS AND GOALS
SUBMITTED UNDER THIS SECTION.

S 1363. ADVERTISING RESTRICTIONS. 1. AS USED IN THIS SECTION:

(A) "ADVERTISEMENT" SHALL MEAN ANY NOTICE OR COMMUNICATION TO THE
PUBLIC OR ANY INFORMATION CONCERNING THE GAMING-RELATED BUSINESS OF A
GAMING FACILITY LICENSEE OR APPLICANT THROUGH BROADCASTING, PUBLICATION
OR ANY OTHER MEANS OF DISSEMINATION, INCLUDING ELECTRONIC DISSEMINATION.
PROMOTIONAL ACTIVITIES ARE CONSIDERED ADVERTISEMENTS FOR PURPOSES OF
THIS SECTION.

(B) "DIRECT ADVERTISEMENT" SHALL MEAN ANY ADVERTISEMENT AS DESCRIBED
IN PARAGRAPH (A) OF THIS SUBDIVISION THAT IS DISSEMINATED TO A SPECIFIC
INDIVIDUAL OR INDIVIDUALS.

2. ADVERTISING SHALL BE BASED UPON FACT, AND SHALL NOT BE FALSE,
DECEPTIVE OR MISLEADING, AND NO ADVERTISING BY OR ON BEHALF OF A GAMING
FACILITY LICENSEE SHALL:

(A) USE ANY TYPE, SIZE, LOCATION, LIGHTING, ILLUSTRATION, GRAPHIC
DEPICTION OR COLOR RESULTING IN THE OBSCURING OF ANY MATERIAL FACT;

(B) FAIL TO CLEARLY AND CONSPICUOUSLY SPECIFY AND STATE ANY MATERIAL
CONDITIONS OR LIMITING FACTORS;

(C) DEPICT ANY PERSON UNDER THE AGE OF TWENTY-ONE ENGAGING IN GAMING
AND RELATED ACTIVITIES; OR

(D) FAIL TO DESIGNATE AND STATE THE NAME AND LOCATION OF THE GAMING
FACILITY CONDUCTING THE ADVERTISEMENT. THE LOCATION OF THE GAMING FACIL-
ITY NEED NOT BE INCLUDED ON BILLBOARDS WITHIN THIRTY MILES OF THE GAMING
FACILITY.

3. EACH ADVERTISEMENT SHALL, CLEARLY AND CONSPICUOUSLY, STATE A PROB-
LEM GAMBLING HOTLINE NUMBER.

4. EACH DIRECT ADVERTISEMENT SHALL, CLEARLY AND CONSPICUOUSLY,
DESCRIBE A METHOD OR METHODS BY WHICH AN INDIVIDUAL MAY DESIGNATE THAT
THE INDIVIDUAL DOES NOT WISH TO RECEIVE ANY FUTURE DIRECT ADVERTISEMENT.

(A) THE DESCRIBED METHOD MUST BE BY AT LEAST TWO OF THE FOLLOWING:

(1) TELEPHONE;

(2) REGULAR U.S. MAIL; OR

(3) ELECTRONIC MAIL.

(B) UPON RECEIPT OF AN INDIVIDUAL'S REQUEST TO DISCONTINUE RECEIPT OF
FUTURE ADVERTISEMENT, A GAMING FACILITY LICENSEE OR APPLICANT SHALL
BLOCK THE INDIVIDUAL IN THE GAMING FACILITY LICENSEE'S DATABASE SO AS TO
PREVENT THE INDIVIDUAL FROM RECEIVING FUTURE DIRECT ADVERTISEMENTS WITH-
IN FIFTEEN DAYS OF RECEIPT OF THE REQUEST.

5. EACH GAMING FACILITY LICENSEE OR APPLICANT SHALL PROVIDE TO THE
COMMISSION AT ITS MAIN OFFICE A COMPLETE AND ACCURATE COPY OF ALL ADVER-
TISEMENTS WITHIN FIVE BUSINESS DAYS OF THE ADVERTISEMENT'S PUBLIC
DISSEMINATION. GAMING FACILITY LICENSEES OR APPLICANTS SHALL DISCONTINUE
THE PUBLIC DISSEMINATION UPON RECEIPT OF NOTICE FROM THE COMMISSION TO
DISCONTINUE AN ADVERTISEMENT.

6. A GAMING FACILITY LICENSEE OR APPLICANT SHALL MAINTAIN A COMPLETE
RECORD OF ALL ADVERTISEMENTS FOR A PERIOD OF AT LEAST TWO YEARS.
RECORDS SHALL BE MADE AVAILABLE TO THE COMMISSION UPON REQUEST.

TITLE 8

MISCELLANEOUS PROVISIONS

SECTION 1364. SMOKING PROHIBITED.

1365. CONSERVATORSHIP.

1366. ZONING.

1367. SPORTS WAGERING.

S 1364. SMOKING PROHIBITED. SMOKING SHALL NOT BE PERMITTED, AND NO
PERSON SHALL SMOKE IN THE INDOOR AREAS OF FACILITIES LICENSED PURSUANT
TO THIS ARTICLE, EXCEPT THAT THE PROVISIONS OF SECTION ONE THOUSAND
THREE HUNDRED NINETY-NINE-Q OF THE PUBLIC HEALTH LAW SHALL BE APPLICABLE
TO FACILITIES LICENSED PURSUANT TO THIS ARTICLE.

S 1365. CONSERVATORSHIP. 1. UPON REVOCATION OR SUSPENSION OF A GAMING
FACILITY LICENSE OR UPON THE FAILURE OR REFUSAL TO RENEW A GAMING FACIL-
ITY LICENSE, THE COMMISSION MAY APPOINT A CONSERVATOR TO TEMPORARILY
MANAGE AND OPERATE THE BUSINESS OF THE GAMING LICENSEE RELATING TO THE
GAMING FACILITY. SUCH CONSERVATOR SHALL BE A PERSON OF SIMILAR EXPERI-
ENCE IN THE FIELD OF GAMING MANAGEMENT AND, IN THE CASE OF REPLACING A
GAMING FACILITY LICENSEE, SHALL HAVE EXPERIENCE OPERATING A GAMING
FACILITY OF SIMILAR CALIBER IN ANOTHER JURISDICTION, AND SHALL BE IN
GOOD STANDING IN ALL JURISDICTIONS IN WHICH THE CONSERVATOR OPERATES A
GAMING FACILITY. UPON APPOINTMENT, A CONSERVATOR SHALL AGREE TO ALL
LICENSING PROVISIONS OF THE FORMER GAMING LICENSEE.

2. A CONSERVATOR SHALL, BEFORE ASSUMING, MANAGERIAL OR OPERATIONAL
DUTIES, EXECUTE AND FILE A BOND FOR THE FAITHFUL PERFORMANCE OF ITS

DUTIES PAYABLE TO THE COMMISSION WITH SUCH SURETY AND IN SUCH FORM AND
AMOUNT AS THE COMMISSION SHALL APPROVE.

3. THE COMMISSION SHALL REQUIRE THAT THE FORMER OR SUSPENDED GAMING
LICENSEE PURCHASE LIABILITY INSURANCE, IN AN AMOUNT DETERMINED BY THE
COMMISSION, TO PROTECT A CONSERVATOR FROM LIABILITY FOR ANY ACTS OR
OMISSIONS OF THE CONSERVATOR DURING THE CONSERVATOR'S APPOINTMENT WHICH
ARE REASONABLY RELATED TO AND WITHIN THE SCOPE OF THE CONSERVATOR'S
DUTIES.

4. DURING THE PERIOD OF TEMPORARY MANAGEMENT OF THE GAMING FACILITY,
THE COMMISSION SHALL INITIATE PROCEEDINGS UNDER THIS ARTICLE TO AWARD A
NEW GAMING FACILITY LICENSE TO A QUALIFIED APPLICANT WHOSE GAMING FACIL-
ITY SHALL BE LOCATED AT THE SITE OF THE PREEXISTING GAMING FACILITY.

5. AN APPLICANT FOR A NEW GAMING FACILITY LICENSE SHALL BE QUALIFIED
FOR LICENSURE UNDER THIS ARTICLE; PROVIDED, HOWEVER, THAT THE COMMISSION
SHALL DETERMINE AN APPROPRIATE LEVEL OF INVESTMENT BY AN APPLICANT INTO
THE PREEXISTING GAMING FACILITY.

6. UPON AWARD OF A NEW GAMING FACILITY LICENSE, THE NEW GAMING FACILI-
TY LICENSEE SHALL PAY THE ORIGINAL LICENSING FEE REQUIRED UNDER THIS
ARTICLE.

S 1366. ZONING. NOTWITHSTANDING ANY INCONSISTENT PROVISION OF LAW,
GAMING AUTHORIZED AT A LOCATION PURSUANT TO THIS ARTICLE SHALL BE DEEMED
AN APPROVED ACTIVITY FOR SUCH LOCATION UNDER THE RELEVANT CITY, COUNTY,
TOWN, OR VILLAGE LAND USE OR ZONING ORDINANCES, RULES, OR REGULATIONS.

S 1367. SPORTS WAGERING. 1. AS USED IN THIS SECTION:

(A) "CASINO" MEANS A LICENSED GAMING FACILITY AT WHICH GAMBLING IS
CONDUCTED PURSUANT TO THE PROVISIONS OF THIS ARTICLE;

(B) "COMMISSION" MEANS THE COMMISSION ESTABLISHED PURSUANT TO SECTION
ONE HUNDRED TWO OF THIS CHAPTER;

(C) "COLLEGIATE SPORT OR ATHLETIC EVENT" MEANS A SPORT OR ATHLETIC
EVENT OFFERED OR SPONSORED BY OR PLAYED IN CONNECTION WITH A PUBLIC OR
PRIVATE INSTITUTION THAT OFFERS EDUCATIONAL SERVICES BEYOND THE SECOND-
ARY LEVEL;

(D) "OPERATOR" MEANS A CASINO WHICH HAS ELECTED TO OPERATE A SPORTS
POOL;

(E) "PROFESSIONAL SPORT OR ATHLETIC EVENT" MEANS AN EVENT AT WHICH TWO
OR MORE PERSONS PARTICIPATE IN SPORTS OR ATHLETIC EVENTS AND RECEIVE
COMPENSATION IN EXCESS OF ACTUAL EXPENSES FOR THEIR PARTICIPATION IN
SUCH EVENT;

(F) "PROHIBITED SPORTS EVENT" MEANS ANY COLLEGIATE SPORT OR ATHLETIC
EVENT THAT TAKES PLACE IN NEW YORK OR A SPORT OR ATHLETIC EVENT IN WHICH
ANY NEW YORK COLLEGE TEAM PARTICIPATES REGARDLESS OF WHERE THE EVENT
TAKES PLACE;

(G) "SPORTS EVENT" MEANS ANY PROFESSIONAL SPORT OR ATHLETIC EVENT AND
ANY COLLEGIATE SPORT OR ATHLETIC EVENT, EXCEPT A PROHIBITED SPORTS
EVENT;

(H) "SPORTS POOL" MEANS THE BUSINESS OF ACCEPTING WAGERS ON ANY SPORTS
EVENT BY ANY SYSTEM OR METHOD OF WAGERING; AND

(I) "SPORTS WAGERING LOUNGE" MEANS AN AREA WHEREIN A SPORTS POOL IS
OPERATED.

2. NO GAMING FACILITY MAY CONDUCT SPORTS WAGERING UNTIL SUCH TIME AS
THERE HAS BEEN A CHANGE IN FEDERAL LAW AUTHORIZING SUCH OR UPON A RULING
OF A COURT OF COMPETENT JURISDICTION THAT SUCH ACTIVITY IS LAWFUL.

3. (A) IN ADDITION TO AUTHORIZED GAMING ACTIVITIES, A LICENSED GAMING
FACILITY MAY WHEN AUTHORIZED BY SUBDIVISION TWO OF THIS SECTION OPERATE
A SPORTS POOL UPON THE APPROVAL OF THE COMMISSION AND IN ACCORDANCE WITH
THE PROVISIONS OF THIS SECTION AND APPLICABLE REGULATIONS PROMULGATED

PURSUANT TO THIS ARTICLE. THE COMMISSION SHALL HEAR AND DECIDE PROMPTLY AND IN REASONABLE ORDER ALL APPLICATIONS FOR A LICENSE TO OPERATE A SPORTS POOL, SHALL HAVE THE GENERAL RESPONSIBILITY FOR THE IMPLEMENTA- TION OF THIS SECTION AND SHALL HAVE ALL OTHER DUTIES SPECIFIED IN THIS SECTION WITH REGARD TO THE OPERATION OF A SPORTS POOL. THE LICENSE TO OPERATE A SPORTS POOL SHALL BE IN ADDITION TO ANY OTHER LICENSE REQUIRED TO BE ISSUED TO OPERATE A GAMING FACILITY. NO LICENSE TO OPERATE A SPORTS POOL SHALL BE ISSUED BY THE COMMISSION TO ANY ENTITY UNLESS IT HAS ESTABLISHED ITS FINANCIAL STABILITY, INTEGRITY AND RESPONSIBILITY AND ITS GOOD CHARACTER, HONESTY AND INTEGRITY.

NO LATER THAN FIVE YEARS AFTER THE DATE OF THE ISSUANCE OF A LICENSE AND EVERY FIVE YEARS THEREAFTER OR WITHIN SUCH LESSER PERIODS AS THE COMMISSION MAY DIRECT, A LICENSEE SHALL SUBMIT TO THE COMMISSION SUCH DOCUMENTATION OR INFORMATION AS THE COMMISSION MAY BY REGULATION REQUIRE, TO DEMONSTRATE TO THE SATISFACTION OF THE EXECUTIVE DIRECTOR OF THE COMMISSION THAT THE LICENSEE CONTINUES TO MEET THE REQUIREMENTS OF THE LAW AND REGULATIONS.

(B) A SPORTS POOL SHALL BE OPERATED IN A SPORTS WAGERING LOUNGE LOCATED AT A CASINO. THE LOUNGE SHALL CONFORM TO ALL REQUIREMENTS CONCERNING SQUARE FOOTAGE, DESIGN, EQUIPMENT, SECURITY MEASURES AND RELATED MATTERS WHICH THE COMMISSION SHALL BY REGULATION PRESCRIBE.

(C) THE OPERATOR OF A SPORTS POOL SHALL ESTABLISH OR DISPLAY THE ODDS AT WHICH WAGERS MAY BE PLACED ON SPORTS EVENTS.

(D) AN OPERATOR SHALL ACCEPT WAGERS ON SPORTS EVENTS ONLY FROM PERSONS PHYSICALLY PRESENT IN THE SPORTS WAGERING LOUNGE. A PERSON PLACING A WAGER SHALL BE AT LEAST TWENTY-ONE YEARS OF AGE.

(E) AN OPERATOR SHALL NOT ADMIT INTO THE SPORTS WAGERING LOUNGE, OR ACCEPT WAGERS FROM, ANY PERSON WHOSE NAME APPEARS ON THE EXCLUSION LIST.

(F) THE HOLDER OF A LICENSE TO OPERATE A SPORTS POOL MAY CONTRACT WITH AN ENTITY TO CONDUCT THAT OPERATION, IN ACCORDANCE WITH THE REGULATIONS OF THE COMMISSION. THAT ENTITY SHALL OBTAIN A LICENSE AS A CASINO VENDOR ENTERPRISE PRIOR TO THE EXECUTION OF ANY SUCH CONTRACT, AND SUCH LICENSE SHALL BE ISSUED PURSUANT TO THE PROVISIONS OF SECTION ONE THOUSAND THREE HUNDRED TWENTY-SEVEN OF THIS ARTICLE AND IN ACCORDANCE WITH THE REGU- LATIONS PROMULGATED BY THE COMMISSION.

(G) IF ANY PROVISION OF THIS ARTICLE OR ITS APPLICATION TO ANY PERSON OR CIRCUMSTANCE IS HELD INVALID, THE INVALIDITY SHALL NOT AFFECT OTHER PROVISIONS OR APPLICATIONS OF THIS ARTICLE WHICH CAN BE GIVEN EFFECT WITHOUT THE INVALID PROVISION OR APPLICATION, AND TO THIS END THE PROVISIONS OF THIS ARTICLE ARE SEVERABLE.

4. (A) ALL PERSONS EMPLOYED DIRECTLY IN WAGERING-RELATED ACTIVITIES CONDUCTED WITHIN A SPORTS WAGERING LOUNGE SHALL BE LICENSED AS A CASINO KEY EMPLOYEE OR REGISTERED AS A GAMING EMPLOYEE, AS DETERMINED BY THE COMMISSION. ALL OTHER EMPLOYEES WHO ARE WORKING IN THE SPORTS WAGERING LOUNGE MAY BE REQUIRED TO BE REGISTERED, IF APPROPRIATE, IN ACCORDANCE WITH REGULATIONS OF THE COMMISSION.

(B) EACH OPERATOR OF A SPORTS POOL SHALL DESIGNATE ONE OR MORE CASINO KEY EMPLOYEES WHO SHALL BE RESPONSIBLE FOR THE OPERATION OF THE SPORTS POOL. AT LEAST ONE SUCH CASINO KEY EMPLOYEE SHALL BE ON THE PREMISES WHENEVER SPORTS WAGERING IS CONDUCTED.

5. EXCEPT AS OTHERWISE PROVIDED BY THIS ARTICLE, THE COMMISSION SHALL HAVE THE AUTHORITY TO REGULATE SPORTS POOLS AND THE CONDUCT OF SPORTS WAGERING UNDER THIS ARTICLE TO THE SAME EXTENT THAT THE COMMISSION REGU- LATES OTHER GAMING. NO CASINO SHALL BE AUTHORIZED TO OPERATE A SPORTS POOL UNLESS IT HAS PRODUCED INFORMATION, DOCUMENTATION, AND ASSURANCES CONCERNING ITS FINANCIAL BACKGROUND AND RESOURCES, INCLUDING CASH

RESERVES, THAT ARE SUFFICIENT TO DEMONSTRATE THAT IT HAS THE FINANCIAL
STABILITY, INTEGRITY, AND RESPONSIBILITY TO OPERATE A SPORTS POOL. IN
DEVELOPING RULES AND REGULATIONS APPLICABLE TO SPORTS WAGERING, THE
COMMISSION SHALL EXAMINE THE REGULATIONS IMPLEMENTED IN OTHER STATES
WHERE SPORTS WAGERING IS CONDUCTED AND SHALL, AS FAR AS PRACTICABLE,
ADOPT A SIMILAR REGULATORY FRAMEWORK. THE COMMISSION SHALL PROMULGATE
REGULATIONS NECESSARY TO CARRY OUT THE PROVISIONS OF THIS SECTION,
INCLUDING, BUT NOT LIMITED TO, REGULATIONS GOVERNING THE:

(A) AMOUNT OF CASH RESERVES TO BE MAINTAINED BY OPERATORS TO COVER
WINNING WAGERS;

(B) ACCEPTANCE OF WAGERS ON A SERIES OF SPORTS EVENTS;

(C) MAXIMUM WAGERS WHICH MAY BE ACCEPTED BY AN OPERATOR FROM ANY ONE
PATRON ON ANY ONE SPORTS EVENT;

(D) TYPE OF WAGERING TICKETS WHICH MAY BE USED;

(E) METHOD OF ISSUING TICKETS;

(F) METHOD OF ACCOUNTING TO BE USED BY OPERATORS;

(G) TYPES OF RECORDS WHICH SHALL BE KEPT;

(H) USE OF CREDIT AND CHECKS BY PATRONS;

(I) TYPE OF SYSTEM FOR WAGERING; AND

(J) PROTECTIONS FOR A PERSON PLACING A WAGER.

6. EACH OPERATOR SHALL ADOPT COMPREHENSIVE HOUSE RULES GOVERNING
SPORTS WAGERING TRANSACTIONS WITH ITS PATRONS. THE RULES SHALL SPECIFY
THE AMOUNTS TO BE PAID ON WINNING WAGERS AND THE EFFECT OF SCHEDULE
CHANGES. THE HOUSE RULES, TOGETHER WITH ANY OTHER INFORMATION THE
COMMISSION DEEMS APPROPRIATE, SHALL BE CONSPICUOUSLY DISPLAYED IN THE
SPORTS WAGERING LOUNGE AND INCLUDED IN THE TERMS AND CONDITIONS OF THE
ACCOUNT WAGERING SYSTEM, AND COPIES SHALL BE MADE READILY AVAILABLE TO
PATRONS.

### TITLE 9

#### GAMING INSPECTOR GENERAL

SECTION 1368. ESTABLISHMENT OF THE OFFICE OF GAMING INSPECTOR GENERAL.

1369. STATE GAMING INSPECTOR GENERAL; FUNCTIONS AND DUTIES.

1370. POWERS.

1371. RESPONSIBILITIES OF THE COMMISSION AND ITS OFFICERS AND
EMPLOYEES.

S 1368. ESTABLISHMENT OF THE OFFICE OF GAMING INSPECTOR GENERAL.
THERE IS HEREBY CREATED WITHIN THE COMMISSION THE OFFICE OF GAMING
INSPECTOR GENERAL. THE HEAD OF THE OFFICE SHALL BE THE GAMING INSPECTOR
GENERAL WHO SHALL BE APPOINTED BY THE GOVERNOR BY AND WITH THE ADVICE
AND CONSENT OF THE SENATE. THE INSPECTOR GENERAL SHALL SERVE AT THE
PLEASURE OF THE GOVERNOR. THE INSPECTOR GENERAL SHALL REPORT DIRECTLY TO
THE GOVERNOR. THE PERSON APPOINTED AS INSPECTOR GENERAL SHALL, UPON HIS
OR HER APPOINTMENT, HAVE NOT LESS THAN TEN YEARS PROFESSIONAL EXPERIENCE
IN LAW, INVESTIGATION, OR AUDITING. THE INSPECTOR GENERAL SHALL BE
COMPENSATED WITHIN THE LIMITS OF FUNDS AVAILABLE THEREFOR, PROVIDED,
HOWEVER, SUCH SALARY SHALL BE NO LESS THAN THE SALARIES OF CERTAIN STATE
OFFICERS HOLDING THE POSITIONS INDICATED IN PARAGRAPH (A) OF SUBDIVISION
ONE OF SECTION ONE HUNDRED SIXTY-NINE OF THE EXECUTIVE LAW.

S 1369. STATE GAMING INSPECTOR GENERAL; FUNCTIONS AND DUTIES. THE
STATE GAMING INSPECTOR GENERAL SHALL HAVE THE FOLLOWING DUTIES AND
RESPONSIBILITIES:

1. RECEIVE AND INVESTIGATE COMPLAINTS FROM ANY SOURCE, OR UPON HIS OR
HER OWN INITIATIVE, CONCERNING ALLEGATIONS OF CORRUPTION, FRAUD, CRIMI-
NAL ACTIVITY, CONFLICTS OF INTEREST OR ABUSE IN THE COMMISSION;

2.  INFORM THE COMMISSION MEMBERS OF SUCH ALLEGATIONS AND THE PROGRESS
OF INVESTIGATIONS RELATED THERETO, UNLESS SPECIAL CIRCUMSTANCES REQUIRE
CONFIDENTIALITY;

3.  DETERMINE WITH RESPECT TO SUCH ALLEGATIONS WHETHER DISCIPLINARY
ACTION, CIVIL OR CRIMINAL PROSECUTION, OR FURTHER INVESTIGATION BY AN
APPROPRIATE FEDERAL, STATE OR LOCAL AGENCY IS WARRANTED, AND TO ASSIST
IN SUCH INVESTIGATIONS;

4.  PREPARE AND RELEASE TO THE PUBLIC WRITTEN REPORTS OF SUCH INVESTI-
GATIONS, AS APPROPRIATE AND TO THE EXTENT PERMITTED BY LAW, SUBJECT TO
REDACTION TO PROTECT THE CONFIDENTIALITY OF WITNESSES. THE RELEASE OF
ALL OR PORTIONS OF SUCH REPORTS MAY BE DEFERRED TO PROTECT THE CONFIDEN-
TIALITY OF ONGOING INVESTIGATIONS;

5.  REVIEW AND EXAMINE PERIODICALLY THE POLICIES AND PROCEDURES OF THE
COMMISSION WITH REGARD TO THE PREVENTION AND DETECTION OF CORRUPTION,
FRAUD, CRIMINAL ACTIVITY, CONFLICTS OF INTEREST OR ABUSE;

6.  RECOMMEND REMEDIAL ACTION TO PREVENT OR ELIMINATE CORRUPTION,
FRAUD, CRIMINAL ACTIVITY, CONFLICTS OF INTEREST OR ABUSE IN THE COMMIS-
SION; AND

7.  ESTABLISH PROGRAMS FOR TRAINING COMMISSION OFFICERS AND EMPLOYEES
REGARDING THE PREVENTION AND ELIMINATION OF CORRUPTION, FRAUD, CRIMINAL
ACTIVITY, CONFLICTS OF INTEREST OR ABUSE IN THE COMMISSION.

S 1370. POWERS.    THE STATE GAMING INSPECTOR GENERAL SHALL HAVE THE
POWER TO:

1.  SUBPOENA AND ENFORCE THE ATTENDANCE OF WITNESSES;

2.  ADMINISTER OATHS OR AFFIRMATIONS AND EXAMINE WITNESSES UNDER OATH;

3.  REQUIRE THE PRODUCTION OF ANY BOOKS AND PAPERS DEEMED RELEVANT OR
MATERIAL TO ANY INVESTIGATION, EXAMINATION OR REVIEW;

4.  NOTWITHSTANDING ANY LAW TO THE CONTRARY, EXAMINE AND COPY OR REMOVE
DOCUMENTS OR RECORDS OF ANY KIND PREPARED, MAINTAINED OR HELD BY THE
COMMISSION;

5.  REQUIRE ANY COMMISSION OFFICER OR EMPLOYEE TO ANSWER QUESTIONS
CONCERNING ANY MATTER RELATED TO THE PERFORMANCE OF HIS OR HER OFFICIAL
DUTIES. THE REFUSAL OF ANY OFFICER OR EMPLOYEE TO ANSWER QUESTIONS
SHALL BE CAUSE FOR REMOVAL FROM OFFICE OR EMPLOYMENT OR OTHER APPROPRI-
ATE PENALTY;

6.  MONITOR THE IMPLEMENTATION BY THE COMMISSION OF ANY RECOMMENDATIONS
MADE BY THE STATE INSPECTOR GENERAL; AND

7.  PERFORM ANY OTHER FUNCTIONS THAT ARE NECESSARY OR APPROPRIATE TO
FULFILL THE DUTIES AND RESPONSIBILITIES OF THE OFFICE.

S 1371. RESPONSIBILITIES OF THE COMMISSION AND ITS OFFICERS AND
EMPLOYEES. 1. EVERY COMMISSION OFFICER OR EMPLOYEE SHALL REPORT PROMPT-
LY TO THE STATE GAMING INSPECTOR GENERAL ANY INFORMATION CONCERNING
CORRUPTION, FRAUD, CRIMINAL ACTIVITY, CONFLICTS OF INTEREST OR ABUSE BY
ANOTHER STATE OFFICER OR EMPLOYEE RELATING TO HIS OR HER OFFICE OR
EMPLOYMENT, OR BY A PERSON HAVING BUSINESS DEALINGS WITH THE COMMISSION
RELATING TO THOSE DEALINGS. THE KNOWING FAILURE OF ANY OFFICER OR
EMPLOYEE TO SO REPORT SHALL BE CAUSE FOR REMOVAL FROM OFFICE OR EMPLOY-
MENT OR OTHER APPROPRIATE PENALTY UNDER THIS ARTICLE. ANY OFFICER OR
EMPLOYEE WHO ACTS PURSUANT TO THIS SUBDIVISION BY REPORTING TO THE STATE
GAMING INSPECTOR GENERAL OR OTHER APPROPRIATE LAW ENFORCEMENT OFFICIAL
IMPROPER GOVERNMENTAL ACTION AS DEFINED IN SECTION SEVENTY-FIVE-B OF THE
CIVIL SERVICE LAW SHALL NOT BE SUBJECT TO DISMISSAL, DISCIPLINE OR OTHER
ADVERSE PERSONNEL ACTION.

2.  THE COMMISSION CHAIR SHALL ADVISE THE GOVERNOR WITHIN NINETY DAYS
OF THE ISSUANCE OF A REPORT BY THE STATE GAMING INSPECTOR GENERAL AS TO

A81Case11:13-cv-S0n410OpEK-DgiFlatDocuEnects 1h4 upSiled N9/9/6/b5k gAargag2O8 of P6de 61 of 114

THE REMEDIAL ACTION THAT THE COMMISSION HAS TAKEN IN RESPONSE TO ANY
RECOMMENDATION FOR SUCH ACTION CONTAINED IN SUCH REPORT.

S 3. Section 225.00 of the penal law is amended by adding eighteen new
subdivisions 13 through 30 to read as follows:

13. "AUTHORIZED GAMING ESTABLISHMENT" MEANS ANY STRUCTURE, STRUCTURE
AND ADJACENT OR ATTACHED STRUCTURE, OR GROUNDS ADJACENT TO A STRUCTURE
IN WHICH CASINO GAMING, CONDUCTED PURSUANT TO ARTICLE THIRTEEN OF THE
RACING, PARI-MUTUEL WAGERING AND BREEDING LAW, OR CLASS III GAMING, AS
AUTHORIZED PURSUANT TO A COMPACT REACHED BETWEEN THE STATE OF NEW YORK
AND A FEDERALLY RECOGNIZED INDIAN NATION OR TRIBE UNDER THE FEDERAL
INDIAN GAMING REGULATORY ACT OF 1988, IS CONDUCTED AND SHALL INCLUDE ALL
PUBLIC AND NON-PUBLIC AREAS OF ANY SUCH BUILDING, EXCEPT FOR SUCH AREAS
OF A BUILDING WHERE EITHER CLASS I OR II GAMING ARE CONDUCTED OR ANY
BUILDING OR GROUNDS KNOWN AS A VIDEO GAMING ENTERTAINMENT FACILITY,
INCLUDING FACILITIES WHERE FOOD AND DRINK ARE SERVED, AS WELL AS THOSE
AREAS NOT NORMALLY OPEN TO THE PUBLIC, SUCH AS WHERE RECORDS RELATED TO
VIDEO LOTTERY GAMING OPERATIONS ARE KEPT, EXCEPT SHALL NOT INCLUDE THE
RACETRACKS OR SUCH AREAS WHERE SUCH VIDEO LOTTERY GAMING OPERATIONS OR
FACILITIES DO NOT TAKE PLACE OR EXIST, SUCH AS RACETRACK AREAS OR FAIR-
GROUNDS WHICH ARE WHOLLY UNRELATED TO VIDEO LOTTERY GAMING OPERATIONS,
PURSUANT TO SECTION SIXTEEN HUNDRED SEVENTEEN-A AND PARAGRAPH FIVE OF
SUBDIVISION A OF SECTION SIXTEEN HUNDRED TWELVE OF THE TAX LAW, AS
AMENDED AND IMPLEMENTED.

14. "AUTHORIZED GAMING OPERATOR" MEANS AN ENTERPRISE OR BUSINESS ENTI-
TY AUTHORIZED BY STATE OR FEDERAL LAW TO OPERATE CASINO OR VIDEO LOTTERY
GAMING.

15. "CASINO GAMING" MEANS GAMES AUTHORIZED TO BE PLAYED PURSUANT TO A
LICENSE GRANTED UNDER ARTICLE THIRTEEN OF THE RACING, PARI-MUTUEL WAGER-
ING AND BREEDING LAW OR BY FEDERALLY RECOGNIZED INDIAN NATIONS OR TRIBES
PURSUANT TO A VALID GAMING COMPACT REACHED IN ACCORDANCE WITH THE FEDER-
AL INDIAN GAMING REGULATORY ACT OF 1988, PUB. L. 100-497, 102 STAT.
2467, CODIFIED AT 25 U.S.C. SS 2701-21 AND 18 U.S.C. SS 1166-68.

16. "CASH EQUIVALENT" MEANS A TREASURY CHECK, A TRAVELERS CHECK, WIRE
TRANSFER OF FUNDS, TRANSFER CHECK, MONEY ORDER, CERTIFIED CHECK, CASH-
IERS CHECK, PAYROLL CHECK, A CHECK DRAWN ON THE ACCOUNT OF THE AUTHOR-
IZED GAMING OPERATOR PAYABLE TO THE PATRON OR TO THE AUTHORIZED GAMING
ESTABLISHMENT, A PROMOTIONAL COUPON, PROMOTIONAL CHIP, PROMOTIONAL
CHEQUE, PROMOTIONAL TOKEN, OR A VOUCHER RECORDING CASH DRAWN AGAINST A
CREDIT CARD OR CHARGE CARD.

17. "CHEQUES" OR "CHIPS" OR "TOKENS" MEANS NONMETAL, METAL OR PARTLY
METAL REPRESENTATIVES OF VALUE, REDEEMABLE FOR CASH OR CASH EQUIVALENT,
AND ISSUED AND SOLD BY AN AUTHORIZED CASINO OPERATOR FOR USE AT AN
AUTHORIZED GAMING ESTABLISHMENT. THE VALUE OF SUCH CHEQUES OR CHIPS OR
TOKENS SHALL BE CONSIDERED EQUIVALENT IN VALUE TO THE CASH OR CASH
EQUIVALENT EXCHANGED FOR SUCH CHEQUES OR CHIPS OR TOKENS UPON PURCHASE
OR REDEMPTION.

18. "CLASS I GAMING" AND "CLASS II GAMING" MEANS THOSE FORMS OF GAMING
THAT ARE NOT CLASS III GAMING, AS DEFINED IN SUBSECTION EIGHT OF SECTION
FOUR OF THE FEDERAL INDIAN GAMING REGULATORY ACT, 25 U.S.C. S 2703.

19. "CLASS III GAMING" MEANS THOSE FORMS OF GAMING THAT ARE NOT CLASS
I OR CLASS II GAMING, AS DEFINED IN SUBSECTIONS SIX AND SEVEN OF SECTION
FOUR OF THE FEDERAL INDIAN GAMING REGULATORY ACT, 25 U.S.C. S 2703 AND
THOSE GAMES ENUMERATED IN THE APPENDIX OF A GAMING COMPACT.

20. "COMPACT" OR "GAMING COMPACT" MEANS THE AGREEMENT BETWEEN A FEDER-
ALLY RECOGNIZED INDIAN TRIBE AND THE STATE OF NEW YORK REGARDING CLASS
III GAMING ACTIVITIES ENTERED INTO PURSUANT TO THE FEDERAL INDIAN GAMING

S. 5883                                    60                            A. 8101

REGULATORY ACT, PUB. L. 100-497, 102 STAT. 2467, CODIFIED AT 25 U.S.C.
SS 2701-21 AND 18 U.S.C. SS 1166-68 (1988 & SUPP. II).

21. "GAMING EQUIPMENT OR DEVICE" MEANS ANY MACHINE OR DEVICE WHICH IS
SPECIALLY DESIGNED OR MANUFACTURED FOR USE IN THE OPERATION OF ANY CLASS
III OR VIDEO LOTTERY GAME.

22. "GAMING REGULATORY AUTHORITY" MEANS, WITH RESPECT TO ANY AUTHOR-
IZED GAMING ESTABLISHMENT ON INDIAN LANDS, TERRITORY OR RESERVATION, THE
INDIAN NATION OR TRIBAL GAMING COMMISSION, ITS AUTHORIZED OFFICERS,
AGENTS AND REPRESENTATIVES ACTING IN THEIR OFFICIAL CAPACITIES OR SUCH
OTHER AGENCY OF A NATION OR TRIBE AS THE NATION OR TRIBE MAY DESIGNATE
AS THE AGENCY RESPONSIBLE FOR THE REGULATION OF CLASS III GAMING, JOINT-
LY WITH THE STATE GAMING AGENCY, CONDUCTED PURSUANT TO A GAMING COMPACT
BETWEEN THE NATION OR TRIBE AND THE STATE OF NEW YORK, OR WITH RESPECT
TO ANY CASINO GAMING AUTHORIZED PURSUANT TO ARTICLE THIRTEEN OF THE
RACING, PARI-MUTUEL WAGERING AND BREEDING LAW OR VIDEO LOTTERY GAMING
CONDUCTED PURSUANT TO SECTION SIXTEEN HUNDRED SEVENTEEN-A AND PARAGRAPH
FIVE OF SUBDIVISION A OF SECTION SIXTEEN HUNDRED TWELVE OF THE TAX LAW,
AS AMENDED AND IMPLEMENTED.

23. "PREMISES" INCLUDES ANY STRUCTURE, PARKING LOT, BUILDING, VEHICLE,
WATERCRAFT, AND ANY REAL PROPERTY.

24. "SELL" MEANS TO SELL, EXCHANGE, GIVE OR DISPOSE OF TO ANOTHER.

25. "STATE GAMING AGENCY" SHALL MEAN THE NEW YORK STATE GAMING COMMIS-
SION, ITS AUTHORIZED OFFICIALS, AGENTS, AND REPRESENTATIVES ACTING IN
THEIR OFFICIAL CAPACITIES AS THE REGULATORY AGENCY OF THE STATE WHICH
HAS RESPONSIBILITY FOR REGULATION WITH RESPECT TO VIDEO LOTTERY GAMING
OR CASINO GAMING.

26. "UNFAIR GAMING EQUIPMENT" MEANS LOADED DICE, MARKED CARDS, SUBSTI-
TUTED CARDS OR DICE, OR FIXED ROULETTE WHEELS OR OTHER GAMING EQUIPMENT
WHICH HAS BEEN ALTERED IN A WAY THAT TENDS TO DECEIVE OR TENDS TO ALTER
THE ELEMENTS OF CHANCE OR NORMAL RANDOM SELECTION WHICH DETERMINE THE
RESULT OF THE GAME OR OUTCOME, OR THE AMOUNT OR FREQUENCY OF THE PAYMENT
IN A GAME.

27. "UNLAWFUL GAMING PROPERTY" MEANS:

(A) ANY DEVICE, NOT PRESCRIBED FOR USE IN CASINIO GAMING BY ITS RULES,
WHICH IS CAPABLE OF ASSISTING A PLAYER:

(I) TO CALCULATE ANY PROBABILITIES MATERIAL TO THE OUTCOME OF A
CONTEST OF CHANCE; OR

(II) TO RECEIVE OR TRANSMIT INFORMATION MATERIAL TO THE OUTCOME OF A
CONTEST OF CHANCE; OR

(B) ANY OBJECT OR ARTICLE WHICH, BY VIRTUE OF ITS SIZE, SHAPE OR ANY
OTHER QUALITY, IS CAPABLE OF BEING USED IN CASINO GAMING AS AN IMPROPER
SUBSTITUTE FOR A GENUINE CHIP, CHEQUE, TOKEN, BETTING COUPON, DEBIT
INSTRUMENT, VOUCHER OR OTHER INSTRUMENT OR INDICIA OF VALUE; OR

(C) ANY UNFAIR GAMING EQUIPMENT.

28. "VIDEO LOTTERY GAMING" MEANS ANY LOTTERY GAME PLAYED ON A VIDEO
LOTTERY TERMINAL, WHICH CONSISTS OF MULTIPLE PLAYERS COMPETING FOR A
CHANCE TO WIN A RANDOM DRAWN PRIZE PURSUANT TO SECTION SIXTEEN HUNDRED
SEVENTEEN-A AND PARAGRAPH FIVE OF SUBDIVISION A OF SECTION SIXTEEN
HUNDRED TWELVE OF THE TAX LAW, AS AMENDED AND IMPLEMENTED.

29. "VOUCHER" MEANS AN INSTRUMENT OF VALUE GENERATED BY A VIDEO
LOTTERY TERMINAL REPRESENTING A MONETARY AMOUNT AND/OR PLAY VALUE OWED
TO A CUSTOMER AT A SPECIFIC VIDEO LOTTERY TERMINAL BASED ON VIDEO
LOTTERY GAMING WINNINGS AND/OR AMOUNTS NOT WAGERED.

S 4. The penal law is amended by adding ten new sections 225.55,
225.60, 225.65, 225.70, 225.75, 225.80, 225.85, 225.90 and 225.95 to
read as follows:

S. 5883                                61                              A. 8101

S 225.55 GAMING FRAUD IN THE SECOND DEGREE.

A PERSON IS GUILTY OF GAMING FRAUD IN THE SECOND DEGREE WHEN HE OR
SHE:

1. WITH INTENT TO DEFRAUD AND IN VIOLATION OF THE RULES OF THE  CASINO
GAMING, MISREPRESENTS, CHANGES THE AMOUNT BET OR WAGERED ON, OR THE
OUTCOME OR POSSIBLE OUTCOME OF THE CONTEST OR EVENT WHICH IS THE SUBJECT
OF THE BET OR WAGER, OR THE AMOUNT OR FREQUENCY OF PAYMENT IN THE CASINO
GAMING; OR

2. WITH INTENT TO DEFRAUD,  OBTAINS  ANYTHING  OF  VALUE  FROM  CASINO
GAMING WITHOUT HAVING WON SUCH AMOUNT BY A BET OR WAGER CONTINGENT THER-
EON.

GAMING FRAUD IN THE SECOND DEGREE IS A CLASS A MISDEMEANOR.

S 225.60 GAMING FRAUD IN THE FIRST DEGREE.

A  PERSON IS GUILTY OF GAMING FRAUD IN THE FIRST DEGREE WHEN HE OR SHE
COMMITS A GAMING FRAUD IN THE SECOND DEGREE, AND:

1. THE VALUE OF THE BENEFIT OBTAINED EXCEEDS ONE THOUSAND DOLLARS; OR

2. HE OR SHE HAS BEEN PREVIOUSLY CONVICTED WITHIN THE  PRECEDING  FIVE
YEARS  OF ANY OFFENSE OF WHICH AN ESSENTIAL ELEMENT IS THE COMMISSION OF
A GAMING FRAUD.

GAMING FRAUD IN THE FIRST DEGREE IS A CLASS E FELONY.

S 225.65 USE OF COUNTERFEIT, UNAPPROVED  OR  UNLAWFUL  WAGERING  INSTRU-
        MENTS.

A  PERSON  IS  GUILTY  OF  USE OF COUNTERFEIT, UNAPPROVED OR UNLAWFUL
WAGERING INSTRUMENTS WHEN IN PLAYING OR USING ANY CASINO GAMING DESIGNED
TO BE PLAYED WITH, RECEIVED OR BE OPERATED BY CHIPS,  CHEQUES,  TOKENS,
VOUCHERS  OR  OTHER  WAGERING  INSTRUMENTS APPROVED  BY THE APPROPRIATE
GAMING REGULATORY AUTHORITY, HE OR SHE KNOWINGLY USES  CHIPS,  CHEQUES,
TOKENS, VOUCHERS OR OTHER WAGERING INSTRUMENTS OTHER THAN THOSE APPROVED
BY  THE  APPROPRIATE  GAMING  REGULATING  AUTHORITY AND THE STATE GAMING
AGENCY OR LAWFUL COIN OR LEGAL TENDER OF THE UNITED STATES OF AMERICA.

POSSESSION OF MORE THAN ONE COUNTERFEIT, UNAPPROVED OR UNLAWFUL WAGER-
ING INSTRUMENT DESCRIBED IN THIS  SECTION  IS  PRESUMPTIVE  EVIDENCE  OF
POSSESSION THEREOF WITH KNOWLEDGE OF ITS CHARACTER OR CONTENTS.

USE  OF  COUNTERFEIT, UNAPPROVED OR UNLAWFUL WAGERING INSTRUMENTS IS A
CLASS A MISDEMEANOR.

S 225.70 POSSESSION OF UNLAWFUL GAMING PROPERTY IN THE THIRD DEGREE.

A PERSON IS GUILTY OF POSSESSION OF UNLAWFUL GAMING  PROPERTY  IN  THE
THIRD  DEGREE WHEN HE OR SHE POSSESSES, WITH INTENT TO USE SUCH PROPERTY
TO COMMIT GAMING FRAUD, UNLAWFUL GAMING PROPERTY AT A  PREMISES  BEING
USED FOR CASINO GAMING.

POSSESSION  OF UNLAWFUL GAMING PROPERTY IN THE THIRD DEGREE IS A CLASS
A MISDEMEANOR.

S 225.75 POSSESSION OF UNLAWFUL GAMING PROPERTY IN THE SECOND DEGREE.

A PERSON IS GUILTY OF POSSESSION OF UNLAWFUL GAMING  PROPERTY  IN  THE
SECOND DEGREE WHEN:

1. HE  OR  SHE  MAKES,  SELLS,  OR POSSESSES WITH INTENT TO SELL, ANY
UNLAWFUL GAMING PROPERTY AT A CASINO GAMING FACILITY, THE VALUE OF WHICH
EXCEEDS THREE HUNDRED DOLLARS, WITH INTENT THAT IT BE MADE AVAILABLE  TO
A PERSON FOR UNLAWFUL USE; OR

2. HE  OR  SHE  COMMITS POSSESSION OF UNLAWFUL GAMING PROPERTY IN THE
THIRD DEGREE AS DEFINED IN SECTION 225.70 OF THIS ARTICLE, AND THE  FACE
VALUE  OF THE IMPROPER SUBSTITUTE PROPERTY EXCEEDS FIVE HUNDRED DOLLARS;
OR

3. HE OR SHE COMMITS THE OFFENSE OF  POSSESSION  OF  UNLAWFUL  GAMING
PROPERTY  IN  THE  THIRD DEGREE AND HAS BEEN PREVIOUSLY CONVICTED WITHIN

THE PRECEDING FIVE YEARS OF ANY OFFENSE OF WHICH AN ESSENTIAL ELEMENT IS
POSSESSION OF UNLAWFUL GAMING PROPERTY.

POSSESSION OF UNLAWFUL GAMING PROPERTY IN THE SECOND DEGREE IS A CLASS
E FELONY.

S 225.80 POSSESSION OF UNLAWFUL GAMING PROPERTY IN THE FIRST DEGREE.

A PERSON IS GUILTY OF POSSESSION OF UNLAWFUL GAMING PROPERTY IN THE
FIRST DEGREE WHEN:

1. HE OR SHE COMMITS THE CRIME OF UNLAWFUL POSSESSION OF GAMING PROP-
ERTY IN THE THIRD DEGREE AS DEFINED IN SECTION 225.70 OF THIS ARTICLE
AND THE FACE VALUE OF THE IMPROPER SUBSTITUTE PROPERTY EXCEEDS ONE THOU-
SAND DOLLARS; OR

2. HE OR SHE COMMITS THE OFFENSE OF POSSESSION OF UNLAWFUL GAMING
PROPERTY IN THE SECOND DEGREE AS DEFINED IN SUBDIVISION ONE OR TWO OF
SECTION 225.75 OF THIS ARTICLE AND HAS BEEN PREVIOUSLY CONVICTED WITHIN
THE PRECEDING FIVE YEARS OF ANY OFFENSE OF WHICH AN ESSENTIAL ELEMENT IS
POSSESSION OF UNLAWFUL GAMING PROPERTY.

POSSESSION OF UNLAWFUL GAMING PROPERTY IN THE FIRST DEGREE IS A CLASS
D FELONY.

S 225.85 USE OF UNLAWFUL GAMING PROPERTY.

A PERSON IS GUILTY OF USE OF UNLAWFUL GAMING PROPERTY WHEN HE OR SHE
KNOWINGLY WITH INTENT TO DEFRAUD USES UNLAWFUL GAMING PROPERTY AT A
PREMISES BEING USED FOR CASINO GAMING.

USE OF UNLAWFUL GAMING PROPERTY IS A CLASS E FELONY.

S 225.90 MANIPULATION OF GAMING OUTCOMES AT AN AUTHORIZED GAMING ESTAB-
        LISHMENT.

A PERSON IS GUILTY OF MANIPULATION OF GAMING OUTCOMES AT AN AUTHORIZED
GAMING ESTABLISHMENT WHEN HE OR SHE:

1. KNOWINGLY CONDUCTS, OPERATES, DEALS OR OTHERWISE MANIPULATES, OR
KNOWINGLY ALLOWS TO BE CONDUCTED, OPERATED, DEALT OR OTHERWISE MANIPU-
LATED, CARDS, DICE OR GAMING EQUIPMENT OR DEVICE, FOR THEMSELVES OR FOR
ANOTHER, THROUGH ANY TRICK OR SLEIGHT OF HAND PERFORMANCE, WITH THE
INTENT OF DECEIVING OR ALTERING THE ELEMENTS OF CHANCE OR NORMAL RANDOM
SELECTION WHICH DETERMINES THE RESULT OR OUTCOME OF THE GAME, OR THE
AMOUNT OR FREQUENCY OF THE PAYMENT IN A GAME; OR

2. KNOWINGLY USES, CONDUCTS, OPERATES, DEALS, OR EXPOSES FOR PLAY, OR
KNOWINGLY ALLOWS TO BE USED, CONDUCTED, OPERATED, DEALT OR EXPOSED FOR
PLAY ANY CARDS, DICE OR GAMING EQUIPMENT OR DEVICE, OR ANY COMBINATION
OF GAMING EQUIPMENT OR DEVICES, WHICH HAVE IN ANY MANNER BEEN ALTERED,
MARKED OR TAMPERED WITH, OR PLACED IN A CONDITION, OR OPERATED IN A
MANNER, THE RESULT OF WHICH TENDS TO DECEIVE OR TENDS TO ALTER THE
ELEMENTS OF CHANCE OR NORMAL RANDOM SELECTION WHICH DETERMINE THE RESULT
OF THE GAME OR OUTCOME, OR THE AMOUNT OR FREQUENCY OF THE PAYMENT IN A
GAME; OR

3. KNOWINGLY USES, OR POSSESSES WITH THE INTENT TO USE, ANY CARDS,
DICE OR OTHER GAMING EQUIPMENT OR DEVICES OTHER THAN THAT PROVIDED BY AN
AUTHORIZED GAMING OPERATOR FOR CURRENT USE IN A PERMITTED GAMING ACTIV-
ITY; OR

4. ALTERS OR MISREPRESENTS THE OUTCOME OF A GAME OR OTHER EVENT ON
WHICH BETS OR WAGERS HAVE BEEN MADE AFTER THE OUTCOME IS MADE SURE BUT
BEFORE IT IS REVEALED TO PLAYERS.

POSSESSION OF ALTERED, MARKED OR TAMPERED WITH DICE, CARDS, OR GAMING
EQUIPMENT OR DEVICES AT AN AUTHORIZED GAMBLING ESTABLISHMENT IS PRESUMP-
TIVE EVIDENCE OF POSSESSION THEREOF WITH KNOWLEDGE OF ITS CHARACTER OR
CONTENTS AND INTENTION TO USE SUCH ALTERED, MARKED OR TAMPERED WITH
DICE, CARDS, OR GAMING EQUIPMENT OR DEVICES IN VIOLATION OF THIS
SECTION.

MANIPULATION OF GAMING OUTCOMES AT AN AUTHORIZED GAMING ESTABLISHMENT IS A CLASS A MISDEMEANOR PROVIDED, HOWEVER, THAT IF THE PERSON HAS PREVIOUSLY BEEN CONVICTED OF THIS CRIME WITHIN THE PAST FIVE YEARS THIS CRIM SHALL BE A CLASS E FELONY.

S 225.95 UNLAWFUL MANUFACTURE, SALE, DISTRIBUTION, MARKING, ALTERING OR MODIFICATION OF EQUIPMENT AND DEVICES ASSOCIATED WITH GAMING.

A PERSON IS GUILTY OF UNLAWFUL MANUFACTURE, SALE, DISTRIBUTION, MARK-ING, ALTERING OR MODIFICATION OF EQUIPMENT AND DEVICES ASSOCIATED WITH GAMING WHEN IF HE OR SHE:

1. MANUFACTURES, SELLS OR DISTRIBUTES ANY CARDS, CHIPS, CHEQUES, TOKENS, DICE, VOUCHERS, GAME OR DEVICE AND HE OR SHE KNEW OR REASONABLY SHOULD HAVE KNOWN IT WAS INTENDED TO BE USED TO VIOLATE ANY PROVISION OF THIS ARTICLE; OR

2. MARKS, ALTERS OR OTHERWISE MODIFIES ANY ASSOCIATED GAMING EQUIPMENT OR DEVICE IN A MANNER THAT EITHER AFFECTS THE RESULT OF THE WAGER BY DETERMINING WIN OR LOSS OR ALTERS THE NORMAL CRITERIA OF RANDOM SELECTION IN A MANNER THAT AFFECTS THE OPERATION OF A GAME OR DETERMINES THE OUTCOME OF A GAME, AND HE OR SHE KNEW OR REASONABLY SHOULD HAVE KNOWN THAT IT WAS INTENDED TO BE USED TO VIOLATE ANY PROVISION OF THIS ARTICLE.

UNLAWFUL MANUFACTURE, SALE, DISTRIBUTION, MARKING, ALTERING OR MODIFI-CATION OF EQUIPMENT AND DEVICES ASSOCIATED WITH GAMING IS A CLASS A MISDEMEANOR PROVIDED, HOWEVER, THAT IF THE PERSON HAS PREVIOUSLY BEEN CONVICTED OF THIS CRIME WITHIN THE PAST FIVE YEARS THIS CRIM SHALL BE A CLASS E FELONY.

S 5. Section 109-a of the racing, pari-mutuel wagering and breeding law is REPEALED and a new section 109-a is added to read as follows:

S 109-A. SEPARATE BOARD FOR FACILITY SITING.   THE COMMISSION SHALL ESTABLISH A SEPARATE BOARD TO BE KNOWN AS THE NEW YORK GAMING FACILITY LOCATION BOARD TO PERFORM DESIGNATED FUNCTIONS UNDER ARTICLE THIRTEEN OF THIS CHAPTER, THE FOLLOWING PROVISIONS SHALL APPLY TO THE BOARD:

1. THE COMMISSION SHALL SELECT FIVE MEMBERS AND NAME THE CHAIR OF THE BOARD. EACH MEMBER OF THE BOARD SHALL BE A RESIDENT OF THE STATE OF NEW YORK. NO MEMBER OF THE LEGISLATURE OR PERSON HOLDING ANY ELECTIVE OR APPOINTIVE OFFICE IN FEDERAL, STATE OR LOCAL GOVERNMENT SHALL BE ELIGI-BLE TO SERVE AS A MEMBER OF THE BOARD.

2. QUALIFICATIONS OF MEMBERS. MEMBERS OF THE BOARD SHALL EACH POSSESS NO LESS THAN TEN YEARS OF RESPONSIBLE EXPERIENCE IN FISCAL MATTERS AND SHALL HAVE ANY ONE OR MORE OF THE FOLLOWING QUALIFICATIONS:

(A) SIGNIFICANT SERVICE AS AN ACCOUNTANT ECONOMIST, OR FINANCIAL ANALYST EXPERIENCED IN FINANCE OR ECONOMICS;

(B) SIGNIFICANT SERVICE IN AN ACADEMIC FIELD RELATING TO FINANCE OR ECONOMICS;

(C) SIGNIFICANT SERVICE AND KNOWLEDGE OF THE COMMERCIAL REAL ESTATE INDUSTRY; OR

(D) SIGNIFICANT SERVICE AS AN EXECUTIVE WITH FIDUCIARY RESPONSIBIL-ITIES IN CHARGE OF A LARGE ORGANIZATION OR FOUNDATION.

3. NO MEMBER OF THE BOARD:

(A) MAY HAVE A CLOSE FAMILIAL OR BUSINESS RELATIONSHIP TO A PERSON THAT HOLDS A LICENSE UNDER THIS CHAPTER;

(B) MAY HAVE ANY DIRECT OR INDIRECT FINANCIAL INTEREST, OWNERSHIP, OR MANAGEMENT, INCLUDING HOLDING ANY STOCKS, BONDS, OR OTHER SIMILAR FINAN-CIAL INTERESTS IN ANY GAMING ACTIVITIES, INCLUDING HORSE RACING, LOTTERY OR GAMBLING;

(C) MAY RECEIVE OR SHARE IN, DIRECTLY OR INDIRECTLY, THE RECEIPTS OR PROCEEDS OF ANY GAMING ACTIVITIES, INCLUDING HORSE RACING, LOTTERY OR GAMBLING;

(D) MAY HAVE A BENEFICIAL INTEREST IN ANY CONTRACT FOR THE MANUFACTURE OR SALE OF GAMING DEVICES, THE CONDUCT OF ANY GAMING ACTIVITY, OR THE PROVISION OF ANY INDEPENDENT CONSULTING SERVICES IN CONNECTION WITH ANY ESTABLISHMENT LICENSED UNDER THIS CHAPTER.

4. BOARD MEMBERS ARE ENTITLED TO ACTUAL AND NECESSARY EXPENSES INCURRED IN THE DISCHARGE OF THEIR DUTIES BUT MAY NOT RECEIVE COMPEN-SATION FOR THEIR SERVICE ON THE BOARD.

5. (A) THE COMMISSION SHALL PROVIDE STAFF TO THE BOARD.

(B) THE BOARD SHALL CONTRACT WITH AN OUTSIDE CONSULTANT TO PROVIDE ANALYSIS OF THE GAMING INDUSTRY AND TO SUPPORT THE BOARD'S COMPREHENSIVE REVIEW AND EVALUATION OF THE APPLICATIONS SUBMITTED TO THE BOARD FOR GAMING FACILITY LICENSES.

(C) THE BOARD MAY CONTRACT WITH ATTORNEYS, ACCOUNTANTS, AUDITORS AND FINANCIAL AND OTHER EXPERTS TO RENDER NECESSARY SERVICES.

(D) ALL OTHER STATE AGENCIES SHALL COOPERATE WITH AND ASSIST THE BOARD IN THE FULFILLMENT OF ITS DUTIES UNDER THIS ARTICLE AND MAY RENDER SUCH SERVICES TO THE BOARD WITHIN THEIR RESPECTIVE FUNCTIONS AS THE BOARD MAY REASONABLY REQUEST.

6. UTILIZING THE POWERS AND DUTIES PRESCRIBED FOR IT BY ARTICLE THIR-TEEN OF THIS CHAPTER, THE BOARD SHALL SELECT, THROUGH A COMPETITIVE PROCESS CONSISTENT WITH PROVISIONS OF ARTICLE THIRTEEN OF THIS CHAPTER, NOT MORE THAN FOUR GAMING FACILITY LICENSE APPLICANTS.  SUCH SELECTEES SHALL BE AUTHORIZED TO RECEIVE A GAMING FACILITY LICENSE, IF FOUND SUIT-ABLE BY THE COMMISSION. THE BOARD MAY SELECT ANOTHER APPLICANT FOR AUTHORIZATION TO BE LICENSED AS A GAMING FACILITY IF A PREVIOUS SELECTEE FAILS TO MEET LICENSING THRESHOLDS, IS REVOKED OR SURRENDERS A LICENSE OPPORTUNITY.

S 6. Subdivision 2 of section 99-h of the state finance law, as amended by section 1 of part V of chapter 59 of the laws of 2006, is amended to read as follows:

2. Such account shall consist of all revenues resulting from tribal-state compacts executed pursuant to article two of the executive law [and], a tribal-state compact with the St. Regis Mohawk tribe executed pursuant to chapter five hundred ninety of the laws of two thousand four AND THE ONEIDA SETTLEMENT AGREEMENT REFERENCED IN SECTION ELEVEN OF THE EXECUTIVE LAW.

S 7. Subdivision 3 of section 99-h of the state finance law, as amended by section 1 of part W of chapter 60 of the laws of 2011, is amended to read as follows:

3. Moneys of the account, following the segregation of appropriations enacted by the legislature, shall be available for purposes including but not limited to: (a) reimbursements or payments to municipal govern-ments that host tribal casinos pursuant to a tribal-state compact for costs incurred in connection with services provided to such casinos or arising as a result thereof, for economic development opportunities and job expansion programs authorized by the executive law; provided, howev-er, that for any gaming facility located in the city of Buffalo, the city of Buffalo shall receive a minimum of twenty-five percent of the negotiated percentage of the net drop from electronic gaming devices the state receives pursuant to the compact, and provided further that for any gaming facility located in the city of Niagara Falls, county of Niagara a minimum of twenty-five percent of the negotiated percentage of the net drop from electronic gaming devices the state receives pursuant

to the compact shall be distributed in accordance with subdivision four
of this section, and provided further that for any gaming facility
located in the county or counties of Cattaraugus, Chautauqua or Allega-
ny, the municipal governments of the state hosting the facility shall
collectively receive a minimum of twenty-five percent of the negotiated
percentage of the net drop from electronic gaming devices the state
receives pursuant to the compact; and provided further that pursuant to
chapter five hundred ninety of the laws of two thousand four, a minimum
of twenty-five percent of the revenues received by the state pursuant to
the state's compact with the St. Regis Mohawk tribe shall be made avail-
able to the counties of Franklin and St. Lawrence, and affected towns in
such counties. Each such county and its affected towns shall receive
fifty percent of the moneys made available by the state; AND PROVIDED
FURTHER THAT THE STATE SHALL ANNUALLY MAKE TWENTY-FIVE PERCENT OF THE
NEGOTIATED PERCENTAGE OF THE NET DROP FROM ALL GAMING DEVICES THE STATE
ACTUALLY RECEIVES PURSUANT TO THE ONEIDA SETTLEMENT AGREEMENT CONFIRMED
BY SECTION ELEVEN OF THE EXECUTIVE LAW AS AVAILABLE TO THE COUNTY OF
ONEIDA, AND A SUM OF THREE AND ONE-HALF MILLION DOLLARS TO THE COUNTY OF
MADISON. ADDITIONALLY, THE STATE SHALL DISTRIBUTE FOR A PERIOD OF NINE-
TEEN AND ONE-QUARTER YEARS, AN ADDITIONAL ANNUAL SUM OF TWO AND ONE-HALF
MILLION DOLLARS TO THE COUNTY OF ONEIDA. ADDITIONALLY, THE STATE SHALL
DISTRIBUTE THE ONE-TIME ELEVEN MILLION DOLLAR PAYMENT RECEIVED BY THE
STATE PURSUANT TO SUCH AGREEMENT WITH THE ONEIDA NATION OF NEW YORK TO
THE COUNTY OF MADISON BY WIRE TRANSFER UPON RECEIPT OF SUCH PAYMENT BY
THE STATE; and (b) support and services of treatment programs for
persons suffering from gambling addictions. Moneys not segregated for
such purposes shall be transferred to the general fund for the support
of government during the fiscal year in which they are received.

  S 7-a. Subdivision 3 of section 99-h of the state finance law, as
amended by section 1 of part QQ of chapter 59 of the laws of 2009, is
amended to read as follows:

  3. Moneys of the account, following appropriation by the legislature,
shall be available for purposes including but not limited to: (a)
reimbursements or payments to municipal governments that host tribal
casinos pursuant to a tribal-state compact for costs incurred in
connection with services provided to such casinos or arising as a result
thereof, for economic development opportunities and job expansion
programs authorized by the executive law; provided, however, that for
any gaming facility located in the city of Buffalo, the city of Buffalo
shall receive a minimum of twenty-five percent of the negotiated
percentage of the net drop from electronic gaming devices the state
receives pursuant to the compact, and provided further that for any
gaming facility located in the city of Niagara Falls, county of Niagara
a minimum of twenty-five percent of the negotiated percentage of the net
drop from electronic gaming devices the state receives pursuant to the
compact shall be distributed in accordance with subdivision four of this
section, and provided further that for any gaming facility located in
the county or counties of Cattaraugus, Chautauqua or Allegany, the
municipal governments of the state hosting the facility shall collec-
tively receive a minimum of twenty-five percent of the negotiated
percentage of the net drop from electronic gaming devices the state
receives pursuant to the compact; and provided further that pursuant to
chapter five hundred ninety of the laws of two thousand four, a minimum
of twenty-five percent of the revenues received by the state pursuant to
the state's compact with the St. Regis Mohawk tribe shall be made avail-
able to the counties of Franklin and St. Lawrence, and affected towns in

such counties. Each such county and its affected towns shall receive fifty percent of the moneys made available by the state; AND PROVIDED FURTHER THAT THE STATE SHALL ANNUALLY MAKE TWENTY-FIVE PERCENT OF THE NEGOTIATED PERCENTAGE OF THE NET DROP FROM ALL GAMING DEVICES THE STATE ACTUALLY RECEIVES PURSUANT TO THE ONEIDA SETTLEMENT AGREEMENT AS CONFIRMED BY SECTION ELEVEN OF THE EXECUTIVE LAW AS AVAILABLE TO THE COUNTY OF ONEIDA, AND A SUM OF THREE AND ONE-HALF MILLION DOLLARS TO THE COUNTY OF MADISON. ADDITIONALLY, THE STATE SHALL DISTRIBUTE FOR A PERIOD OF NINETEEN AND ONE-QUARTER YEARS, AN ADDITIONAL ANNUAL SUM OF TWO AND ONE-HALF MILLION DOLLARS TO THE COUNTY OF ONEIDA. ADDITIONALLY, THE STATE SHALL DISTRIBUTE THE ONE-TIME ELEVEN MILLION DOLLAR PAYMENT RECEIVED BY THE STATE PURSUANT TO SUCH AGREEMENT WITH THE ONEIDA NATION OF NEW YORK TO THE COUNTY OF MADISON BY WIRE TRANSFER UPON RECEIPT OF SUCH PAYMENT BY THE STATE; and (b) support and services of treatment programs for persons suffering from gambling addictions. Moneys not appropriated for such purposes shall be transferred to the general fund for the support of government during the fiscal year in which they are received.

  S 8. Subdivision 3 of section 99-h of the state finance law, as amended by section 23 of part HH of chapter 57 of the laws of 2013, is amended to read as follows:

  3. Moneys of the account, following the segregation of appropriations enacted by the legislature, shall be available for purposes including but not limited to: (a) reimbursements or payments to municipal governments that host tribal casinos pursuant to a tribal-state compact for costs incurred in connection with services provided to such casinos or arising as a result thereof, for economic development opportunities and job expansion programs authorized by the executive law; provided, however, that for any gaming facility located in the county of Erie or Niagara, the municipal governments hosting the facility shall collectively receive a minimum of twenty-five percent of the negotiated percentage of the net drop from electronic gaming devices the state receives pursuant to the compact and provided further that for any gaming facility located in the county or counties of Cattaraugus, Chautauqua or Allegany, the municipal governments of the state hosting the facility shall collectively receive a minimum of twenty-five percent of the negotiated percentage of the net drop from electronic gaming devices the state receives pursuant to the compact; and provided further that pursuant to chapter five hundred ninety of the laws of two thousand four, a minimum of twenty-five percent of the revenues received by the state pursuant to the state's compact with the St. Regis Mohawk tribe shall be made available to the counties of Franklin and St. Lawrence, and affected towns in such counties. Each such county and its affected towns shall receive fifty percent of the moneys made available by the state; AND PROVIDED FURTHER THAT THE STATE SHALL ANNUALLY MAKE TWENTY-FIVE PERCENT OF THE NEGOTIATED PERCENTAGE OF THE NET DROP FROM ALL GAMING DEVICES THE STATE ACTUALLY RECEIVES PURSUANT TO THE ONEIDA SETTLEMENT AGREEMENT CONFIRMED BY SECTION ELEVEN OF THE EXECUTIVE LAW AVAILABLE TO THE COUNTY OF ONEIDA, AND A SUM OF THREE AND ONE-HALF MILLION DOLLARS TO THE COUNTY OF MADISON. ADDITIONALLY, THE STATE SHALL DISTRIBUTE, FOR A PERIOD OF NINETEEN AND ONE-QUARTER YEARS, AN ADDITIONAL ANNUAL SUM OF TWO AND ONE-HALF MILLION DOLLARS TO THE COUNTY OF ONEIDA. ADDITIONALLY, THE STATE SHALL DISTRIBUTE THE ONE-TIME ELEVEN MILLION DOLLAR PAYMENT ACTUALLY RECEIVED BY THE STATE PURSUANT TO THE ONEIDA SETTLEMENT AGREEMENT TO THE COUNTY OF MADISON BY WIRE TRANSFER UPON RECEIPT OF SUCH PAYMENT BY THE STATE; and (b) support and services

of treatment programs for persons suffering from gambling addictions. Moneys not segregated for such purposes shall be transferred to the general fund for the support of government during the fiscal year in which they are received.

S 9. Section 99-h of the state finance law, as amended by chapter 747 of the laws of 2006, is amended by adding a new subdivision 3-a to read as follows:

3-A. TEN PERCENT OF ANY OF THE FUNDS ACTUALLY RECEIVED BY THE STATE PURSUANT TO THE TRIBAL-STATE COMPACTS AND AGREEMENTS DESCRIBED IN SUBDI-VISION TWO OF THIS SECTION THAT ARE RETAINED IN THE FUND AFTER THE DISTRIBUTIONS REQUIRED BY SUBDIVISION THREE OF THIS SECTION, BUT PRIOR TO THE TRANSFER OF UNSEGREGATED MONEYS TO THE GENERAL FUND REQUIRED BY SUCH SUBDIVISION, SHALL BE DISTRIBUTED TO COUNTIES IN EACH RESPECTIVE EXCLUSIVITY ZONE PROVIDED THEY DO NOT OTHERWISE RECEIVE A SHARE OF SAID REVENUES PURSUANT TO THIS SECTION. SUCH DISTRIBUTION SHALL BE MADE AMONG SUCH COUNTIES ON A PER CAPITA BASIS, EXCLUDING THE POPULATION OF ANY MUNICIPALITY THAT RECEIVES A DISTRIBUTION PURSUANT TO SUBDIVISION THREE OF THIS SECTION.

S 10. The state finance law is amended by adding a new section 97-nnnn to read as follows:

S 97-NNNN. COMMERCIAL GAMING REVENUE FUND. 1. THERE IS HEREBY ESTAB-LISHED IN THE JOINT CUSTODY OF THE COMPTROLLER AND THE COMMISSIONER OF TAXATION AND FINANCE AN ACCOUNT IN THE MISCELLANEOUS SPECIAL REVENUE FUND TO BE KNOWN AS THE "COMMERCIAL GAMING REVENUE FUND".

2. SUCH ACCOUNT SHALL CONSIST OF ALL REVENUES FROM ALL TAXES AND FEES IMPOSED BY ARTICLE THIRTEEN OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW; ANY INTEREST AND PENALTIES IMPOSED BY THE NEW YORK STATE GAMING COMMISSION RELATING TO THOSE TAXES; THE PERCENTAGE OF THE VALUE OF EXPIRED GAMING RELATED OBLIGATIONS; AND ALL PENALTIES LEVIED AND COLLECTED BY THE COMMISSION. ADDITIONALLY, THE STATE GAMING COMMISSION SHALL PAY INTO THE ACCOUNT ANY APPROPRIATE FUNDS, CASH OR PRIZES FORFEITED FROM GAMBLING ACTIVITY.

3. MONEYS OF THE ACCOUNT SHALL BE AVAILABLE AS FOLLOWS, UNLESS OTHER-WISE SPECIFIED BY THE UPSTATE NEW YORK GAMING ECONOMIC DEVELOPMENT ACT OF TWO THOUSAND THIRTEEN, FOLLOWING APPROPRIATION BY THE LEGISLATURE:

A. EIGHTY PERCENT OF THE MONEYS IN SUCH FUND SHALL BE APPROPRIATED OR TRANSFERRED ONLY FOR ELEMENTARY AND SECONDARY EDUCATION OR REAL PROPERTY TAX RELIEF.

B. TEN PERCENT OF THE MONEYS IN SUCH FUND SHALL BE APPROPRIATED OR TRANSFERRED FROM THE COMMERCIAL GAMING REVENUE FUND EQUALLY BETWEEN THE HOST MUNICIPALITY AND HOST COUNTY.

C. TEN PERCENT OF THE MONEYS IN SUCH FUND, AS ATTRIBUTABLE TO A SPECIFIC LICENSED GAMING FACILITY, SHALL BE APPROPRIATED OR TRANSFERRED FROM THE COMMERCIAL GAMING REVENUE FUND AMONG COUNTIES WITHIN THE REGION, AS DEFINED BY SECTION ONE THOUSAND THREE HUNDRED TEN OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW, HOSTING SAID FACILITY FOR THE PURPOSE OF REAL PROPERTY TAX RELIEF AND FOR EDUCATION ASSISTANCE. SUCH DISTRIBUTION SHALL BE MADE AMONG THE COUNTIES ON A PER CAPITA BASIS, SUBTRACTING THE POPULATION OF HOST MUNICIPALITY AND COUNTY.

4. A. AS USED IN THIS SECTION, THE TERM "BASE YEAR GAMING REVENUE" SHALL MEAN THE SUM OF ALL REVENUE GENERATED TO SUPPORT EDUCATION FROM VIDEO LOTTERY GAMING AS DEFINED BY SECTION SIXTEEN HUNDRED SEVENTEEN-A OF THE TAX LAW IN THE TWELVE MONTHS PRECEDING THE OPERATION OF ANY GAMING FACILITY PURSUANT TO EITHER ARTICLE THIRTEEN OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW OR PURSUANT TO PARAGRAPH FOUR OF SECTION ONE THOUSAND SIX HUNDRED SEVENTEEN-A OF THE TAX LAW.

B. AMOUNTS TRANSFERRED IN ANY YEAR TO SUPPORT ELEMENTARY AND SECONDARY EDUCATION SHALL BE CALCULATED AS FOLLOWS:

(I) AN AMOUNT EQUAL TO THE POSITIVE DIFFERENCE, IF ANY, BETWEEN THE BASE YEAR GAMING REVENUE AMOUNT AND THE SUM OF ALL REVENUE GENERATED TO SUPPORT EDUCATION FROM VIDEO LOTTERY GAMING AS DEFINED BY SECTION SIXTEEN HUNDRED SEVENTEEN-A OF THE TAX LAW IN THE CURRENT FISCAL YEAR PROVIDED THAT SUCH POSITIVE AMOUNT, IF ANY, SHALL BE TRANSFERRED TO THE STATE LOTTERY FUND; AND

(II) THE AMOUNT OF REVENUE COLLECTED IN THE PRIOR STATE FISCAL YEAR, TO BE DISTRIBUTED PURSUANT TO PARAGRAPH A OF SUBDIVISION THREE OF THIS SECTION, AND IN EXCESS OF ANY AMOUNTS TRANSFERRED PURSUANT TO SUBPARA-GRAPH (I) OF THIS PARAGRAPH IN SUCH PRIOR FISCAL YEAR, IF ANY.

C. NOTWITHSTANDING ANY PROVISION OF LAW TO THE CONTRARY, AMOUNTS APPROPRIATED OR TRANSFERRED FROM THE COMMERCIAL GAMING REVENUE FUND PURSUANT TO SUBPARAGRAPH (II) OF THIS PARAGRAPH SHALL NOT BE INCLUDED IN: (I) THE ALLOWABLE GROWTH AMOUNT COMPUTED PURSUANT TO PARAGRAPH DD OF SUBDIVISION ONE OF SECTION THIRTY-SIX HUNDRED TWO OF THE EDUCATION LAW, (II) THE PRELIMINARY GROWTH AMOUNT COMPUTED PURSUANT TO PARAGRAPH FF OF SUBDIVISION ONE OF SECTION THIRTY-SIX HUNDRED TWO OF THE EDUCATION LAW, AND (III) THE ALLOCABLE GROWTH AMOUNT COMPUTED PURSUANT TO PARAGRAPH GG OF SUBDIVISION ONE OF SECTION THIRTY-SIX HUNDRED TWO OF THE EDUCATION LAW.

5. NOTWITHSTANDING THE FOREGOING, MONIES RECEIVED PURSUANT TO:

A. SECTIONS ONE THOUSAND THREE HUNDRED FORTY-FIVE AND ONE THOUSAND THREE HUNDRED FORTY-EIGHT OF THIS ARTICLE SHALL BE EXCLUSIVELY APPROPRI-ATED TO THE OFFICE OF ALCOHOLISM AND SUBSTANCE ABUSE SERVICES TO BE USED FOR PROBLEM GAMBLING EDUCATION AND TREATMENT PURPOSES.

B. SECTION ONE THOUSAND THREE HUNDRED FORTY-NINE OF THIS ARTICLE SHALL BE EXCLUSIVELY APPROPRIATED TO THE COMMISSION FOR REGULATORY INVESTI-GATIONS.

C. SECTION ONE THOUSAND THREE HUNDRED FIFTY OF THIS ARTICLE SHALL BE EXCLUSIVELY APPROPRIATED TO THE COMMISSION FOR COSTS REGULATION.

S 11. The penal law is amended by adding a new section 156.40 to read as follows:

S 156.40 OPERATING AN UNLAWFUL ELECTRONIC SWEEPSTAKES.

1. AS USED IN THIS SECTION THE FOLLOWING WORDS AND TERMS SHALL HAVE THE FOLLOWING MEANINGS:

(A) "ELECTRONIC MACHINE OR DEVICE" MEANS A MECHANICALLY, ELECTRICALLY OR ELECTRONICALLY OPERATED MACHINE OR DEVICE THAT IS OWNED, LEASED OR OTHERWISE POSSESSED BY A SWEEPSTAKES SPONSOR OR PROMOTER, OR ANY SPON-SORS, PROMOTERS, PARTNERS, AFFILIATES, SUBSIDIARIES OR CONTRACTORS THER-EOF; THAT IS INTENDED TO BE USED BY A SWEEPSTAKES ENTRANT; THAT USES ENERGY; AND THAT DISPLAYS THE RESULTS OF A GAME ENTRY OR GAME OUTCOME TO A PARTICIPANT ON A SCREEN OR OTHER MECHANISM AT A BUSINESS LOCATION, INCLUDING A PRIVATE CLUB; PROVIDED, THAT AN ELECTRONIC MACHINE OR DEVICE MAY, WITHOUT LIMITATION:

(1) BE SERVER-BASED;

(2) USE A SIMULATED GAME TERMINAL AS A REPRESENTATION OF THE PRIZES ASSOCIATED WITH THE RESULTS OF THE SWEEPSTAKES ENTRIES;

(3) UTILIZE SOFTWARE SUCH THAT THE SIMULATED GAME INFLUENCES OR DETER-MINES THE WINNING OR VALUE OF THE PRIZE;

(4) SELECT PRIZES FROM A PREDETERMINED FINITE POOL OF ENTRIES;

(5) UTILIZE A MECHANISM THAT REVEALS THE CONTENT OF A PREDETERMINED SWEEPSTAKES ENTRY;

(6) PREDETERMINE THE PRIZE RESULTS AND STORES THOSE RESULTS FOR DELIV-ERY AT THE TIME THE SWEEPSTAKES ENTRY RESULTS ARE REVEALED;

S. 5883                          69                          A. 8101

(7) UTILIZE SOFTWARE TO CREATE A GAME RESULT;

(8) REQUIRE DEPOSIT OF ANY MONEY, COIN OR TOKEN, OR THE USE OF ANY
CREDIT CARD, DEBIT CARD, PREPAID CARD OR ANY OTHER METHOD OF PAYMENT TO
ACTIVATE THE ELECTRONIC MACHINE OR DEVICE;

(9) REQUIRE DIRECT PAYMENT INTO THE ELECTRONIC MACHINE OR DEVICE, OR
REMOTE ACTIVATION OF THE ELECTRONIC MACHINE OR DEVICE;

(10) REQUIRE PURCHASE OF A RELATED PRODUCT HAVING LEGITIMATE VALUE;

(11) REVEAL THE PRIZE INCREMENTALLY, EVEN THOUGH IT MAY NOT INFLUENCE
IF A PRIZE IS AWARDED OR THE VALUE OF ANY PRIZE AWARDED;

(12) DETERMINE AND ASSOCIATE THE PRIZE WITH AN ENTRY OR ENTRIES AT THE
TIME THE SWEEPSTAKES IS ENTERED; OR

(13) BE A SLOT MACHINE OR OTHER FORM OF ELECTRICAL, MECHANICAL, OR
COMPUTER GAME.

(B) "ENTER" OR "ENTRY" MEANS THE ACT OR PROCESS BY WHICH A PERSON
BECOMES ELIGIBLE TO RECEIVE ANY PRIZE OFFERED IN A SWEEPSTAKES.

(C) "ENTERTAINING DISPLAY" MEANS ANY VISUAL INFORMATION, CAPABLE OF
BEING SEEN BY A SWEEPSTAKES ENTRANT, THAT TAKES THE FORM OF ACTUAL GAME
PLAY OR SIMULATED GAME PLAY.

(D) "PRIZE" MEANS ANY GIFT, AWARD, GRATUITY, GOOD, SERVICE, CREDIT OR
ANYTHING ELSE OF VALUE, WHICH MAY BE TRANSFERRED TO A PERSON, WHETHER
POSSESSION OF THE PRIZE IS ACTUALLY TRANSFERRED, OR PLACED ON AN ACCOUNT
OR OTHER RECORD AS EVIDENCE OF THE INTENT TO TRANSFER THE PRIZE.

(E) "SWEEPSTAKES" MEANS ANY GAME, ADVERTISING SCHEME OR PLAN, OR OTHER
PROMOTION, WHICH, WITH OR WITHOUT PAYMENT OF ANY CONSIDERATION, A PERSON
MAY ENTER TO WIN OR BECOME ELIGIBLE TO RECEIVE ANY PRIZE, THE DETERMI-
NATION OF WHICH IS BASED UPON CHANCE.

2. A PERSON IS GUILTY OF OPERATING AN UNLAWFUL ELECTRONIC SWEEPSTAKES
WHEN HE OR SHE KNOWINGLY POSSESSES WITH THE INTENT TO OPERATE, OR PLACE
INTO OPERATION, AN ELECTRONIC MACHINE OR DEVICE TO:

(A) CONDUCT A SWEEPSTAKES THROUGH THE USE OF AN ENTERTAINING DISPLAY,
INCLUDING THE ENTRY PROCESS OR THE REVEAL OF A PRIZE; OR

(B) PROMOTE A SWEEPSTAKES THAT IS CONDUCTED THROUGH THE USE OF AN
ENTERTAINING DISPLAY, INCLUDING THE ENTRY PROCESS OR THE REVEAL OF A
PRIZE.

3. NOTHING IN THIS SECTION SHALL BE CONSTRUED TO MAKE ILLEGAL ANY
ACTIVITY WHICH IS LAWFULLY CONDUCTED AS THE NEW YORK STATE LOTTERY FOR
EDUCATION AS AUTHORIZED BY ARTICLE THIRTY-FOUR OF THE TAX LAW; PARI-MU-
TUEL WAGERING ON HORSE RACES AS AUTHORIZED BY ARTICLES TWO, THREE, FOUR,
FIVE-A, AND TEN OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW;
THE GAME OF BINGO AS AUTHORIZED PURSUANT TO ARTICLE FOURTEEN-H OF THE
GENERAL MUNICIPAL LAW; GAMES OF CHANCE AS AUTHORIZED PURSUANT TO ARTICLE
NINE-A OF THE GENERAL MUNICIPAL LAW; GAMING AS AUTHORIZED BY ARTICLE
THIRTEEN OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW; OR PURSU-
ANT TO THE FEDERAL INDIAN GAMING REGULATORY ACT.

OPERATING AN UNLAWFUL ELECTRONIC SWEEPSTAKES IS A CLASS E FELONY.

S 12. The legislature hereby finds that long-standing disputes between
the Oneida Nation of New York and the State of New York, Madison County
and Oneida County, have generated litigation in state and federal courts
regarding property and other taxation, the status of Oneida Nation lands
and transfer of such lands to the United States to be held in trust for
the Oneida Nation, and that such litigation and disputes have caused
decades of unrest and uncertainty for the citizens and residents of the
Central New York region of this state. The legislature further finds
that it is in the best interests of all citizens, residents and poli-
tical subdivisions of this state to remove any uncertainty that such
litigation or disputes have created regarding the title to and jurisdic-

tional status of land within the state. The legislature recognizes that
negotiated settlement of these disputes will facilitate a cooperative
relationship between the state, the counties and the Oneida Nation.
Therefore, the legislature declares that the following provisions are
enacted to implement the settlement agreement that has been negotiated
and executed by the governor on behalf of the people of this state.

§ 13. Section 11 of the executive law is REPEALED and a new section 11
is added to read as follows:

§ 11. INDIAN SETTLEMENT AGREEMENTS. 1. ONEIDA SETTLEMENT AGREEMENT.
NOTWITHSTANDING ANY OTHER PROVISION OF LAW, UPON FILING WITH THE SECRE-
TARY OF STATE, THE SETTLEMENT AGREEMENT EXECUTED BETWEEN THE GOVERNOR,
THE COUNTIES OF ONEIDA AND MADISON, AND THE ONEIDA NATION OF NEW YORK
DATED THE SIXTEENTH DAY OF MAY, TWO THOUSAND THIRTEEN, TO BE KNOWN AS
THE ONEIDA SETTLEMENT AGREEMENT, INCLUDING, WITHOUT LIMITATION, THE
PROVISIONS CONTAINED THEREIN RELATING TO ARBITRATION AND JUDICIAL REVIEW
IN STATE OR FEDERAL COURTS AND, FOR THE SOLE PURPOSE THEREOF, A LIMITED
WAIVER OF THE STATE'S ELEVENTH AMENDMENT SOVEREIGN IMMUNITY FROM SUIT,
SHALL UPON ITS EFFECTIVE DATE BE DEEMED APPROVED, RATIFIED, VALIDATED
AND CONFIRMED BY THE LEGISLATURE. IT IS THE INTENTION OF THE LEGISLATURE
IN ENACTING THIS SECTION TO ENSURE THAT THE SETTLEMENT AGREEMENT SHALL
BE FULLY ENFORCEABLE IN ALL RESPECTS AS TO THE RIGHTS, BENEFITS, RESPON-
SIBILITIES AND PRIVILEGES OF ALL PARTIES THERETO.

§ 14. Notwithstanding any inconsistent provision of law, the Nation-
State compact entered into by the State on April 16, 1993 and approved
by the United States Department of the Interior on June 4, 1993, which
approval was published at 58 Fed. Reg. 33160 (June 15, 1993), is deemed
ratified, validated and confirmed nunc pro tunc by the legislature.

§ 15. Sections 2 and 3 of the Indian law are renumbered sections 3 and
4 and a new section 2 is added to read as follows:

§ 2. NEW YORK STATE INDIAN NATIONS AND TRIBES. THE TERM "INDIAN NATION
OR TRIBE" MEANS ONE OF THE FOLLOWING NEW YORK STATE INDIAN NATIONS OR
TRIBES: CAYUGA NATION, ONEIDA NATION OF NEW YORK, ONONDAGA NATION, POOS-
PATUCK OR UNKECHAUGE NATION, SAINT REGIS MOHAWK TRIBE, SENECA NATION OF
INDIANS, SHINNECOCK INDIAN NATION, TONAWANDA BAND OF SENECA AND TUSCARO-
RA NATION.

§ 16. The Indian law is amended by adding a new section 16 to read as
follows:

§ 16. INDIAN SETTLEMENT AGREEMENTS. NOTWITHSTANDING ANY OTHER
PROVISION OF LAW, THE PROVISIONS OF THE ONEIDA SETTLEMENT AGREEMENT
REFERENCED IN SECTION ELEVEN OF THE EXECUTIVE LAW SHALL BE DEEMED TO
SUPERSEDE ANY INCONSISTENT LAWS AND REGULATIONS.

§ 17. Subdivision 18 of section 282 of the tax law, as added by
section 3 of part K of chapter 61 of the laws of 2005, is amended to
read as follows:

18. "Indian nation or tribe" means one of the following New York state
Indian nations or tribes: Cayuga [Indian] Nation [of New York], Oneida
[Indian] Nation of New York, Onondaga Nation [of Indians], Poospatuck or
Unkechauge Nation, [St.] SAINT Regis Mohawk TRIBE, Seneca Nation of
Indians, Shinnecock [Tribe] INDIAN NATION, Tonawanda Band of [Senecas]
SENECA and Tuscarora Nation [of Indians].

§ 18. Subdivision 14 of section 470 of the tax law, as added by
section 1 of part K of chapter 61 of the laws of 2005, is amended to
read as follows:

14. "Indian nation or tribe." One of the following New York state
Indian nations or tribes: Cayuga [Indian] Nation [of New York], Oneida
[Indian] Nation of New York, Onondaga Nation [of Indians], Poospatuck or

S. 5883                                    71                                    A. 8101

Unkechauge Nation, ~~{St.}~~ SAINT Regis Mohawk TRIBE, Seneca Nation of
Indians, Shinnecock ~~{Tribe}~~ INDIAN NATION, Tonawanda Band of ~~{Senecas}~~
SENECA and Tuscarora Nation ~~{of Indians}~~.

S 19. Intentionally omitted.

S 20. Intentionally omitted.

S 21. Intentionally omitted.

S 22. Intentionally omitted.

S 23. Intentionally omitted.

S 24. Intentionally omitted.

S 25. Section 104 of the racing, pari-mutuel wagering and breeding law
is amended by adding a new subdivision 21 to read as follows:

21. THE COMMISSION SHALL PROMPTLY MAKE AVAILABLE FOR PUBLIC INSPECTION
AND COPYING VIA ELECTRONIC CONNECTION TO THE COMMISSION'S WEBSITE A COPY
OF ANY REPORT RECEIVED FROM THE NEW YORK STATE BOARD OF ELECTIONS PURSU-
ANT TO ARTICLE FOURTEEN OF THE ELECTION LAW.

S 26. Section 1617-a of the tax law is amended by adding a new subdi-
vision g to read as follows:

G. EVERY VIDEO LOTTERY GAMING LICENSE, AND EVERY RENEWAL LICENSE,
SHALL BE VALID FOR A PERIOD OF FIVE YEARS, EXCEPT THAT VIDEO GAMING
LICENSES ISSUED BEFORE THE EFFECTIVE DATE OF THIS SUBDIVISION SHALL BE
FOR A TERM EXPIRING ON JUNE THIRTIETH, TWO THOUSAND FOURTEEN.

THE GAMING COMMISSION MAY DECLINE TO RENEW ANY LICENSE AFTER NOTICE
AND AN OPPORTUNITY FOR HEARING IF IT DETERMINES THAT:

(1) THE LICENSEE HAS VIOLATED SECTION ONE THOUSAND SIX HUNDRED SEVEN
OF THIS ARTICLE;

(2) THE LICENSEE HAS VIOLATED ANY RULE, REGULATION OR ORDER OF THE
GAMING COMMISSION;

(3) THE APPLICANT OR ITS OFFICERS, DIRECTORS OR SIGNIFICANT STOCKHOLD-
ERS, AS DETERMINED BY THE GAMING COMMISSION, HAVE BEEN CONVICTED OF A
CRIME INVOLVING MORAL TURPITUDE; OR

(4) THAT THE CHARACTER OR FITNESS OF THE LICENSEE AND ITS OFFICERS,
DIRECTORS, AND SIGNIFICANT STOCKHOLDERS, AS DETERMINED BY THE GAMING
COMMISSION IS SUCH THAT THE PARTICIPATION OF THE APPLICANT IN VIDEO
LOTTERY GAMING OR RELATED ACTIVITIES WOULD BE INCONSISTENT WITH THE
PUBLIC INTEREST, CONVENIENCE OR NECESSITY OR WITH THE BEST INTERESTS OF
VIDEO GAMING GENERALLY.

(H) THE GAMING COMMISSION, SUBJECT TO NOTICE AND AN OPPORTUNITY FOR
HEARING, MAY REVOKE, SUSPEND, AND CONDITION THE LICENSE OF THE VIDEO
GAMING LICENSEE, ORDER THE VIDEO GAMING LICENSEE TO TERMINATE THE
CONTINUED APPOINTMENT, POSITION OR EMPLOYMENT OF OFFICERS AND DIRECTORS,
OR ORDER THE VIDEO GAMING LICENSEE TO REQUIRE SIGNIFICANT STOCKHOLDERS
TO DIVEST THEMSELVES OF ALL INTERESTS IN THE VIDEO GAMING LICENSEE.

S 27. Clause (G) of subparagraph (ii) of paragraph 1 of subdivision b
of section 1612 of the tax law is REPEALED and a new clause (G) is added
to read as follows:

(G) NOTWITHSTANDING ANY PROVISION TO THE CONTRARY, WHEN A VENDOR TRACK
IS LOCATED WITHIN REGIONS ONE, TWO, OR FIVE OF DEVELOPMENT ZONE TWO AS
DEFINED BY SECTION THIRTEEN HUNDRED TEN OF THE RACING, PARI-MUTUEL
WAGERING AND BREEDING LAW, SUCH VENDOR TRACK SHALL RECEIVE AN ADDITIONAL
COMMISSION AT A RATE EQUAL TO THE PERCENTAGE OF REVENUE WAGERED AT THE
VENDOR TRACK AFTER PAYOUT FOR PRIZES PURSUANT TO THIS CHAPTER LESS TEN
PERCENT RETAINED BY THE COMMISSION FOR OPERATION, ADMINISTRATION, AND
PROCUREMENT PURPOSES AND PAYMENT OF THE VENDOR'S FEE, MARKETING ALLOW-
ANCE, AND CAPITAL AWARD PAID PURSUANT TO THIS CHAPTER AND THE EFFECTIVE
TAX RATE PAID ON ALL GROSS GAMING REVENUE PAID BY A GAMING FACILITY
WITHIN THE SAME REGION PURSUANT TO SECTION THIRTEEN HUNDRED FIFTY-ONE OF

THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW.    THE ADDITIONAL
COMMISSION SHALL BE PAID TO THE VENDOR TRACK WITHIN SIXTY DAYS AFTER THE
CONCLUSION OF THE STATE FISCAL YEAR BASED ON THE  CALCULATED  PERCENTAGE
DURING THE PREVIOUS FISCAL YEAR.

    S 28. Intentionally omitted.

    S 29. Intentionally omitted.

    S  30.    The opening paragraph of subparagraph (ii) of paragraph 1 of
subdivision b of section 1612 of the tax law, as amended by section 6 of
part K of chapter 57 of the laws of 2010, is amended to read as follows:

    less a vendor's fee the amount of which is to be paid for serving as a
lottery agent to the track operator of a vendor track OR THE OPERATOR OF
A RESORT FACILITY:

    S 31.  Section 1 of part HH of chapter 57 of the laws of 2013 relating
to providing for the administration of certain funds and accounts
related to the 2013-14 budget, is amended by adding a new subdivision 39
to read as follows:

    39. COMMERCIAL GAMING REVENUE FUND:

    A. COMMERCIAL GAMING REVENUE ACCOUNT.

    S  32.  Subdivision  a of section 1617-a of the tax law, as amended by
section 2 of part O-1 of chapter 57 of the laws of 2009, is  amended  to
read as follows:

    a. The division of the lottery is hereby authorized to license, pursu-
ant  to  rules  and regulations to be promulgated by the division of the
lottery, the operation of video lottery gaming:

    (1) at Aqueduct, Monticello, Yonkers, Finger Lakes, and  Vernon  Downs
racetracks,

    (2)  or  at  any other racetrack licensed pursuant to article three of
the racing, pari-mutuel wagering and breeding law that are located in  a
county  or  counties  in  which video lottery gaming has been authorized
pursuant to local law, excluding the licensed racetrack commonly
referred  to  in  article  three of the racing, pari-mutuel wagering and
breeding law as the "New York state exposition" held in Onondaga  county
and  the racetracks of the non-profit racing association known as Belmont
Park racetrack and the Saratoga thoroughbred racetrack,

    (3) AT FACILITIES ESTABLISHED, PURSUANT TO A COMPETITIVE PROCESS TO BE
DETERMINED  BY  THE STATE GAMING COMMISSION WITHIN REGIONS ONE, TWO, AND
FIVE OF ZONE TWO AS ESTABLISHED BY SECTION ONE  THOUSAND  THREE  HUNDRED
TEN OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW FOLLOWING LOCAL
GOVERNMENTAL  CONSULTATION AND CONSIDERATION OF MARKET FACTORS INCLUDING
POTENTIAL  REVENUE  IMPACT,  ANTICIPATED  JOB  DEVELOPMENT AND  CAPITAL
INVESTMENT  TO BE MADE. THE FACILITIES AUTHORIZED PURSUANT TO THIS PARA-
GRAPH SHALL BE DEEMED VENDORS FOR ALL PURPOSES UNDER THIS  ARTICLE,  AND
NEED  NOT BE OPERATED BY LICENSED THOROUGHBRED OR HARNESS RACING ASSOCI-
ATIONS OR CORPORATIONS.

    Such rules and regulations shall provide, as a condition of licensure,
that racetracks to be licensed are certified to be  in  compliance  with
all state and local fire and safety codes, that the division is afforded
adequate  space,  infrastructure, and amenities consistent with industry
standards for such video gaming operations as found at  racetracks  in
other  states,  that  racetrack employees involved in the operation of
video lottery gaming pursuant to this section are licensed by the racing
and wagering board, and such other terms and conditions of licensure  as
the  division  may establish. Notwithstanding any inconsistent provision
of law, video lottery gaming at a racetrack pursuant to this section
shall  be deemed an approved activity for such racetrack under the rele-
vant city, county, town, or village land use or  zoning  ordinances,

rules, or regulations. No entity licensed by the division operating video lottery gaming pursuant to this section may house such gaming activity in a structure deemed or approved by the division as "temporary" for a duration of longer than eighteen-months. Nothing in this section shall prohibit the division from licensing an entity to operate video lottery gaming at an existing racetrack as authorized in this subdivision whether or not a different entity is licensed to conduct horse racing and pari-mutuel wagering at such racetrack pursuant to article two or three of the racing, pari-mutuel wagering and breeding law.

The division, in consultation with the racing and wagering board, shall establish standards for approval of the temporary and permanent physical layout and construction of any facility or building devoted to a video lottery gaming operation. In reviewing such application for the construction or reconstruction of facilities related or devoted to the operation or housing of video lottery gaming operations, the division, in consultation with the racing and wagering board, shall ensure that such facility:

(1) possesses superior consumer amenities and conveniences to encourage and attract the patronage of tourists and other visitors from across the region, state, and nation.

(2) has adequate motor vehicle parking facilities to satisfy patron requirements.

(3) has a physical layout and location that facilitates access to and from the horse racing track portion of such facility to encourage patronage of live horse racing events that are conducted at such track.

S 33. Subparagraph (ii) of paragraph 1 of subdivision b of section 1612 of the tax law is amended by adding a new clause (H-1) to read as follows:

(H-1) NOTWITHSTANDING CLAUSES (A), (B), (C), (D), (E), (F), (G) AND (H) OF THIS SUBPARAGRAPH WHERE THE VENDOR IS AUTHORIZED PURSUANT TO PARAGRAPH THREE OF SUBDIVISION A OF SECTION SIXTEEN HUNDRED SEVENTEEN-A OF THIS ARTICLE, AT A RATE OF FORTY PERCENT OF THE TOTAL REVENUE WAGERED AT THE FACILITY AFTER PAYOUT FOR PRIZES. ALL FACILITIES AUTHORIZED PURSUANT TO PARAGRAPH THREE OF SUBDIVISION A OF SECTION SIXTEEN HUNDRED SEVENTEEN-A OF THIS ARTICLE SHALL NOT BE ELIGIBLE FOR ANY VENDOR'S CAPITAL AWARD BUT ARE ENTITLED TO THE VENDOR'S MARKETING ALLOWANCE OF TEN PERCENT AUTHORIZED BY SUBPARAGRAPH (III) OF THIS PARAGRAPH. FACILITIES AUTHORIZED BY PARAGRAPH THREE OF SUBDIVISION A OF SECTION SIXTEEN HUNDRED SEVENTEEN-A OF THIS ARTICLE SHALL PAY

(I) AN AMOUNT TO HORSEMEN FOR PURSES AT THE LICENSED RACETRACKS IN THE REGION THAT WILL ASSURE THE PURSE SUPPORT FROM VIDEO LOTTERY GAMING FACILITIES IN THE REGION TO THE LICENSED RACETRACKS IN THE REGION TO BE MAINTAINED AT THE SAME DOLLAR LEVELS REALIZED IN TWO THOUSAND THIRTEEN TO BE ADJUSTED BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT OF LABOR BUREAU OF LABOR STATISTICS; AND

(II) AMOUNTS TO THE AGRICULTURAL AND NEW YORK STATE HORSE BREEDING DEVELOPMENT FUND AND THE NEW YORK STATE THOROUGHBRED BREEDING AND DEVELOPMENT FUND TO MAINTAIN PAYMENTS FROM VIDEO LOTTERY GAMING FACILITIES IN THE REGION TO SUCH FUNDS TO BE MAINTAINED AT THE SAME DOLLAR LEVELS REALIZED IN TWO THOUSAND THIRTEEN TO BE ADJUSTED BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT OF LABOR BUREAU OF LABOR STATISTICS.

S 34. Section 54-l of the state finance law, as added by section 1 of part J of chapter 57 of the laws of 2011, paragraph b of subdivision 2

S. 5883                               74                          A. 8101

as amended by section 1 of part EE of chapter 57 of the laws of 2013, is
amended to read as follows:

  S 54-l. State assistance to eligible cities and eligible munici-
palities in which a video lottery gaming facility is located. 1. Defi-
nitions. When used in this section, unless otherwise expressly stated:
  a. "Eligible city" shall mean a city with a population equal to or
greater than one hundred twenty-five thousand and less than one million
in which a video lottery gaming facility is located and operating as of
January first, two thousand nine pursuant to section sixteen hundred
seventeen-a of the tax law.
  b. "Eligible municipality" shall mean a county, city, town or village
in which a video lottery gaming facility is located pursuant to section
sixteen hundred seventeen-a of the tax law that is not located in a city
with a population equal to or greater than one hundred twenty-five thou-
sand.
  C. "NEWLY ELIGIBLE CITY" SHALL MEAN A CITY WITH A POPULATION EQUAL TO
OR GREATER THAN ONE HUNDRED TWENTY-FIVE THOUSAND AND LESS THAN ONE
MILLION IN WHICH A VIDEO LOTTERY GAMING FACILITY PURSUANT TO SECTION
SIXTEEN HUNDRED SEVENTEEN-A OF THE TAX LAW IS LOCATED AND WHICH WAS NOT
OPERATING AS OF JANUARY FIRST, TWO THOUSAND THIRTEEN.
  D. "NEWLY ELIGIBLE MUNICIPALITY" SHALL MEAN A COUNTY, CITY, TOWN OR
VILLAGE IN WHICH A VIDEO LOTTERY GAMING FACILITY IS LOCATED PURSUANT TO
SECTION SIXTEEN HUNDRED SEVENTEEN-A OF THE TAX LAW THAT IS NOT LOCATED
IN A CITY WITH A POPULATION EQUAL TO OR GREATER THAN ONE HUNDRED TWEN-
TY-FIVE THOUSAND AND WHICH WAS NOT OPERATING AS OF JANUARY FIRST, TWO
THOUSAND THIRTEEN.
  E. "ESTIMATED NET MACHINE INCOME" SHALL MEAN THE ESTIMATED FULL ANNUAL
VALUE OF TOTAL REVENUE WAGERED AFTER PAYOUT FOR PRIZES FOR GAMES KNOWN
AS VIDEO LOTTERY GAMING AS AUTHORIZED UNDER ARTICLE THIRTY-FOUR OF THE
TAX LAW DURING THE STATE FISCAL YEAR IN WHICH STATE AID PAYMENTS ARE
MADE PURSUANT TO SUBDIVISION TWO OF THIS SECTION.
  2. a. Within the amount appropriated therefor, an eligible city shall
receive an amount equal to the state aid payment received in the state
fiscal year commencing April first, two thousand eight from an appropri-
ation for aid to municipalities with video lottery gaming facilities.
  b. Within the amounts appropriated therefor, eligible municipalities
shall receive an amount equal to fifty-five percent of the state aid
payment received in the state fiscal year commencing April first, two
thousand eight from an appropriation for aid to municipalities with
video lottery gaming facilities.
  C. A NEWLY ELIGIBLE CITY SHALL RECEIVE A STATE AID PAYMENT EQUAL TO
TWO PERCENT OF THE "ESTIMATED NET MACHINE INCOME" GENERATED BY A VIDEO
LOTTERY GAMING FACILITY LOCATED IN SUCH ELIGIBLE CITY. SUCH STATE AID
PAYMENT SHALL NOT EXCEED TWENTY MILLION DOLLARS PER ELIGIBLE CITY.
  D. A NEWLY ELIGIBLE MUNICIPALITY SHALL RECEIVE A STATE AID PAYMENT
EQUAL TO TWO PERCENT OF THE "ESTIMATED NET MACHINE INCOME" GENERATED BY
A VIDEO LOTTERY GAMING FACILITY LOCATED WITHIN SUCH NEWLY ELIGIBLE MUNI-
CIPALITY AS FOLLOWS: (I) TWENTY-FIVE PERCENT SHALL BE APPORTIONED AND
PAID TO THE COUNTY; AND (II) SEVENTY-FIVE PERCENT SHALL BE APPORTIONED
AND PAID ON A PRO RATA BASIS TO ELIGIBLE MUNICIPALITIES, OTHER THAN THE
COUNTY, BASED UPON THE POPULATION OF SUCH ELIGIBLE MUNICIPALITIES. SUCH
STATE AID PAYMENT SHALL NOT EXCEED TWENTY-FIVE PERCENT OF AN ELIGIBLE
MUNICIPALITY'S TOTAL EXPENDITURES AS REPORTED IN THE STATISTICAL REPORT
OF THE COMPTROLLER IN THE PRECEDING STATE FISCAL YEAR PURSUANT TO
SECTION THIRTY-SEVEN OF THE GENERAL MUNICIPAL LAW.

   3. a. State aid payments made to an eligible city OR TO A NEWLY ELIGI-
BLE CITY pursuant to [paragraph] PARAGRAPHS a AND C of subdivision two
of this section shall be used to increase support for public schools  in
such city.
   b. State  aid  payments  made to [an] eligible [municipality] MUNICI-
PALITIES AND NEWLY ELIGIBLE MUNICIPALITIES pursuant to [paragraph] PARA-
GRAPHS b AND D of subdivision two of this section shall be used by  such
eligible municipality to: (i) defray local costs associated with a video
lottery gaming facility, or (ii) minimize or reduce real property taxes.
   4.  Payments of state aid pursuant to this section shall be made on or
before June thirtieth of each state fiscal  year  to  the  chief  fiscal
officer  of  each  eligible city and each eligible municipality on audit
and warrant of the state comptroller out of moneys appropriated  by  the
legislature  for such purpose to the credit of the local assistance fund
in the general fund of the state treasury.
   S 35. Section 1 of chapter 50 of the laws of 2013,  State  Operations
budget,  is  amended  by repealing the items hereinbelow set forth in
brackets and by adding to such section the other  items  underscored  in
this section.

                  NEW YORK STATE GAMING COMMISSION
                       STATE OPERATIONS 2013-14

For payment according to the following schedule:

                                    APPROPRIATIONS  REAPPROPRIATIONS
  Special Revenue Funds - Other ...... [111,604,700]            0
                                       111,772,700
                                    ---------------  ----------------

  All Funds ....................... [111,604,700]            0
                                       111,772,700

                              SCHEDULE

ADMINISTRATION OF GAMING COMMISSION PROGRAM ... [1,000,000]  1,168,000
                                            --------------

  SPECIAL REVENUE FUNDS - OTHER
  MISCELLANEOUS SPECIAL REVENUE FUND
  COMMERCIAL GAMING REVENUE ACCOUNT
 FOR  SERVICES  AND  EXPENSES  RELATED TO THE
  ADMINISTRATION  AND   OPERATION   OF   THE
  COMMERCIAL GAMING REVENUE ACCOUNT, PROVID-
  ING  THAT MONEYS HEREBY APPROPRIATED SHALL
  BE  AVAILABLE  TO  THE  PROGRAM   NET   OF
  REFUNDS, REBATES, REIMBURSEMENTS AND CRED-
  ITS.  A  PORTION OF THIS APPROPRIATION MAY
  BE USED FOR SUBALLOCATION TO THE NEW  YORK
  STATE  GAMING  FACILITY  LOCATION BOARD OR
  OTHER AGENCIES FOR SERVICES AND  EXPENSES,
  INCLUDING FRINGE BENEFITS.
 NOTWITHSTANDING  ANY PROVISION OF LAW TO THE
  CONTRARY, THE  MONEY  HEREBY  APPROPRIATED
  MAY  NOT  BE,  IN WHOLE OR IN PART, INTER-

S. 5883                              76                        A. 8101

    CHANGED WITH ANY OTHER APPROPRIATION WITH-
    IN THE STATE GAMING COMMISSION, EXCEPT
    THOSE APPROPRIATIONS THAT FUND ACTIVITIES
    RELATED TO THE ADMINISTRATION OF GAMING
    COMMISSION PROGRAM.
                        PERSONAL SERVICE
    PERSONAL SERVICE--REGULAR ....................... 100,000
        AMOUNT AVAILABLE FOR PERSONAL SERVICE ........ 100,000
                                                   --------------
                       NONPERSONAL SERVICE
    TRAVEL ........................................... 10,000
    FRINGE BENEFITS .................................. 55,000
    INDIRECT COSTS ................................... 3,000
                                                   --------------
        AMOUNT AVAILABLE FOR NONPERSONAL SERVICE ...... 68,000
                                                   --------------

    Special Revenue Funds - Other
    Miscellaneous Special Revenue Fund
    New York State Gaming Commission Account
  For services and expenses related to the
    administration and operation of the admin-
    istration of gaming commission program,
    providing that moneys hereby appropriated
    shall be available to the program net of
    refunds, rebates, reimbursements and cred-
    its.
  Notwithstanding any provision of law to the
    contrary, the money hereby appropriated
    may not be, in whole or in part, inter-
    changed with any other appropriation with-
    in the state gaming commission, except
    those appropriations that fund activities
    related to the administration of gaming
    commission program.
  Notwithstanding any other provision of law
    to the contrary, the OGS Interchange and
    Transfer Authority and the IT Interchange
    and Transfer Authority as defined in the
    2013-14 state fiscal year state operations
    appropriation for the budget division
    program of the division of the budget, are
    deemed fully incorporated herein and a
    part of this appropriation as if fully
    stated.
                        PERSONAL SERVICE
    Personal service--regular ....................... 527,000
    Holiday/overtime compensation ................... 10,000
                                                   --------------

S. 5883                           77                        A. 8101

    Amount available for personal service .......... 537,000
                                              --------------

                        NONPERSONAL SERVICE

Supplies and materials ............................ 13,000
Travel ............................................ 80,000
Contractual services .............................. 99,000
Equipment ......................................... 30,000
Fringe benefits .................................. 228,000
Indirect costs .................................... 13,000
                                              --------------
    Amount available for nonpersonal service ....... 463,000
                                              --------------

    S 36. Section 104 of the racing, pari-mutuel wagering and breeding law
is amended by adding a new subdivision 22 to read as follows:
    22. THE COMMISSION SHALL ANNUALLY CONDUCT AN EVALUATION OF VIDEO
LOTTERY GAMING TO CONSIDER THE VARIOUS COMPETITIVE FACTORS IMPACTING
SUCH INDUSTRY AND SHALL CONSIDER ADMINISTRATIVE CHANGES THAT MAY BE
NECESSARY TO ENSURE A COMPETITIVE INDUSTRY AND PRESERVE ITS PRIMARY
FUNCTION OF RAISING REVENUE FOR PUBLIC EDUCATION.
    S 37. Clause (H) of subparagraph (ii) of paragraph 1 of subdivision b
of section 1612 of the tax law, as amended by chapter 454 of the laws of
2012, is amended to read as follows:
    (H) notwithstanding clauses (A), (B), (C), (D), (E), (F) and (G) of
this subparagraph, the track operator of a vendor track shall be eligi-
ble for a vendor's capital award of up to four percent of the total
revenue wagered at the vendor track after payout for prizes pursuant to
this chapter, which shall be used exclusively for capital project
investments to improve the facilities of the vendor track which promote
or encourage increased attendance at the video lottery gaming facility
including, but not limited to hotels, other lodging facilities, enter-
tainment facilities, retail facilities, dining facilities, events
arenas, parking garages and other improvements that enhance facility
amenities; provided that such capital investments shall be approved by
the division, in consultation with the state racing and wagering board,
and that such vendor track demonstrates that such capital expenditures
will increase patronage at such vendor track's facilities and increase
the amount of revenue generated to support state education programs. The
annual amount of such vendor's capital awards that a vendor track shall
be eligible to receive shall be limited to two million five hundred
thousand dollars, except for Aqueduct racetrack, for which there shall
be no vendor's capital awards. Except for tracks having less than one
thousand one hundred video gaming machines, AND EXCEPT FOR A VENDOR
TRACK LOCATED WEST OF STATE ROUTE 14 FROM SODUS POINT TO THE PENNSYLVA-
NIA BORDER WITHIN NEW YORK, each track operator shall be required to
co-invest an amount of capital expenditure equal to its cumulative
vendor's capital award. For all tracks, except for Aqueduct racetrack,
the amount of any vendor's capital award that is not used during any one
year period may be carried over into subsequent years ending before
April first, two thousand fourteen. Any amount attributable to a capital
expenditure approved prior to April first, two thousand fourteen and
completed before April first, two thousand sixteen; OR APPROVED PRIOR TO
APRIL FIRST, TWO THOUSAND EIGHTEEN AND COMPLETED BEFORE APRIL FIRST, TWO
THOUSAND TWENTY FOR A VENDOR TRACK LOCATED WEST OF STATE ROUTE 14 FROM

SODUS POINT TO THE PENNSYLVANIA BORDER WITHIN NEW YORK, shall be eligi-
ble to receive the vendor's capital award. In the event that a vendor
track's capital expenditures, approved by the division prior to April
first, two thousand fourteen and completed prior to April first, two
thousand sixteen, exceed the vendor track's cumulative capital award
during the five year period ending April first, two thousand fourteen,
the vendor shall continue to receive the capital award after April
first, two thousand fourteen until such approved capital expenditures
are paid to the vendor track subject to any required co-investment. In
no event shall any vendor track that receives a vendor fee pursuant to
clause (F) or (G) of this subparagraph be eligible for a vendor's capi-
tal award under this section. Any operator of a vendor track which has
received a vendor's capital award, choosing to divest the capital
improvement toward which the award was applied, prior to the full depre-
ciation of the capital improvement in accordance with generally accepted
accounting principles, shall reimburse the state in amounts equal to the
total of any such awards. Any capital award not approved for a capital
expenditure at a video lottery gaming facility by April first, two thou-
sand fourteen shall be deposited into the state lottery fund for educa-
tion aid; and

   S  38. Item (iii) of clause (I) of subparagraph (ii) of paragraph 1 of
subdivision b of section 1612 of the tax law, as added by section 1 of
part O of chapter 61 of the laws of 2011, is amended to read as follows:
   (iii) less an additional vendor's marketing allowance at a rate of ten
percent for the first one hundred million dollars annually and eight
percent thereafter of the total revenue wagered at the vendor track
after payout for prizes to be used by the vendor track for the marketing
and promotion and associated costs of its video lottery gaming oper-
ations and pari-mutuel horse racing operations, as long as any such
costs associated with pari-mutuel horse racing operations simultaneously
encourage increased attendance at such vendor's video lottery gaming
facilities, consistent with the customary manner of marketing comparable
operations in the industry and subject to the overall supervision of the
division; provided, however, that the additional vendor's marketing
allowance shall not exceed eight percent in any year for any operator of
a racetrack located in the county of Westchester or Queens; provided,
however, a vendor track that receives a vendor fee pursuant to clause
(G) of subparagraph (ii) of this paragraph shall not receive the addi-
tional vendor's marketing allowance; PROVIDED, HOWEVER, EXCEPT FOR A
VENDOR TRACK LOCATED WEST OF STATE ROUTE 14 FROM SODUS POINT TO THE
PENNSYLVANIA BORDER WITHIN NEW YORK SHALL CONTINUE TO RECEIVE A MARKET-
ING ALLOWANCE OF TEN PERCENT ON TOTAL REVENUE WAGERED AT THE VENDOR
TRACK AFTER PAYOUT FOR PRIZES IN EXCESS OF ONE HUNDRED MILLION DOLLARS
ANNUALLY. In establishing the vendor fee, the division shall ensure the
maximum lottery support for education while also ensuring the effective
implementation of section sixteen hundred seventeen-a of this article
through the provision of reasonable reimbursements and compensation to
vendor tracks for participation in such program. Within twenty days
after any award of lottery prizes, the division shall pay into the state
treasury, to the credit of the state lottery fund, the balance of all
moneys received from the sale of all tickets for the lottery in which
such prizes were awarded remaining after provision for the payment of
prizes as herein provided. Any revenues derived from the sale of adver-
tising on lottery tickets shall be deposited in the state lottery fund.
   S 39. Subdivision a of section 1617-a of the tax law is amended by
adding a new paragraph 4 to read as follows:

(4) AT A MAXIMUM OF TWO FACILITIES, NEITHER TO EXCEED ONE THOUSAND
VIDEO LOTTERY GAMING DEVICES, ESTABLISHED WITHIN REGION THREE OF ZONE
ONE AS DEFINED BY SECTION ONE THOUSAND THREE HUNDRED TEN OF THE RACING,
PARI-MUTUEL WAGERING AND BREEDING LAW, ONE EACH OPERATED BY A CORPO-
RATION ESTABLISHED PURSUANT TO SECTION FIVE HUNDRED TWO OF THE RACING,
PARI-MUTUEL WAGERING AND BREEDING LAW IN THE SUFFOLK REGION AND THE
NASSAU REGION TO BE LOCATED WITHIN A FACILITY AUTHORIZED PURSUANT TO
SECTIONS ONE THOUSAND EIGHT OR ONE THOUSAND NINE OF THE RACING, PARI-MU-
TUEL WAGERING AND BREEDING LAW. THE FACILITIES AUTHORIZED PURSUANT TO
THIS PARAGRAPH SHALL BE DEEMED VENDORS FOR ALL PURPOSES UNDER THIS ARTI-
CLE.

S 40. Section 1612 of the tax law, as amended by chapter 2 of the laws
of 1995, paragraph 1 of subdivision a as amended by chapter 147 of the
laws of 2010, subparagraph (A) of paragraph 1 of subdivision a as
amended by section 1 of part S of chapter 59 of the laws of 2012, para-
graph 2 of subdivision a as amended by section 1 of part P of chapter 61
of the laws of 2011, paragraphs 3, 4 and 5 and the second undesignated
and closing paragraph of subdivision a as amended by section 1 of part Q
of chapter 61 of the laws of 2011, subdivision 6 as amended by section 1
of part O-1 of chapter 57 of the laws of 2009, the opening paragraph of
paragraph 1 of subdivision b as amended by section 1 of part R of chap-
ter 61 of the laws of 2011, subparagraph (ii) of paragraph 1 of subdivi-
sion b as amended by section 6 of part K of chapter 57 of the laws of
2010, clause (F) of subparagraph (ii) of paragraph 1 of subdivision b as
amended by section 1 of part T of chapter 59 of the laws of 2013, clause
(H) of subparagraph (ii) of paragraph 1 of subdivision b as amended by
chapter 454 of the laws of 2012, clause (I) of subparagraph (ii) of
paragraph 1 of subdivision b as added by section 1 of part O of chapter
61 of the laws of 2011, paragraphs 2 and 3 of subdivision 6 as amended
by section 1 of part J of chapter 55 of the laws of 2013, subdivision c
as amended by section 2 of part CC of chapter 61 of the laws of 2005,
paragraph 1 of subdivision c as amended by section 2 of part R of chap-
ter 61 of the laws of 2011, subdivision d as amended and subdivision e
as added by chapter 18 of the laws of 2008, subdivisions f and g as
amended by chapter 140 of the laws of 2008, paragraph 1 of subdivision f
as amended by section 2 of part J of chapter 55 of the laws if 2013,
subdivision h as added by section 13 of part A of chapter 60 of the laws
of 2012, is amended to read as follows:

S 1612. Disposition of revenues. a. The division shall pay into an
account, to be known as the lottery prize account, under the joint
custody of the comptroller and the commissioner, within one week after
collection of sales receipts from a lottery game, such moneys necessary
for the payment of lottery prizes but not to exceed the following
percentages, plus interest earned thereon:

(1) sixty percent of the total amount for which tickets have been sold
for a lawful lottery game introduced on or after the effective date of
this paragraph, subject to the following provisions:

(A) such game shall be available only on premises occupied by licensed
lottery sales agents, subject to the following provisions:

(i) if the licensee does not hold a license issued pursuant to the
alcoholic beverage control law to sell alcoholic beverages for consump-
tion on the premises, then the premises must have a minimum square
footage greater than two thousand five hundred square feet;

(ii) notwithstanding the foregoing provisions, television equipment
that automatically displays the results of such drawings may be

installed and used without regard to the square footage if such premises are used as:

(I) a commercial bowling establishment, or

(II) a facility authorized under the racing, pari-mutuel wagering and breeding law to accept pari-mutuel wagers;

(B) the rules for the operation of such game shall be as prescribed by regulations promulgated and adopted by the division, provided however, that such rules shall provide that no person under the age of twenty-one may participate in such games on the premises of a licensee who holds a license issued pursuant to the alcoholic beverage control law to sell alcoholic beverages for consumption on the premises; and, provided, further, that such regulations may be revised on an emergency basis not later than ninety days after the enactment of this paragraph in order to conform such regulations to the requirements of this paragraph; or

(2) sixty-five percent of the total amount for which tickets have been sold for the "Instant Cash" game in which the participant purchases a preprinted ticket on which dollar amounts or symbols are concealed on the face or the back of such ticket, provided however up to five new games may be offered during the fiscal year, seventy-five percent of the total amount for which tickets have been sold for such five games in which the participant purchases a preprinted ticket on which dollar amounts or symbols are concealed on the face or the back of such ticket; or

(3) fifty-five percent of the total amount for which tickets have been sold for any joint, multi-jurisdiction, and out-of-state lottery except as otherwise provided in paragraph one of subdivision b of this section for any joint, multi-jurisdiction, out-of-state video lottery gaming; or

(4) fifty percent of the total amount for which tickets have been sold for games known as: (A) the "Daily Numbers Game" or "Win 4", discrete games in which the participants select no more than three or four of their own numbers to match with three or four numbers drawn by the division for purposes of determining winners of such games, (B) "Pick 10", offered no more than once daily, in which participants select from a specified field of numbers a subset of ten numbers to match against a subset of numbers to be drawn by the division from such field of numbers for the purpose of determining winners of such game, (C) "Take 5", offered no more than once daily, in which participants select from a specified field of numbers a subset of five numbers to match against a subset of five numbers to be drawn by the division from such field of numbers for purposes of determining winners of such game; or

(5) forty percent of the total amount for which tickets have been sold for: (A) "Lotto", offered no more than once daily, a discrete game in which all participants select a specific subset of numbers to match a specific subset of numbers, as prescribed by rules and regulations promulgated and adopted by the division, from a larger specific field of numbers, as also prescribed by such rules and regulations and (B) with the exception of the game described in paragraph one of this subdivision, such other state-operated lottery games which the division may introduce, offered no more than once daily, commencing on or after forty-five days following the official publication of the rules and regulations for such game.

The moneys in the lottery prize account shall be paid out of such account on the audit and warrant of the comptroller on vouchers certified or approved by the director or his or her duly designated official.

Prize money derived from ticket sales receipts of a particular game and deposited in the lottery prize account in accordance with the

percentages set forth above may be used to pay prizes in such game. Balances in the lottery prize account identified by individual games may be carried over from one fiscal year to the next to ensure proper payout of games.

b. 1. Notwithstanding section one hundred twenty-one of the state finance law, on or before the twentieth day of each month, the division shall pay into the state treasury, to the credit of the state lottery fund created by section ninety-two-c of the state finance law, not less than forty-five percent of the total amount for which tickets have been sold for games defined in paragraph four of subdivision a of this section during the preceding month, not less than thirty-five percent of the total amount for which tickets have been sold for games defined in paragraph three of subdivision a of this section during the preceding month, not less than twenty percent of the total amount for which tickets have been sold for games defined in paragraph two of subdivision a of this section during the preceding month, provided however that for games with a prize payout of seventy-five percent of the total amount for which tickets have been sold, the division shall pay not less than ten percent of sales into the state treasury and not less than twenty-five percent of the total amount for which tickets have been sold for games defined in paragraph one of subdivision a of this section during the preceding month; and the balance of the total revenue after payout for prizes for games known as "video lottery gaming," including any joint, multi-jurisdiction, and out-of-state video lottery gaming, (i) less ten percent of the total revenue wagered after payout for prizes to be retained by the division for operation, administration, and procurement purposes; (ii) less a vendor's fee the amount of which is to be paid for serving as a lottery agent to the track operator of a vendor track OR THE OPERATOR OF ANY OTHER VIDEO LOTTERY GAMING FACILITY AUTHORIZED PURSUANT TO SECTION ONE THOUSAND SIX HUNDRED SEVENTEEN A OF THIS ARTICLE:

(A) having fewer than one thousand one hundred video gaming machines, at a rate of thirty-five percent for the first fifty million dollars annually, twenty-eight percent for the next hundred million dollars annually, and twenty-five percent thereafter of the total revenue wagered at the vendor track after payout for prizes pursuant to this chapter;

(B) having one thousand one hundred or more video gaming machines, at a rate of thirty-one percent of the total revenue wagered at the vendor track after payout for prizes pursuant to this chapter, except for such facility located in the county of Westchester, in which case the rate shall be thirty percent until March thirty-first, two thousand twelve.

Notwithstanding the foregoing, not later than April first, two thousand twelve, the vendor fee shall become thirty-one percent and remain at that level thereafter; and except for Aqueduct racetrack, in which case the vendor fee shall be thirty-eight percent of the total revenue wagered at the vendor track after payout for prizes pursuant to this chapter;

(C) notwithstanding clauses (A) and (B) of this subparagraph, when the vendor track is located in an area with a population of less than one million within the forty mile radius around such track, at a rate of thirty-nine percent for the first fifty million dollars annually, twenty-eight percent for the next hundred million dollars annually, and twenty-five percent thereafter of the total revenue wagered at the vendor track after payout for prizes pursuant to this chapter;

(D) notwithstanding clauses (A), (B) and (C) of this subparagraph, when the vendor track is located within fifteen miles of a Native American class III gaming facility at a rate of forty-one percent of the total revenue wagered at the vendor track after payout for prizes pursuant to this chapter;

(E) notwithstanding clauses (A), (B), (C) and (D) of this subparagraph, when a Native American class III gaming facility is established, after the effective date of this subparagraph, within fifteen miles of the vendor track, at a rate of forty-one percent of the total revenue wagered after payout for prizes pursuant to this chapter;

(E-1) for purposes of this subdivision, the term "class III gaming" shall have the meaning defined in 25 U.S.C. S 2703(8).

(F) notwithstanding clauses (A), (B), (C), (D) and (E) of this subparagraph, when a vendor track, is located in Sullivan county and within sixty miles from any gaming facility in a contiguous state such vendor fee shall, for a period of six years commencing April first, two thousand eight, be at a rate of forty-one percent of the total revenue wagered at the vendor track after payout for prizes pursuant to this chapter, after which time such rate shall be as for all tracks in clause (C) of this subparagraph.

(G) notwithstanding clauses (A), (B), (C), (D), (E) and (F) of this subparagraph, when no more than one vendor track located in the town of Thompson in Sullivan county at the site of the former Concord Resort at which a qualified capital investment has been made and no fewer than one thousand full-time, permanent employees have been newly hired, is located in Sullivan county and is within sixty miles from any gaming facility in a contiguous state, then for a period of forty years the vendor's fee shall equal the total revenue wagered at the vendor track after payout of prizes pursuant to this subdivision reduced by the greater of (i) twenty-five percent of total revenue after payout for prizes for "video lottery games" or (ii) for the first eight years of operation thirty-eight million dollars, and beginning in the ninth year of operation such amount shall increase annually by the lesser of the increase in the consumer price index or two percent, plus seven percent of total revenue after payout of prizes. In addition, in the event the vendor fee is calculated pursuant to subclause (i) of this clause, the vendor's fee shall be further reduced by 11.11 percent of the amount by which total revenue after payout for prizes exceeds two hundred fifteen million dollars, but in no event shall such reduction exceed five million dollars.    PROVIDED, FURTHER, NO VENDOR IS ELIGIBLE FOR THE VENDOR'S FEE DESCRIBED IN THIS CLAUSE WHO OPERATES OR INVESTS IN OR OWNS, IN WHOLE OR IN PART, ANOTHER VENDOR LICENSE OR IS LICENSED AS A VENDOR TRACK THAT CURRENTLY RECEIVES A VENDOR FEE FOR THE OPERATION OF VIDEO LOTTERY GAMING PURSUANT TO THIS ARTICLE.

Provided, however, that in the case of [no more than one vendor track] A RESORT FACILITY located [in the town of Thompson] in Sullivan county [at the site of the former Concord Resort] with a qualified capital investment, and one thousand full-time, permanent employees if at any time after three years of opening operations of the licensed video gaming facility [or licensed vendor track], the [vendor track] RESORT FACILITY experiences an employment shortfall, then the recapture amount shall apply, for only such period as the shortfall exists.

For the purposes of this section "qualified capital investment" shall mean an investment of a minimum of six hundred million dollars as reflected by audited financial statements of which not less than three hundred million dollars shall be comprised of equity and/or mezzanine

financing as an initial investment in a county where twelve percent of
the population is below the federal poverty level as measured by the
most recent Bureau of Census Statistics prior to the qualified capital
investment commencing that results in the construction, development or
improvement of at least one eighteen hole golf course, and the
construction and issuance of certificates of occupancy for hotels, lodg-
ing, spas, dining, retail and entertainment venues, parking garages and
other capital improvements at or adjacent to the licensed video gaming
facility or licensed vendor track which promote or encourage increased
attendance at such facilities.

   For the purposes of this section, "full-time, permanent employee"
shall mean an employee who has worked at the video gaming facility[,
vendor track] or related and adjacent facilities for a minimum of thir-
ty-five hours per week for not less than four consecutive weeks and who
is entitled to receive the usual and customary fringe benefits extended
to other employees with comparable rank and duties; or two part-time
employees who have worked at the video gaming facility, vendor track or
related and adjacent facilities for a combined minimum of thirty-five
hours per week for not less than four consecutive weeks and who are
entitled to receive the usual and customary fringe benefits extended to
other employees with comparable rank and duties.

   For the purpose of this section "employment goal" shall mean one thou-
sand five hundred full-time permanent employees after three years of
opening operations of the licensed video gaming facility [or licensed
vendor track].

   For the purpose of this section "employment shortfall" shall mean a
level of employment that falls below the employment goal, as certified
annually by vendor's certified accountants and the chairman of the
empire state development corporation.

   For the purposes of this section "recapture amount" shall mean the
difference between the amount of the vendor's fee paid to a vendor
[track] with a qualified capital investment, and the vendor fee other-
wise payable to a vendor [track] pursuant to clause (F) of this subpara-
graph, that is reimbursable by the vendor track to the division for
payment into the state treasury, to the credit of the state lottery fund
created by section ninety-two-c of the state finance law, due to an
employment shortfall pursuant to the following schedule only for the
period of the employment shortfall:

   (i) one hundred percent of the recapture amount if the employment
shortfall is greater than sixty-six and two-thirds percent of the
employment goal;

   (ii) seventy-five percent of the recapture amount if the employment
shortfall is greater than thirty-three and one-third percent of the
employment goal;

   (iii) forty-nine and one-half percent of the recapture amount if the
employment shortfall is greater than thirty percent of the employment
goal;

   (iv) twenty-two percent of the recapture amount if the employment
shortfall is greater than twenty percent of the employment goal;

   (v) eleven percent of the recapture amount if the employment shortfall
is greater than ten percent of the employment goal.

   (G-1) NOTWITHSTANDING CLAUSE (A) AND (B) OF THIS SUBPARAGRAPH, WHEN A
VIDEO LOTTERY GAMING FACILITY IS LOCATED IN EITHER THE COUNTY OF NASSAU
OR SUFFOLK AND IS OPERATED BY A CORPORATION ESTABLISHED PURSUANT TO
SECTION FIVE HUNDRED TWO OF THE RACING, PARI-MUTUEL WAGERING AND BREED-

ING LAW AT A RATE OF THIRTY- FIVE PERCENT OF THE TOTAL REVENUE WAGERED
AT THE VENDOR TRACK AFTER PAYOUT FOR PRIZES PURSUANT TO THIS CHAPTER;

(H) NOTWITHSTANDING ANY PROVISION TO THE CONTRARY, WHEN A VENDOR TRACK
IS LOCATED WITHIN REGIONS ONE, TWO, OR FIVE OF DEVELOPMENT ZONE TWO AS
DEFIED BY SECTION THIRTEEN HUNDRED TEN OF THE RACING, PARI-MUTUEL WAGER-
ING AN BREEDING LAW, SUCH VENDOR TRACK SHALL RECEIVE AN ADDITIONAL
COMMISSION AT A RATE EQUAL TO THE PERCENTAGE OF REVENUE WAGERED AT THE
VENDOR TRACK AFTER PAYOUT FOR PRIZES PURSUANT TO THIS CHAPTER LESS THAN
TEN PERCENT RETAINED BY THE COMMISSION FOR OPERATION, ADMINISTRATION,
AND PROCUREMENT PURPOSES AND PAYMENT OF THE VENDOR'S FEE, MARKETING
ALLOWANCE, AND CAPITAL AWARD PAID PURSUANT TO THIS CHAPTER AND THE
EFFECTIVE TAX RATE PAID ON ALL GROSS GAMING REVENUE PAID BY A GAMING
FACILITY WITHIN THE SAME REGION PURSUANT TO SECTION THIRTEEN HUNDRED
FIFTY-ONE OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW. THE
ADDITIONAL COMMISSION SHALL BE PAID TO THE VENDOR TACK WITHIN SIXTY DAYS
AFTER THE CONCLUSION OF THE STATE FISCAL YEAR BASED ON THE CALCULATED
PERCENTAGE DURING THE PREVIOUS FISCAL YEAR.

  [(H)] (I) notwithstanding clauses (A), (B), (C), (D), (E), (F), and
[(G)] (G-1) of this subparagraph, the track operator of a vendor track
shall be eligible for a vendor's capital award of up to four percent of
the total revenue wagered at the vendor track after payout for prizes
pursuant to this chapter, which shall be used exclusively for capital
project investments to improve the facilities of the vendor track which
promote or encourage increased attendance at the video lottery gaming
facility including, but not limited to hotels, other lodging facilities,
entertainment facilities, retail facilities, dining facilities, events
arenas, parking garages and other improvements that enhance facility
amenities; provided that such capital investments shall be approved by
the division, in consultation with the state racing and wagering board,
and that such vendor track demonstrates that such capital expenditures
will increase patronage at such vendor track's facilities and increase
the amount of revenue generated to support state education programs. The
annual amount of such vendor's capital awards that a vendor track shall
be eligible to receive shall be limited to two million five hundred
thousand dollars, except for Aqueduct racetrack, for which there shall
be no vendor's capital awards. Except for tracks having less than one
thousand one hundred video gaming machines, each track operator shall be
required to co-invest an amount of capital expenditure equal to its
cumulative vendor's capital award. For all tracks, except for Aqueduct
racetrack, the amount of any vendor's capital award that is not used
during any one year period may be carried over into subsequent years
ending before April first, two thousand fourteen. Any amount attribut-
able to a capital expenditure approved prior to April first, two thou-
sand fourteen and completed before April first, two thousand sixteen
shall be eligible to receive the vendor's capital award. In the event
that a vendor track's capital expenditures, approved by the division
prior to April first, two thousand fourteen and completed prior to April
first, two thousand sixteen, exceed the vendor track's cumulative capi-
tal award during the five year period ending April first, two thousand
fourteen, the vendor shall continue to receive the capital award after
April first, two thousand fourteen until such approved capital expendi-
tures are paid to the vendor track subject to any required co-invest-
ment. In no event shall any vendor track that receives a vendor fee
pursuant to clause (F) or (G) of this subparagraph be eligible for a
vendor's capital award under this section. Any operator of a vendor
track which has received a vendor's capital award, choosing to divest

the capital improvement toward which the award was applied, prior to the
full depreciation of the capital improvement in accordance with general-
ly accepted accounting principles, shall reimburse the state in amounts
equal to the total of any such awards. Any capital award not approved
for a capital expenditure at a video lottery gaming facility by April
first, two thousand fourteen shall be deposited into the state lottery
fund for education aid; and

[(I)] (J) Notwithstanding any provision of law to the contrary, free
play allowance credits authorized by the division pursuant to subdivi-
sion f of section sixteen hundred seventeen-a of this article shall not
be included in the calculation of the total amount wagered on video
lottery games, the total amount wagered after payout of prizes, the
vendor fees payable to the operators of video lottery facilities,
vendor's capital awards, fees payable to the division's video lottery
gaming equipment contractors, or racing support payments.

(iii) less an additional vendor's marketing allowance at a rate of ten
percent for the first one hundred million dollars annually and eight
percent thereafter of the total revenue wagered at the vendor track
after payout for prizes to be used by the vendor track for the marketing
and promotion and associated costs of its video lottery gaming oper-
ations and pari-mutuel horse racing operations, as long as any such
costs associated with pari-mutuel horse racing operations simultaneously
encourage increased attendance at such vendor's video lottery gaming
facilities, consistent with the customary manner of marketing comparable
operations in the industry and subject to the overall supervision of the
division; provided, however, that the additional vendor's marketing
allowance shall not exceed eight percent in any year for any operator of
a racetrack located in the county of Westchester or Queens; provided,
however, a vendor track that receives a vendor fee pursuant to clause
(G) of subparagraph (ii) of this paragraph shall not receive the addi-
tional vendor's marketing allowance

PROVIDED, HOWEVER, A VENDOR THAT RECEIVES A VENDOR FEE PURSUANT TO
CLAUSE (G-1) OF SUBPARAGRAPH (II) OF THIS PARAGRAPH SHALL RECEIVE AN
ADDITIONAL MARKETING ALLOWANCE AT A RATE OF TEN PERCENT OF THE TOTAL
REVENUE WAGERED AT THE VIDEO LOTTERY GAMING FACILITY AFTER PAYOUT FOR
PRIZES. THE DIVISION SHALL ENSURE THE MAXIMUM LOTTERY SUPPORT FOR
EDUCATION WHILE ALSO ENSURING THE EFFECTIVE IMPLEMENTATION OF SECTION
SIXTEEN HUNDRED SEVENTEEN-A OF THIS ARTICLE THROUGH THE PROVISION OF
REASONABLE REIMBURSEMENTS AND COMPENSATION TO VENDOR TRACKS FOR PARTIC-
IPATION IN SUCH PROGRAM. WITHIN TWENTY DAYS AFTER ANY AWARD OF LOTTERY
PRIZES, THE DIVISION SHALL PAY INTO THE STATE TREASURY, TO THE CREDIT OF
THE STATE LOTTERY FUND, THE BALANCE OF ALL MONEYS RECEIVED FROM THE SALE
OF ALL TICKETS FOR THE LOTTERY IN WHICH SUCH PRIZES WERE AWARDED REMAIN-
ING AFTER PROVISION FOR THE PAYMENT OF PRIZES AS HEREIN PROVIDED. ANY
REVENUES DERIVED FROM THE SALE OF ADVERTISING ON LOTTERY TICKETS SHALL
BE DEPOSITED IN THE STATE LOTTERY FUND.

2. As consideration for the operation of a video lottery gaming facil-
ity, the division, shall cause the investment in the racing industry of
a portion of the vendor fee received pursuant to paragraph one of this
subdivision in the manner set forth in this subdivision. With the
exception of Aqueduct racetrack OR A FACILITY IN THE COUNTY OF NASSAU OR
SUFFOLK OPERATED BY A CORPORATION ESTABLISHED PURSUANT TO SECTION FIVE
HUNDRED TWO OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW OR A
FACILITY IN THE COUNTY OF NASSAU OR SUFFOLK OPERATED BY A CORPORATION
ESTABLISHED PURSUANT TO SECTION FIVE HUNDRED TWO OF THE RACING, PARI-MU-
TUEL WAGERING AND BREEDING LAW , EACH SUCH TRACK SHALL DEDICATE A

A81 Case 1:13-cv-00114-EK-LB Document 112 Filed 08/06/13 Page 235 of 261 Page 88 of 114

PORTION OF ITS VENDOR FEES, RECEIVED PURSUANT TO CLAUSE (A), (B), (C), (D), (E), (F), OR (G) OF SUBPARAGRAPH (II) OF PARAGRAPH ONE OF THIS SUBDIVISION, SOLELY FOR THE PURPOSE OF ENHANCING PURSES AT SUCH TRACK, IN AN AMOUNT EQUAL TO EIGHT AND THREE-QUARTERS PERCENT OF THE TOTAL REVENUE WAGERED AT THE VENDOR TRACK AFTER PAY OUT FOR PRIZES. ONE PERCENT OF SUCH PURSE ENHANCEMENT AMOUNT SHALL BE PAID TO THE GAMING COMMISSION TO BE USED EXCLUSIVELY TO PROMOTE AND ENSURE EQUINE HEALTH AND SAFETY IN NEW YORK. ANY PORTION OF SUCH FUNDING TO THE GAMING COMMISSION UNUSED DURING A FISCAL YEAR SHALL BE RETURNED TO THE VIDEO LOTTERY GAMING OPERATORS ON A PRO RATA BASIS IN ACCORDANCE WITH THE AMOUNTS ORIGINALLY CONTRIBUTED BY EACH OPERATOR AND SHALL BE USED FOR THE PURPOSE OF ENHANCING PURSES AT SUCH TRACK. IN ADDITION, WITH THE EXCEPTION OF AQUEDUCT RACETRACK, one and one-quarter percent of total revenue wagered at the vendor track after pay out for prizes, received pursuant to clause (A), (B), (C), (D), (E), (F), or (G) of subparagraph (ii) of paragraph one of this subdivision, shall be distributed to the appropriate breeding fund for the manner of racing conducted by such track.

Provided, further, that nothing in this paragraph shall prevent each track from entering into an agreement, not to exceed five years, with the organization authorized to represent its horsemen to increase or decrease the portion of its vendor fee dedicated to enhancing purses at such track during the years of participation by such track, or to race fewer dates than required herein.

3. Nothing in paragraph two of this subdivision shall affect any agreement in effect on or before the effective date of this paragraph, except that the obligation to pay funds to the gaming commission to promote and ensure equine health and safety shall supersede any provision to the contrary in any such agreement.

c. 1. The specifications for video lottery gaming, including any joint, multi-jurisdiction, and out-of-state video lottery gaming, shall be designed in such a manner as to pay prizes that average no less than ninety percent of sales.

2. Of the ten percent retained by the division for administrative purposes, any amounts beyond that which are necessary for the operation and administration of this pilot program shall be deposited in the lottery education account.

d. Notwithstanding any law, rule or regulation to the contrary, any successor to the New York Racing Association, Inc. with respect to the operation and maintenance of video lottery gaming at Aqueduct racetrack shall be deemed the successor to the New York Racing Association, Inc. for purposes of being subject to existing contracts and loan agreements, if any, entered into by the New York Racing Association, Inc. directly related to the construction, operation, management and distribution of revenues of the video lottery gaming facility at Aqueduct racetrack.

e. The video lottery gaming operator selected to operate a video lottery terminal facility at Aqueduct will be subject to a memorandum of understanding between the governor, temporary president of the senate and the speaker of the assembly. Notwithstanding subparagraph (i) of paragraph a of subdivision eight of section two hundred twelve of the racing, pari-mutuel wagering and breeding law, the state, pursuant to an agreement with the video lottery gaming operator to operate a video lottery terminal facility at Aqueduct, may authorize, as part of such agreement or in conjunction with such agreement at the time it is executed, additional development at the Aqueduct racing facility. The selection will be made in consultation with the franchised corporation,

but is not subject to such corporation's approval. The franchised corpo-
ration shall not be eligible to compete to operate or to operate a video
lottery terminal facility at Aqueduct. The state will use its best
efforts to ensure that the video lottery terminal facility at Aqueduct
is opened as soon as is practicable and will, if practicable, pursue the
construction of a temporary video lottery terminal facility at Aqueduct
subject to staying within an agreed budget for such video lottery termi-
nal facility and subject to such temporary facility not having an
adverse impact on opening of the permanent facility at Aqueduct. To
facilitate the opening of the video lottery gaming facility at Aqueduct
as soon as is practicable, the division of the lottery may extend the
term of any existing contract related to the video lottery system.

  f. As consideration for the operation of the video lottery gaming
facility at Aqueduct racetrack, the division shall cause the investment
in the racing industry of the following percentages of the vendor fee to
be deposited or paid, as follows:

  1. Six and one-half percent of the total wagered after payout of
prizes for the first year of operation of video lottery gaming at Aque-
duct racetrack, seven percent of the total wagered after payout of
prizes for the second year of operation, and seven and one-half percent
of the total wagered after payout of prizes for the third year of opera-
tion and thereafter, for the purpose of enhancing purses at Aqueduct
racetrack, Belmont Park racetrack and Saratoga race course. One percent
of such purse enhancement amount shall be paid to the gaming commission
to be used exclusively to promote and ensure equine health and safety in
New York. Any portion of such funding to the gaming commission unused
during a fiscal year shall be returned on a pro rata basis in accordance
with the amounts originally contributed and shall be used for the
purpose of enhancing purses at such tracks.

  2. One percent of the total wagered after payout of prizes for the
first year of operation of video lottery gaming at Aqueduct racetrack,
one and one-quarter percent of the total wagered after payout of prizes
for the second year of operation, and one and one-half percent of the
total wagered after payout of prizes for the third year of operation and
thereafter, for an appropriate breeding fund for the manner of racing
conducted at Aqueduct racetrack, Belmont Park racetrack and Saratoga
race course.

  3. Four percent of the total revenue wagered after payout of prizes to
be deposited into an account of the franchised corporation established
pursuant to section two hundred six of the racing, pari-mutuel wagering
and breeding law to be used for capital expenditures in maintaining and
upgrading Aqueduct racetrack, Belmont Park racetrack and Saratoga race
course.

  4. Three percent of the total revenue wagered after payout for prizes
to be deposited into an account of the franchised corporation estab-
lished pursuant to section two hundred six of the racing, pari-mutuel
wagering and breeding law to be used for general thoroughbred racing
operations at Aqueduct racetrack, Belmont Park racetrack and Saratoga
race course.

  5. Paragraphs one, two, three and four of this subdivision shall be
known collectively as the "racing support payments".

  g. In the event the state elects to construct a video lottery terminal
facility at the Aqueduct racetrack, all video lottery terminal revenues
payable to the video lottery gaming operator at the Aqueduct racetrack
remaining after payment of the racing support payments shall first be
used to repay the state's advances for (i) confirmation of the chapter

eleven plan of reorganization and cash advances for the franchised
corporation's operations following confirmation of the chapter eleven
plan of reorganization and (ii) the amount expended by the state to
construct such video lottery terminal facility at Aqueduct racetrack
pursuant to an agreement with the state. Subparagraphs (i) and (ii) of
this paragraph shall be defined as the state advance amount and the
amounts payable to the division of the lottery.

   h.   As consideration for the operation of a video lottery gaming
resort facility located in Sullivan county, the division shall cause the
investment in the racing industry at the following amount from the
vendor fee to be paid as follows:

   As amount to the horsemen for purses at a licensed racetrack in Sulli-
van county and to the agriculture and New York state horse breeding
development  fund to maintain racing support payments at the same dollar
levels realized in two thousand thirteen, to be adjusted by the consumer
price index for all urban consumers, as published annually by the United
States department of labor bureau of labor statistics.   In no circum-
stance shall  net proceeds of the lottery, including the proceeds from
video lottery gaming, be used for the payment of non-lottery expenses of
the gaming commission, administrative or otherwise.

   (F-1) AS CONSIDERATION FOR OPERATION OF VIDEO LOTTERY GAMING  FACILITY
LOCATED IN THE COUNTY OF NASSAU OF SUFFOLK AND OPERATED BY A CORPORATION
ESTABLISHED PURSUANT TO SECTION FIVE HUNDRED TWO OF THE RACING, PARI-MU-
TUEL  WAGERING  AND  BREEDING  LAW,  THE DIVISION SHALL CAUSE THE IN THE
RACING INDUSTRY OF THE FOLLOWING PERCENTAGES OF THE  VENDOR  FEE  TO  BE
DEPOSITED OR PAID AS FOLLOWS:

   (1)  TWO AND THREE TENTHS PERCENT OF THE TOTAL WAGERED AFTER PAYOUT OF
PRIZES FOR THE  PURPOSE  OF  ENHANCING  PURSES  AT  AQUEDUCT  RACETRACK,
BELMONT PARK RACETRACK AND SARATOGA RACE COURSE, PROVIDED, HOWEVER, THAT
ANY  AMOUNT  THAT IS IN EXCESS OF THE AMOUNT NECESSARY TO MAINTAIN PURSE
SUPPORT FROM VIDEO LOTTERY GAMING AT AQUEDUCT  RACETRACK,  BELMONT  PARK
RACETRACK  AND SARATOGA RACE COURSE AT THE SAME LEVEL REALIZED IN IN TWO
THOUSAND THIRTEEN, TO BE ADJUSTED BY THE CONSUMER PRICE  INDEX  FOR  ALL
URBAN  CONSUMERS,  AS PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT
OF BUREAU OF LABOR STATISTICS, SHALL  BE  INSTEAD  BE  RETURNED  TO  THE
COMMISSION.

   (2)  FIVE  TENTHS  PERCENT OF THE TOTAL WAGERED AFTER PAYOUT OF PRIZES
FOR THE APPROPRIATE BREEDING FUND FOR THE MANNER OF RACING AT  AQUEDUCT
RACETRACK,  BELMONT  PARK  RACETRACK AND SARATOGA RACE COURSE, PROVIDED,
HOWEVER, THAT ANY AMOUNT THAT IS IN EXCESS OF THE  AMOUNT  NECESSARY  TO
MAINTAIN PAYMENTS FROM VIDEO LOTTERY GAMING AT AQUEDUCT RACETRACK AT THE
SAME  LEVEL  REALIZED IN IN TWO THOUSAND THIRTEEN, TO BE ADJUSTED BY THE
CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED  ANNUALLY  BY
THE  UNITED  STATES  DEPARTMENT  OF BUREAU OF LABOR STATISTICS, SHALL BE
INSTEAD BE RETURNED TO THE COMMISSION.

   (3) ONE AND THREE TENTHS PERCENT OF THE TOTAL  REVENUE  WAGERED  AFTER
PAYOUT  OF  PRIZES  TO  BE  DEPOSITED  INTO AN ACCOUNT OF THE FRANCHISED
CORPORATION ESTABLISHED PURSUANT TO  SECTION  TWO  HUNDRED  SIX  OF  THE
RACING,  PARI-MUTUEL  WAGERING  AND  BREEDING LAW TO BE USED FOR CAPITAL
EXPENDITURES IN MAINTAINING AND UPGRADING AQUEDUCT  RACETRACK,  BELMONT
PARK  RACETRACK  AND  SARATOGA  RACE COURSE, PROVIDED, HOWEVER, THAT ANY
AMOUNT THAT IS IN EXCESS OF THE AMOUNT NECESSARY  TO  MAINTAIN  PAYMENTS
FOR CAPITAL EXPENDITURES FROM VIDEO LOTTERY GAMING AT AQUEDUCT RACETRACK
AT  THE  SAME  LEVEL REALIZED IN IN TWO THOUSAND THIRTEEN, TO BE ADJUSTED
BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED  ANNU-

ALLY BY THE UNITED STATES DEPARTMENT OF BUREAU OF LABOR STATISTICS, SHALL BE INSTEAD BE RETURNED TO THE COMMISSION.

  (4) NINE TENTHS PERCENT OF THE TOTAL REVENUE WAGERED AFTER PAYOUT FOR PRIZES TO BE DEPOSITED INTO AN ACCOUNT OF THE FRANCHISED CORPORATION ESTABLISHED PURSUANT TO SECTION TWO HUNDRED SIX OF THE RACING, PARI-MU- TUEL WAGERING AND BREEDING LAW TO BE USED FOR GENERAL THOROUGHBRED RACING OPERATIONS AT AQUEDUCT RACETRACK, BELMONT PARK RACETRACK AND SARATOGA RACE COURSE, PROVIDED, HOWEVER, THAT ANY AMOUNT THAT IS IN EXCESS OF THE AMOUNT NECESSARY TO MAINTAIN PAYMENTS FOR GENERAL THOROUGHBRED RACING OPERATIONS FROM VIDEO LOTTERY GAMING AT AQUEDUCT RACETRACK AT THE SAME LEVEL REALIZED IN IN TWO THOUSAND THIRTEEN, TO BE ADJUSTED BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT OF BUREAU OF LABOR STATISTICS, SHALL BE INSTEAD BE RETURNED TO THE COMMISSION.

  S 41. Subdivision a of section 1617-a of the tax law is amended by adding a new paragraph 5 to read as follows:

  (5) AT A FACILITY ESTABLISHED PURSUANT TO A COMPETITIVE PROCESS TO BE DETERMINED BY THE STATE GAMING COMMISSION, ESTABLISHED WITHIN REGION THREE OF ZONE ONE AS ESTABLISHED BY SECTION ONE THOUSAND THREE HUNDRED TEN OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW, LIMITED TO NASSAU COUNTY. SUCH FACILITY MAY ONLY BE AUTHORIZED BY THE STATE GAMING COMMISSION FOLLOWING LOCAL GOVERNMENTAL CONSULTATION AND CONSIDERATION OF MARKET FACTORS SUCH AS POTENTIAL REVENUE IMPACT, JOB DEVELOPMENT AND CAPITAL INVESTMENT. THE FACILITY AUTHORIZED PURSUANT TO THIS PARAGRAPH SHALL BE DEEMED A VENDOR FOR ALL PURPOSES UNDER THIS ARTICLE, AND NEED NOT BE OPERATED BY LICENSED THOROUGHBRED OR HARNESS RACING ASSOCIATIONS OR CORPORATIONS. THE FACILITY AUTHORIZED PURSUANT TO THIS PARAGRAPH SHALL BE DEEMED VENDORS FOR ALL PURPOSES UNDER THIS ARTICLE.

  S 42. Section 1612 of the tax law, as amended by chapter 2 of the laws of 1995, paragraph 1 of subdivision a as amended by chapter 147 of the laws of 2010, subparagraph (A) of paragraph 1 of subdivision a as amended by section 1 of part S of chapter 59 of the laws of 2012, para- graph 2 of subdivision a as amended by section 1 of part P of chapter 61 of the laws of 2011, paragraphs 3, 4 and 5 and the second undesignated and closing paragraph of subdivision a as amended by section 1 of part Q of chapter 61 of the laws of 2011, subdivision 6 as amended by section 1 of part O-1 of chapter 57 of the laws of 2009, the opening paragraph of paragraph 1 of subdivision b as amended by section 1 of part R of  chap- ter 61 of the laws of 2011, subparagraph (ii) of paragraph 1 of subdivi- sion b as amended by section 6 of part K of chapter 57 of the laws of 2010, clause (F) of subparagraph (ii) of paragraph 1 of subdivision b as amended by section 1 of part T of chapter 59 of the laws of 2013, clause (H) of subparagraph (ii) of paragraph 1 of subdivision b as amended by chapter 454 of the laws of 2012, clause (I) of subparagraph (ii) of paragraph 1 of subdivision b as added by section 1 of part O of  chapter 61 of the laws of 2011, paragraphs 2 and 3 of subdivision 6 as amended by section 1 of part J of chapter 55 of the laws of 2013, subdivision  c as amended by section 2 of part CC of chapter 61 of the laws of 2005, paragraph 1 of subdivision c as amended by section 2 of part R of  chap- ter 61 of the laws of 2011, subdivision d as amended and subdivision e as added by chapter 18 of the laws of 2008, subdivisions f and g as amended by chapter 140 of the laws of 2008, paragraph 1 of subdivision f as amended by section 2 of part J of chapter 55 of the laws if 2013, subdivision h as added by section 13 of part A of chapter 60 of the laws of 2012, is amended to read as follows:

S 1612. Disposition of revenues. a. The division shall pay into an account, to be known as the lottery prize account, under the joint custody of the comptroller and the commissioner, within one week after collection of sales receipts from a lottery game, such moneys necessary for the payment of lottery prizes but not to exceed the following percentages, plus interest earned thereon:

(1) sixty percent of the total amount for which tickets have been sold for a lawful lottery game introduced on or after the effective date of this paragraph, subject to the following provisions:

(A) such game shall be available only on premises occupied by licensed lottery sales agents, subject to the following provisions:

(i) if the licensee does not hold a license issued pursuant to the alcoholic beverage control law to sell alcoholic beverages for consumption on the premises, then the premises must have a minimum square footage greater than two thousand five hundred square feet;

(ii) notwithstanding the foregoing provisions, television equipment that automatically displays the results of such drawings may be installed and used without regard to the square footage if such premises are used as:

(I) a commercial bowling establishment, or

(II) a facility authorized under the racing, pari-mutuel wagering and breeding law to accept pari-mutuel wagers;

(B) the rules for the operation of such game shall be as prescribed by regulations promulgated and adopted by the division, provided however, that such rules shall provide that no person under the age of twenty-one may participate in such games on the premises of a licensee who holds a license issued pursuant to the alcoholic beverage control law to sell alcoholic beverages for consumption on the premises; and, provided, further, that such regulations may be revised on an emergency basis not later than ninety days after the enactment of this paragraph in order to conform such regulations to the requirements of this paragraph; or

(2) sixty-five percent of the total amount for which tickets have been sold for the "Instant Cash" game in which the participant purchases a preprinted ticket on which dollar amounts or symbols are concealed on the face or the back of such ticket, provided however up to five new games may be offered during the fiscal year, seventy-five percent of the total amount for which tickets have been sold for such five games in which the participant purchases a preprinted ticket on which dollar amounts or symbols are concealed on the face or the back of such ticket; or

(3) fifty-five percent of the total amount for which tickets have been sold for any joint, multi-jurisdiction, and out-of-state lottery except as otherwise provided in paragraph one of subdivision b of this section for any joint, multi-jurisdiction, out-of-state video lottery gaming; or

(4) fifty percent of the total amount for which tickets have been sold for games known as: (A) the "Daily Numbers Game" or "Win 4", discrete games in which the participants select no more than three or four of their own numbers to match with three or four numbers drawn by the division for purposes of determining winners of such games, (B) "Pick 10", offered no more than once daily, in which participants select from a specified field of numbers a subset of ten numbers to match against a subset of numbers to be drawn by the division from such field of numbers for the purpose of determining winners of such game, (C) "Take 5", offered no more than once daily, in which participants select from a specified field of numbers a subset of five numbers to match against a

A810 Case 1:13-cv-01100-LEK-DEP Document 1-1 up Filed 09/06/13 gaming color Page 93 of 114

subset of five numbers to be drawn by the division from such field of
numbers for purposes of determining winners of such game; or

(5) forty percent of the total amount for which tickets have been sold
for: (A) "Lotto", offered no more than once daily, a discrete game in
which all participants select a specific subset of numbers to match a
specific subset of numbers, as prescribed by rules and regulations
promulgated and adopted by the division, from a larger specific field of
numbers, as also prescribed by such rules and regulations and (B) with
the exception of the game described in paragraph one of this subdivi-
sion, such other state-operated lottery games which the division may
introduce, offered no more than once daily, commencing on or after
forty-five days following the official publication of the rules and
regulations for such game.

The moneys in the lottery prize account shall be paid out of such
account on the audit and warrant of the comptroller on vouchers certi-
fied or approved by the director or his or her duly designated official.

Prize money derived from ticket sales receipts of a particular game
and deposited in the lottery prize account in accordance with the
percentages set forth above may be used to pay prizes in such game.
Balances in the lottery prize account identified by individual games may
be carried over from one fiscal year to the next to ensure proper payout
of games.

b. 1. Notwithstanding section one hundred twenty-one of the state
finance law, on or before the twentieth day of each month, the division
shall pay into the state treasury, to the credit of the state lottery
fund created by section ninety-two-c of the state finance law, not less
than forty-five percent of the total amount for which tickets have been
sold for games defined in paragraph four of subdivision a of this
section during the preceding month, not less than thirty-five percent of
the total amount for which tickets have been sold for games defined in
paragraph three of subdivision a of this section during the preceding
month, not less than twenty percent of the total amount for which tick-
ets have been sold for games defined in paragraph two of subdivision a
of this section during the preceding month, provided however that for
games with a prize payout of seventy-five percent of the total amount
for which tickets have been sold, the division shall pay not less than
ten percent of sales into the state treasury and not less than twenty-
five percent of the total amount for which tickets have been sold for
games defined in paragraph one of subdivision a of this section during
the preceding month; and the balance of the total revenue after payout
for prizes for games known as "video lottery gaming," including any
joint, multi-jurisdiction, and out-of-state video lottery gaming, (i)
less ten percent of the total revenue wagered after payout for prizes to
be retained by the division for operation, administration, and procure-
ment purposes; (ii) less a vendor's fee the amount of which is to be
paid for serving as a lottery agent to the track operator of a vendor
track:

(A) having fewer than one thousand one hundred video gaming machines,
at a rate of thirty-five percent for the first fifty million dollars
annually, twenty-eight percent for the next hundred million dollars
annually, and twenty-five percent thereafter of the total revenue
wagered at the vendor track after payout for prizes pursuant to this
chapter;

(B) having one thousand one hundred or more video gaming machines, at
a rate of thirty-one percent of the total revenue wagered at the vendor
track after payout for prizes pursuant to this chapter, except for such

facility located in the county of Westchester, in which case the rate
shall be thirty percent until March thirty-first, two thousand twelve.

  Notwithstanding the foregoing, not later than April first, two thou-
sand twelve, the vendor fee shall become thirty-one percent and remain
at that level thereafter; and except for Aqueduct racetrack, in which
case the vendor fee shall be thirty-eight percent of the total revenue
wagered at the vendor track after payout for prizes pursuant to this
chapter;

  (C) notwithstanding clauses (A) and (B) of this subparagraph, when the
vendor track is located in an area with a population of less than one
million within the forty mile radius around such track, at a rate of
thirty-nine percent for the first fifty million dollars annually, twen-
ty-eight percent for the next hundred million dollars annually, and
twenty-five percent thereafter of the total revenue wagered at the
vendor track after payout for prizes pursuant to this chapter;

  (D) notwithstanding clauses (A), (B) and (C) of this subparagraph,
when the vendor track is located within fifteen miles of a Native Ameri-
can class III gaming facility at a rate of forty-one percent of the
total revenue wagered at the vendor track after payout for prizes pursu-
ant to this chapter;

  (E) notwithstanding clauses (A), (B), (C) and (D) of this subpara-
graph, when a Native American class III gaming facility is established,
after the effective date of this subparagraph, within fifteen miles of
the vendor track, at a rate of forty-one percent of the total revenue
wagered after payout for prizes pursuant to this chapter;

  (E-1) for purposes of this subdivision, the term "class III gaming"
shall have the meaning defined in 25 U.S.C. S 2703(8).

  (F) notwithstanding clauses (A), (B), (C), (D) and (E) of this subpar-
agraph, when a vendor track, is located in Sullivan county and within
sixty miles from any gaming facility in a contiguous state such vendor
fee shall, for a period of six years commencing April first, two thou-
sand eight, be at a rate of forty-one percent of the total revenue
wagered at the vendor track after payout for prizes pursuant to this
chapter, after which time such rate shall be as for all tracks in clause
(C) of this subparagraph.

  (G) notwithstanding clauses (A), (B), (C), (D), (E) and (F) of this
subparagraph, when [no more than one vendor track] A RESORT FACILITY TO
BE OPERATED BY OTHER THAN A PRESENTLY LICENSED VIDEO LOTTERY GAMING
OPERATOR OR ANY ENTITY AFFILIATED THEREWITH SELECTED BY THE DIVISION
FOLLOWING A COMPETITIVE PROCESS located in [the town of Thompson in]
Sullivan county [at the site of the former Concord Resort] at which a
qualified capital investment has been made and no fewer than one thou-
sand full-time, permanent employees have been newly hired, is located in
Sullivan county and is within sixty miles from any gaming facility in a
contiguous state, then for a period of forty years the vendor's fee
shall equal the total revenue wagered at the vendor track after payout
of prizes pursuant to this subdivision reduced by the greater of (i)
twenty-five percent of total revenue after payout for prizes for "video
lottery games" or (ii) for the first eight years of operation thirty-
eight million dollars, and beginning in the ninth year of operation such
amount shall increase annually by the lesser of the increase in the
consumer price index or two percent, plus seven percent of total revenue
after payout of prizes. In addition, in the event the vendor fee is
calculated pursuant to subclause (i) of this clause, the vendor's fee
shall be further reduced by 11.11 percent of the amount by which total
revenue after payout for prizes exceeds two hundred fifteen million

dollars, but in no event shall such reduction exceed five million dollars.

Provided, however, that in the case of [no more than one vendor track] A RESORT FACILITY located [in the town of Thompson] in Sullivan county [at the site of the former Concord Resort] with a qualified capital investment, and one thousand full-time, permanent employees if at any time after three years of opening operations of the licensed video gaming facility [or licensed vendor track], the [vendor track] RESORT FACILITY experiences an employment shortfall, then the recapture amount shall apply, for only such period as the shortfall exists.

For the purposes of this section "qualified capital investment" shall mean an investment of a minimum of six hundred million dollars as reflected by audited financial statements of which not less than three hundred million dollars shall be comprised of equity and/or mezzanine financing as an initial investment in a county where twelve percent of the population is below the federal poverty level as measured by the most recent Bureau of Census Statistics prior to the qualified capital investment commencing that results in the construction, development or improvement of at least one eighteen hole golf course, and the construction and issuance of certificates of occupancy for hotels, lodging, spas, dining, retail and entertainment venues, parking garages and other capital improvements at or adjacent to the licensed video gaming facility or licensed vendor track which promote or encourage increased attendance at such facilities.

For the purposes of this section, "full-time, permanent employee" shall mean an employee who has worked at the video gaming facility[, vendor track] or related and adjacent facilities for a minimum of thirty-five hours per week for not less than four consecutive weeks and who is entitled to receive the usual and customary fringe benefits extended to other employees with comparable rank and duties; or two part-time employees who have worked at the video gaming facility, vendor track or related and adjacent facilities for a combined minimum of thirty-five hours per week for not less than four consecutive weeks and who are entitled to receive the usual and customary fringe benefits extended to other employees with comparable rank and duties.

For the purpose of this section "employment goal" shall mean one thousand five hundred full-time permanent employees after three years of opening operations of the licensed video gaming facility [or licensed vendor track].

For the purpose of this section "employment shortfall" shall mean a level of employment that falls below the employment goal, as certified annually by vendor's certified accountants and the chairman of the empire state development corporation.

For the purposes of this section "recapture amount" shall mean the difference between the amount of the vendor's fee paid to a vendor [track] with a qualified capital investment, and the vendor fee otherwise payable to a vendor [track] pursuant to clause (F) of this subparagraph, that is reimbursable by the vendor track to the division for payment into the state treasury, to the credit of the state lottery fund created by section ninety-two-c of the state finance law, due to an employment shortfall pursuant to the following schedule only for the period of the employment shortfall:

(i) one hundred percent of the recapture amount if the employment shortfall is greater than sixty-six and two-thirds percent of the employment goal;

(ii) seventy-five percent of the recapture amount if the employment
shortfall is greater than thirty-three and one-third percent of the
employment goal;

(iii) forty-nine and one-half percent of the recapture amount if the
employment shortfall is greater than thirty percent of the employment
goal;

(iv) twenty-two percent of the recapture amount if the employment
shortfall is greater than twenty percent of the employment goal;

(v) eleven percent of the recapture amount if the employment shortfall
is greater than ten percent of the employment goal.

(G) notwithstanding clauses (A), (B), (C), (D), (E) and (F) of this
subparagraph, when no more than one vendor track located in the town of
Thompson in Sullivan county at the site of the former Concord Resort at
which a qualified capital investment has been made and no fewer than one
thousand full-time, permanent employees have been newly hired, is
located in Sullivan county and is within sixty miles from any gaming
facility in a contiguous state, then for a period of forty years the
vendor's fee shall equal the total revenue wagered at the vendor track
after payout of prizes pursuant to this subdivision reduced by the
greater of (i) twenty-five percent of total revenue after payout for
prizes for "video lottery games" or (ii) for the first eight years of
operation thirty-eight million dollars, and beginning in the ninth year
of operation such amount shall increase annually by the lesser of the
increase in the consumer price index or two percent, plus seven percent
of total revenue after payout of prizes. In addition, in the event the
vendor fee is calculated pursuant to subclause (i) of this clause, the
vendor's fee shall be further reduced by 11.11 percent of the amount by
which total revenue after payout for prizes exceeds two hundred fifteen
million dollars, but in no event shall such reduction exceed five
million dollars.

Provided, however, that in the case of no more than one vendor track
located in the town of Thompson in Sullivan county at the site of the
former Concord Resort with a qualified capital investment, and one thou-
sand full-time, permanent employees if at any time after three years of
opening operations of the licensed video gaming facility or licensed
vendor track, the vendor track experiences an employment shortfall, then
the recapture amount shall apply, for only such period as the shortfall
exists.

For the purposes of this section "qualified capital investment" shall
mean an investment of a minimum of six hundred million dollars as
reflected by audited financial statements of which not less than three
hundred million dollars shall be comprised of equity and/or mezzanine
financing as an initial investment in a county where twelve percent of
the population is below the federal poverty level as measured by the
most recent Bureau of Census Statistics prior to the qualified capital
investment commencing that results in the construction, development or
improvement of at least one eighteen hole golf course, and the
construction and issuance of certificates of occupancy for hotels, lodg-
ing, spas, dining, retail and entertainment venues, parking garages and
other capital improvements at or adjacent to the licensed video gaming
facility or licensed vendor track which promote or encourage increased
attendance at such facilities.

For the purposes of this section, "full-time, permanent employee"
shall mean an employee who has worked at the video gaming facility,
vendor track or related and adjacent facilities for a minimum of thir-
ty-five hours per week for not less than four consecutive weeks and who

is entitled to receive the usual and customary fringe benefits extended
to other employees with comparable rank and duties; or two part-time
employees who have worked at the video gaming facility, vendor track or
related and adjacent facilities for a combined minimum of thirty-five
hours per week for not less than four consecutive weeks and who are
entitled to receive the usual and customary fringe benefits extended to
other employees with comparable rank and duties.

  For the purpose of this section "employment goal" shall mean one thou-
sand five hundred full-time permanent employees after three years of
opening operations of the licensed video gaming facility or licensed
vendor track.

  For the purpose of this section "employment shortfall" shall mean a
level of employment that falls below the employment goal, as certified
annually by vendor's certified accountants and the chairman of the
empire state development corporation.

  For the purposes of this section "recapture amount" shall mean the
difference between the amount of the vendor's fee paid to a vendor track
with a qualified capital investment, and the vendor fee otherwise paya-
ble to a vendor track pursuant to clause (F) of this subparagraph, that
is reimbursable by the vendor track to the division for payment into the
state treasury, to the credit of the state lottery fund created by
section ninety-two-c of the state finance law, due to an employment
shortfall pursuant to the following schedule only for the period of the
employment shortfall:

  (i) one hundred percent of the recapture amount if the employment
shortfall is greater than sixty-six and two-thirds percent of the
employment goal;

  (ii) seventy-five percent of the recapture amount if the employment
shortfall is greater than thirty-three and one-third percent of the
employment goal;

  (iii) forty-nine and one-half percent of the recapture amount if the
employment shortfall is greater than thirty percent of the employment
goal;

  (iv) twenty-two percent of the recapture amount if the employment
shortfall is greater than twenty percent of the employment goal;

  (v) eleven percent of the recapture amount if the employment shortfall
is greater than ten percent of the employment goal.

  (G-1) NOTWITHSTANDING CLAUSE (A) AND (B) OF THIS SUBPARAGRAPH, WHEN A
VIDEO LOTTERY GAMING FACILITY IS LOCATED IN EITHER THE COUNTY OF NASSAU
OR SUFFOLK AND IS OPERATED BY A CORPORATION ESTABLISHED PURSUANT TO
SECTION FIVE HUNDRED TWO OF THE RACING, PARI-MUTUEL WAGERING AND BREED-
ING LAW AT A RATE OF THIRTY-FIVE PERCENT OF THE TOTAL REVENUE WAGERED AT
THE VENDOR TRACK AFTER PAYOUT FOR PRIZES PURSUANT TO THIS CHAPTER;

  (G-2) NOTWITHSTANDING CLAUSE (A) AND (B) OF THIS SUBPARAGRAPH, WHEN A
VIDEO LOTTERY GAMING FACILITY IS LOCATED IN THE COUNTY OF NASSAU ESTAB-
LISHED PURSUANT TO A COMPETITIVE PROCESS PURSUANT TO PARAGRAPH (5) OF
SECTION SIX THOUSAND SEVENTEEN-A OF THIS ARTICLE AT A RATE OF
THIRTY-FIVE PERCENT OF THE TOTAL REVENUE WAGERED AT THE VENDOR TRACK
AFTER PAYOUT FOR PRIZES PURSUANT TO THIS CHAPTER;

  (H) notwithstanding clauses (A), (B), (C), (D), (E), (F) and (G) of
this subparagraph, the track operator of a vendor track shall be eligi-
ble for a vendor's capital award of up to four percent of the total
revenue wagered at the vendor track after payout for prizes pursuant to
this chapter, which shall be used exclusively for capital project
investments to improve the facilities of the vendor track which promote
or encourage increased attendance at the video lottery gaming facility

including, but not limited to hotels, other lodging facilities, enter-
tainment facilities, retail facilities, dining facilities, events
arenas, parking garages and other improvements that enhance facility
amenities; provided that such capital investments shall be approved by
the division, in consultation with the state racing and wagering board,
and that such vendor track demonstrates that such capital expenditures
will increase patronage at such vendor track's facilities and increase
the amount of revenue generated to support state education programs. The
annual amount of such vendor's capital awards that a vendor track shall
be eligible to receive shall be limited to two million five hundred
thousand dollars, except for Aqueduct racetrack, for which there shall
be no vendor's capital awards. Except for tracks having less than one
thousand one hundred video gaming machines, each track operator shall be
required to co-invest an amount of capital expenditure equal to its
cumulative vendor's capital award. For all tracks, except for Aqueduct
racetrack, the amount of any vendor's capital award that is not used
during any one year period may be carried over into subsequent years
ending before April first, two thousand fourteen. Any amount attribut-
able to a capital expenditure approved prior to April first, two thou-
sand fourteen and completed before April first, two thousand sixteen
shall be eligible to receive the vendor's capital award. In the event
that a vendor track's capital expenditures, approved by the division
prior to April first, two thousand fourteen and completed prior to April
first, two thousand sixteen, exceed the vendor track's cumulative capi-
tal award during the five year period ending April first, two thousand
fourteen, the vendor shall continue to receive the capital award after
April first, two thousand fourteen until such approved capital expendi-
tures are paid to the vendor track subject to any required co-invest-
ment. In no event shall any vendor track that receives a vendor fee
pursuant to clause (F) or (G) of this subparagraph be eligible for a
vendor's capital award under this section. Any operator of a vendor
track which has received a vendor's capital award, choosing to divest
the capital improvement toward which the award was applied, prior to the
full depreciation of the capital improvement in accordance with general-
ly accepted accounting principles, shall reimburse the state in amounts
equal to the total of any such awards. Any capital award not approved
for a capital expenditure at a video lottery gaming facility by April
first, two thousand fourteen shall be deposited into the state lottery
fund for education aid; and

(I) Notwithstanding any provision of law to the contrary, free play
allowance credits authorized by the division pursuant to subdivision f
of section sixteen hundred seventeen-a of this article shall not be
included in the calculation of the total amount wagered on video lottery
games, the total amount wagered after payout of prizes, the vendor fees
payable to the operators of video lottery facilities, vendor's capital
awards, fees payable to the division's video lottery gaming equipment
contractors, or racing support payments.

(iii) less an additional vendor's marketing allowance at a rate of ten
percent for the first one hundred million dollars annually and eight
percent thereafter of the total revenue wagered at the vendor track
after payout for prizes to be used by the vendor track for the marketing
and promotion and associated costs of its video lottery gaming oper-
ations and pari-mutuel horse racing operations, as long as any such
costs associated with pari-mutuel horse racing operations simultaneously
encourage increased attendance at such vendor's video lottery gaming
facilities, consistent with the customary manner of marketing comparable

operations in the industry and subject to the overall supervision of the
division; provided, however, that the additional vendor's marketing
allowance shall not exceed eight percent in any year for any operator of
a racetrack located in the county of Westchester or Queens; provided,
however, a vendor track that receives a vendor fee pursuant to clause
(G) of subparagraph (ii) of this paragraph shall not receive the addi-
tional vendor's marketing allowance. In establishing the vendor fee, the
division shall ensure the maximum lottery support for education while
also ensuring the effective implementation of section sixteen hundred
seventeen-a of this article through the provision of reasonable
reimbursements and compensation to vendor tracks for participation in
such program. Within twenty days after any award of lottery prizes, the
division shall pay into the state treasury, to the credit of the state
lottery fund, the balance of all moneys received from the sale of all
tickets for the lottery in which such prizes were awarded remaining
after provision for the payment of prizes as herein provided. Any reven-
ues derived from the sale of advertising on lottery tickets shall be
deposited in the state lottery fund.

  2. As consideration for the operation of a video lottery gaming facil-
ity, the division, shall cause the investment in the racing industry of
a portion of the vendor fee received pursuant to paragraph one of this
subdivision in the manner set forth in this subdivision. With the
exception of Aqueduct racetrack, each such track shall dedicate a
portion of its vendor fees, received pursuant to clause (A), (B), (C),
(D), (E), (F), or (G) of subparagraph (ii) of paragraph one of this
subdivision, solely for the purpose of enhancing purses at such track,
in an amount equal to eight and three-quarters percent of the total
revenue wagered at the vendor track after pay out for prizes. One
percent of such purse enhancement amount shall be paid to the gaming
commission to be used exclusively to promote and ensure equine health
and safety in New York. Any portion of such funding to the gaming
commission unused during a fiscal year shall be returned to the video
lottery gaming operators on a pro rata basis in accordance with the
amounts originally contributed by each operator and shall be used for
the purpose of enhancing purses at such track. In addition, with the
exception. of Aqueduct racetrack, one and one-quarter percent of total
revenue wagered at the vendor track after pay out for prizes, received
pursuant to clause (A), (B), (C), (D), (E), (F), or (G) of subparagraph
(ii) of paragraph one of this subdivision, shall be distributed to the
appropriate breeding fund for the manner of racing conducted by such
track.

  Provided, further, that nothing in this paragraph shall prevent each
track from entering into an agreement, not to exceed five years, with
the organization authorized to represent its horsemen to increase or
decrease the portion of its vendor fee dedicated to enhancing purses at
such track during the years of participation by such track, or to race
fewer dates than required herein.

  3. Nothing in paragraph two of this subdivision shall affect any
agreement in effect on or before the effective date of this paragraph,
except that the obligation to pay funds to the gaming commission to
promote and ensure equine health and safety shall supersede any
provision to the contrary in any such agreement.

  c. 1. The specifications for video lottery gaming, including any
joint, multi-jurisdiction, and out-of-state video lottery gaming, shall
be designed in such a manner as to pay prizes that average no less than
ninety percent of sales.

2. Of the ten percent retained by the division for administrative purposes, any amounts beyond that which are necessary for the operation and administration of this pilot program shall be deposited in the lottery education account.

d. Notwithstanding any law, rule or regulation to the contrary, any successor to the New York Racing Association, Inc. with respect to the operation and maintenance of video lottery gaming at Aqueduct racetrack shall be deemed the successor to the New York Racing Association, Inc. for purposes of being subject to existing contracts and loan agreements, if any, entered into by the New York Racing Association, Inc. directly related to the construction, operation, management and distribution of revenues of the video lottery gaming facility at Aqueduct racetrack.

e. The video lottery gaming operator selected to operate a video lottery terminal facility at Aqueduct will be subject to a memorandum of understanding between the governor, temporary president of the senate and the speaker of the assembly. Notwithstanding subparagraph (i) of paragraph a of subdivision eight of section two hundred twelve of the racing, pari-mutuel wagering and breeding law, the state, pursuant to an agreement with the video lottery gaming operator to operate a video lottery terminal facility at Aqueduct, may authorize, as part of such agreement or in conjunction with such agreement at the time it is executed, additional development at the Aqueduct racing facility. The selection will be made in consultation with the franchised corporation, but is not subject to such corporation's approval. The franchised corporation shall not be eligible to compete to operate or to operate a video lottery terminal facility at Aqueduct. The state will use its best efforts to ensure that the video lottery terminal facility at Aqueduct is opened as soon as is practicable and will, if practicable, pursue the construction of a temporary video lottery terminal facility at Aqueduct subject to staying within an agreed budget for such video lottery terminal facility and subject to such temporary facility not having an adverse impact on opening of the permanent facility at Aqueduct. To facilitate the opening of the video lottery gaming facility at Aqueduct as soon as is practicable, the division of the lottery may extend the term of any existing contract related to the video lottery system.

f. As consideration for the operation of the video lottery gaming facility at Aqueduct racetrack, the division shall cause the investment in the racing industry of the following percentages of the vendor fee to be deposited or paid, as follows:

1. Six and one-half percent of the total wagered after payout of prizes for the first year of operation of video lottery gaming at Aqueduct racetrack, seven percent of the total wagered after payout of prizes for the second year of operation, and seven and one-half percent of the total wagered after payout of prizes for the third year of operation and thereafter, for the purpose of enhancing purses at Aqueduct racetrack, Belmont Park racetrack and Saratoga race course. One percent of such purse enhancement amount shall be paid to the gaming commission to be used exclusively to promote and ensure equine health and safety in New York. Any portion of such funding to the gaming commission unused during a fiscal year shall be returned on a pro rata basis in accordance with the amounts originally contributed and shall be used for the purpose of enhancing purses at such tracks.

2. One percent of the total wagered after payout of prizes for the first year of operation of video lottery gaming at Aqueduct racetrack, one and one-quarter percent of the total wagered after payout of prizes for the second year of operation, and one and one-half percent of the

total wagered after payout of prizes for the third year of operation and thereafter, for an appropriate breeding fund for the manner of racing conducted at Aqueduct racetrack, Belmont Park racetrack and Saratoga race course.

3. Four percent of the total revenue wagered after payout of prizes to be deposited into an account of the franchised corporation established pursuant to section two hundred six of the racing, pari-mutuel wagering and breeding law to be used for capital expenditures in maintaining and upgrading Aqueduct racetrack, Belmont Park racetrack and Saratoga race course.

4. Three percent of the total revenue wagered after payout for prizes to be deposited into an account of the franchised corporation established pursuant to section two hundred six of the racing, pari-mutuel wagering and breeding law to be used for general thoroughbred racing operations at Aqueduct racetrack, Belmont Park racetrack and Saratoga race course.

5. Paragraphs one, two, three and four of this subdivision shall be known collectively as the "racing support payments".

(F-2) AS CONSIDERATION FOR OPERATION OF A VIDEO LOTTERY GAMING FACILI-TY LOCATED IN THE COUNTY OF NASSAU ESTABLISHED PURSUANT TO A COMPETITIVE PROCESS PURSUANT TO PARAGRAPH (5) OF SECTION SIX THOUSAND SEVENTEEN A OF THIS ARTICLE, THE DIVISION SHALL CAUSE THE IN THE RACING INDUSTRY OF THE FOLLOWING PERCENTAGES OF THE VENDOR FEE TO BE DEPOSITED OR PAID AS FOLLOWS:

(1) TWO AND THREE TENTHS PERCENT OF THE TOTAL WAGERED AFTER PAYOUT OF PRIZES FOR THE PURPOSE OF ENHANCING PURSES AT AQUEDUCT RACETRACK, BELMONT PARK RACETRACK AND SARATOGA RACE COURSE, PROVIDED, HOWEVER, THAT ANY AMOUNT THAT IS IN EXCESS OF THE AMOUNT NECESSARY TO MAINTAIN PURSE SUPPORT FROM VIDEO LOTTERY GAMING AT AQUEDUCT RACETRACK, BELMONT PARK RACETRACK AND SARATOGA RACE COURSE AT THE SAME LEVEL REALIZED IN IN TWO THOUSAND THIRTEEN, TO BE ADJUSTED BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT OF BUREAU OF LABOR STATISTICS, SHALL BE INSTEAD BE RETURNED TO THE COMMISSION.

(2) FIVE TENTHS PERCENT OF THE TOTAL WAGERED AFTER PAYOUT OF PRIZES FOR THE APPROPRIATE BREEDING FUND FOR THE MANNER OF RACING AT AQUEDUCT RACETRACK, BELMONT PARK RACETRACK AND SARATOGA RACE COURSE, PROVIDED, HOWEVER, THAT ANY AMOUNT THAT IS IN EXCESS OF THE AMOUNT NECESSARY TO MAINTAIN PAYMENTS FROM VIDEO LOTTERY GAMING AT AQUEDUCT RACETRACK AT THE SAME LEVEL REALIZED IN IN TWO THOUSAND THIRTEEN, TO BE ADJUSTED BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT OF BUREAU OF LABOR STATISTICS, SHALL BE INSTEAD BE RETURNED TO THE COMMISSION.

(3) ONE AND THREE TENTHS PERCENT OF THE TOTAL REVENUE WAGERED AFTER PAYOUT OF PRIZES TO BE DEPOSITED INTO AN ACCOUNT OF THE FRANCHISED CORPORATION ESTABLISHED PURSUANT TO SECTION TWO HUNDRED SIX OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW TO BE USED FOR CAPITAL EXPENDITURES IN MAINTAINING AND UPGRADING AQUEDUCT RACETRACK, BELMONT PARK RACETRACK AND SARATOGA RACE COURSE, PROVIDED, HOWEVER, THAT ANY AMOUNT THAT IS IN EXCESS OF THE AMOUNT NECESSARY TO MAINTAIN PAYMENTS FOR CAPITAL EXPENDITURES FROM VIDEO LOTTERY GAMING AT AQUEDUCT RACETRACK AT THE SAME LEVEL REALIZED IN IN TWO THOUSAND THIRTEEN, TO BE ADJUSTED BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS PUBLISHED ANNU-ALLY BY THE UNITED STATES DEPARTMENT OF BUREAU OF LABOR STATISTICS, SHALL BE INSTEAD BE RETURNED TO THE COMMISSION.

(4) NINE TENTHS PERCENT OF THE TOTAL REVENUE WAGERED AFTER PAYOUT FOR
PRIZES TO BE DEPOSITED INTO AN ACCOUNT OF THE FRANCHISED CORPORATION
ESTABLISHED PURSUANT TO SECTION TWO HUNDRED SIX OF THE RACING, PARI-MU-
TUEL WAGERING AND BREEDING LAW TO BE USED FOR GENERAL THOROUGHBRED
RACING OPERATIONS AT AQUEDUCT RACETRACK, BELMONT PARK RACETRACK AND
SARATOGA RACE COURSE, PROVIDED, HOWEVER, THAT ANY AMOUNT THAT IS IN
EXCESS OF THE AMOUNT NECESSARY TO MAINTAIN PAYMENTS FOR GENERAL
THOROUGHBRED RACING OPERATIONS FROM VIDEO LOTTERY GAMING AT AQUEDUCT
RACETRACK AT THE SAME LEVEL REALIZED IN IN TWO THOUSAND THIRTEEN, TO BE
ADJUSTED BY THE CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS, AS
PUBLISHED ANNUALLY BY THE UNITED STATES DEPARTMENT OF BUREAU OF LABOR
STATISTICS, SHALL BE INSTEAD BE RETURNED TO THE COMMISSION.

g. In the event the state elects to construct a video lottery terminal
facility at the Aqueduct racetrack, all video lottery terminal revenues
payable to the video lottery gaming operator at the Aqueduct racetrack
remaining after payment of the racing support payments shall first be
used to repay the state's advances for (i) confirmation of the chapter
eleven plan of reorganization and cash advances for the franchised
corporation's operations following confirmation of the chapter eleven
plan of reorganization and (ii) the amount expended by the state to
construct such video lottery terminal facility at Aqueduct racetrack
pursuant to an agreement with the state. Subparagraphs (i) and (ii) of
this paragraph shall be defined as the state advance amount and the
amounts payable to the division of the lottery.

h. In no circumstance shall net proceeds of the lottery, including the
proceeds from video lottery gaming, be used for the payment of non-lot-
tery expenses of the gaming commission, administrative or otherwise.

S 43. Section 1001 of the racing, pari-mutuel wagering and breeding
law, as added by chapter 363 of the laws of 1984, subdivisions n, o and
p as added by chapter 445 of the laws of 1997, is amended to read as
follows:

S 1001. Definitions. As used in this article, the following terms
shall have the following meanings:

a. "Simulcast" means the telecast of live audio and visual signals of
running, harness or quarter horse races [conducted in the state] for the
purposes of pari-mutuel wagering;

b. "Track" means the grounds or enclosures within which horse races
are conducted by any person, association or corporation lawfully author-
ized to conduct such races in accordance with the terms and conditions
of this chapter OR THE LAWS OF ANOTHER JURISDICTION;

c. "Sending track" means any track from which simulcasts originate;

d. "Receiving track" means any track where simulcasts originated from
another track are displayed;

e. "Applicant" means any association [or], corporation OR BUSINESS
ENTITY applying for a simulcast license in accordance with the
provisions of this article;

f. "Operator" means any association [or], corporation OR BUSINESS
ENTITY operating a simulcast facility in accordance with the provisions
of this article;

g. "Regional track or tracks" means any or all tracks located within a
region defined as an off-track betting region, except that for the
purposes of section one thousand eight of this article any track located
in New York city, or Nassau, Suffolk and Westchester counties, shall be
deemed a regional track for all regions located in district one, as
defined in this section;

h. "[The board]COMMISSION" means the state [racing and wagering board] GAMING COMMISSION;

i. "Branch office" means an establishment maintained and operated by an off-track betting corporation, where off-track pari-mutuel betting on horse races may be placed in accordance with the terms and conditions of this chapter and rules and regulations issued pursuant thereto;

j. "Simulcast facility" means those facilities within the state that are authorized pursuant to the provisions of this article to display simulcasts for pari-mutuel wagering purposes;

k. "Off-track betting region" means those regions as defined in section five hundred nineteen of this chapter;

l. "Simulcast theater" means a simulcast facility which is also a public entertainment and wagering facility, and which may include any or all of the following: a large screen television projection and display unit, a display system for odds, pools, and payout prices, areas for viewing and seating, a food and beverage facility, and any other convenience currently provided at racetracks and not inconsistent with local zoning ordinances;

m. "Simulcast districts" means one or more of the following named districts comprised of the counties within which pari-mutuel racing events are conducted as follows:

| District 1 | New York City, Suffolk, Nassau, and Westchester counties |
| District 2 | Sullivan county |
| District 3 | Saratoga county |
| District 4 | Oneida county |
| District 5 | Erie, Genesee and Ontario counties |

n. "Initial out-of-state thoroughbred track" means the track commencing full-card simulcasting to New York prior to any other out-of-state thoroughbred track after 1:00 PM on any calendar day.

o. "Second out-of-state thoroughbred track" means the track (or subsequent track or tracks where otherwise authorized by this article) conducting full-card simulcasting to New York after the race program from the initial out-of-state thoroughbred track that has commenced simulcasting on any calendar day.

p. "Mixed meeting" means a race meeting which has a combination of thoroughbred, quarter horse, Appaloosa, paint, and/or Arabian racing on the same race program.

Q. "ACCOUNT WAGERING" MEANS A FORM OF PARI-MUTUEL WAGERING IN WHICH A PERSON ESTABLISHES AN ACCOUNT WITH AN ACCOUNT WAGERING LICENSEE AND SUBSEQUENTLY COMMUNICATES VIA TELEPHONE OR OTHER ELECTRONIC MEDIA TO THE ACCOUNT WAGERING LICENSEE WAGERING INSTRUCTIONS CONCERNING THE FUNDS IN SUCH PERSON'S ACCOUNT AND WAGERS TO BE PLACED ON THE ACCOUNT OWNER'S BEHALF.

R. "ACCOUNT WAGERING LICENSEE" MEANS RACING ASSOCIATIONS, AND CORPORATIONS; FRANCHISED CORPORATIONS, OFF-TRACK BETTING CORPORATIONS, AND COMMISSION APPROVED MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDERS THAT HAVE BEEN AUTHORIZED BY THE COMMISSION TO OFFER ACCOUNT WAGERING.

S. "DORMANT ACCOUNT" MEANS AN ACCOUNT WAGERING ACCOUNT HELD BY AN ACCOUNT WAGERING LICENSEE IN WHICH THERE HAS BEEN NO WAGERING ACTIVITY FOR THREE YEARS.

T. "MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDER" MEANS A BUSINESS ENTITY DOMICILED IN A JURISDICTION, OTHER THAN THE STATE OF NEW YORK, THAT DOES NOT OPERATE EITHER A SIMULCAST FACILITY THAT IS OPEN TO THE PUBLIC WITHIN THE STATE OF NEW YORK OR A LICENSED OR FRANCHISED RACE-TRACK WITHIN THE STATE, BUT WHICH IS LICENSED BY SUCH OTHER JURISDICTION

S. 5883                                    102                                    A. 8101

TO OFFER PARI-MUTUEL ACCOUNT WAGERING ON RACES SUCH PROVIDER SIMULCASTS
AND OTHER RACES IT OFFERS IN ITS WAGERING MENU TO PERSONS LOCATED IN OR
OUT OF THE JURISDICTION ISSUING SUCH LICENSE.

  S  44.  Section  1002 of the racing, pari-mutuel wagering and breeding
law, as added by chapter 363 of the  laws  of  1984,  subdivision  2  as
amended  by  chapter  18  of  the  laws  of  2008, is amended to read as
follows:

  S 1002. General jurisdiction. 1. The [state racing and wagering board]
COMMISSION  shall  have  general  jurisdiction  over  the  simulcasting of
horse  races  AND  ACCOUNT  WAGERING  within  the  state,  and the [board]
COMMISSION  may  issue  rules  and  regulations  in  accordance  with  the
provisions of this article.

  2.  The  [board]  COMMISSION  shall annually submit reports on or before
July first following each year in which simulcasting AND ACCOUNT  WAGER-
ING  is  conducted  to  the  director of the budget, the chairman of the
senate finance committee and the chairman of the assembly ways and means
committee evaluating the results of such simulcasts AND ACCOUNT  WAGERING
on  the compatibility with the well-being of the horse racing,  breeding
and pari-mutuel wagering industries in this state and make any recommen-
dations  it  deems  appropriate.  Such reports may be submitted together
with the reports required by subdivision  two  of  section  two  hundred
thirty-six  and  subparagraph  (iii)  of paragraph a and subparagraph (i) of
paragraph b of subdivision one of section three hundred eighteen of this
chapter.

  S  45.  Section  1003 of the racing, pari-mutuel wagering and breeding
law, as added by chapter 363 of the laws of 1984, subdivision 1 as sepa-
rately amended by chapters 2 and 70 of the laws of 1995,  paragraph  (a)
of  subdivision  1 as amended by section 1 of part U of chapter 59 of the
laws of 2013, the opening paragraph of paragraph a of subdivision  2  as
amended  by chapter 538 of the laws of 1999 and subdivision 5 as amended
by chapter 287 of the laws of 1985, is amended to read as follows:

  S 1003. Licenses for simulcast facilities. 1. (a) Any racing  associ-
ation  or  corporation or regional off-track betting corporation, author-
ized to conduct pari-mutuel wagering under  this  chapter,  desiring  to
display  the  simulcast of horse races on which pari-mutuel betting shall
be permitted in the manner and subject to the conditions provided for in
this article may apply to the [board] COMMISSION for a license so to do.
Applications for licenses shall be in such form as may be prescribed  by
the  [board]  COMMISSION and shall contain such information or other mate-
rial or evidence as the [board] COMMISSION may require. No license shall
be  issued  by  the  [board]  COMMISSION authorizing the simulcast trans-
mission of thoroughbred races from a track located  in  Suffolk  county.
The  fee  for  such licenses shall be five hundred dollars per simulcast
facility AND FOR ACCOUNT WAGERING LICENSEES THAT DO NOT OPERATE EITHER A
SIMULCAST FACILITY THAT IS OPEN TO THE PUBLIC WITHIN THE  STATE  OF  NEW
YORK  OR  A LICENSED RACETRACK WITHIN THE STATE, TWENTY THOUSAND DOLLARS
per year payable by the licensee to the [board] COMMISSION  for  deposit
into  the  general fund. Except as provided [herein] IN THIS SECTION, the
[board] COMMISSION shall not approve any application to  conduct  simul-
casting  into  individual  or group residences, homes or other areas for
the purposes of or in connection with pari-mutuel  wagering.  The  board
may  approve  simulcasting  into  residences,  homes or other areas to be
conducted jointly by one or more regional off-track betting corporations
and one or more of the following: a franchised corporation, thoroughbred
racing  corporation  or  a  harness  racing  corporation  or  association;
provided  (i)  the  simulcasting  consists  only  of those races on which

pari-mutuel betting is authorized by this chapter at one or more simul-
cast facilities for each of the contracting off-track betting corpo-
rations which shall include wagers made in accordance with section one
thousand fifteen, one thousand sixteen and one thousand seventeen of
this article; provided further that the contract provisions or other
simulcast arrangements for such simulcast facility shall be no less
favorable than those in effect on January first, two thousand five; (ii)
that each off-track betting corporation having within its · geographic
boundaries such residences, homes or other areas technically capable of
receiving the simulcast signal shall be a contracting party; (iii) the
distribution of revenues shall be subject to contractual agreement of
the parties except that statutory payments to non-contracting parties,
if any, may not be reduced; provided, however, that nothing herein to
the contrary shall prevent a track from televising its races on an
irregular basis primarily for promotional or marketing purposes as found
by the board. For purposes of this paragraph, the provisions of section
one thousand thirteen of this article shall not apply. Any agreement
authorizing an in-home simulcasting experiment commencing prior to May
fifteenth, nineteen hundred ninety-five, may, and all its terms, be
extended until June thirtieth, two thousand fourteen; provided, however,
that any party to such agreement may elect to terminate such agreement
upon conveying written notice to all other parties of such agreement at
least forty-five days prior to the effective date of the termination,
via registered mail. Any party to an agreement receiving such notice of
an intent to terminate, may request the board to mediate between the
parties new terms and conditions in a replacement agreement between the
parties as will permit continuation of an in-home experiment until June
thirtieth, two thousand fourteen; and (iv) no in-home simulcasting in
the thoroughbred special betting district shall occur without the
approval of the regional thoroughbred track.

(b) Any agreement authorizing in-home simulcasting pursuant to this
section shall be in writing, and upon written request, a copy shall be
provided to the representative horsemen's group of the racing associ-
ation or corporation that is party to said agreement. Such agreement
shall include a categorical statement of new and incremental expenses
directly related and attributable to the conduct of in-home simulcast-
ing. The representative horsemen's group may, within thirty days of
receiving the agreement, petition the board for a determination as to
the appropriateness and reasonableness of any expenses attributed by
either the racing association or corporation or the off-track betting
corporation.

2. Before it may grant such license, the [board] COMMISSION shall
review and approve a plan of operation submitted by such applicant
including, but not limited to the following information:

a. A feasibility study denoting the revenue earnings expected from the
simulcast facility and the costs expected to operate such facility. No
feasibility study shall be received for a simulcast facility that is
applying to renew its license. The form of the feasibility study shall
be prescribed by the [board] COMMISSION and may include:

(i) the number of simulcast races to be displayed;

(ii) the types of wagering to be offered;

(iii) the level of attendance expected and the area from which such
attendance will be drawn;

(iv) the level of anticipated wagering activity;

(v) the source and amount of revenues expected from other than pari-
mutuel wagering;

(vi)  the cost of operating the simulcast facility and the identifica-
tion of costs to be amortized and the method  of  amortization  of  such
costs;

(vii)  the  amount  and  source  of  revenues needed for financing the
simulcast facility;

(viii) the probable impact of the proposed operation on  revenues  to
local government;

b.  The  security  measures to be employed to protect the facility, to
control crowds, to safeguard the transmission of the  simulcast  signals
and  to  control  the transmission of wagering data to effectuate common
wagering pools;

c. The type of data processing, communication and transmission  equip-
ment to be utilized;

d. The description of the management groups responsible for the opera-
tion of the simulcast facility;

e.  The  system of accounts to maintain a separate record of revenues
collected by the simulcast facility, the distribution of  such  revenues
and the accounting of costs relative to the simulcast operation;

f. The location of the facility and a written confirmation from appro-
priate  local officials that the location of such facility and the number
of  patrons  expected to occupy such facility are in compliance with all
applicable local ordinances;

g. The written agreements and letters  of  consent  between  specified
parties  pursuant to sections one thousand seven, one thousand eight and
one thousand nine of this article.

3. Within forty-five days of receipt of the plan of operation provided
in subdivision two of this section, the [board] COMMISSION  shall  issue
an  order approving the plan, approving it with modifications or denying
approval, in which latter case the [board] COMMISSION  shall  state  its
reasons  therefor. Within such period the [board] COMMISSION may request
additional information or suggest amendments. If the [board]  COMMISSION
fails  to  approve the plan, the applicant may request a public hearing to
be  held within thirty days of the issuance of an order denying it. The
[board] COMMISSION shall issue its final determination within  ten  days
of  such  hearing.  The  applicant  may submit an amended application no
sooner than thirty days after a denial.

4. No racing association, FRANCHISED  CORPORATION  or  corporation  or
regional  off-track  betting  corporation  shall be allowed to operate a
simulcast facility except according to the  provisions  of  an  approved
plan  of  operation.  No change in such plan of operation may occur until
an amendment proposing a change to the plan is approved by  the  [board]
COMMISSION.  A  plan of operation may be amended from time to time at the
request of either the operator or the [board] COMMISSION.  The  operator
shall  have  the  right to be heard concerning any amendment to the plan
and the [board] COMMISSION shall dispose of such proposed amendments  as
expeditiously  as  practicable,  but no later than thirty days following
submission by the operator or, in the case of amendments proposed by the
[board] COMMISSION, objection by the operator.

5. For the purpose of maintaining proper  control  over  simulcasts
conducted  pursuant  to this  article,  the  [state racing and wagering
board] COMMISSION shall license any person, association or corporation
participating  in  simulcasting,  as  the  [board] COMMISSION may by rule
prescribe, including, if the [board] COMMISSION deem it necessary so  to
do,  any  or  all persons, associations or corporations who create,
distribute, transmit or display simulcast signals. In  the  case  of
thoroughbred  racing  simulcasting  or  harness racing simulcasting, such

licenses shall be issued in accordance with and subject to the
provisions governing licenses for participants and employees in article
two or article three of this chapter as may be applicable to such type
of racing.

S 46. Section 1012 of the racing, pari-mutuel wagering and breeding
law, as amended by chapter 18 of the laws of 2008, subdivision 4-b as
added by chapter 402 of the laws of 2011 and subdivision 5 as amended by
section 10 of part U of chapter 59 of the laws of 2013, is amended to
read as follows:

S 1012. [Telephone accounts and telephone] ACCOUNT wagering. [Any
regional off-track betting corporation, and any franchised corporation,
harness, thoroughbred, quarter horse racing association or corporation
licensed to conduct pari-mutuel racing may maintain telephone betting
accounts for wagers placed on races and special events offered by such
corporation or association.] RACING ASSOCIATIONS AND CORPORATIONS, FRAN-
CHISED CORPORATIONS, OFF-TRACK BETTING CORPORATIONS AND MULTI-JURISDIC-
TIONAL ACCOUNT WAGERING PROVIDERS MAY APPLY TO THE COMMISSION TO BE
LICENSED TO OFFER ACCOUNT WAGERING.

1. RACING ASSOCIATIONS AND CORPORATIONS, FRANCHISED CORPORATIONS,
OFF-TRACK BETTING CORPORATIONS AND MULTI-JURISDICTIONAL ACCOUNT WAGERING
PROVIDERS MAY FORM PARTNERSHIPS, JOINT VENTURES, OR ANY OTHER AFFIL-
IATIONS OR CONTRACTUAL ARRANGEMENT IN ORDER TO FURTHER THE PURPOSES OF
THIS SECTION. MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDERS INVOLVED
IN SUCH JOINT AFFILIATIONS OR CONTRACTUAL ARRANGEMENTS SHALL FOLLOW THE
SAME DISTRIBUTIONAL POLICY WITH RESPECT TO RETAINED COMMISSIONS AS THEIR
IN-STATE AFFILIATE OR CONTRACTUAL PARTNER.

2. THE COMMISSION SHALL PROMULGATE RULES AND REGULATIONS TO LICENSE
AND REGULATE ALL PHASES OF ACCOUNT WAGERING.

3. THE COMMISSION SHALL SPECIFY A NON-REFUNDABLE APPLICATION FEE WHICH
SHALL BE PAID BY EACH APPLICANT FOR AN ACCOUNT WAGERING LICENSE OR
RENEWAL THEREOF.

4. ACCOUNT WAGERING LICENSEES SHALL UTILIZE PERSONAL IDENTIFICATION
NUMBERS AND SUCH OTHER TECHNOLOGIES AS THE COMMISSION MAY SPECIFY TO
ASSURE THAT ONLY THE ACCOUNT HOLDER HAS ACCESS TO THE ADVANCE DEPOSIT
WAGERING ACCOUNT.

5. ACCOUNT WAGERING LICENSEES SHALL PROVIDE FOR: A. WITHDRAWALS FROM
THE WAGERING ACCOUNT ONLY BY MEANS OF A CHECK MADE PAYABLE TO THE
ACCOUNT HOLDER AND SENT TO THE ADDRESS OF THE ACCOUNT HOLDER OR BY MEANS
OF AN ELECTRONIC TRANSFER TO AN ACCOUNT HELD BY THE VERIFIED ACCOUNT
HOLDER OR B. THAT THE ACCOUNT HOLDER MAY WITHDRAW FUNDS FROM THE WAGER-
ING ACCOUNT AT A FACILITY APPROVED BY THE COMMISSION BY PRESENTING VERI-
FIABLE PERSONAL AND ACCOUNT IDENTIFICATION INFORMATION.

6. ACCOUNT WAGERING LICENSEES MAY ENGAGE IN INTERSTATE WAGERING TRANS-
ACTIONS ONLY WHERE THERE IS COMPLIANCE WITH CHAPTER FIFTY-SEVEN OF TITLE
FIFTEEN OF THE UNITED STATES CODE, COMMONLY REFERRED TO AS THE "INTER-
STATE HORSE RACING ACT".

7. THE ACCOUNT HOLDER'S DEPOSITS TO THE WAGERING ACCOUNT SHALL BE
SUBMITTED BY THE ACCOUNT HOLDER TO THE ACCOUNT WAGERING LICENSEE AND
SHALL BE IN THE FORM OF ONE OF THE FOLLCWING: A. CASH GIVEN TO THE
ACCOUNT WAGERING LICENSEE; B. CHECK, MONEY ORDER, NEGOTIABLE ORDER OF
WITHDRAWAL, OR WIRE OR ELECTRONIC TRANSFER, PAYABLE AND REMITTED TO THE
ACCOUNT WAGERING LICENSEE; OR C. CHARGES MADE TO AN ACCOUNT HOLDER'S
DEBIT OR CREDIT CARD UPON THE ACCOUNT HOLDER'S DIRECT AND PERSONAL
INSTRUCTION, WHICH INSTRUCTION MAY BE GIVEN BY TELEPHONE COMMUNICATION
OR OTHER ELECTRONIC MEANS TO THE ACCOUNT WAGERING LICENSEE OR ITS AGENT

BY THE ACCOUNT HOLDER IF THE USE OF THE CARD HAS BEEN APPROVED BY THE
ACCOUNT WAGERING LICENSEE.

8. A. EACH WAGER SHALL BE IN THE NAME OF A NATURAL PERSON AND SHALL
NOT BE IN THE NAME OF ANY BENEFICIARY, CUSTODIAN, JOINT TRUST, CORPO-
RATION, PARTNERSHIP OR OTHER ORGANIZATION OR ENTITY.

B. A WAGERING ACCOUNT MAY BE ESTABLISHED BY A PERSON COMPLETING AN
APPLICATION FORM APPROVED BY THE COMMISSION AND SUBMITTING IT TOGETHER
WITH A CERTIFICATION, OR OTHER PROOF, OF AGE AND RESIDENCY. SUCH FORM
SHALL INCLUDE THE ADDRESS OF THE PRINCIPAL RESIDENCE OF THE PROSPECTIVE
ACCOUNT HOLDER AND A STATEMENT THAT A FALSE STATEMENT MADE IN REGARD TO
AN APPLICATION MAY SUBJECT THE APPLICANT TO PROSECUTION.

C. THE PROSPECTIVE ACCOUNT HOLDER SHALL SUBMIT THE COMPLETED APPLICA-
TION TO THE ACCOUNT WAGERING LICENSEE. THE ACCOUNT WAGERING LICENSEE MAY
ACCEPT OR REJECT AN APPLICATION AFTER RECEIPT AND REVIEW OF THE APPLICA-
TION AND CERTIFICATION, OR OTHER PROOF, OF AGE AND RESIDENCY FOR COMPLI-
ANCE WITH THIS SECTION.

D. NO PERSON OTHER THAN THE PERSON IN WHOSE NAME AN ACCOUNT HAS BEEN
ESTABLISHED MAY ISSUE WAGERING INSTRUCTIONS RELATING TO THAT ACCOUNT OR
OTHERWISE ENGAGE IN WAGERING TRANSACTIONS RELATING TO THAT ACCOUNT.

9. A WAGERING ACCOUNT SHALL NOT BE ASSIGNABLE OR OTHERWISE TRANSFERA-
BLE.

10. EXCEPT AS OTHERWISE PROVIDED IN THIS ARTICLE OR IN REGULATIONS
WHICH THE COMMISSION MAY ADOPT PURSUANT THERETO, ALL ACCOUNT WAGERS
SHALL BE FINAL AND NO WAGER SHALL BE CANCELED BY THE ACCOUNT HOLDER AT
ANY TIME AFTER THE WAGER HAS BEEN ACCEPTED BY THE ACCOUNT WAGERING
LICENSEE.

11. DORMANT ACCOUNTS SHALL BE TREATED AS ABANDONED PROPERTY PURSUANT
TO SECTION THREE HUNDRED OF THE ABANDONED PROPERTY LAW.

12. ACCOUNT WAGERING PROVIDERS MUST POSSESS APPROPRIATE TOTALIZATOR
AND ACCOUNTING CONTROLS THAT WILL SAFEGUARD THE TRANSMISSION OF WAGERING
DATA AND WILL KEEP A SYSTEM OF ACCOUNTS WHICH WILL MAINTAIN A SEPARATE
RECORD OF REVENUES AND AN ACCOUNTING OF COSTS RELATIVE TO THE OPERATION
OF THE WAGERING PROVIDER.

13. WAGERS PLACED WITH THE ACCOUNT WAGERING PROVIDERS SHALL RESULT IN
THE COMBINATION OF ALL WAGERS PLACED WITH SUCH PROVIDER WITH THE WAGER-
ING POOLS AT THE HOST TRACK SO AS TO PRODUCE COMMON PARI-MUTUEL BETTING
POOLS FOR THE CALCULATION OF ODDS AND THE DETERMINATION OF PAYOUTS FROM
SUCH POOLS, WHICH PAYOUT SHALL BE THE SAME FOR ALL WINNING TICKETS,
IRRESPECTIVE OF WHETHER A WAGER IS PLACED AT A HOST TRACK OR AT AN
ACCOUNT WAGERING PROVIDER.

14. ANY {REGIONAL OFF-TRACK BETTING CORPORATION AND ANY FRANCHISED
CORPORATION, HARNESS, THOROUGHBRED, QUARTER HORSE RACING ASSOCIATION OR
CORPORATION LICENSED TO CONDUCT PARI-MUTUEL RACING} ACCOUNT WAGERING
LICENSEE MAY REQUIRE A MINIMUM ACCOUNT BALANCE IN AN AMOUNT TO BE DETER-
MINED BY SUCH ENTITY.

{2.} 15. a. ANY REGIONAL OFF-TRACK BETTING CORPORATION MAY SUSPEND
COLLECTION OF THE SURCHARGE IMPOSED UNDER SECTION FIVE HUNDRED THIRTY-
TWO OF THIS CHAPTER ON WINNING WAGERS PLACED IN {TELEPHONE} WAGERING
ACCOUNTS MAINTAINED BY SUCH REGIONAL CORPORATION.

b. IN A CITY OF ONE MILLION OR MORE ANY REGIONAL OFF-TRACK BETTING
CORPORATION, WITH THE APPROVAL OF THE MAYOR OF SUCH CITY, MAY SUSPEND
COLLECTION OF THE SURCHARGE IMPOSED UNDER SECTION FIVE HUNDRED THIRTY-
TWO OF THIS CHAPTER IN WINNING WAGERS PLACED IN {TELEPHONE} WAGERING
ACCOUNTS MAINTAINED BY SUCH REGIONAL CORPORATION.

{3. ANY TELEPHONE ACCOUNT MAINTAINED BY A REGIONAL OFF-TRACK BETTING
CORPORATION, FRANCHISED CORPORATION, HARNESS, THOROUGHBRED, QUARTER

~~horse association or corporation, with inactivity for a period of three~~
~~years shall be forfeited and paid to the commissioner of taxation and~~
~~finance. Such amounts when collected shall be paid by the commissioner~~
~~of taxation and finance into the general fund of the state treasury.~~

—~~4.~~ 16. The maintenance and operation of such [telephone] WAGERING
accounts provided for in this section shall be subject to rules and
regulations of the [state racing and wagering board] COMMISSION. The
[board] COMMISSION shall include in such regulation a requirement that
[telephone] WAGERING account information pertaining to surcharge and
nonsurcharge [telephone] WAGERING accounts shall be separately reported.

[4-a.] 17. For the purposes of this section, "telephone [betting]
WAGERING accounts" [and "telephone wagering"] shall mean and include all
those wagers which utilize any wired or wireless communications device,
including but not limited to wireline telephones, wireless telephones[,]
and the internet[,] to transmit the placement of wagers on races and
special events offered by any regional off-track betting corporation,
and any harness, thoroughbred, quarter horse racing association or
corporation licensed or franchised to conduct pari-mutuel racing in [New
York] THIS state.

[4-b.] 18. Every racing association, off-track betting corporation,
franchised corporation, harness, thoroughbred, quarter horse racing
association or corporation or other entity licensed OR FRANCHISED in
this state to conduct pari-mutuel racing and wagering, or authorized to
conduct races within the state, which operates [an account] A wagering
[platform] ACCOUNT for the acceptance of wagers, shall locate the call
center where such wagers are received within the state of New York.

[5. The provisions of this section shall expire and be of no further
force and effect after June thirtieth, two thousand fourteen.]

S 47. The racing, pari-mutuel wagering and breeding law is amended by
adding a new section 1012-a to read as follows:

S    1012-A.    MULTI-JURISDICTIONAL   ACCOUNT   WAGERING   PROVIDERS.    A
MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDER SHALL ONLY BE LICENSED
UNDER THE FOLLOWING CONDITIONS:

1.  THE  MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDER IS LICENSED BY
THE STATE IN WHICH IT IS LOCATED AND, IF REQUIRED, BY EACH STATE IN
WHICH IT OPERATES;

2. THE CHARACTER AND THE BACKGROUND OF THE MULTI-JURISDICTIONAL
ACCOUNT WAGERING PROVIDER IS SUCH THAT GRANTING THE APPLICATIONS FOR A
LICENSE IS IN THE PUBLIC INTEREST AND THE BEST INTEREST OF HONEST HORSE
RACING;

3. THE MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDER SHALL UTILIZE
THE SERVICES OF AN INDEPENDENT THIRD PARTY TO PERFORM IDENTITY AND
VERIFICATION SERVICES WITH RESPECT TO THE ESTABLISHMENT OF WAGERING
ACCOUNTS FOR PERSONS WHO ARE RESIDENTS OF THE STATE OF NEW YORK;

4. THE COMMISSION SHALL BE ALLOWED ACCESS TO THE PREMISES OF THE
MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDER TO VISIT, INVESTIGATE
AND, PLACE SUCH EXPERT ACCOUNTANTS AND OTHER PERSONS IT DEEMS NECESSARY
FOR THE PURPOSE OF INSURING COMPLIANCE WITH THE RULES AND REGULATIONS OF
THE COMMISSION;

5. IF NOT ALREADY REGISTERED, THE MULTI-JURISDICTIONAL ACCOUNT  WAGER-
ING PROVIDER SHALL AGREE PROMPTLY TO TAKE THOSE STEPS NECESSARY TO QUAL-
IFY TO DO BUSINESS IN NEW YORK STATE, AND TO MAINTAIN SUCH STATUS IN
GOOD STANDING THROUGHOUT THE LICENSE PERIOD;

6. MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDERS SHALL PAY A MARKET
ORIGIN FEE EQUAL TO FIVE PER CENTUM ON EACH WAGER ACCEPTED FROM NEW YORK
RESIDENTS.    MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDERS SHALL MAKE

A8101-2013 - NY Senate Open Legislation - Enacts the upstate New York gaming...
Case 1:13-cv-01100-PLK-DEP Document 1-1 Filed 09/06/13 Page 257 of 261
110 of 114

S. 5883                                108                                A. 8101

THE REQUIRED PAYMENTS TO THE MARKET ORIGIN ACCOUNT ON OR BEFORE THE
FIFTH BUSINESS DAY OF EACH MONTH AND SUCH REQUIRED PAYMENTS SHALL COVER
PAYMENTS DUE FOR THE PERIOD OF THE PRECEDING CALENDAR MONTH; PROVIDED,
HOWEVER, THAT SUCH PAYMENTS REQUIRED TO BE MADE ON APRIL FIFTEENTH SHALL
BE ACCOMPANIED BY A REPORT UNDER OATH, SHOWING THE TOTAL OF ALL SUCH
PAYMENTS, TOGETHER WITH SUCH OTHER INFORMATION AS THE COMMISSION MAY
REQUIRE. A PENALTY OF FIVE PER CENTUM AND INTEREST AT THE RATE OF ONE
PER CENTUM PER MONTH FROM THE DATE THE REPORT IS REQUIRED TO BE FILED TO
THE DATE THE PAYMENT SHALL BE PAYABLE IN CASE ANY PAYMENTS REQUIRED BY
THIS SUBDIVISION ARE PAID WHEN DUE. IF THE COMMISSION DETERMINES THAT
ANY MONEYS RECEIVED UNDER THIS SUBDIVISION WERE PAID IN ERROR, THE
COMMISSION MAY CAUSE THE SAME TO BE REFUNDED WITHOUT INTEREST OUT OF ANY
MONEYS COLLECTED THEREUNDER, PROVIDED AN APPLICATION THEREFOR IS FILED
WITH THE COMMISSION WITHIN ONE YEAR FROM THE TIME THE ERRONEOUS PAYMENT
WAS MADE. THE COMMISSION SHALL PAY INTO THE RACING REGULATION ACCOUNT,
UNDER THE JOINT CUSTODY OF THE COMPTROLLER AND THE COMMISSION, THE TOTAL
AMOUNT OF THE FEE COLLECTED PURSUANT TO THIS SECTION.

  S 48. Subdivision 2 of section 1017 of the racing, pari-mutuel wager-
ing and breeding law, as amended by chapter 18 of the laws of 2008, is
amended to read as follows:

  2. a. Maintenance of effort. Any off-track betting corporation which
engages in accepting wagers on the simulcasts of thoroughbred races from
out-of-state or out-of-country as permitted under subdivision one of
this section shall submit to the [board] COMMISSION, for its approval, a
schedule of payments to be made in any year or portion thereof, that
such off-track corporation engages in nighttime thoroughbred simulcast-
ing. In order to be approved by the [board] COMMISSION, the payment
schedule shall be identical to the actual payments and distributions of
such payments to tracks and purses made by such off-track corporation
pursuant to the provisions of section one thousand fifteen of this arti-
cle during the year two thousand two, as derived from out-of-state
harness races displayed after 6:00 P.M. If approved by the [board]
COMMISSION, such scheduled payments shall be made from revenues derived
from any simulcasting conducted pursuant to this section and section one
thousand fifteen of this article.

  b. Additional payments. During each calendar year, to the extent, and
at such time in the event, that aggregate statewide wagering handle
after 7Labor P.M. on out-of-state and out-of-country thoroughbred races
exceeds one hundred million dollars, each off-track betting corporation
conducting such simulcasting shall pay to its regional harness track or
tracks, an amount equal to two percent of its proportionate share of
such excess handle. In any region where there are two or more regional
harness tracks, such two percent shall be divided between or among the
tracks in a proportion equal to the proportion of handle on live harness
races conducted at such tracks during the preceding calendar year. Fifty
percent of the sum received by each track pursuant to this paragraph
shall be used exclusively for increasing purses, stakes and prizes at
that regional harness track. FOR THE PURPOSE OF DETERMINING WHETHER
SUCH AGGREGATE STATEWIDE HANDLE EXCEEDS ONE HUNDRED MILLION DOLLARS, ALL
WAGERING ON SUCH THOROUGHBRED RACES ACCEPTED BY LICENSED MULTI-JURISDIC-
TIONAL ACCOUNT WAGERING PROVIDERS FROM CUSTOMERS WITHIN NEW YORK STATE
SHALL BE EXCLUDED.

  S 49. Section 503 of the racing, pari-mutuel wagering and breeding law
is amended by adding a new subdivision 12-a to read as follows:

  12-A. TO ENTER INTO, AMEND, CANCEL AND TERMINATE AGREEMENTS FOR THE
PERFORMANCE AMONG THEMSELVES, LICENSED RACING ASSOCIATIONS AND CORPO-

S. 5883                         109                          A. 8101

RATIONS, AND MULTI-JURISDICTIONAL ACCOUNT WAGERING PROVIDERS, AS DEFINED
IN SECTION ONE THOUSAND ONE OF THIS CHAPTER, OF THEIR RESPECTIVE FUNC-
TIONS, POWERS AND DUTIES ON A COOPERATIVE OR CONTRACT BASIS.

 S 50. The racing, pari-mutuel wagering and breeding law is amended by
adding a new section 115-b to read as follows:

 S 115-B. MARKET ORIGIN CREDITS. 1. NOTWITHSTANDING ANY OTHER PROVISION
OF LAW TO THE CONTRARY, ANY RACING ASSOCIATIONS AND CORPORATIONS, FRAN-
CHISED CORPORATIONS, AND OFF-TRACK BETTING CORPORATIONS THAT MAKES A
PAYMENT OF THE REGULATORY FEES IMPOSED BY THIS CHAPTER MAY REDUCE SUCH
PAYMENT BY AN AMOUNT EQUAL TO THE MARKET ORIGIN CREDIT ALLOCATED TO SUCH
RACING ASSOCIATION OR CORPORATION, FRANCHISED CORPORATION, OR OFF-TRACK
BETTING CORPORATION BY THE COMMISSION. THE COMMISSION SHALL ALLOCATE
CREDITS IN AN AMOUNT EQUAL TO NINETY PERCENT OF THE AMOUNT RECEIVED FROM
THE MARKET ORIGIN FEE PAID PURSUANT TO SUBDIVISION SIX OF SECTION ONE
THOUSAND TWELVE-A OF THIS CHAPTER FOR THE PERIOD FROM THE SIXTEENTH DAY
OF THE PRECEDING MONTH THROUGH THE FIFTEENTH DAY OF THE CURRENT MONTH.
THE COMMISSION SHALL NOTIFY PARTICIPANTS OF ALLOCATIONS ON OR BEFORE THE
TWENTIETH DAY OF THE CURRENT MONTH.

 2. THE COMMISSION SHALL ALLOCATE CREDITS TO RACING ASSOCIATIONS AND
CORPORATIONS, FRANCHISED CORPORATIONS, AND OFF-TRACK BETTING CORPO-
RATIONS IN THE FOLLOWING AMOUNTS:

 A. FORTY PERCENT OF THE AMOUNT RECEIVED FROM THE MARKET ORIGIN FEE
PAID PURSUANT TO SUBDIVISION SIX OF SECTION ONE THOUSAND TWELVE-A OF
THIS CHAPTER TO REGIONAL OFF-TRACK BETTING CORPORATIONS. ALLOCATIONS TO
INDIVIDUAL REGIONAL OFF-TRACK BETTING CORPORATIONS SHALL BE MADE BASED
ON A RATIO WHERE THE NUMERATOR IS THE REGIONAL CORPORATION'S TOTAL
IN-STATE HANDLE FOR THE PREVIOUS CALENDAR YEAR AS CALCULATED BY THE
COMMISSION AND THE DENOMINATOR IS THE TOTAL IN-STATE HANDLE OF ALL THE
REGIONAL OFF-TRACK BETTING CORPORATIONS FOR THE PREVIOUS CALENDAR YEAR
AS CALCULATED BY THE COMMISSION;

 B. FIFTY PERCENT OF THE AMOUNT RECEIVED FROM THE MARKET ORIGIN FEE
PAID PURSUANT TO SUBDIVISION SIX OF SECTION ONE THOUSAND TWELVE-A OF
THIS CHAPTER TO THE RACING ASSOCIATIONS AND CORPORATIONS AND FRANCHISED
CORPORATIONS. ALLOCATIONS TO INDIVIDUAL RACING ASSOCIATIONS AND CORPO-
RATIONS AND FRANCHISED CORPORATIONS SHALL BE MADE AS FOLLOWS:

 (I) SIXTY PERCENT TO THOROUGHBRED RACING ASSOCIATIONS AND FRANCHISED
CORPORATIONS. FIVE-SIXTHS SHALL BE ALLOCATED TO A FRANCHISED CORPO-
RATION AND ONE-SIXTH SHALL BE ALLOCATED TO A THOROUGHBRED RACING ASSOCI-
ATION.

 (II) FORTY PERCENT TO HARNESS RACING ASSOCIATIONS AND CORPORATIONS.
ALLOCATIONS TO INDIVIDUAL HARNESS RACING ASSOCIATIONS AND CORPORATIONS
SHALL BE MADE BASED ON A RATIO WHERE THE NUMERATOR IS THE ASSOCIATION'S
OR CORPORATION'S TOTAL IN-STATE HANDLE ON LIVE RACING FOR THE PREVIOUS
CALENDAR YEAR AS CALCULATED BY THE COMMISSION AND THE DENOMINATOR IS THE
TOTAL IN-STATE ON LIVE HANDLE FOR ALL HARNESS RACING ASSOCIATIONS AND
CORPORATIONS FOR THE PREVIOUS CALENDAR YEAR AS CALCULATED BY THE COMMIS-
SION.

 3. AS A CONDITION FOR ANY RACING ASSOCIATION OR CORPORATION OR FRAN-
CHISED CORPORATION TO CLAIM ANY MARKET ORIGIN CREDITS ALLOCATED TO IT,
SUCH RACING ASSOCIATION OR CORPORATION OR FRANCHISED CORPORATION MUST
MAKE PAYMENTS FOR MONEYS OTHERWISE TO BE USED TO PAY THE REGULATORY FEE
AS FOLLOWS:

 (I) PAYMENT OF AN AMOUNT EQUAL TO FORTY PERCENT OF THE ALLOCATED CRED-
ITS INTO AN ACCOUNT USED SOLELY FOR THE PURPOSE OF ENHANCING PURSES AT
SUCH RACING ASSOCIATION OR CORPORATION OR FRANCHISED CORPORATION. SUCH
PAYMENT SHALL BE MADE WITHIN FIVE DAYS FROM RECEIPT OF NOTIFICATION OF

AN ALLOCATION BY THE COMMISSION OF AN ALLOCATION OF MARKET ORIGIN CRED-
ITS;

(II) PAYMENT OF AN AMOUNT EQUAL TO TWENTY PERCENT OF THE ALLOCATED
CREDITS TO THE STATE'S BREEDING FUNDS. SIXTY PERCENT OF THE PAYMENTS TO
THE BREEDING FUNDS SHALL BE ALLOCATED TO THE NEW YORK STATE THOROUGHBRED
BREEDING AND DEVELOPMENT FUND CORPORATION ESTABLISHED PURSUANT TO
SECTION TWO HUNDRED FIFTY-TWO OF THIS CHAPTER, AND FORTY PERCENT TO THE
AGRICULTURE AND NEW YORK STATE HORSE BREEDING DEVELOPMENT FUND ESTAB-
LISHED PURSUANT TO SECTION THREE HUNDRED THIRTY OF THIS CHAPTER. SUCH
PAYMENT SHALL BE MADE WITHIN FIVE DAYS FROM RECEIPT OF NOTIFICATION OF
AN ALLOCATION BY THE COMMISSION OF AN ALLOCATION OF MARKET ORIGIN CRED-
ITS.

4. THE COMMISSION SHALL PROMULGATE ANY RULES AND REGULATIONS NECESSARY
FOR THE ADMINISTRATION OF THE MARKET ORIGIN CREDIT.

S 51. Section 99-i of the state finance law, as added by section 26 of
part F3 of chapter 62 of the laws of 2003, is amended to read as
follows:

S 99-i. Racing regulation account. l. There is hereby established in
the joint custody of the comptroller and the [racing and wagering board]
GAMING COMMISSION a special revenue fund to be known as the "racing
regulation account".

2. The racing [revenue] REGULATION account shall consist of all money
received by the [board] COMMISSION as regulatory fees AND MARKET ORIGIN
FEES pursuant to the provisions of the racing, pari-mutuel wagering and
breeding law.

3. Moneys of this account shall be available to the [board] COMMISSION
to pay for the costs of carrying out the purposes of the racing, pari-
mutuel wagering and breeding law; PROVIDED, HOWEVER, AN AMOUNT EQUAL TO
FIVE PERCENT OF THE AMOUNT RECEIVED BY THE ACCOUNT FROM THE MARKET
ORIGIN FEE IMPOSED BY SUBDIVISION SIX OF SECTION ONE THOUSAND TWELVE-A
OF THE RACING, PARI-MUTUEL WAGERING AND BREEDING LAW SHALL BE TRANS-
FERRED TO THE STATE DEPARTMENT OF TAXATION AND FINANCE AND THE DEPART-
MENT SHALL DEEM THIS TRANSFER AS A PAYMENT OF A PARI-MUTUEL TAX.

4. All payments from the fund shall be made on the audit and warrant
of the comptroller.

(f) Sections forth through forty-eight of this act shall take effect
January 1, 2014; except that the New York state gaming commission may
accept and review applications for licenses for account wagering and for
multi-jurisdictional account wagering providers commencing on October 1,
2013.

S 52. This act shall take effect immediately; provided, however, that:
(a) sections one, two, five, nine, ten, twenty-seven and thirty-one of
this act shall take effect on the first of January next succeeding the
date upon which the people shall approve and ratify amendments to subdi-
vision 1 of section 9 of article I of the constitution by a majority of
the electors voting thereon relating to casino gambling in the state;

(b) sections six, seven, fourteen and sixteen of this act shall take
effect on the same date as the agreement between the Oneida Nation of
New York and the state of New York entered into on the sixteenth day of
May, 2013 takes effect; provided, further, that the amendments to subdi-
vision 2 of section 99-h of the state finance law made by section six of
this act shall take effect on the same date as the reversion of such
section as provided in section 2 of chapter 747 of the laws of 2006, as
amended; provided, further, that the amendments to subdivision 3 of
section 99-h of the state finance law made by section seven of this act
shall be subject to the expiration and reversion of such subdivision as

provided in section 3 of part W of chapter 60 of the laws  of  2011,  as
amended  when  upon  such date the provisions of section seven-a of this
act shall take effect; provided, further, that the amendments to  subdi-
vision  3  of  section  99-h  of  the  state finance law made by section
seven-a of this act shall be subject to the the expiration and reversion
of such section as provided in section 2 of chapter 747 of the  laws  of
2006,  as amended when upon such date the provisions of section eight of
this act shall take effect; provided, further, however, that the  amend-
ment  to  section  99-h of the state finance law made by section nine of
this act shall not affect the expiration of such section  and  shall  be
deemed  repealed  therewith;  provided,  further,  that the state gaming
commission shall notify the legislative bill  drafting  commission  upon
the  occurrence of such agreement between the Oneida Nation and the state
of New York becoming effective in order that the commission may maintain
an  accurate  and timely effective data base of the official text of the
laws of the state of New York in furtherance of effecting the provisions
of section 44 of the legislative law and  section  70-b  of  the  public
officers law;

  (c) section 1368 of the racing, pari-mutuel wagering and breeding law,
as  added by section two of this act, shall take effect upon a change in
federal law authorizing the activity permitted by such section or upon a
ruling by a court  of  competent  jurisdiction  that  such  activity  is
lawful.  The  state  gaming commission shall notify the legislative bill
drafting commission upon the occurrence of the change in federal law  or
upon  the  ruling of a court of competent jurisdiction in order that the
commission may maintain an accurate and timely effective  data  base  of
the  official text of the laws of the state of New York in furtherance of
effecting the provisions of section 44  of  the  legislative  law  and
section 70-b of the public officers law;

  (d) section thirty-five of this act shall be deemed to  have  been  in
full force and effect on and after April 1, 2013;

  (e)  notwithstanding the foregoing, sections thirty-two, thirty-three,
thirty-four, forty-one and forty-two of this act, shall only  be  effec-
tive  in  the  event  that an amendment to the constitution to authorize
casino gambling is defeated.

  (f) section forty through forty-eight of this act  shall  take  effect
January  1,  2014;  except that the New York state gaming commission may
accept and review applications for licenses for account wagering and for
multi-jurisdictional account wagering providers commencing on October 1,
2013.

## Comments



This content is licensed under Creative Commons BY-NC-ND 3.0. Permissions beyond the scope of
this license are available here.

The software and services provided under this site are offered under the BSD License and the GPL v3 License.