UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TOWN OF VERONA (Oneida County);
TOWN OF VERNON (Oneida County);
MICHAEL MCDONOUGH; DANIEL
DEAL; JAMES ANDERSON; and
MELVIN PHILLIPS,

                Plaintiffs,

  -against-                                 1:13-CV-1100 (LEK/DEP)

HON. ANDREW CUOMO, as Governor of
the State of New York; MADISON
COUNTY; JOHN M. BECKER, as
Chairman of the Board of Supervisors of
Madison County; ONEIDA COUNTY;
ANTHONY J. PICENTE, JR., as Oneida
County Executive; the NEW YORK STATE
GAMING COMMISSION; SHELDON
SILVER, as Speaker of the New York State
Assembly; DEAN SKELOS, as Co-Majority
Leader of the New York State Senate; and
JEFFREY KLEIN, as Co-Majority Leader
of the New York State Senate,

                Defendants.
_____

## MEMORANDUM-DECISION and ORDER

I. **INTRODUCTION**

Plaintiffs the Town of Verona, the Town of Vernon (collectively, the "Government Plaintiffs"), Michael McDonough, Daniel Deal, James Anderson, and Melvin Phillips (collectively, the "Individual Plaintiffs") (together with the Government Plaintiffs, "Plaintiffs"), commenced this action in New York State Supreme Court, Albany County, against the New York State Gaming Commission, Oneida and Madison Counties, and several state and county officials (collectively, "Defendants"), challenging the legality of efforts to legalize and regulate casino gambling. Dkt. No.

1-1 ("Complaint"). Defendants removed the action from state court on September 6, 2013. Dkt. No. 1. Currently pending before the Court are Defendants' Motion to dismiss and Plaintiffs' Cross-Motion to remand. Dkt. Nos. 8 ("Motion to Dismiss"); 12 ("Motion to Remand"). For the following reasons, this action is remanded in its entirety.

## II. BACKGROUND[1]

### A. The New York State Constitution

The New York State Constitution bans most forms of gambling. N.Y. CONST. art. I, § 9; Compl. ¶ 7. The constitution can be amended if two successively elected legislatures approve the proposed amendment and the amendment is then approved by a statewide popular referendum. N.Y. CONST. art. XIX, § 1; Compl. ¶ 6. In 2012, at the behest of Defendant Governor Andrew Cuomo ("Governor Cuomo"), both houses of the New York State Legislature (the "Legislature") passed a resolution containing a proposed constitutional amendment that would "authorize casino gambling as regulated by the state." Dkt. No. 1-1, Ex. A; Compl. ¶ 7. The resolution passed again at the end of the 2013 legislative session, and a popular referendum seeking approval of the amendment will be on the November 2013 general-election ballot. Compl. ¶ 26.

### B. The Oneida Indian Nation and the Turning Stone Casino

Among the groups that initially voiced opposition to the campaign for state-regulated casinos was the Oneida Indian Nation (the "OIN"), which operates the Turning Stone Casino, a major gambling casino in the Town of Verona in Oneida County. Compl. ¶¶ 8-9. The Federal

---

[1] Because this matter is before the Court on a motion to dismiss, the allegations of the Complaint are accepted as true and form the basis of this section. See Raila v. United States, 355 F.3d 118, 119 (2d Cir. 2004) ("When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.").

Indian Gaming Regulatory Act ("IGRA") preempts New York's constitutional ban on casino gambling and allows gaming to be conducted on Indian lands pursuant to a tribal-state compact. 25 U.S.C. §§ 2701-2721; Dalton v. Pataki, 835 N.E.2d 1180 (N.Y. 2005); Compl. ¶ 9. Relying on IGRA, the OIN has operated Turning Stone Casino pursuant to a 1993 compact reached between the OIN and then-Governor Mario Cuomo ("1993 Compact"). Compl. ¶¶ 8-11. The OIN currently enjoys a geographic monopoly on casino gambling in Central New York. Compl. ¶ 9.

In 2005, the United States Supreme Court ruled that the OIN's repurchase of traditional tribal lands did not restore tribal sovereignty, thereby casting doubt on the legality of the Turning Stone Casino under IGRA. Oneida Indian Nation v. City of Sherill, 544 U.S. 197 (2005); Compl. ¶¶ 12-13. As a result, the OIN applied to the U.S. Secretary of the Interior and the Bureau of Indian Affairs to place land it owns in Oneida and Madison Counties, including the Turning Stone Casino location, into trust for the benefit of the OIN. Compl. ¶¶ 13-14; see 25 U.S.C. § 465. After the Secretary of the Interior approved the OIN's application in part in May 2008, New York State, Madison and Oneida Counties, and the Towns of Verona and Vernon challenged that determination in federal court. Compl. ¶ 16; see New York v. Salazar, No. 08-CV-0644 (N.D.N.Y. filed June 19, 2008); Town of Verona v. Salazar, No. 08-CV-0647 (N.D.N.Y. filed June 19, 2008).

### C. The Settlement Agreement

As part of the campaign to neutralize opposition to the legalization of non-Indian casinos, Governor Cuomo initiated negotiations with the OIN in 2013. Compl. ¶ 19. On May 16, 2013, the OIN and Governor Cuomo signed an agreement settling outstanding disputes between New York State, Madison and Oneida Counties, and the OIN. Dkt. No. 1-1, Ex. F ("Agreement"); Compl. ¶ 20. The Agreement contains a number of concessions by the State and the Counties:

- The State agreed to guarantee the OIN's geographic monopoly on casino gambling within a 10-county region in Central New York. Agreement § IV(A); Compl. ¶ 21.

- The State and Counties agreed to withdraw their federal court action challenging the Secretary's decision to take 13,000 acres of OIN land into trust. Agreement § VI(A)(1)(a); Compl. ¶ 21.

- The Counties agreed to withdraw tax foreclosure proceedings commenced against land owned by the Oneidas that was in tax-delinquent status. Agreement §§ VI(A)(2)-(3); Compl. ¶ 21.

- The State agreed that the Legislature would ratify the 1993 Compact. Agreement § IV(C); Compl. ¶ 21.

- The State agreed that the Legislature would enact legislation incorporating the Agreement. Agreement § VIII(B); Compl. ¶ 21.

As part of the settlement, the OIN agreed to support the referendum to amend the constitution's prohibition on casino gambling:

> The Nation shall support any referendum authorized by the State Legislature following second passage of a concurrent resolution to amend the State Constitution to permit or authorize casino gambling. Additionally, the Nation shall not directly or indirectly fund any public education campaign or program opposing any such referendum, or fund directly or indirectly any litigation or administrative challenge in connection with any such referendum.

Agreement § VI(C)(7).

### D. Upstate New York Gaming Economic Development Act

In June 2013, the Legislature passed the Upstate New York Gaming Economic Development Act of 2013 ("UNYGEDA"), and the Governor signed the bill into law on July 30. 2013 N.Y. Sess. Laws ch. 174; Compl. ¶ 25. UNYGEDA ratifies the Agreement and the 1993 Compact, and also enacts a comprehensive scheme to authorize and regulate casino gambling contingent on the approval of the constitutional amendment by popular referendum. Compl. ¶ 24.

## III. PROCEDURAL HISTORY

Plaintiffs commenced a hybrid Article 78 proceeding and declaratory judgment action in New York State Supreme Court, Albany County on August 19, 2013.[2] Compl. The Complaint lists three causes of action: (1) violation of the Individual Plaintiffs' constitutional rights to freedom of speech and equal protection under the law; (2) loss of the Government Plaintiffs' "sovereign control" to "govern within their boundaries" in violation of state law; and (3) violation of the state constitution's prohibition on casino gambling in enacting UNYGEDA. Compl. ¶¶ 89-99. Plaintiffs seek: (1) a declaration that Defendants exceeded their authority in entering into and ratifying the Agreement; (2) a declaration that the Governor and the Legislature exceeded their authority in enacting UNYGEDA; (3) a declaration that UNYGEDA is unconstitutional; and (4) an injunction preventing state and county officials from implementing the Agreement or UNYGEDA. Compl. at 33-34.

On September 6, 2013, Defendants removed the action based on 28 U.S.C. §§ 1331 and 1362. Dkt. No. 1. On September 20, 2013, Defendants filed the joint Motion to Dismiss for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6). Mot. to Dismiss. Plaintiffs filed the Motion to Remand and their opposition to the Motion to Dismiss on October 7, 2013. Mot. to Remand. Defendants filed a Reply on October 21, 2013. Dkt. No. 16 ("Reply").

---

[2] Article 78 of the New York Civil Practice Law and Rules provides a special statutory procedure for adjudicating claims that a body or officer has acted in a manner not authorized by state law. See Carver v. Nassau Cnty. Interim Fin. Auth., No. 13-0801, 2013 WL 5289050, at *4 (2d Cir. Sept. 20, 2013).

## III. LEGAL STANDARDS

### A. Rule 12(b)(1) Motion to Dismiss

When a defendant "moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." United States ex rel. Kreindler & Kreindler v. United Tech. Corp., 985 F.2d 1148, 1155–56 (2d Cir. 1993) (internal quotation marks and citation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "To survive a defendant's Rule 12(b)(1) motion to dismiss for lack of standing, plaintiffs must allege facts that affirmatively and plausibly suggest that [they have] standing to sue." Kiryas Joel Alliance v. Village of Kiryas Joel, 495 F. App'x 183, 188 (2d Cir. 2012) (alteration in original) (internal quotation marks omitted). In considering a motion to dismiss under Rule 12(b)(1), a court must accept as true all material factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiffs. Buday v. N.Y. Yankees P'Ship, 486 F. App'x 894, 896 (2d Cir. 2012). Plaintiffs, as the parties asserting subject matter jurisdiction, bear the burden of establishing their standing as the proper parties to bring this action.[3] See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc., 697 F.3d 59, 65 (2d Cir. 2012).

---

[3] Although Defendants first invoked the jurisdiction of the Court by removing this action, Plaintiffs argue in their Motion to Remand that they have standing to bring their claims in federal court, Mot. to Remand at 19-20, and base their argument for remand on abstention doctrine and the law governing supplemental jurisdiction, id. at 10.

6

**B. Article III Standing**

Standing is an "essential aspect" of the limits of federal judicial power under Article III of the Constitution, which authorizes federal courts to decide only actual "Cases" or "Controversies."[4] Hollingsworth v. Perry, 133 S.Ct. 2652, 2661 (2013). To have standing to invoke the power of a federal court, a litigant must prove that: (1) she "has suffered a concrete and particularized injury"; (2) the injury "is fairly traceable to the challenged conduct"; and (3) the injury "is likely to be redressed by a favorable judicial decision." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)); see also Lujan, 504 U.S. at 560 (describing these three elements as "the irreducible constitutional minimum of standing"). "To have standing, a litigant must seek relief for an injury that affects him in a personal and individual way. He must possess a direct stake in the outcome of the case." Hollingsworth, 133 S.Ct. at 2662 (citations and quotation marks omitted). A litigant "raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." Lujan, 504 U.S. at 573-74.

---

[4] Plaintiffs assert that they have taxpayer standing to bring this suit under New York law, and that because they have "a clear cause of action under State law," standing cannot be eliminated by removal to federal court. Mot. to Dismiss at 19. Plaintiffs are incorrect. "[S]tanding in federal court is a question of federal law, not state law." Hollingsworth v. Perry, 133 S.Ct. 2652, 2667 (2013). Although states are free to grant private parties standing to bring generalized grievances in state courts (where Article III does not apply), state law cannot overturn Article III's limits on federal court standing. See id. Accordingly, the question of whether the Court can hear Plaintiffs' claims is governed by Article III of the U.S. Constitution. The question of whether Plaintiffs have state court standing to bring their claims is properly left to the state court on remand.

## IV. DISCUSSION

### A. First Amendment Claim

The Complaint states that by entering into the Agreement with the OIN, Defendants violated the Individual Plaintiffs' "rights to freedom of speech, including the right to be informed of the views of the Oneidas with respect to a pending ballot proposition . . . ." Compl. ¶ 93. Defendants argue that Plaintiffs lack standing to bring First Amendment free speech claims because: (1) they do not have "third-party standing" to assert the OIN's freedom of speech rights; and (2) the OIN is not a "willing speaker," and Plaintiffs therefore have not suffered a redressable injury that would confer Article III standing. Mot. to Dismiss at 9-11.

*1. Third-Party Standing*

"A plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate: (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) 'some hindrance to the third party's ability to protect his or her own interests.'" Camacho v. Brandon, 317 F.3d 153, 159 (2d Cir. 2003) (quoting Campbell v. Louisiana, 523 U.S. 392, 397 (1998)). Here, the Court need only consider the second precondition, because it is clearly not satisfied. Plaintiffs do not have a "close relationship" with the OIN such that they can effectively advocate for the OIN's free speech rights. To the extent there is a relationship at all, it is antagonistic. Plaintiff Phillips "is opposed to the Settlement Agreement . . . which purports to take into trust land he owns." Compl. ¶ 37. As for the three other Individual Plaintiffs, the Complaint alleges no relationship with the OIN at all, other than that they are residents and property owners in the Government Plaintiff Towns of Vernon and Verona. Compl. ¶¶ 34-36. The Government Plaintiffs have opposed the OIN's

activities for years, and now seek to void the Agreement secured by the OIN. Compl. ¶¶ 16, 21-22. Accordingly, Plaintiffs' relationship to the OIN is not even remotely of the type that would permit third-party standing.

                    2. *Plaintiffs' Right to Hear the OIN's Speech*

"[T]he First Amendment protects not only the right to engage in protected speech, but also the right to receive such speech." Spargo v. N.Y. State Comm'n on Judicial Conduct, 351 F.3d 65, 83 (2d Cir. 2003) (citing Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756 (1976)). "The success of a third-party recipient's First Amendment claim is entirely derivative of the First Amendment right of the speaker subject to the challenged regulation. . . . A third-party action thus presupposes a willing speaker." Price v. Saugerties Cent. Sch. Dist., 305 F. App'x 715, 716 (2d Cir. 2009) (citation and internal quotation marks omitted). A "willing speaker" is a person who, but for the government restriction, would convey information to a willing recipient. ACLU v. Holder, 673 F.3d 245, 255 (4th Cir. 2011). "The purpose of the 'willing speaker' requirement, therefore, is not to tie the third party's interests to those of the speaker, but to ensure that there is an injury in fact that would be redressed by a favorable decision." United States v. Wecht, 484 F.3d 194, 203 (3d Cir. 2007); see also Price, 305 F. App'x at 716 (refusing to infer the existence of a willing speaker from the mere existence of a government restriction because doing so "would eviscerate Article III's requirement that a party demonstrate a specific and particularized injury"). "In the absence of a willing speaker, an Article III court must dismiss the action for lack of standing." Pa. Family Inst., Inc. v. Black, 489 F.3d 156, 166 (3d Cir. 2007) (internal quotation marks omitted).

      Here, Plaintiffs have not identified a willing speaker whose speech is restricted by the

9

Agreement and protected under the First Amendment. To the extent the OIN may have had a First Amendment right to voice its opinion on the referendum, such a right can be waived by contract. See, e.g., Democratic Nat. Comm. v. Republican Nat. Comm., 673 F.3d 192, 205 (3d Cir. 2012). Since the OIN has bound itself to refrain from some speech as part of a settlement agreement, the OIN is not a willing speaker on which Plaintiffs can premise a First Amendment right-to-receive claim. See Bond v. Utreras, 585 F.3d 1061, 1078 (7th Cir. 2009) ("Where . . . the litigants have voluntarily bound themselves to keep certain discovery confidential and do not themselves seek relief from the requirements of the protective order, there is no willing speaker on which to premise a First Amendment right-to-receive claim.").

Plaintiffs' reliance on the recent decision in Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, 133 S.Ct. 2321 (2013), does not change the analysis. There, the Supreme Court recognized that the government can violate the First Amendment by conditioning receipt of a government benefit on the affirmation of a belief supported by the government. Id. at 2330-32. Plaintiffs argue that Defendants violated the OIN's free speech rights by requiring them to support the referendum in exchange for the benefits provided in the Agreement. Mem. at 28. In other words, they argue that the OIN remains a willing speaker despite voluntarily consenting to the Agreement. The Court need not consider the merits of this argument, because it cannot cure the defects in Plaintiffs' standing. In Alliance, the Court of Appeals found standing because the speaker-plaintiffs, although they had voluntarily accepted the government funds at issue, nevertheless testified that the government's speech requirements had compelled them to adopt policy statements that they otherwise would not have adopted and had restricted them from engaging in privately funded speech. 651 F.3d 218, 227-28 (2d Cir. 2011). Plaintiffs have not

10

made any analogous showing that the OIN, despite voluntarily signing the Agreement, would be engaging in protected speech absent the restrictions of Section VI(C). They therefore have not alleged facts showing that the OIN is a willing speaker.

Because Plaintiffs have not identified a willing speaker, they have not identified a concrete and particularized injury to their First Amendment rights, and therefore lack standing to bring their First Amendment claim in federal court.

**B. Equal Protection Claim**

The Complaint alleges that Defendants violated the Individual Plaintiffs' "right to equal protection under the law, and the right to vote in a fair and honest election in which the Government did not abuse its power to favor a certain outcome by, in effect, improperly buying votes." Compl. ¶ 93. In moving to dismiss the Complaint, Defendants argue that Plaintiffs lack standing to bring an equal protection claim because: (1) they have not articulated a claim for vote buying; and (2) cannot show how Defendants' actions have injured them directly. Mot. to Dismiss at 11-15.

Plaintiffs assert that Defendants have "unconstitutionally attempted to 'rig' an election . . . by, in effect, improperly buying votes." Compl. ¶ 93. However, the Complaint and the Agreement present no evidence of direct vote buying. Although the Agreement requires the OIN to support the referendum, it makes no reference to the votes of individual OIN members in the upcoming election. See Agreement § VI(C)(7); Reply at 2. The Complaint does not allege any facts suggesting that Defendants have improperly induced any voters to vote or not vote for or against the referendum such that Plaintiffs' votes in opposition will be diluted.

Absent any showing of actual vote buying, what remains of Plaintiffs equal protection claim is their allegation that Defendants "abuse[d] their power to favor a certain outcome . . . ." Compl.

11

¶ 93; see Kardules v. City of Columbus, 95 F.3d 1335, 1349 (6th Cir. 1996) (distinguishing "classic vote dilution cases involv[ing] injuries that can be established with mathematical certainty" from claims that the government has "distort[ed] the political landscape surrounding [an election] in a constitutionally significant way"). Federal courts have generally found that voters challenging the use of incumbency to influence the political playing field lack standing if their only asserted injury is a diminished ability to influence the electoral outcome through voting. See, e.g., id. at 1346-56 (finding no "injury in fact" or "causation" where voters' ability to influence outcome of referendum was impaired by government contracts that distorted political landscape); Colo. Taxpayers Union, Inc. v. Romer, 963 F.2d 1394, 1398-1403 (10th Cir. 1992) (rejecting taxpayer standing in suit alleging governor illegally used state funds to defeat a popular referendum that plaintiff-taxpayers supported); Shakman v. Dunne, 829 F.2d 1387, 1398 (7th Cir. 1987) ("A plaintiff cannot assert injury to . . . his influence as a voter simply on the basis of the advantage—real or imagined—of incumbency." (footnote and citations omitted)); Winspinger v. Watson, 628 F.2d 133, 137-39 (D.C. Cir. 1980) (finding that voters alleging incumbent illegally used public authority and funds to influence election lacked standing); Mallof v. D.C. Bd. of Elections and Ethics, 1 A.3d 383 (D.C. 2010) (finding that voters did not suffer "injury in fact" when candidate allegedly used public resources in re-election campaign). Here, Plaintiffs allege that Defendants used state resources to influence the outcome of the referendum, but have not shown how this allegedly illegal interference in the election process rises above the level of a generalized grievance shared with all other voters. They therefore lack Article III standing to bring their equal protection claim.[5]

---

[5] The Court notes for the sake of thoroughness that the Individual Plaintiffs lack "competitor standing." Under this theory, "a plaintiff may have standing to bring an equal protection claim where the government's allocation of a particular benefit creates an uneven playing field for

## V. REMAND FOR LACK OF SUBJECT MATTER JURISDICTION

Because Plaintiffs lack Article III standing to bring their federal claims, the Court does not have subject matter jurisdiction over them. See St. Pierre v. Dyer, 208 F.3d 394, 400 (2d Cir. 2000) ("[A] dismissal for lack of Article III standing is a dismissal for lack of subject matter jurisdiction."). Furthermore, because 28 U.S.C. § 1367 requires original jurisdiction over some claim to exercise supplemental jurisdiction over related state law claims, the lack of subject matter jurisdiction over Plaintiffs' federal claims precludes the Court from exercising supplemental jurisdiction over Plaintiffs' other claims. See Gonzalez v. L'Oreal USA, Inc., 489 F. Supp. 2d 181, 186 (N.D.N.Y. 2007). Consequently, the Court does not have subject matter jurisdiction over any of Plaintiffs' claims.[6]

In a case removed from state court, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. 1447(c); see also Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 89 (1991) ("[T]he

---

organizations advocating their views in the public arena." Ctr. for Reprod. Law & Policy v. Bush, 304 F.3d 183, 197 (2d Cir. 2002). A plaintiff relying on a competitor theory must "show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit." Id.

Here, even assuming that the government has bestowed an illegal benefit on the OIN or on some other pro-amendment party, the Individual Plaintiffs, as voters, are not in the same competitive arena as the OIN or other non-voting entities that may advocate in favor of the amendment. See Radford v. Erie Cnty. Bd. of Elections, 09-CV-583S, 2011 WL 4527327, at *4 (W.D.N.Y. Sept. 27, 2011) (describing voters as part of a distinct arena); see also In re U.S Catholic Conference (USCC), 885 F.2d 1020, 1030 (2d Cir. 1989) (finding individual pro-choice voters lacked standing to challenge distortion of political process through granting of tax-exempt status to Catholic Church). That the government bestows an illegal benefit to a group engaged in political advocacy does not cause a concrete and particularized injury to Plaintiffs' interests as voters.

[6] In removing this case, Defendants asserted federal jurisdiction under 28 U.S.C. §§ 1331 and 1362. Although § 1362 could potentially provide original jurisdiction over state law claims, no recognized Indian tribe is a party to this action and so § 1362 does not apply.

literal words of § 1447(c) . . . give no discretion to dismiss rather than remand an action.").

Therefore, although Defendants are correct that Plaintiffs' claims cannot be heard in federal court, the case must be remanded rather than dismissed.[7]

## VI. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiffs' Cross-Motion (Dkt. No. 12) to remand is **GRANTED**; and it is further

**ORDERED**, that Defendants' Motion (Dkt. No. 8) to dismiss is **DENIED as moot**; and it is further

**ORDERED**, that the Clerk of the Court remand the entire action to New York State Supreme Court, Albany County; and it is further

**ORDERED**, that the Clerk of the Court mail a certified copy of this Memorandum-Decision and Order to the Clerk of New York State Supreme Court, Albany County, pursuant to 28 U.S.C. § 1447(c); and it is further

**ORDERED**, that the Clerk of the Court close this case; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

---

[7] As stated *supra*, whether Plaintiffs' claims can be heard in state court is a question for the state court. See supra note 4; Hollingsworth, 133 S.Ct. at 2667; Smith v. Wis. Dep't of Agriculture, Trade, & Consumer Prot., 23 F.3d 1134, 1142 (7th Cir. 1994) ("While some consider it odd that a state court might have the authority to hear a federal constitutional claim in a setting where a federal court would not, it is clear that Article III's 'case or controversy' limitations apply only to the federal courts . . . . [And] § 1447(c) says that a case removed to federal court 'shall be remanded' to the state court if it is discovered that the federal court lacks subject matter jurisdiction.") (citations omitted).

14

**IT IS SO ORDERED**.

DATED: October 30, 2013
Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge